1  James R. Touchstone, SBN 184584
      jrt@jones-mayer.com
2  Denise L. Rocawich, SBN 232792
      dlr@jones-mayer.com
3  Scott Wm. Davenport, SBN 159432
      swd@jones-mayer.com
4  JONES MAYER
   3777 North Harbor Boulevard
5  Fullerton, CA 92835
   Telephone:  (714) 446-1400
6  Facsimile:  (714) 446-1448

7  Attorneys for Defendants,
   CITY OF ONTARIO and ALBERT ALVARADO

8

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11

| FRANK BENAVENTE and NICOLE VENTRESS,<br><br>Plaintiffs,<br><br>v.<br><br>ALBERT ALVARADO; CITY OF ONTARIO; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.:  5:23-CV-00266-SSS<br><br>*Judge:*  Hon. Sunshine S. Sykes<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OF ISSUES; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:   May 17, 2024<br>Time:   2:00 p.m.<br>Ctrm:   2 |
| --- | --- |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on May 17, 2024, at 2:00 p.m., in Courtroom 2 of the above-entitled court, located at 3470 Twelfth Street, Riverside, California 92501, or as soon thereafter as the matter may be heard, Defendants CITY OF ONTARIO and ALBERT ALVARADO will and hereby do move for summary judgment and/or partial summary judgment as follows:

1. Plaintiffs have failed to carry their burden of demonstrating that they are entitled to relief on their first cause of action for detention and arrest;

2. Plaintiffs have failed to carry their burden of demonstrating that they are entitled to relief on their second cause of action for excessive force;

3. Plaintiffs have failed to carry their burden of demonstrating that they are entitled to relief on their third cause of action for denial of medical care;

4. Plaintiffs have failed to carry their burden of demonstrating that they are entitled to relief on their fourth cause of action for denial of familial relationship;

5. Plaintiffs have failed to carry their burden of demonstrating that they are entitled to relief on their fifth cause of action for a *Monell* violation;

6. Plaintiffs have failed to carry their burden of demonstrating that they are entitled to relief on their sixth cause of action for failure to train; and

7. Plaintiffs have failed to carry their burden of demonstrating that they are entitled to relief on their seventh cause of action for ratification.

The Motion is based on this Notice of Motion and Motion and attached Memorandum of Points and Authorities, the Declarations of and Exhibits filed Concurrently Herewith, the [Proposed] Statement of Uncontroverted Facts and Conclusions of Law filed concurrently herewith, the file and records in this case, and any further argument or evidence the Court deems fit to receive at the hearing.

This Motion is being heard after attempts to meet and confer pursuant to Local Rule 7-3 were unable to resolve this matter informally without court intervention.  See Declaration of Scott Wm. Davenport attached hereto.

Dated: March 29, 2024                    JONES MAYER


                                         */s/ Scott Wm. Davenport*

                                         By: _____
                                             JAMES R. TOUCHSTONE
                                             DENISE L. ROCAWICH
                                             SCOTT WM. DAVENPORT

                                         Attorneys for Defendants,
                                         CITY OF ONTARIO and ALBERT
                                         ALVARADO

-2-

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ..................................................................3

TABLE OF AUTHORITES ...............................................................4

MEMORANDUM OF POINTS AND AUTHORITIES..........................6

1.   INTRODUCTION ...............................................................6

2.   STATEMENT OF FACTS ....................................................9

3.   SUMMARY   JUDGMENT   IS   PROPER   WHEN   A   PLAINTIFF CANNOT DEMONSTRATE GENUINE ISSUES OF FACT ...................................................................10

4.   NO GENUINE ISSUE OF FACT EXISTS WITH RESPECT TO   PLAINTIFF'S   CLAIMS   FOR   VIOLATIONS   OF   42 U.S.C. § 1983 ...................................................................11

   A.   The Detention, Arrest, and Force Claims ...............................11

      1.   Applicable Law ...............................................11

      2.   No Issues of Fact Exist..................................16

   B.   The Denial of Medical Care Claim .........................................18

   C.   The Denial of Familial Relationship Claim..........................19

5.   DEFENDANTS   ARE   ENTITLED   TO   QUALIFIED IMMUNITY ...................................................................20

6.   DEFENDANTS   ARE   ENTITLED   TO   SUMMARY JUDGMENT ON PLAINTIFFS' INSTITUTIONAL CLAIMS .....23

7.   CONCLUSION ...................................................................24

CERTIFICATE OF COMPLIANCE ...............................................25

1
## TABLE OF AUTHORITIES

2 **Page**

3 <u>**CASES**</u>

4 *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ........................................... 10, 11

5 *Bd. of Cnty. Commr's v. Brown*, 520 U.S. 397 (1997). ....................................... 23

6 *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ................................................ 10

7 *City of Los Angeles v. Heller*, 475 U.S. 796 (1986) ....................................... 8, 23

8 *Davis v. Scherer*, 468 U.S. 183 (1984) ........................................................ 21

9 *Forrester v. City of San Diego*, 25 F.3d 804 (9th Cir. 1994) ............................ 18

10 *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011) ............................. 18

