**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Albert Alvarado on 07/28/2023**

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   FRANK BENAVENTE; and NICOLE VENTRESS, )
                                          )
 5               Plaintiffs,              )
                                          )
 6               vs.                      )Case No.
                                          )5:23-CV-00266-SSS-KK
 7   ALBERT ALVARADO; CITY OF ONTARIO;    )
     and DOES 1 through 10,               )
 8                                        )
                 Defendants.              )
 9   _____ )

10

11

12

13

14         REMOTE VIDEOCONFERENCE DEPOSITION OF

15                  ALBERT ALVARADO

16              FRIDAY, JULY 28, 2023

17

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  459584
```

```
 1    in court?

 2         A.   I testified more than 30 times, approximately.

 3         Q.   Now, the date of the incident we're here to talk

 4    about, do you recall the date?

 5         A.   Approximately, yes.

 6         Q.   What was the date?

 7         A.   February 22nd.

 8         Q.   Of what year?

 9         A.   2021.

10         Q.   About what time did the shooting happen?

11         A.   The shooting occurred at approximately 23:55

12    hours.

13         Q.   Is that about 11:55 at night?

14         A.   Yes, sir.

15         Q.   Where did it happen?

16         A.   It occurred in the city of Ontario.

17         Q.   Did it occur in a particular street?

18         A.   Yes, it did.

19         Q.   And what was the street's name?

20         A.   The street's name is Beverly Court.

21         Q.   Did you discharge your firearm during the

22    incident?

23         A.   I did.

24         Q.   What type of firearm did you discharge?

25         A.   I have a Glock 17, a 9-millimeter.
```

```
1        A.   It was red compact sedan.

2        Q.   And when you fired your first shot, were you moving

3   or stationary?

4        A.   I was stationary.

5        Q.   Did you have the weapon in one hand or two?

6        A.   I believe it was in one hand.

7        Q.   What part of the vehicle were you shooting

8   through?

9        A.   Are you referring to Mr. Benavente's car?

10       Q.   I'm assuming you were shooting -- it's my

11  understanding you were standing somewhere outside of your

12  vehicle, and you were shooting into the red vehicle.

13       A.   Yes.

14       Q.   And you were trying to strike the driver of the

15  vehicle.

16       A.   I was trying to stop the threat which was the red

17  vehicle.

18       Q.   I understand that.  But were you trying to shoot the

19  driver to stop the threat?

20       A.   Yes, sir.

21       Q.   What I'm trying to get at, I don't know if your

22  first shot was through the front windshield, through the side

23  window, the back window.

24            I'm trying to find out, if you know, when you fired

25  your first shot, what part of the car were you firing through
```

```
 1   driver?

 2        A.   Yes, I could.

 3        Q.   Did any part of the car ever strike you?

 4        A.   At that time I was led to believe I was being struck

 5   by the vehicle as I was being crushed in between my door and

 6   the police vehicle due to Mr. Benavente's vehicle running

 7   alongside the passenger side of my patrol vehicle.

 8        Q.   What I'm saying, did any part of the car actually

 9   strike you?

10           And if so, I'm going to want to know what part of

11   your body and whether you had any physical injuries.

12           MR. TOUCHSTONE:  Vague as to car, Dale.

13           Are you referring to Mr. Benavente's vehicle?

14           MR. GALIPO:  Yes.  Sorry, Jim.

15           MR. TOUCHSTONE:  Go ahead.

16           THE WITNESS:  Can you repeat that question again,

17   please.

18   BY MR. GALIPO:

19        Q.   Sure.  Did any part of the red vehicle actually

20   strike you?

21        A.   No, sir.

22        Q.   What would you estimate the speed of the red vehicle

23   when you fired your first shot?

24        A.   It was -- I estimate just to be a high rate of

25   speed.  I don't have a number to give.
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 13

 1      Q.   Could you give any range?

 2      A.   It would be an approximate, but it was just going at

 3   a high rate of speed in a reversing manner towards our police

 4   car.

 5      Q.   What approximation would you give?

 6      A.   An approximation I would give today would be more

 7   than 20 miles-per-hour.

 8      Q.   What was the speed of the vehicle when you fired

 9   your second shot?

10      A.   It was continuing to accelerate.

11           So I believe it would have continued to be more than

12   20 miles-per-hour.

