```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4   FRANK BENAVENTE; and NICOLE VENTRESS, )
                                           )
 5              Plaintiffs,                )
                                           )
 6              vs.                        )Case No.
                                           )5:23-CV-00266-SSS-KK
 7   ALBERT ALVARADO; CITY OF ONTARIO;     )
     and DOES 1 through 10, inclusive,     )
 8                                         )
                Defendants.                )
 9   _____)

10

11

12

13

14            REMOTE VIDEOCONFERENCE DEPOSITION OF

15                     KEVIN VASQUEZ LOPEZ

16                  THURSDAY, JANUARY 11, 2024

17

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  34657
```

Page 6

1  Q.  And what years were you there?
2  A.  At the Sheriff's Academy I was there from 2014 to
3  2017.
4  Q.  And after that you went to Ontario?
5  A.  Correct.
6  Q.  And have you been at Ontario ever since?
7  A.  Correct.
8  Q.  What is your current assignment?
9  A.  I'm a police officer with the Career Criminal
10 Division.
11 Q.  Do you recall the date of the incident we're here to
12 talk about?
13 A.  Yes.
14 Q.  What was the date?
15 A.  February 21, 2021.
16 Q.  Do you recall the name of the street it occurred
17 on?
18 A.  Beverly Court.
19 Q.  And do you have an estimate as to what time the
20 shots occurred, approximately?
21 A.  Approximately 11:55 at night.
22 Q.  How many shots did you hear?
23 A.  I heard between two and three, approximate.
24 Q.  Did they sound like they were in fairly rapid
25 succession?

```
 1    A.   Yes, they did.
 2    Q.   And where were you when you heard the shots?
 3    A.   I was inside my vehicle.
 4    Q.   Do you recall if you were in the process of getting
 5  out when you heard the shots?
 6    A.   Yes and no.
 7    Q.   You want to explain that, please?
 8    A.   My door was ajar attempting to get out, and then
 9  there was a collision that occurred which made me stay inside
10  the vehicle.
11    Q.   The collision you're referring to, would that be
12  between your vehicle and the red vehicle?
13    A.   Correct.
14    Q.   And what part of the vehicles came in contact?
15         Would it be the front of your vehicle?
16    A.   Correct.
17    Q.   And the rear of the red car?
18    A.   Correct.
19    Q.   And are you saying that you heard the shots after
20  the impact?
21    A.   Correct.
22    Q.   And how long after the impact approximately did you
23  hear the shots?
24    A.   It was almost instantly.
25    Q.   Almost immediately after the impact?
```

