FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL
Andres Varela on 01/12/2024

```
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3

 4   FRANK BENAVENTE; and NICOLE VENTRESS, )
                                           )
 5              Plaintiffs,                )
                                           )
 6              vs.                        )Case No.
                                           )5:23-CV-00266-SSS-KK
 7   ALBERT ALVARADO; CITY OF ONTARIO;     )
     and DOES 1 through 10, inclusive,     )
 8                                         )
                Defendants.                )
 9   _____)

10

11

12

13

14             REMOTE VIDEOCONFERENCE DEPOSITION OF

15                         ANDRES VARELA

16                   FRIDAY, JANUARY 12, 2024

17

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.: 34660
```

| | | |
|---|---|---|
| 1 | Q. | Okay.  Is there any reason why you can't have your |
| 2 | | deposition taken today, give your best testimony? |
| 3 | A. | No. |
| 4 | Q. | Do you understand you're here to discuss the |
| 5 | | officer-involved shooting of Mr. Benavente? |
| 6 | A. | Yes. |
| 7 | Q. | Do you recall the date of the incident? |
| 8 | A. | February 22 of 2021. |
| 9 | Q. | And do you recall approximately what time it |
| 10 | | occurred? |
| 11 | A. | Yes. |
| 12 | Q. | What time was it? |
| 13 | A. | Approximately 11:55 p.m. |
| 14 | Q. | Did you use any force during the incident? |
| 15 | A. | No. |
| 16 | Q. | Do you know if anyone else used force during the |
| 17 | | incident? |
| 18 | A. | Can you clarify that? |
| 19 | | Do you mean at the time or after reviewing my |
| 20 | | body-worn? |
| 21 | Q. | Right.  As you sit here today, do you know if anyone |
| 22 | | else used force during the incident? |
| 23 | A. | Yes. |
| 24 | Q. | Who was that? |
| 25 | A. | Corporal Alvarado. |

Page 10

1   Q.   And do you know what type of force he used?
2   A.   Yes.
3   Q.   What type of force?
4   A.   He discharged his firearm.
5   Q.   Is that classified as deadly force?
6   A.   Yes.
7   Q.   Do you know how many times he discharged his firearm
8   as you sit here today?
9   A.   Yes.
10  Q.   How many?
11  A.   Three times.
12  Q.   During the incident do you know how many times he
13  discharged his firearm?
14  A.   During the incident I believed it was two shots.
15  Q.   Is it fair to say that they occurred in rapid
16  succession?
17  A.   Yes.
18  Q.   Did you review any documents in preparation for
19  today?
20  A.   Yes.
21  Q.   What did you review?
22  A.   My transcript and body-worn camera.
23  Q.   By transcript, do you mean the transcript of your
24  interview with the detectives?
25  A.   Yes.

1    Q.   Right. Would you have considered him a supervisor
2  of the officers that were involved in the pursuit?
3    A.   Yes.
4    Q.   And he was the only corporal in the officers that
5  were involved in the pursuit; right?
6    A.   During that time, yes.
7    Q.   And the other officers that were involved, their
8  rank was officer?
9    A.   Yes.
10   Q.   What other officers were involved in the pursuit
11  besides you and Corporal Alvarado?
12   A.   From my knowledge during the pursuit or now?
13   Q.   Of what you know now.
14   A.   What I know now, Officer Escobar was driving his
15  unit and Corporal Alvarado was in the passenger seat of that
16  vehicle.  He was training Officer Escobar at that time, and
17  Officer Vasquez Lopez was driving the third vehicle by
18  himself.
19   Q.   And I take it you knew that Officer Escobar and
20  Corporal Alvarado were in the second unit?
21   A.   Yes.
22   Q.   Is it fair to say that you found out later that
23  Officer Vasquez Lopez was also involved in the pursuit?
24   A.   Yes.  At a later time.
25   Q.   Prior to the day of the incident, had you ever had

Page 26

```
 1      A.   No.
 2      Q.   Is it fair to say that you don't know what
 3   Mr. Benavente was thinking at the time of the incident?
 4      A.   Yes.
 5      Q.   In other words, you didn't know what was going on in
 6   his state of mind at the time?
 7      A.   No.  Because my traffic stop was for a simple tinted
 8   window violation.  So most individuals pull over for that
 9   type of minor incident.
10           So I -- a million things were going through my
11   head.
12      Q.   Let me I guess go to that traffic stop.
13           Did you initiate the traffic stop?
14      A.   Yes.
15      Q.   Did Corporal Alvarado tell you to initiate the
16   traffic stop?
17      A.   No.
18      Q.   Do you recall Corporal Alvarado communicating with
19   you through the open windows of the patrol vehicles?
20      A.   I know we communicated.  I just don't recall the
21   conversation we had.
22      Q.   So was your patrol vehicle and the red car stopped
23   at a red light on Mountain and at the Fourth Street light?
24      A.   Yes.
25      Q.   Was the red car already next to you when Corporal
```