11 *Graham v. Connor*, 490 U.S. 386 (1989) ..............................................*passim*

12 *Hansen v. Black*, 885 F.2d 642 (9th Cir. 1989) ............................................ 11

13 *Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .............................................. 8, 20

14 *Jackson v. County of Bremerton*, 268 F.3d 646 (9th Cir 2001) ................... 20, 21

15 *Lam v. City of Los Banos,* 976 F.3d 986 (9th Cir. 2020) ................................ 19

16 *Maddox v. City of Los Angeles*, 792 F.2d 1408 (9th Cir. 1986) ....................... 19

17 *Malley v. Briggs*, 475 U.S. 335 (1986) ...................................................... 21

18 *Matsushita Elec. v. Zenith Radio*, 475 U.S. 574 (1986) ............................ 10, 11

19 *Miller v. Clark Cty.,* 340 F.3d 959 (9th Cir. 2003) ....................................... 12

20 *Monell v. Dept. Soc. Serv*, 436 U.S. 658 (1978) .....................................*passim*

21 *Monzon v. City of Murrieta*, 978 F.3d 1150 (9th Cir. 2020) ......................*passim*

22 *Nelson v. City of Davis,* 685 F.3d 867 (2012) ............................................. 18

23 *Ochoa v. City of Mesa*, 26 F.4th 1050 (9th Cir. 2022) ............................... 19, 20

24 *Pearson v. Callahan*, 555 U.S. 223 (2009) .......................................... 20, 21, 22

25 *Plumhoff v. Rickard,* 572 U.S. 765 (2014) ..............................................*passim*

26 *Quintanilla v. City of Downey*, 84 F.3d 353 (9th Cir. 1996) ........................... 24

27 *Ryburn v. Huff*, 565 U.S. 469 (2012) .................................................... 12, 18

28 *Smith v. City of Hemet*, 394 F.3d 689 (9th 2005) ....................................... 12, 18

*Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 950 (9th Cir. 1990) ..................... 11

*Tatum v. City and Cnty. of S.F.*, 441 F.3d 1090 (9th Cir. 2006) .................... 18, 19

*Trevino v. Gates*, 99 F.3d. 911, 918 (9th Cir. 1996) ......................................... 8, 23

*United States v. Aceves-Rosales*, 832 F.2d 1155 (9th Cir. 1987) ........................ 13

*Villanueva v. California,* 986 F.3d 1158 (9th Cir. 2021) .................................. 16

*Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000) ................................................ 23

*Ward v. San Diego County*, 791 F.2d 1329 (9th Cir. 1986) ................................. 21

*White v. Pauly*, 580 U.S. 73 (2017) ................................................................. 8, 21

*Williams v. City of Grosse Pointe Park*, 496 F.3d 482 (6th Cir. 2007) ...15, 16, 21

**STATUTES**

42 U.S.C. § 1983 .................................................................................... 11, 23

*Fed.R.Civ.P.*
    Rule 50 .................................................................................................. 11
    Rule 56 .................................................................................................. 10

## MEMORANDUM OF POINTS AND AUTHORITIES

**1.    INTRODUCTION**

Shortly before midnight on February 22, 2021, recent parolee Joseph Benavente led multiple members of the Ontario Police Department on a high-speed chase in which he drove on the wrong side of the road, almost t-boned a civilian motorist, stopped suddenly, and then performed a U-turn in order to attempt to escape.

After attempting to evade the officers for approximately five to seven minutes, Benavente pulled into a cul-de-sac, found himself trapped, and came to an abrupt halt.  Believing that a foot pursuit was about to ensue, Corporal Albert Alvarado, an experienced field training officer, opened his car door and started to exit his vehicle.  However, instead of surrendering himself, Benavente threw his car into reverse, revved his engine, and accelerated backwards at a high rate of speed, striking Corporal Alvarado's patrol vehicle at a speed estimated to be between 14 and 16 mph.



1   Finding himself in the terrifying position of being sandwiched between his
2   open  patrol car door and the frame of his vehicle – and believing he was about to
3   be crushed to death – Corporal Alvarado fired three shots at Benavente's car from
4   a distance of approximately one to four feet in an attempt to stop the threat.



17   Benavente's car continued backwards  striking another patrol.  At this point,
18   Benavente appeared hurt and slumped forwards towards the steering wheel.  His
19   car, however, was still operational, was placed into drive and began to roll forward
20   slowly before coming to rest against a tree. The tires continued spinning while the
21   vehicle was pinned against the tree.

22   After clearing Benavente's car of a passenger and securing the scene,
23   Officers approached and observed that Benavente was slumped over and had been
24   shot.  Benavente was removed from the car, handcuffed, and searched for
25   weapons.  Medical care, which had been staged until Benavente was safely taken
26   into custody evaluated Benavente and subsequently pronounced him dead at the
27   scene.