13      Q.   And what was the speed of the vehicle when you fired

14   your third shot?

15      A.   Again, it would continue being more than 20

16   miles-per-hour as it continued to accelerate backwards

17   essentially in the -- behind me -- not behind me, as it

18   continued in reverse.

19           That's what I meant to say.

20      Q.   So it sounds like when you fired your first shot,

21   you were kind of in line with the rear door on the driver's

22   side; is that correct?

23           MR. TOUCHSTONE:  Misstates his testimony.

24           But go ahead and answer.

25           THE WITNESS:  So I don't understand when you say in

```
 1        A.   I think there would be an accurate measurement that
 2   I don't want to make up a number.  If I would say in steps,
 3   it's three to four steps in total from the rear quarter panel
 4   to the driver's door.  I don't think it's very -- not very
 5   much.
 6        Q.   Did you have the impression as to whether any of
 7   your shots struck him?
 8        A.   I did have that impression, yes.
 9        Q.   What was your impression?
10        A.   He was hurt once he slumped over.
11        Q.   And when he slumped over, did he slump over to the
12   right towards center console or in some other way?
13        A.   Towards the steering wheel.
14        Q.   Kind of forward?
15        A.   Yes, sir.
16        Q.   Which direction did the car go immediately after you
17   saw him slump over?
18        A.   In a northeast direction.
19        Q.   Would that be backwards or forwards?
20        A.   It would be forwards.
21        Q.   So the car is initially reversing; you fired three
22   shots; after your third shot, you saw him slump over and the
23   car started moving forward?
24        A.   No, sir.
25        Q.   What part of that is incorrect?
```

1    Detective Bureau, and lastly, I have been working in the

2    Traffic Division.

3        Q.   What was your assignment at the time of this

4    shooting incident?

5        A.   I was a patrol officer.  Specifically, I was a

6    corporal and a field training officer.

7        Q.   And then when were you assigned to the Detective

8    Bureau?

9        A.   I was assigned in October of 2022, approximately.

10       Q.   And how about to Traffic, when did you receive that

11   assignment?

12       A.   Approximately in May of 2023.

13       Q.   Other than your 9-millimeter, did you have any

14   less-lethal on you at the time of this incident such as a

15   pepper spray, a Taser, or a police baton?

16       A.   I did.

17       Q.   What did you have?

18       A.   So I had my collapsible baton which is referred to

19   as ASP, A-S-P.  I had a Taser; I had a pepper spray; and I

20   believe that's what you're referring -- I think those are the

21   three items other than my firearm I had.

22       Q.   Okay.  What type of Taser did you have?

23       A.   At this time I can't remember the model of it, but

24   it's an AXON Taser.

25       Q.   Do you know if it was an X26 or an X2?

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
*Albert Alvarado on 07/28/2023*                                    Page 26

```
 1   probably not going to be able --
 2       Q.   I'm not asking verbatim.  Just in general.
 3       A.   Essentially, you should try to avert the vehicle,
 4   the moving vehicle, get out of its way.
 5       Q.   Get out of the path, rather than shooting?
 6       A.   Doesn't say anything about not shooting.
 7            Just attempting to get out of the way unless it's an
 8   immediate imminent threat to the officer.
 9       Q.   Did you do anything in your mind to attempt to get
10   out of the way of the red car when it was backing up?
11       A.   The red car backing up was immediate.
12            There was nowhere I could have gone or done
13   differently to avoid that red car coming in the direction
14   where I was at.
15       Q.   I'm just wondering whether you tried to do anything
16   in your mind to get out of the way.
17       A.   It would have caused even more -- could caused even
18   more serious injury or even death if I would have moved in
19   any direction other than where I stayed.
20       Q.   So you're saying you didn't try to get out of the
21   way because you thought that might make it worse?
22       A.   It would have made it worse, but everything happened
23   immediately.  The speed of this red compact sedan coming at
24   our police car running along side the passenger side happened
25   so quickly.  I had nowhere to go.
```

1     Q.    So when you first saw the vehicle backing up, was

2  that the same spot you were in when you fired your first

3  shot?

4     A.    No.

5     Q.    How much time passed from you seeing the vehicle

6  backing up to you firing your first shot?

7     A.    So that was when it was approximately three seconds

8  from the red compact sedan striking my patrol vehicle along

9  the passenger side and running alongside the passenger side.