Page 9

| | | |
|---|---|---|
| 1 | A. | From my recollection, no. |
| 2 | Q. | Did you hear any commands in the five seconds before |
| 3 | the shots? | |
| 4 | A. | My recollection, no. |
| 5 | Q. | Do you know now who fired the shots? |
| 6 | A. | Yes, I do. |
| 7 | Q. | And what is your understanding? |
| 8 | A. | His name? |
| 9 | Q. | Yes. |
| 10 | A. | His name is Corporal Alvarado. |
| 11 | Q. | And I'm assuming you had worked with Corporal |
| 12 | Alvarado before the date of the incident? | |
| 13 | A. | Correct. |
| 14 | Q. | You were familiar with what he looked like, |
| 15 | generally? | |
| 16 | A. | Correct. |
| 17 | Q. | Did you see Corporal Alvarado at any time, let's |
| 18 | say, in the ten seconds before you heard the shots? | |
| 19 | A. | No. |
| 20 | Q. | Did you see Corporal Alvarado during the shots? |
| 21 | A. | No. |
| 22 | Q. | Did you see Corporal Alvarado immediately after the |
| 23 | shots? | |
| 24 | A. | No. |
| 25 | Q. | Where was Corporal Alvarado when you first saw him |

```
 1   BY MR. GALIPO:
 2       Q.   You don't recall if your car was stopped or moving
 3   at the time of the impact?
 4       A.   I can't recall.
 5       Q.   And then almost immediately after the impact, you're
 6   saying you heard the two or three shots?
 7       A.   Correct.
 8       Q.   Where was the red car when you first saw it?
 9       A.   It was parked facing north on Beverly Court close to
10   the east curbline.
11       Q.   At some point was there a vehicle pursuit?
12       A.   Correct.
13       Q.   Were you in the vehicle pursuit?
14       A.   Correct.
15       Q.   And which car were you, if you know?
16            In other words, the second car back, the third car
17   back?
18       A.   The third car back.
19       Q.   Do you know who was in the first car following the
20   red car in the pursuit?
21       A.   I do not.
22       Q.   Do you know who was in the second car?
23       A.   I do not.
24       Q.   But you were in the third car?
25       A.   Correct.
```

```
 1      A.   Yes, I did.
 2      Q.   And while it was coming back in your direction, were
 3 you still moving forward, or had you already stopped?
 4      A.   Moving forward.
 5      Q.   And so at some point as you continue to move forward
 6 and it's coming back in your direction, there would be the
 7 impact we discussed earlier?
 8      A.   No.  There was an additional impact.
 9      Q.   Okay.  Can you explain that to me, please.
10      A.   Yes.  The red vehicle began backing up and made what
11 appeared to me at the time an S motion where its rear bumper
12 turned in the direction of Corporal Alvarado's vehicle.
13           And then there was that collision between the red
14 car and Corporal Alvarado's vehicle.
15      Q.   If I call that Collision 1, will you know what I'm
16 referring to?
17      A.   Yes, sir.
18      Q.   And just so that I'm clear in that Collision 1, what
19 part of the red car impacted what part of Corporal Alvarado's
20 vehicle?
21           MR. TOUCHSTONE:  Objection.  Lacks foundation.
22           You can answer.
23           THE WITNESS:  At the time it appeared that the rear
24 driver side of the red vehicle contacted the front panel on
25 the passenger side of the police unit Corporal Alvarado's was
```

Page 19

1  there.

2         MR. GALIPO:  Jim, your voice -- I'm not sure if the
3  court reporter got it or not on your objection because you're
4  probably further away from the microphone.

5         So maybe I should ask:  Did you get Mr. Touchstone's
6  last objection before the response?

7         COURT REPORTER:  Yes, I did.

8         (Record read back.)

9         MR. GALIPO:  Okay.  Thank you.

10 BY MR. GALIPO:

11    Q.   So those are the two parts that came of the cars
12 that came together in Collision 1?

13    A.   From my perspective, yes.

14    Q.   And then Collision 2 would be with your vehicle?

15    A.   Correct.

16    Q.   And how far would you estimate the red car moved
17 back prior to Collision 1?

18    A.   I cannot give you an estimate on that.

19    Q.   Do you know if it was more or less than a car
20 length?

21    A.   I can't give you an estimate on that.

22    Q.   Do you know if Corporal Alvarado's vehicle was
23 stopped at the time of Collision 1?

24    A.   From my perspective it appeared to be stopped.

25    Q.   Was your vehicle still moving forward at the time of

```
 1   car moving forward towards the curb?
 2        A.   At which point?
 3        Q.   After the shots.
 4        A.   After the shots it appeared to me at the time that
 5   the car was slowly moving forward.
 6        Q.   And did it come to rest at some point in the area of
 7   the curb?
 8        A.   Eventually it came to rest on the east curb of
 9   Beverly Court.
10        Q.   And where did you position yourself?
11        A.   When the vehicle came to a rest at the east
12   curbline, I ended up -- my position was almost at the rear
13   bumper on the passenger side of the red vehicle.
14        Q.   Could you see into the vehicle from your perspective
15   when it was coming in your direction?
16        A.   No.
17        Q.   Could you see into the vehicle after the shots?
18        A.   While I was inside the vehicle after the shots,
19   no.
20        Q.   Did you give some commands to the driver of the
21   vehicle after the red car moved forward and came to a stop?
22        A.   When I was at the -- when the car had stopped on the
23   curb and I was behind it, yes, I was giving commands inside
24   the vehicle.
25        Q.   And what type of commands were you giving?
```

1   Q.   Who else approached with you?

2   A.   And this was for the rescue.  It was Officer
3   Bernette, Officer Medina, myself, Alex Roldan [phonetic.].
4        I can't remember who else was behind her.