Page 30

1    MR. TOUCHSTONE:  The windshield; is that what you
2 said?
3    MR. SINCICH:  Yeah, the windshield.
4    THE WITNESS:  I saw the front driver window being
5 tinted.  I'm not sure about the windshield.
6 BY MR. SINCICH:
7    Q.  I could be wrong.  I thought that there was some
8 kind of percentage of tint that was allowed on the driver and
9 passenger front windows.
10         Do you recall if that's allowed or not?
11    A.  I don't recall.
12    Q.  So your intent was to pull him over and to give him
13 the ticket for having the tint on his windows?
14    A.  No.  My intent was to pull him over and advise him
15 about the tinting, possibly give him a ticket.  I didn't make
16 that decision yet.
17         I just saw the tint.  I was going to pull him over.
18 I always give individuals tickets for tinted windows.
19    Q.  And I believe you said you were the primary vehicle
20 in the pursuit; right?
21    A.  Yes.
22    Q.  And I know you mentioned that your focus has been on
23 the subject vehicle.
24         But what are the responsibilities of the primary
25 vehicle?

FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL
Andres Varela on 01/12/2024

Page 32

1    Q.    Do you know how long the pursuit lasted
2    approximately?
3    A.    I would estimate maybe five to seven minutes.
4    Q.    And when you say five to seven minutes, for what
5    location are you starting that kind of mental timer?
6    A.    From Fourth and San Antonio, I would probably
7    estimate.
8    Q.    So from Fourth and San Antonio until the
9    officer-involved shooting, that was between five and seven
10   minutes, approximately?
11   A.    I would estimate that.
12   Q.    And I'm not as familiar with the area.
13         Are you familiar with that area?
14   A.    Yes.
15   Q.    Do you know approximately the distance between those
16   two locations from Fourth and San Antonio to the location of
17   officer-involved shooting accounting for the fact that you
18   guys went up to the bridge and then made the U-turn?
19   A.    I wouldn't be able to give you distance, the amount
20   of distance for that.
21   Q.    Could you give me an approximate distance?
22         I mean was this several hundred yards, or was it
23   several -- do you know?
24   A.    I can just give you it started from San Antonio and
25   Fourth all the way up to the bridge of just north of Sixth

Page 34

```
 1    Q.   I understand that he stopped on the bridge that goes
 2  over the 10 Freeway on San Antonio; is that correct?
 3    A.   Momentarily, yes.
 4    Q.   And when he stopped on the bridge, did you also have
 5  occasion to stop behind him?
 6    A.   I'm sorry.  You broke up.
 7         Can you repeat that.
 8    Q.   After he stopped on the bridge, did you also have
 9  occasion to stop behind him?
10    A.   Momentarily, yes.
11    Q.   And did you shine your spotlight on him?
12    A.   Yes.
13    Q.   Did you exit the vehicle at that time?
14    A.   No.
15    Q.   Why not?
16    A.   Because he ended -- Mr. Benavente continued in the
17  red car to make a U-turn and never had a chance to exit the
18  vehicle.
19    Q.   How long was he stopped on San Antonio on the
20  bridge?
21    A.   Sorry.  You broke up.
22         San Antonio and what?
23    Q.   How long was he stopped for on the bridge on San
24  Antonio?
25         MR. TOUCHSTONE:  Let me clarify.  There is no bridge
```

Page 43

1    Q.   And at that time just before you're turning left on
2  Sixth Street, did you see any other patrol vehicles coming
3  north on San Antonio?
4    A.   I don't recall.
5    Q.   Did you know at the time based off of your training
6  and experience in that vehicle pursuit that was being put out
7  over the radio, that there was going to be additional
8  officers joining as backup?
9    A.   Yes.  I was aware more officers were going to
10 assist.
11       And did you ever hear any officers over the radio
12 state that they were going to -- come.
13   A.   I don't recall, but I do recall the MDC our mobile
14 data computer seeing a lot of people getting added to the
15 call.  So I knew people were coming.  We have CADS our call
16 log for officers and their call sign.  So I knew additional
17 officers were being -- were heading over to my direction, to
18 my location.
19   Q.   Is that a large patrol area that you guys were in
20 charge of?
21   A.   Yes.
22   Q.   For instance, when you saw other officers being
23 added to the call, did you anticipate that they would be able
24 to join the call within a matter of a minute or so?
25       MR. TOUCHSTONE:  Objection.  Foundation;