28

Benavente's mother and father have now brought this action against the City of Ontario and Corporal Alvarado asserting multiple civil rights violations. However, inasmuch as the events of this case are captured on both Body Worn Camera video, as well as not just one but two Independent Ring Videos,[1] the uncontroverted facts demonstrate that the actions of the officers in this case were reasonable under the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 394-397 (1989). Indeed, this case bears a striking similarity to both *Plumhoff v. Rickard,* 572 U.S. 765 (2014) and *Monzon v. City of Murrieta*, 978 F.3d 1150 (9th Cir. 2020), both of which found that no Fourth Amendment violation had occurred on facts which were more egregious than this case.

In addition, given that there is no clearly established law demonstrating that the officers' actions were unconstitutional, they would be entitled to qualified immunity on all federal causes of action. *White v. Pauly*, 580 U.S. 73, 79 (2017); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Finally, with respect to his institutional claims for a violation of Monell, failure to train, and ratification, Plaintiffs cannot establish the predicate actions were unconstitutional such as to allow these claims. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). And, even if he could, Plaintiffs have no evidence of an unconstitutional police or practice which would give rise to such a claim. *Trevino v. Gates*, 99 F.3d. 911, 918 (9th Cir. 1996).

Accordingly, because Corporal Alvarado acted reasonably in self-defense and in defense of his fellow officers, and properly prevented a fleeing felon from escaping apprehension pursuant to *Plumhoff*, there can be no civil rights violation and Defendants, therefore, are entitled to summary judgment, as a matter of law.

---

[1] For the convenience of the Court and the parties, hypertext links to these videos are included. These videos are also being manually lodged with the Court.

## 2.   **STATEMENT OF FACTS**

Shortly before midnight on February 22, 2021, members of the Ontario Police Department attempted to initiate a traffic stop of Joseph Benavente who was driving a car with what appeared to be illegally tinted windows.  Undisputed Fact ("UF") 1.  Unbeknownst to the officers, Benavente was a recent parolee who had been in-and-out of both the juvenile justice systems and adult incarceration for most of his life.   UF 2.  Rather than pulling over, Benavente led the officers on a five to seven minute  high-speed chase in which he drove on the wrong side of the road, almost t-boned a civilian motorist at an intersection, stopped abruptly, and performed a U-turn in an attempt to escape.  UF 3.

After attempting to evade the officers for approximately five to seven minutes, Benavente pulled into a cul-de-sac, found himself trapped, and came to an abrupt halt.  UF 4.  Believing that a foot pursuit was about to ensue, Corporal Albert Alvarado, an experienced field training officer, opened his car door and started to exit his vehicle.  UF 5.  When Benavente stopped for the second time, Corporal Alvarado did not know if he was going to run, surrender, or drive off again.  UF 6.

However, instead of surrendering himself, Benavente threw his car into reverse, revved his engine, accelerated backwards at a high rate of speed while significantly turning his vehicle directly toward Corporal Alvarado's patrol vehicle, striking both the front of  Corporal Alvarado's patrol vehicle as well as the door Corporal Alvarado was standing behind.   UF 7.  As Corporal Alvarado stepped out of his car, he saw Benavente's reverse lights come on, but he had no time to get back in the car.  UF 8.

 Finding himself sandwiched between his open patrol car door and the frame of his vehicle, and believing he was about to be crushed to death, Corporal Alvarado fired three shots in rapid succession at Benavente's car from a distance of approximately one to four feet.  UF 9.  Corporal Alvarado fired because he was

1    trying to stop the threat.  UF. 10.

2         Benavente's car continued backwards and struck  a second patrol car almost

3    simultaneously.  UF 11.  At this point, Benavente appeared hurt and slumped

4    forwards toward the steering wheel.  UF 12.  Benavente's car, however, was still

5    operational, was placed in drive and began to roll forward before coming to rest

6    against a sidewalk curb and tree.  UF 13.

7         After clearing Benavente's car of a passenger and securing the scene,

8    Officers made repeated calls for Benavente to exit the vehicle.  UF 14.  After

9    approximately four minutes and seeing no response from Benavente, the officers

10   approached and observed that Benavente had been shot through the neck.  UF 15.

11   Benavente was removed from the car, handcuffed, and searched for weapons.  UF

12   16.  Benavente was subsequently pronounced dead at the scene by responding

13   paramedics.  UF 17.

14

15   **3.**    <u>**SUMMARY JUDGMENT IS PROPER WHEN A PLAINTIFF**</u>

16        <u>**CANNOT DEMONSTRATE GENUINE ISSUES OF FACT**</u>

17        Summary judgment is proper if the moving party demonstrates "that there is

18   no genuine issue as to any material fact . . . " *Fed.R.Civ.P.* 56(c). In a trilogy of

19   cases, the United States Supreme Court clarified the burden of proof of each party

20   with regard to the resolution of summary judgment motions. *Celotex Corp. v.*

21   *Catrett,* 477 U.S. 317 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986);

22   *Matsushita Elec. v. Zenith Radio*, 475 U.S. 574 (1986).

23        In *Celotex,* the Court rejected the contention that the moving party must

24   support its summary judgment motion with evidence proving the non-existence of

25   an essential element of plaintiff's cause of action. Rather, the Court held that "the

26   moving party bears the burden of informing the court of the basis for its motion,

27   and identifying parts of the file which it believes indicated an absence of a general

28   issue of material fact." *Celotex Corp*., 477 U.S. at 323. The burden then shifts to

the respondent to set forth affirmative evidence showing that there is a genuine issue of material fact for trial. *Anderson*, 477 U.S. at 248.