10    Q.    Did you move anywhere in those three seconds?

11    A.    There was no time for me to move or to go

12  anywhere.

13    Q.    So that's what I was trying to get at.

14          Were you in the same position when you observed the

15  impact as you were when you fired your first shot?

16    A.    There was two impacts.  Are you referring to my

17  patrol vehicle, or are you referring to Officer Varela's

18  vehicle?

19    Q.    Well, how many impacts were there before you

20  fired?

21    A.    There was two.

22    Q.    Well, the first impact and the second impact, were

23  you in different positions?

24    A.    Yes.

25    Q.    So where were you at the time of the first impact?

FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.
Albert Alvarado on 07/28/2023                              Page 29

1    Q.   Was your door opened or closed when you fired the

2  shots?

3    A.   It was open.

4    Q.   Do you know if the door of your vehicle was

5  struck?

6    A.   I learned that it was struck.

7    Q.   And how did you learn that?

8    A.   Reviewing photos.

9    Q.   Did you realize it was struck prior to you firing

10  your shots?

11    A.   When that situation was occurring, I -- everything

12  about me was telling me that my passenger door was being

13  struck, and I was being crushed by my passenger door into my

14  police car because I'm being sandwiched by the red compact

15  sedan.  So my -- the door was struck.

16    Q.   Were you in the "V" of your door when you fired your

17  shots?

18    A.   I was in that general vicinity.

19    Q.   General vicinity of what?

20    A.   So just as anybody would get out of their vehicle

21  and stand outside the door, that's where I was standing.

22    Q.   Well, I'm not so sure if everyone gets out of their

23  vehicle the same way and stands the same way.

24       But what I'm trying to figure out, sometimes

25  officers open their door and they stay in the "V" of the door

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 30

```
 1   for some cover.
 2           I don't know if you were in the "V" of your door or
 3   you were somewhere else.
 4           That's what I'm trying to figure out.
 5      A.   So I don't want to say that I'm standing at the "V"
 6   of the door because I would call that more like the -- I
 7   don't even know if it's the appropriate word, the apex, where
 8   they both meet.
 9           No.  I would just say I'm standing at the door frame
10   of my door.
11      Q.   Okay.
12      A.   The frame that outlines my door, I'm in that area.
13      Q.   So was your door in between you and the red car?
14      A.   Yes.  Because the door's open.
15      Q.   Did you have any visible injuries from this
16   incident?
17      A.   No, I did not, sir.
18      Q.   Do you know if you had any rips or tears to your
19   uniform?
20      A.   No, I did not.
21      Q.   What was the nature of the call that you were
22   responding to, initially?
23      A.   This was a result of a traffic stop.
24      Q.   And were you in your patrol vehicle when you
25   initially heard the dispatch related to this call?
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                   Page 33

1   training that we do in briefing and classes I've attended.

2   While my experience in the field and what I've been through

3   in other events led me to believe that he could have been

4   reaching for a weapon, he could have been trying to discard

5   evidence.

6          It just kept happening over and over where he --

7   he's fidgeting in the car, and I'm seeing this from the

8   steering wheel because he's going in the east direction to

9   the car behind the north, south direction, and it was very

10  obvious to me.

11         And then in totality, once we get to San Antonio, he

12  takes off at a high rate of speed.  So now I know that there

13  is a pursuit that is going to occur.  The pursuit continues

14  northbound on San Antonio, and in turn we get to about 5th or

15  6th Street, and there is a car -- and I'm going to call it an

16  innocent truck or civilian just driving on the street, and

17  the red compact sedan almost collides into it.

18         Almost it looks like it was going to be T-boned.

19         And I knew that something -- the propensity of

20  violence was going to occur or was heightened because that's

21  what happens in pursuits especially with what I had seen, my

22  experiences.  I almost saw that T-bone.  He didn't go on the

23  back side of the car.  So I knew that the truck had stopped

24  in the middle of the road.

25         The red compact sedan had passed him in the front,

1      Q.   Any information that he had ever physically harmed

2   another person?

3      A.   Well, if we're talking about get into the 10

4   Freeway, from that time frame, yeah, he almost T-boned an

5   innocent motorist.

6      Q.   Yeah.  I'm not asking about almost.

7           I'm asking actually harmed.

8      A.   No.  At that time he did not hurt anybody at the

9   time.

10     Q.   And then after, take me from the stop on the 10

11  Freeway.

12     A.   The 10 Freeway, he stops, and it led me to think --

13  led me to think it's a possible ambush situation and/or he

14  was just giving up.  The moment we drove up, the red compact

15  sedan made a U-turn.  And what I started noticing was the

16  acceleration and the sudden stopping, meaning the braking, of

17  the red compact sedan where I was leading to believe that he

18  was trying to get Officer Varela to smash into his unit.

19          Well, that heightened my senses that this was

20  becoming much more violent and/or closing that gap due to an

21  ambush situation.

22          Typically, my experiences have led me to know that

23  people that lead the police on vehicle pursuits want to get

24  away, but given that the gap is closing, my training is

25  telling me that propensity of violence is there.

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 39