5   Q.   Okay.  Can you spell the last name of the last
6   officer you mentioned?

7   A.   R-o-l-d-a-n.

8   Q.   Okay.  It sounds like other officers arrived
9   on-scene after the shooting?

10  A.   Yes.

11  Q.   And did you observe the driver at some point when
12  you approached the red car?

13  A.   Yes.

14  Q.   And where was the driver when you observed him when
15  you approached?

16  A.   He was seated in the driver seat of the vehicle.

17  Q.   Okay.  And what was his position, if you recall?
18       Was he slumped over to one side or the other?

19  A.   At that point he was slumped over towards the front
20  passenger seat.

21  Q.   Was he the only one remaining in the vehicle at that
22  point?

23  A.   Correct.

24  Q.   Do you have an estimate as to how much time passed
25  in between the shooting and you approaching and making this

Page 29

1    observation?
2       A.   I do not.
3       Q.   Do you know if it was more or less than ten
4    minutes?
5       A.   I do not.
6       Q.   Could you tell whether or not he appeared to have
7    been shot when you approached?
8       A.   During that point when he was slumped over, I could
9    not tell if he was shot.
10      Q.   What did you -- did you make any further
11   observations regarding the driver after the shooting other
12   than just seeing him slumped over?
13      A.   At which part?  At this point?
14      Q.   I'm just trying to move forward now.
15           It sounds like you first approached and saw him
16   slumped over towards the passenger side; is that correct?
17      A.   No.
18      Q.   Can you explain to me your observations of the
19   driver after approaching?
20      A.   So I approached the vehicle -- are you specifying
21   whether I saw him during -- after Collision 2 when it started
22   going forward?
23           Remember, I mentioned I was in the back, that side?
24           Are you talking about that --
25      Q.   What I'm trying to do, I think in my mind, we're

Page 30

1  talking about the time frame after the red vehicle moved
2  forward, after it came to a stop, after the female got out,
3  after she was detained.
4       A.   Okay.  And we went to do the rescue?
5       Q.   Correct.
6       A.   Okay.  What was your question?
7            I'm sorry.
8       Q.   I'm just wondering what observations you made
9  regarding the driver after you approached.
10      A.   He was slumped over towards the front passenger
11 side.
12      Q.   Did you make any further observations later like
13 when he was taken out of the vehicle or anything else?
14      A.   Yes.
15      Q.   Can you explain that, please.
16      A.   It appeared that he had a gunshot wound to somewhere
17 in the neck area.
18      Q.   What did you see in that regards?
19      A.   It just looked like a small hole.
20           At that time it appeared to me to possibly be an
21 entry wound.
22      Q.   Did you see some blood associated with that wound?
23      A.   There was from my perspective, there was no blood in
24 that area.
25      Q.   Did you see blood anywhere else?