Page 45

1   attempt to get the pursuit to slow down and just maintain
2   visual with the air support?
3        A.   That's a tactic.  However, during the pursuit the
4   red vehicle that Mr. Benavente was driving at a high rate of
5   speed on northbound on San Antonio.  So he almost collided
6   into a civilian that was driving westbound.
7             So at this point I was unsure if he was under the
8   influence of drug or if he was just committed a crime an
9   trying to get away from me for some reason.
10            Because again, it was just a simple vehicle code
11  violation.  So my -- as an officer, if the pursuit doesn't
12  exceed my driving capabilities, I continue the pursuit and
13  then usually a supervisor, if they deem, to make that
14  decision and start, hey, well, if we have an area overhead,
15  then possibly, they can say we're going to cancel the pursuit
16  or fall back and have the air unit visually watch the car.
17            However, I do -- in my experience, I do know when
18  we have cars -- we have pursuits that people that are driving
19  at high rates of speed almost collide into individuals which
20  Mr. Benavente was doing and driving on the wrong side of the
21  road on Sixth Street, driving to oncoming traffic.
22            Usually we start taking into account possibly maybe
23  he's under the influence of alcohol or drugs.  So with those
24  types of pursuits, we don't usually cancel those pursuits or
25  let our air unit follow because just the danger to the

Page 49

```
 1      A.   Yes.  On my backdrop I was looking at, I didn't see
 2   anybody.
 3      Q.   And was there any people in vehicles on Beverly?
 4      A.   Not to my knowledge.
 5      Q.   When you were on --
 6           MR. TOUCHSTONE:  You cut out, Marcel.
 7           I'm sorry.
 8   BY MR. SINCICH:
 9      Q.   Oh, no problem.
10           When you were on Beverly, is it fair to say that the
11   red car stopped about halfway down Beverly towards the
12   cul-de-sac?
13      A.   I would estimate that.
14      Q.   And I believe I don't know if it was your statement
15   or someone else's.  They said it was approximately four
16   houses counting the houses on the right-hand side, four
17   houses down?
18      A.   I wouldn't be able to say if it was four houses or
19   not.
20      Q.   When you first turned on Beverly, you didn't know it
21   was a dead end cul-de-sac?
22      A.   Initially, no.
23      Q.   How far down Beverly did you get before you were
24   able to identify that it was a dead end cul-de-sac?
25      A.   I would say as soon as I made that turn, I didn't
```

Page 52

1  to my -- I would assume he was going to either exit, get out
2  the vehicle and run or make another U-turn.
3     Q.   Okay.  And approximately what was the distance that
4  you stopped from the red car on Beverly?
5     A.   I would estimate it to be 15 feet, possibly 20
6  feet.
7     Q.   Okay.  Approximately -- strike that.
8          When you stopped on Beverly was the red car still
9  stopped?
10    A.   Yes.
11    Q.   And at some point after you stopped, did the red car
12 go in reverse?
13    A.   Yes.
14    Q.   Approximately how long when you stopped for before
15 the red car went in reverse?
16    A.   I would estimate a second.
17    Q.   Okay.  And approximately how long was it from the
18 time that you first saw the red car stopped to the time that
19 you came to a stop?
20    A.   Can you repeat that?  I'm sorry.
21    Q.   Yeah.  From the time that you saw the red car come
22 to a stop to the time that you came to a stop, approximately
23 how much time passed?
24    A.   Short amount of time.  I would say no more than two
25 seconds, maybe even a second.