The Supreme Court also made it clear that the party who bears the burden of proof at trial also bears the burden of producing sufficient evidence in opposition to the summary judgment motion to enable reasonable jurors to find for that party. The standard is the same as that for judgment as a matter of law under *Fed.R.Civ.P.* 50(a). *Anderson*, 477 at 249.

In opposing a motion for summary judgment, it is insufficient to merely show that there is some "metaphysical doubt as to material facts." *Matsushita Elec.*, 475 U.S. at 576. The plaintiff must show the existence of a genuine issue and "produce at least some 'significant probative evidence tending to support the complaint.'" *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990) (citations omitted). The responding party cannot merely rest upon the allegations and the pleadings. *Hansen v. Black*, 885 F.2d 642, 644 (9th Cir. 1989).

## 4.   <u>NO GENUINE ISSUE OF FACT EXISTS WITH RESPECT TO PLAINTIFF'S CLAIMS FOR VIOLATIONS OF 42 U.S.C. § 1983</u>

Turning to the merits of the case, Plaintiffs have asserted civil rights violations for: (1) detention and arrest; (2) excessive force; (3) denial of medical care; and (4) denial of familiar relationship.  However, as set forth below, Plaintiffs have failed to carry his burden on any of these claims.

### A. The Detention, Arrest, and Force Claims

#### 1.  Applicable Law

In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court held that an excessive force claim is properly analyzed under the Fourth Amendment's objective reasonableness standard.  *Id*. at 388.  The *Graham* court set forth a non-exhaustive list of factors to be considered in evaluating whether the force used to affect a particular seizure is reasonable: (1) the severity of the crime at issue; (2)

whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resists detention or attempts to escape. *Id*. at 394-395.  The test is an objective one, viewed from the vantage of a reasonable officer at the scene, and is highly deferential to the police officer's need to protect himself or others.  *Id*. at 396-397.

The Supreme Court has indicated that "judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation."  *Ryburn v. Huff*, 565 U.S. 469, 477 (2012). Moreover, the most important single element of the three specified factors is whether the suspect poses an immediate threat to the safety of the officers or others.  *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th 2005).

"The government has an undeniable legitimate interest in apprehending criminal suspects, . . . and that interest is even stronger when the criminal is . . . suspected of a felony." *Miller v. Clark Cty.,* 340 F.3d 959, 964 (9th Cir. 2003) [citations omitted]. When dealing with a felony suspect, the "severity of the crime" factor "strongly favors the government." *Id.*

In *Plumhoff v. Rickard,* 572 U.S. 765 (2014), the United States Supreme Court addressed a situation in which a driver sped away from a traffic stop and a high-speed pursuit ensued.  The pursuit came to a temporary halt when Rickard spun out into a parking lot, resumed maneuvering his car, and as he continued to use the accelerator even though his bumper was flush against a patrol car, and officer fired three shots into the car.  Rickard managed to get away, almost hitting an officer in the process, and then officers fired 12 more shots as Rickard fled, fatally wounding him and his passenger.  Applying *Graham v. Connor,* the *Rickard* court concluded that the officers' conduct did not violate the Fourth Amendment under the totality of the circumstances from the perspective of a reasonable officer on scene.  *Id.* at 766.

Here, the danger to Corporal Alvarado was even more immediate than the danger justifying deadly force in *Plumhoff*. In *Plumhoff*, in the seconds before the first shots were fired, Rickard was accelerating but pushed against a police cruiser. *Id.* Then, "at the moment [the second volley of] shots were fired….Rickard was [merely] intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." *Id*. at 777. In other words, the mere possibility of that deadly threat to the public posed by Rickard permitted the use of deadly force.

Here, Benavente was not simply "resuming flight" and the threat he posed to Corporal Alvarado was concrete and immediate. In the seconds before the shots were fired and as the shots were fired, Benavente had reversed at maximum acceleration significantly turning his vehicle thus aiming directly at Corporal Alvarado's cruiser. UF 7.  Benavente then struck the door behind which Corporal Alvarado was standing, sandwiching him, then continuing on to strike another cruiser behind Corporal Alvarado's. UF 7. The threat posed by Benavente was a clear and immediate threat to the life of Corporal Alvarado who was mere inches away from being crushed by the vehicle driven by Benavente. "***It is indisputable that an automobile can inflict deadly force on a person and that it can be used as a deadly weapon***." *United States v. Aceves-Rosales*, 832 F.2d 1155, 1157 (9th Cir. 1987) (per curiam).