```
 1     A.   Every situation is different.

 2          I don't understand what you're saying --

 3     Q.   I'm trying to talk about this situation --

 4     A.   I understand what you're saying, but the

 5    circumstance -- that's not what the circumstances that had

 6    occurred at that moment.  So I just -- I --

 7     Q.   I guess what I'm getting at is, you told me that he

 8    had stopped before, but then ended up taking off again?

 9     A.   Yes.

10     Q.   So when he stopped this time, you were not sure

11    whether he was going to foot bail, surrender, or maybe take

12    off again; is that fair?

13     A.   Yes.  That's a fair description, sir.

14     Q.   And we know he ended up backing up at some point,

15    true?

16     A.   True.  But I wouldn't use the word "backing up."

17     Q.   Okay.  He reversed at, I think you described, a

18    fairly high rate of speed?

19     A.   Yes, sir.

20     Q.   So what I'm trying to get at, I take it if you would

21    have seen him reversing, actually moving backwards, and you

22    were still in your car, then for safety reasons, you would

23    have stayed in your car; is that fair?

24     A.   Yes.  Given your description, seeing that he's

25    already reversing and the car's already in motion towards my
```

1    Q.   So in your statement when you said you didn't know

2    why Escobar was stopping there, that's what you were

3    referring to?

4    A.   Yes.

5    Q.   And how far was the position where Escobar was

6    stopping your vehicle, how far was that from the position

7    that you thought he was going to stop to the side of Varela's

8    car?

9    A.   Sir, are you asking the distance from the front of

10   Varela's car to the front of my -- or the back of Officer

11   Varela's car to the front of my car?

12   Q.   Yeah.  Essentially, how far forward more were you

13   expecting Escobar to stop the car?

14   A.   I just assumed that we were going to park along side

15   Officer Varela.

16   Q.   And much further was that from where you actually

17   stopped?

18        Was it two-car lengths ahead?

19   A.   I would say yeah, about a car length and a half.

20   Q.   But you don't recall saying anything to Escobar at

21   the time as to why he's stopping there or telling him to pull

22   forward?

23   A.   No.  I didn't -- we didn't talk about any of that

24   when that was occurring.

25   Q.   Where were you when you saw the reverse lights first

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 47

1   come on?

2       A.   I was outside my passenger door.

3       Q.   How far outside?

4       A.   I had just stepped out.  I don't want to say I just

5   stepped out.  I was outside my door within the door frame --

6   within the frame of the car and my door being wide open.

7       Q.   Did you ever consider getting back in the car?

8       A.   At that time there was -- there was nothing stating

9   I needed to get back in the car.

10      Q.   And this includes when you saw the reverse lights

11  coming on?

12      A.   Well, the moment the reverse lights came on, that's

13  when everything immediately began to happen.

14      Q.   Right.  That's what I'm wondering.

15           When you saw the reverse lights, did you consider

16  getting back in your car?

17      A.   There was no time to get back in that car.

18      Q.   I'm just wondering whether you considered it as an

19  option, but then thought, I don't have enough time.

20      A.   No.  There was -- there was no time of how quickly

21  the vehicle was reversing and colliding into our cars.

22           It had been immediately.

23      Q.   And at some point you see the impact with Officer

24  Varela's car; correct?

25      A.   Here, yes, sir.

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 48

1    Q.   Did you hear the red car make impact with your car

2    before you shot?

3    A.   I think it's more than that.  It's -- you hear it

4    and you see it.  Everything's happening right in front of

5    me.

6    Q.   What parts of the car is impacted, the red car and

7    your car, before you shot that you heard and saw?

8    A.   Well, it would be the rear driver's side bumper and

9    quarter panel, and then collided into our front passenger

10   fender headlight, but that's just when the initial collision

11   occurred.

12        Once the vehicle began reversing running alongside

13   the passenger side of our police vehicle, that's when the

14   discharging -- I started discharging my firearm as it ran

15   alongside the passenger side of our police car.

16   Q.   And I think you've already told me this, but your

17   first shot, you could not see the driver; is that correct?

18   A.   No, sir.

19   Q.   Is that correct?

20   A.   Yes, yes, you're correct.

21   Q.   But your second and third shots, you could see the

22   driver because you were shooting through the driver's side

23   window at the driver?

24   A.   Yes.

25   Q.   Obviously, you were to the side of the car for the

1   second and third shots?

2       A.   Well, I am to the side of the car being crushed,

3   believing I'm being crushed by his vehicle and to my vehicle.

4       Q.   Right.  But you would at least agree you ended up

5   not being crushed?

6       A.   I would agree after the fact, yeah, I was not

7   crushed.

8       Q.   Okay.  Was there a passenger in that red car?

9       A.   Yes, there was.

10      Q.   And that was a female?

11      A.   Yes, yes, sir.

12      Q.   And she was setting in the right front seat?

13      A.   Yes, sir.

14      Q.   Did you know that when you fired your two shots at

15  the driver?

16      A.   Yes, I knew that, yes.

17      Q.   And you were aware if one of your shots missed the

18  driver, she could be struck?

19      A.   Yeah.  I took that to full consideration, but at

20  that time immediately my life was in danger of serious bodily

21  injury or I would not be here today.  Death was -- was felt

22  like it was going to be imminent.

23      Q.   That's the worst type of death, imminent.

24           And speaking of death, were you aware that the

25  driver died?

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 50