Page 31

```
 1      A.   Yes.  I could see some blood somewhere around the
 2   front of his pants pocket, like in front of his pants.
 3      Q.   Do you know if he was handcuffed at some point?
 4      A.   Yes.
 5      Q.   And was he?
 6      A.   Yes.
 7      Q.   Do you know who handcuffed him?
 8      A.   I believe it was myself and Officer Wilbur
 9   [phonetic.].
10      Q.   Was he still alive when you handcuffed him?
11      A.   I could not tell.
12      Q.   I'm assuming he was taken out of the vehicle before
13   he was handcuffed?
14      A.   Yes.
15      Q.   Who took him out of the vehicle?
16      A.   It was myself and Officer Wilbur.
17      Q.   Did you have any weapons on him?
18      A.   From my recollection, no.
19      Q.   Do you know when the ambulance and the paramedics
20   got to him?
21      A.   A time frame, I do not.
22      Q.   Would it be -- were they on the scene when he was
23   handcuffed?
24      A.   They were not on the scene at the scene where the
25   incident occurred, but it appeared to me from dispatch that
```

Page 36

```
 1          MR. GALIPO:  Can we go to Exhibit 4, please.
 2          (Exhibit 4 was marked for identification.)
 3   BY MR. GALIPO:
 4      Q.  This is at 23:56:44.
 5          Again, we can see the red car in the front of your
 6   car?
 7      A.  Yes.
 8      Q.  And it appears that we can see at least someone in
 9   the red car in this image?
10      A.  In that image you can tell that there is somebody on
11   that corner towards the front passenger side.
12      Q.  And at least in this image, again, it looks like the
13   red car is either touching the front of your car or very
14   close to it?
15      A.  Touching or very close.
16      Q.  And the door on the passenger side of Alvarado's
17   vehicle, again, looks open?
18      A.  Correct.
19      Q.  Okay.
20          MR. GALIPO:  Can we go to the next Exhibit 5,
21   please.
22          (Exhibit 5 was marked for identification.)
23   BY MR. GALIPO:
24      Q.  Again, this is at 23:56:44.
25          The back of the read car and the front of your car
```

1  appear to be touching or very close?
2      A.   Correct.
3      Q.   Again, we can see someone inside the red vehicle in
4  this image?
5      A.   In that image, yes.
6      Q.   And we see the door again partially opened, the
7  passenger door of Alvarado's vehicle?
8      A.   Correct.
9           MR. GALIPO:  Can we go to the next 6.
10          (Exhibit 6 was marked for identification.)
11 BY MR. GALIPO:
12     Q.   Again, we can see the front of your vehicle and the
13 rear of the red car?
14     A.   Yes.
15     Q.   And the time stamp is 23:56:44.
16          Again, they either appear touching or very close?
17     A.   Correct.
18     Q.   And in this image we can actually see Corporal
19 Alvarado in the open door area of his vehicle on the
20 passenger side?
21     A.   His head is cut off partially.
22          I see a -- looks like an officer.
23     Q.   Okay.  Fair enough.
24          And is the officer you see in this image appear to
25 have a weapon in his hand pointed towards the driver's window

Page 38

```
 1   of the red car?
 2      A.   Correct.
 3      Q.   Okay.
 4           MR. GALIPO:  And can we go to Exhibit 7, please.
 5           (Exhibit 7 was marked for identification.)
 6   BY MR. GALIPO:
 7      Q.   This is at 23:56:45.
 8           Again, we see the red car either touching or very
 9   close to the front of your car?
10      A.   Correct.
11      Q.   And although we can't see the head, we see the
12   officer pointing a weapon towards the driver's window of the
13   red car?
14      A.   Correct.
15      Q.   And it looks like at the top there is another
16   officer with a weapon in his hand?
17      A.   I can't see that from here.
18      Q.   Okay.  No problem.
19           MR. GALIPO:  Okay.  Thank you.
20   BY MR. GALIPO:
21      Q.   I'll just go for about another five minutes and then
22   we'll take a break.
23           You obviously have training or have had training
24   with respect to the use of deadly force?
25      A.   I have had training.
```

```
 1                        CERTIFICATE

 2                            OF

 3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5            I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8            That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10            That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12            That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15            Further, that the foregoing is an accurate

16   transcription thereof.

17            I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21            IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  January 11, 2024.

23
                              _____
24
                              Jinna Grace Kim, CSR No. 14151
25
```