1    Q.   Did you attempt to get out of your vehicle at that
2  point in time?
3    A.   No.
4    Q.   Why not?
5    A.   At that point I wasn't looking at my -- through the
6  passenger window of my vehicle at the red car that
7  Mr. Benavente was driving.
8    Q.   And then the red car continued to go in reverse?
9    A.   Yes.
10   Q.   Did you get out of your vehicle after it continued
11 to go in reverse when it was no longer directly parallel with
12 you?
13   A.   No.
14   Q.   Why not?
15   A.   Because as he was parallel and he drove past me, I
16 was able -- he went out of the sight.  Mr. Benavente's red
17 vehicle was out of view, out of sight, and I instantly heard
18 what I assumed to be -- he collided into Officer Escobar and
19 Alvarado's vehicle and followed up by two quick pops.
20   Q.   Is it fair to say that what was going through your
21 mind at the time that you saw the red vehicle continuing to
22 reverse past your vehicle was that he was going to continue
23 to flee in the vehicle?
24   A.   I assumed he was trying to disable my vehicle or
25 hurt me, and when he continued and I heard the second

Page 58

1  vehicles getting disabled.
2          Is it fair to say that you've probably seen vehicles
3  being disabled if they got into a traffic collision on the
4  freeway?
5      A.  On the freeway or on the streets.
6      Q.  And typically, those occurrences happen when both
7  vehicles are traveling at a high speed?
8          MR. TOUCHSTONE:  Vague and ambiguous as to high
9  speed.
10         THE WITNESS:  Not typically.  I've seen some pretty
11 odd collisions where there's been parking -- private parking
12 lots where a parked car gets disabled by a car just the
13 angle.  I'm not a mechanic, but I have seen it.
14         It's been very -- so it's odd.
15 BY MR. SINCICH:
16     Q.  Okay.  Approximately how fast would you estimate the
17 red vehicle was going in reverse from the stopped position
18 until the time that it impacted your vehicle?
19     A.  After reviewing my transcript, I estimated to be 20
20 miles to 30 miles-per-hour.
21     Q.  Outside of reviewing your transcript, do you have a
22 recollection of how fast you believe it was going?
23     A.  Can you say it one more time?  I'm sorry.
24     Q.  Outside of reviewing your transcript, do you have a
25 recollection of how fast you believe it was going?

1    A.   Yes.

2    Q.   How fast do you think it was going?

3    A.   Approximately 20 to 30 miles.

4    Q.   It's your belief that the vehicle went from the

5    stopped position to 30 miles-per-hour in approximately 15

6    feet?

7         MR. TOUCHSTONE:  Assumes facts not in evidence; it's

8    also an incomplete hypothetical question as phrased; lacks

9    foundation; calls for speculation.

10        You can answer.

11        THE WITNESS:  It was an estimation.  Anywhere

12   between 20 miles-per-hour and 30 because the -- when he --

13   when the red vehicle reversed, it came at a high rate of

14   speed and hit me instantly -- that collision was very

15   instant.

16   BY MR. SINCICH:

17   Q.   Okay.  Now what portion of the red vehicle came into

18   contact with your vehicle?

19   A.   The red vehicle's rear bumper area, rear panel

20   driver side panel area hit with my passenger I would say

21   headlight of my vehicle.

22   Q.   So let me back up.  The red vehicle stopped on the

23   east side of Beverly; is that fair?

24   A.   Yes.  East curbline.

25   Q.   And you were attempting to park at an offset in

```
 1   to the time that Benavente was pulled out of the red car?
 2       A.   I am unsure.  I would estimate from me exiting my
 3   vehicle and officers developing a tactical plan, that whole
 4   incident -- five to seven minutes.
 5       Q.   After Mr. Benavente was pulled out of the vehicle,
 6   did any officer render medical aid?
 7            MR. TOUCHSTONE:  Vague and ambiguous as to medical
 8   aid.
 9            Go ahead.
10            THE WITNESS:  Can you clarify that, sir.
11   BY MR. SINCICH:
12       Q.   You got training in providing medical aid POST
13   Learning Domain 30 --
14       A.   Can you repeat that?  You kept breaking up.
15            I'm sorry.
16       Q.   You received training in providing medical aid
17   through POST Learning Domain 37; correct?
18       A.   Yes.  We received training.
19       Q.   Did any officer provide medical aid as trained after
20   Mr. Benavente was pulled from the vehicle?
21       A.   I did not see anybody.
22       Q.   Did Mr. Benavente was handcuffed and searched,
23   though; correct?
24       A.   Yes.
25       Q.   Okay.  How long after Mr. Benavente was pulled from
```

```
 1                        CERTIFICATE

 2                             OF

 3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5          I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8          That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10          That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12          That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15          Further, that the foregoing is an accurate

16   transcription thereof.

17          I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21          IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  January 12, 2024.

23

24                          _____
                            Jinna Grace Kim, CSR No. 14151
25
```