Moreover, even if this Court does not find that Corporal Alvarado was in immediate danger, deadly force was nonetheless reasonable under *Plumhoff* as Benavente was a fleeing felon who posed a sufficient threat to the public at large. Nearly identical to Rickard in *Plumhoff*, Benavente's actions during the pursuit amounted to felony evading as he repeatedly endangered lives during the course of the pursuit driving on the wrong side of the road and nearly t-boning a civilian motorist at an intersection. UF 3; *see also* Cal. Veh. Code § 2800.2.  Also, nearly identical to Rickard in *Plumhoff*, though surrounded by police cruisers and in a cul-

1  de-sac, Benavente demonstrated that he was "intent on resuming his flight" when

2  he reversed at maximum speed. Had he been "allowed to do so, he would once

3  again pose a deadly threat for others on the road." *See Plumhoff*. In sum, whether

4  due to the threat posed to Corporal Alvardo or due to the threat posed to then

5  public, the conclusion that deadly force was reasonable here is inescapable.

6       Further support for this conclusion is found in the Ninth Circuit case

7  *Monzon*, 978 F.3d 1150. In *Monzon*, after leading police officers on a high-speed

8  chase, Monzon turned down a dead-end street.  He stopped at the end of the road,

9  and the police officers parked and exited their cruisers behind him.  Monzon turned

10  the van around, pointing it generally toward the officers.  As the van accelerated in

11  an arc toward and eventually between the officers, they commanded Monzon to

12  stop and fired on him when the van moved in their direction and in the direction of

13  their fellow officers. Monzon crashed into a police cruiser, pushing that cruiser

14  into one of the officers, and the officers continued to fire.  Monzon sustained

15  multiple gunshot wounds and was pronounced dead at the scene. *Id.* at 1158.  The

16  court found that the officers' use of deadly force was objectively reasonable "in this

17  dynamic and urgent situation, where officers were faced with the immediate threat

18  of significant physical harm." *Id.* at 1154.

19       This was true even with respect to the officers who fired ***after*** Monzon's

20  vehicle was no longer moving.  The court found: "Even though [Monzon's van]

21  was no longer moving, . . . these officers could hear the engine revving, exactly the

22  same in <u>this</u> case, and they were now situated on all sides of a van containing a

23  driver desperate to escape—so desperate, from their perspective, that he crashed

24  his van, first into a fencepost, and then into one of their cars.  It was not

25  unreasonable for the officers in that situation to believe that Monzon, who had just

26  seconds before crashed the van into a fence post yet continued on, had to be

27  stopped after this second impact before he drove the van into one of them." *Id.* at

28  1158 (internal citations and quotation marks omitted).

The parallels between *Monzon* and the case at hand are striking.  Indeed, rarely is a use of force case as directly on point with another as between *Monzon* and this incident.  Like Monzon, Benavente turned down a dead-end street.  Like Monzon, Benavente initially stopped at which time Corporal Alvarado began to exit his vehicle.  Like Monzon, Benavente then turned toward officers and accelerated in their direction.  Like Monzon, Benavente did not stop even after multiple impacts to police cars.  Accordingly, like Monzon, Corporal Alvarado's use of deadly force was objectively reasonable "in this dynamic and urgent situation, where officers were faced with the immediate threat of significant physical harm."  Further, this is true even if Corporal Alvarado fired upon Benavente after the Hyundai stopped as Benavente continued to press the accelerator and indeed, after the shots were fired even put the car back into drive and drove forward before impacting a tree. *Monzon*, even more so than *Plumhoff*, compels the conclusion that the force here was reasonable. Also illuminating and nearly directly on point is the Sixth Circuit's decision in *Williams v. City of Grosse Pointe Park*, 496 F.3d 482 (6th Cir. 2007). There, officers fired at a fleeing suspect who had attempted to "reverse [his vehicle] in an apparent effort to flee but found his egress blocked by" an officer's cruiser, before he accelerated and  tried to weave his vehicle between the officers and the street curb, knocking down an officer who had attempted to reach his hand into the vehicle to stop the suspect's progress. *Id.* at 484. In affirming the district court's grant of qualified immunity, the court found:

> At the point [the officer] fired his weapon, he was faced with a difficult choice: (1) use deadly force to apprehend a suspect who had demonstrated a willingness to risk the injury of others in order to escape; or (2) allow [the suspect] to flee, give chase, and take the chance that [the suspect] would further injure [the officer who was knocked down] or an innocent civilian in his efforts to avoid capture. Moreover, [the officer] had only an instant in which to settle on a course of action. Under the circumstances, we cannot say that [the officer] acted unreasonably, nor do we believe that a rational juror could conclude otherwise. *Id.* at 486.

Like the officer in *Williams*, Corporal Alvarado had only a split second, as Benavente accelerated toward him indeed impacting the door he was standing behind, to decide to shoot. Though Corporal Alvardo remained on his feet, unlike the officer in *Williams*, the threat to his life was no less significant.

Finally, in *Villanueva v. California,* 986 F.3d 1158 (9th Cir. 2021), the Ninth Circuit considered whether two officers were entitled to summary judgment where they used deadly force against a slow-moving vehicle following a high speed chase. *Id.* at 1162. In affirming the denial of summary judgment, the Ninth Circuit placed great weight on the speed of the vehicle at the shots were fired, noting that deadly force was not reasonable to stop a slow-moving vehicle when the officers could have easily stepped out of the vehicle's path to avoid danger. *Id.* at 1170.