```
 1      A.    I am aware.

 2      Q.    And I take it you were aware that using deadly force

 3   shooting someone in their upper body, was likely to cause

 4   death or serious bodily injury?

 5      A.    So -- I'm sorry.  I just didn't understand whether

 6   you're asking me a question or -- I didn't understand the

 7   parts of that.

 8      Q.    That's okay.  I'll rephrase it.

 9            You wear a ballistic vest when you're on duty;

10   correct?

11      A.    I do.

12      Q.    And that's to protect you against gunshots,

13   hopefully, to your chest and abdomen?

14      A.    Yes, sir.

15      Q.    Because you're trained if someone takes gunshots to

16   their upper body, it may cause of death or serious bodily

17   injury?

18      A.    I understand.

19      Q.    And you knew that when you were shooting him in his

20   upper body?

21      A.    It was not a concern of where I was shooting.

22            It was a concern of stopping the threat which was

23   the vehicle trying to crush me.

24      Q.    Do you even know if he saw you before you shot?

25      A.    I think he knew that he saw the police lights and
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 63

```
 1     A.   The driver's -- are you saying the driver's side
 2  window would have been --
 3     Q.   Of the red car, would have been in line with your
 4  position when you were firing?
 5          MR. TOUCHSTONE:  When you say in line, Dale, are you
 6  saying perpendicular?
 7          MR. GALIPO:  Yes.
 8          MR. TOUCHSTONE:  Do you understand the --
 9          THE WITNESS:  Yes, yes, it was right beside me, yes.
10  BY MR. GALIPO:
11     Q.   Okay.  And then you're saying after you fired your
12  three shots, the vehicle continued to go backwards?
13     A.   Yes.  At a high rate of speed.
14     Q.   Did it make an impact?
15     A.   Yes.  I heard another impact.
16          I did not know there was another patrol car behind
17  us.
18     Q.   And we see a patrol car behind you in this photo;
19  correct?
20     A.   Yes, sir.
21     Q.   Okay.  Have you ever seen any photo showing the
22  trajectory of the shots in the person's body?
23     A.   No, I have not.
24     Q.   Those are my next two exhibits, but I think I'm
25  going to spare you from having to look at those today.
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                                        Page 68

```
 1                        CERTIFICATE

 2                            OF

 3          CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5          I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8          That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10          That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12          That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15          Further, that the foregoing is an accurate

16   transcription thereof.

17          I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21          IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  July 28, 2023.

23

24          _____
            Jinna Grace Kim, CSR No. 14151

25
```