In contrast to *Villanueva,* this case involved an extremely dangerous situation. All officers testified that Benavente reversed at a high-rate of speed before crashing into two vehicles. This is confirmed in the video evidence. Moreover, it is also confirmed by uncontroverted expert data reconstruction evidence,[2] which estimates the speed of the vehicle at the time of impact to have been 14 to 16 mph. *Exhibit* "K" at 9. This is a frighteningly dangerous speed, particularly given Corporal Alvarado's vulnerable position between the open door and his vehicle were he would have been subjected to thousands of pounds of crushing force and catastrophic injury. *Exhibit* "K" at 8; see also *Exhibit* "E" at 2.

## 2. No Issues of Fact Exist

As a threshold matter, although this matter began as a somewhat innocuous stop for a Vehicle Code violation, Benavente escalated the situation by transforming what should have been a simple citation into a dangerous, high speed chase in which he drove on the wrong side of the road, almost t-boned a civilian motorist, and stopped repeatedly and attempted to escape. UF 1, 3. Plaintiffs' suggestion that there was no basis for a detention and arrest given these facts is

---

[2] Defendants note that plaintiffs did not designate an accident reconstruction expert.

without merit.

Turning to the issue of force, as stated above, in analyzing the conduct of Corporal Alvarado, the Courts look to the factors listed in *Graham v. Connor*:  (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resists detention or attempts to escape.  *Graham v. Connor,* 490 U.S. at 394-395. The test is an objective one, viewed from the vantage of a reasonable officer at the scene, and is highly deferential to the police officer's need to protect himself or others.  *Id*. at 396-397.

Again, while this matter started off somewhat innocuously, Benavente quickly escalated the situation dramatically.  What resulted was a high-speed chase involving extremely dangerous circumstances.  UF 3.  Officers had no idea whether Benavente was going to run, surrender, or drive off again.  UF 6.  And, when confronted with being boxed-in, Benavente made the worst possible decision and rammed Corporal Alvarado's car, sandwiching him between his door and the body of his police car.  UF 7-9.  It is remarkable that Corporal Alvarado was not killed or seriously injured during this incident. The seriousness of this crime – assault with a deadly upon a police officer, and conceivably attempted murder – weighs heavily in favor of Defendants.

The second *Graham* factor, "whether the suspect pose[d] an immediate threat to the safety of the officers or others," is "the most important single element of the three specified factors." *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994). When viewing the facts from the perspective of the officers, Benavente constituted a potential danger, a danger so real and immediate that he damaged two patrol cars and could have easily killed Corporal Alvarado.  UF 7-9.  16.

Finally, the third factor of whether Benavente was resisting or attempting to evade arrest, also weighs heavily in Defendants' favor. Here, not only did Benavente refuse to yield to officers, but he also physically resisted and assaulted

them. Another telling fact was that Benavente's vehicle was placed in drive again and began rolling forward even after the shots were fired at him, evidencing an intent to further evade arrest.

The Ninth Circuit also considers whether there were less intrusive means of force that might have been used before officers resorted to force. *Glenn v. Washington County*, 673 F.3d 864, 876 (9th Cir. 2011). "Officers 'are not required to use the least intrusive degree of force possible.'" *Nelson v. City of Davis,* 685 F.3d 867, 882 (2012) *quoting Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994). In this case, given Benavente's impulsive actions, there was simply no time to undertake any other course of action. UF 8-10.

In sum, the facts of this case are extremely similar to, and even less egregious than, those in *Plumhoff v. Rickard* and *Munoz v. City of Murrieta.* Given the rapidly evolving events in this case, this Court should be careful of second-guessing the police officers' assessment regarding the amount of force necessary to obtain compliance on this suspect who was resisting arrest, which was minimal, as depicted in the video footage in this case. *Ryburn v. Huff*, 565 U.S. at 477. Summary judgment, therefore, is appropriate on these claims.

## B. The Denial of Medical Care Claims

Allegations of denial of medical care immediately following arrest are also analyzed under the Fourth Amendment's reasonableness standard. See *Tatum v. City and Cnty. of S.F.*, 441 F.3d 1090, 1098 (9th Cir. 2006). The reasonableness inquiry in this context is whether the officer's actions with regard to medical care were "'objectively reasonable' in light of the facts and circumstances confronting" the officer. *Smith v. City of Hemet*, 394 F.3d at 701. "Just as the Fourth Amendment does not require a police officer to use the least intrusive method of arrest, neither does it require an officer to provide what hindsight reveals to be the most effective medical care for an arrested suspect." *Tatum*, 441 F.3d at 1098. An officer satisfies the Fourth Amendment reasonableness standard by summoning the

necessary medical  assistance for an injured arrestee. *Tatum*, 441 F.3d at 1099; see also *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986).

This standard was unquestionably met here. After the shooting, Officers made an approach within a matter of just a few minutes as soon as they were convinced that it was safe to do so.  UF 14-15; see *Exhibit* "G" (BWC at 3:20-7:37).  Once it was determined that Benavente had been shot, he was removed from the vehicle, handcuffed for officer safety, and searched for weapons.  *Id*. at 8:13-9:29.  Paramedics approached within approximately two additional minutes; however, they undertook no action due to Benavente's apparent condition.  *Id.* at 11:46.  Within a few additional moments, his body was covered, and he was pronounced dead at the scene.  *Id.* at 16:40-17:08.

Thus, this was not a situation in which an obviously injured suspect was callously and gratuitously denied medical care.  Rather, it appears as if Benavente had slumped over immediately after the shots had been fired, having been shot through the neck.  Given the severity of his injuries and the immediacy of the intervention, there is simply no basis for this claim.

## C.    The Denial of Familial Relationship Claim

In addition to his excessive force claim, Plaintiffs have also included a claim for denial of familial relations under the Fourteenth Amendment.  Such a substantial due process violation occurs when the officers' actions "shock the conscience" or when they act with deliberate indifference or a "purpose to harm." See *Lam v. City of Los Banos,* 976 F.3d 986, 1003 (9th Cir. 2020); *Ochoa v. City of Mesa,* 26 F.4th 1050 (9th Cir. 2022).  This standard requires more of the Plaintiffs than the Fourth Amendment excessive force standard often applies in police shooting cases.  *Ochoa,* 26 F.4th at 1053, 1056.  It also requires that the officers had time to deliberate their conduct.  *Id.* at 1056.

In this case, however, Corporal Alvarado did not have sufficient time to deliberate before shooting Benavente.  As the uncontroverted evidence clearly

1   shows, Benavente came to an abrupt stop and, instead of surrendering, threw his

2   car into reverse, revved his engine, and accelerated backwards at a high rate of

3   speed, striking Corporal Alvarado's patrol vehicle, sandwiching him between his

4   open patrol car door and the frame of his vehicle, and nearly crushing him.  U.F. 6-

5   9.  Moreover, as multiple videos demonstrate, these events occurred within a

6   matter of mere seconds.  See *Exhibit* "G-2" at 0:01-0:06; *Exhibit* "G-3" at 0:58-

7   1:00.  Such an immediate response to an imminent threat of death of great bodily

8   injury simply cannot serve as a basis for a heightened Fourteenth-Amendment

9   violation, as a matter of law.  *Ochoa,* 26 F.4th at 1053, 1056.

10

11   **5.**   **DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY**

12       Although Defendants stand by their position that the uncontroverted

13   evidence demonstrates that their actions were reasonable, even if this Court were to

14   disagree, Defendants would nonetheless be entitled to summary judgment under

15   the doctrine of qualified immunity.

16       It is well –settled that qualified immunity protects government officials from

17   suit under federal law claims if "their conduct does not violate clearly established

18   statutory or constitutional rights of which a reasonable person would have known."

19   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "The protection of qualified

20   immunity applies regardless of whether the government official's error is 'a

21   mistake of law, a mistake of fact, or a mistake based on mixed questions of law

22   and fact.'"  *Pearson v. Callahan*, 555 U.S. 223, 230 (2009).

23       To evaluate qualified immunity, a court must first decide whether the facts

24   show that the governmental official's conduct violated a constitutional right.

25   *Jackson v. County of Bremerton*, 268 F.3d 646 (9th Cir 2001).  Second, a court

26   decides whether the governmental official could nevertheless have reasonably but

27   mistakenly believed that his or her conduct did not violate a clearly established

28   right.  *Id*.  However, the court may skip the first step and proceed to the second.

1     *Pearson v. Callahan*, 555 U.S. at 227.

2        The U.S. Supreme Court has recently clarified that a governmental official is

3 entitled to qualified immunity from suit/liability where, at the time of the conduct,

4 there was no prior precedent or case law with facts specifically and substantially

5 identical to the facts of the incident at issue which would have put the defendant on

6 notice that his or her conduct was unconstitutional. *White v. Pauly*, 580 U.S. 73,

7 79 (2017) ("clearly established law" should not be defined "at a high level of

8 generality" but must be "particularized" to the facts of the case).  The Supreme

9 Court has emphasized this point again and again because qualified immunity is

10 important to society as a whole and because the immunity from suit is effectively

11 lost if a case is erroneously permitted to go to trial. *Id*. at 551-555.

12        Under the doctrine of qualified immunity, if a government official's mistake

13 as to what the law requires is reasonable, the government official is entitled to

14 qualified immunity. *Davis v. Scherer*, 468 U.S. 183, 205 (1984).  Moreover, this

15 doctrine is sweeping in scope and designed to protect "all but the plainly

16 incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S.

17 335, 341 (1986).  Finally, although law enforcement officers must be aware of

18 constitutional developments, they are not expected to do so to the same extent as

19 law professors.  Indeed, a "reasonable person" standard applies. *Ward v. San

20 Diego County*, 791 F.2d 1329, 1332 (9th Cir. 1986).

21        Applying the two-pronged qualified immunity analysis, this Court must first

22 look to whether defendants' conduct violated a constitutional right. *Jackson v.

23 County of Bremerton*, 268 F.3d at 646.  While plaintiff may attempt to argue that

24 the law is clearly established that excessive force cannot be used, such a "high

25 level of generality" is contrary to the Supreme Court's repeated admonitions that

26 this analysis must be "particularized" to the facts of the case. *White v. Pauly*, 580

27 U.S. at 79.

28

As discussed at length above, Plaintiffs suffered no constitutional violation of any sort. However, assuming arguendo this Court were to find that a constitutional violation *had* occurred, Corporal Alvarado would nonetheless be entitled to summary judgment on the grounds of qualified immunity because the rights alleged by Plaintiff were anything but clearly established at the time of the incident. In fact, not only is there a lack of law prohibiting Corporal Alvarado's conduct, but there are also a significant number of cases *supporting* Corporal Alvarado's conduct.

As discussed at length above, *Plumhoff, Monzon, Williams* and *Vasquez* are all, and in some cases extremely, factually similar to the situation faced by Corporal Alvarado. In each, the firing officer or officers were found to have acted reasonably. Notably, *Monzon* was decided a mere four months before the incident involving Corporal Alvarado nullifying any argument that the state of the law at the time of the incident did not permit Corporal Alvarado to fire at a vehicle accelerating toward him.

Simply stated, since these cases hold that officers can fire upon an individual during a high-speed chase for fear of hurting the general citizenry, how can Plaintiffs credibly argue that the law clearly establishes that deadly force cannot be used when an officer is sandwiched between his patrol car and his door frame?

Finally, even if this Court were to conclude that such relevant authority did exist at the time of this incident (which it clearly does not), Corporal Alvarado would still be entitled to qualified immunity under the second prong of the qualified immunity analysis as any mistakes which arguably may have been made were reasonable. *Pearson v. Callahan*, 555 U.S. at 230. Specifically, even if Corporal Alvardo was incorrect in his assessment that he was at great personal risk, given Benavente's actions displayed in the video, this perception would constitute, at a minimum, a reasonable mistake of fact which would not preclude a grant of summary judgment.

**6.      THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' INSTITUTIONAL CLAIMS**

In addition to their individual claims against Corporal Alvarado, Plaintiffs have asserted institutional claims for a violation of *Monell,* failure to train, and ratification against the City of Ontario.  None of these claims yields merit.

Municipal entities are not subject to respondeat superior liability for federal civil rights claims. See *Monell v. Dept. Soc. Serv*, 436 U.S. 658, 690 (1978); *Wallis v. Spencer*, 202 F.3d 1126, 1144, n. 16 (9th Cir. 2000). However, having concluded that Section 1983 does not permit respondeat superior liability in suits against state actors, the *Monell* Court announced that claimants suing state actors must establish that their alleged injury was the result of a "policy or custom" of that state actor. *Bd. of Cnty. Commr's v. Brown*, 520 U.S. 397, 403 (1997).

As a prerequisite to establishing Section 1983 municipal liability, the plaintiff must satisfy one of three conditions: (1) the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a long-standing practice or custom which constitutes the standard operating procedure of the local governmental entity; (2) the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself this constituted an act of official governmental policy; and (3) the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.  After proving that one of the three circumstances existed, a plaintiff also must show that the circumstance was:  (1) the cause in fact; and (2) the proximate cause of the constitutional deprivation.  See  *Trevino v. Gates*, 99 F.3d at  918.

Moreover, in *City of Los Angeles v. Heller*, 475 U.S. at 799, the Supreme Court held that a public entity is not liable for Section 1983 damages under a policy that can cause constitutional deprivations when the factfinder concludes that

an individual officer, acting pursuant to the policy, inflicted no constitutional harm to the plaintiff.  If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point. *Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir. 1996).

In this case, as discussed above, the uncontroverted facts demonstrate that the actions of Corporal Alvarado did not constitute a constitutional violation. Accordingly, in the absence of any such underlying predicate violation, there can be no corresponding *Monell* violation.  *Heller*, 475 U.S. at 799; *Quintanilla*, 84 F.3d at 355.

Moreover, even if a constitutional violation were shown, Plaintiffs have no evidence demonstrating an unconstitutional pattern and practice which would give rise to liability under *Monell*, for failure to train, or for ratification  Accordingly, the City is entitled to summary judgment on Plaintiffs' institutional claims.

## 7. <u>CONCLUSION</u>

Based on the forgoing, the Court should grant Defendants' Motion for Summary Judgment and/or Partial Summary Judgment and enter judgment in their favor and against Plaintiff.

Dated: March 29, 2024                    JONES MAYER

                                                    */s/ Scott Wm. Davenport*

                                                    By: _____
                                                    JAMES R. TOUCHSTONE
                                                    DENISE L. ROCAWICH
                                                    SCOTT WM. DAVENPORT

                                                    Attorneys for Defendants,
                                                    CITY OF ONTARIO and ALBERT
                                                    ALVARADO

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for CITY OF ONTARIO and ALBERT ALVARADO, certifies that this brief contains 6,958 words, which complies with the word limit of Local Rule 11-6.1.

Dated: March 29, 2024                     JONES MAYER

                                          */s/ Scott Wm. Davenport*

                                          By: _____
                                              SCOTT WM. DAVENPORT

                                          Attorneys for Defendants,
                                          CITY OF ONTARIO and ALBERT
                                          ALVARADO