1  **LAW OFFICES OF DALE K. GALIPO**
   Dale K. Galipo, Esq. (SBN 144074)
2  dalekgalipo@yahoo.com
   Marcel F. Sincich, Esq. (SBN 319508)
3  msincich@galipolaw.com
   21800 Burbank Boulevard, Suite 310
4  Woodland Hills, CA 91367
   Telephone: (818) 347-3333
5  Facsimile: (818) 347-4118

6  *Attorneys for Plaintiffs*

7

8

9              **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11

12  FRANK BENAVENTE; and NICOLE          Case No.: 5:23-cv-00266-SSS-DTBx
13  VENTRESS,
                                         [*Honorable Sunshine S. Sykes*]
14              Plaintiffs,              *Magistrate Judge David T. Bristow*

15       vs.                            **PLAINTIFFS' STATEMENT OF
                                        GENUINE DISPUTES OF
16  ALBERT ALVARADO; CITY OF            MATERIAL FACT**
    ONTARIO; and DOES 1 through 10,
17  inclusive,                          [*Filed concurrently:* Plaintiffs'
                                        Opposition to Defendants' Motions for
18              Defendants.             Summary Judgment; Memorandum of
                                        Points and Authorities in support
19                                      thereof; Plaintiffs' Statement of
                                        Genuine Disputes of Material Fact;
20                                      Plaintiffs' Statement of Evidentiary
                                        Objections, *and Proposed Order
21                                      thereto*; Plaintiffs' Additional Material
                                        Facts; Declaration of Marcel F. Sincich
22                                      *and exhibits thereto*; Declaration of
                                        Roger Clark *and exhibits thereto*]
23
                                        MSJ Date:   May 17, 2024
24                                      Time:       2:00 p.m.
                                        Dept.:      2, 2nd Floor
25

26

27

28

1

## PLAINTIFFS' GENUINE DISPUTES OF MATERIAL FACT

2

3

4

Pursuant to Local Rule 56-2, and this Court's Civil Standing Order (Doc. 10), Plaintiffs FRANK BENAVENTE and NICOLE VENTRESS respectfully submit this Statement of Genuine Disputes of Material Fact.

5

6

7

8

9

10

Please take notice that, where page numbers exist in the original documents, the citations to page numbers to Plaintiffs' Supporting Evidence below references to the page of the original document prior to being cut down to the cited pages only (i.e., not the pdf page number). If the BATES number is utilized to pin-cite in the record, it will specifically be annotated as such.

11

12

DATED:  April 12, 2024                    **LAW OFFICES OF DALE K. GALIPO**

13

14

15

By:          *Marcel F. Sincich*
Dale K. Galipo, Esq.
Marcel F. Sincich, Esq.
*Attorney for Plaintiffs*

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' GENUINE DISPUTES OF MATERIAL FACT**

| | Defendants' Undisputed Material Fact and Supporting Evidence | Plaintiffs' Genuine Disputes of Material Fact |
|---|---|---|
| **1.** | Shortly before midnight on February 22, 2021, members of the Ontario Police Department attempted to initiate a traffic stop of Joseph Benavente who was driving a car with what appeared to be illegally tinted windows.<br><br>Moving Party's Evidence: Benavente Depo at 12; Alvarado Depo at 6, 30; Vasquez Lopez Depo at 6; Varela Depo at 9, 26, 30. | **Disputed** that Benavente had "illegally tinted windows" and that officers initiate a traffic stop because Benavente appeared to have "illegally tinted windows."<br>• Defendants do not provide support that the window tint was illegal.<br>• The car did not have a tinted window violation. (**Exh 6, Alvarado Interview** at BATES 232:39-40, to Sincich Decl ¶6; **Exh. 15, Incident Photos** at 9, to Sincich Decl ¶15.)<br>• Varela does not know the vehicle code or what the vehicle code says related to tinted windows. (**Exh 3, Varela Depo** at 28:19-21, 28:10-17, to Sincich Decl ¶3; *see* Cal. Veh. Code §26708(d).)<br>• Varela does not know the vehicle code related to tinted windows. (**Exh 3, Varela Depo** at 28:22-24, to Sincich Decl ¶6.)<br>• Alvarado first claimed that he did not know the reason for the traffic stop, then Alvarado claimed the pullover was for the red car running a red light when it turned eastbound on 4th from Mountain Ave. (**Exh 1, Alvarado Depo** at 31:11-18, to Sincich Decl ¶1.)<br>• Nevertheless, the primary officer testified that the light was green. (*See supra*, **PAMF** 32.)<br>Otherwise, **Undisputed** for the purpose of this Opposition to Defendants' Motion for Summary Judgment ("Motion"). |

| | Defendants' Undisputed Material Fact and Supporting Evidence | Plaintiffs' Genuine Disputes of Material Fact |
|---|---|---|
| **2.** | Unbeknownst to the officers, Benavente was a recent parolee who had been in-and-out of both the juvenile justice and adult incarceration systems for most of his life and had only been in California for six days.<br><br>Moving Party's Evidence: Benavente Depo at 32, 34, 36, 44-50, 53, 60. | **Disputed** as Defendants admittedly list this information as unknown to Alvarado and is therefore irrelevant to the analysis here.<br>**Disputed** to the extent that Defendants evidence does not support their contention that Benavente was "a recent parolee." Defendants do not provide support for this contention.<br>**Disputed** to the extent that Defendants infer that Benavente had been in custody for most of his life. Defendants do not provide support for this contention.<br>• Benavente was in foster care early in his life. (See Defendants Exhibit B at 44:5-17.) |
| **3.** | Rather than pulling over, Benavente led the officers on a five to seven minute high-speed chase in which he drove on the wrong side of the road, almost t-boned a civilian motorist at an intersection, stopped and then performed a U-turn in an attempt to escape.<br><br>Moving Party's Evidence: Alvarado Depo at 33, 35; Vasquez Lopez Depo at 11; Varela Depo at 32, 34, 43, 45; *Exhibit* G-1 at 0:13-0:30), *Exhibit* G-3 at 0:45. | **Disputed** that Benavente almost t-boned a civilian motorist.<br>• The truck almost T-boned the red car as it passed in front of the truck. The truck stopped and Benavente went in front of the truck. (**Exh 1, Alvarado Depo** at 33:14-25, to Sincich Decl ¶1; **Exh. 6, Alvarado Interview** at BATES 220:33-36, to Sincich Decl ¶6.)<br>**Disputed** that this was a "high-speed chase." (*See supra*, **PAMF 39**: Benavente stopped several times during the pursuit, including on the bridge and at 6th St., and several additional times on 6th St.)<br>**Undisputed** that the "pursuit" lasted between 5-7 minutes. |
| **4.** | After attempting to evade the officers for approximately five to seven minutes, Benavente pulled into a cul-de-sac, found himself trapped, and came to an abrupt halt. | **Disputed** that Benavente "found himself trapped, and came to an abrupt halt."<br>• No video shows the car coming to an abrupt halt as opposed to merely stopping. (*See* Defendants' *Exhibit* "G-2" at 0:01-0:06.)<br>• Defendants' evidence does not |

| | Defendants' Undisputed Material Fact and Supporting Evidence | Plaintiffs' Genuine Disputes of Material Fact |
|---|---|---|
| | Moving Party's Evidence: Varela Depo at 32, 49, 52; *Exhibit* "G-2" at 0:01-0:06. | support their argument that Benavente felt trapped or came to an abrupt halt. Varela did not testify as to how Benavente was feeling. Varela did not testify that the car came to an abrupt halt. (*See* Defendants' evidence.)<br>• Officers did not know what was going on in Benavente's mind during the incident. (**Exh 3, Varela Depo** at 26:2-7, to Sincich Decl ¶3.)<br>**Undisputed** that the "pursuit" lasted between 5-7 minutes and that Benavente pulled into Beverly and stopped. |
| 5. | Believing that a foot pursuit was about to ensue, Corporal Albert Alvarado, an experienced field training officer, opened his car door and started to exit his vehicle.<br><br>Moving Party's Evidence: Alvarado Depo at 20; Varela Depo at 20. | **Disputed** that Alvarado believed there would be a foot pursuit.<br>• Alvarado knew that Benavente had stopped before and took off again and knew it *was not* going to be a foot-bail situation because Varela did not get out of his vehicle. (**Exh 1, Alvarado Depo** at 39:7-9, to Sincich Decl. ¶1.)<br>• Escobar believed it would be another U-turn, (**Exh 9, Escobar Interview** at BATES 139:29-31, to Sincich Decl. ¶9.)<br>• Alvarado saw both Benavente and Varela stop and saw Benavente start reversing. (**Exh 1, Alvarado Depo** at 38:3-5, 40:19-21, 47:23-25, to Sincich Decl. ¶1; **Exh 10, Surveillance Video** at 00:00-00:05, to Sincich Decl ¶10.)<br>• Alvarado's testimony cited by Defendants does not support nor establish whether Alvarado believed there would be a foot pursuit. (*See* Defendants Exhibit C, Alvarado Depo at 20.)<br>• Varela's testimony cited by Defendants does not mention anything |

| Defendants' Undisputed Material Fact and Supporting Evidence | Plaintiffs' Genuine Disputes of Material Fact |
|---|---|
|  | related to a foot pursuit and still would not establish Alvarado's state of mind. (*See* Defendants Exhibit F, Varela Depo at 20.)<br><br>• It would be unreasonable for "an experienced field training officer" to believe that there was going to be a foot pursuit where: (1) the car was reversing prior to Escobar's vehicle coming to a stop (**Exh 4, Handy Depo** at 149:13-20, 149:25-150:14, to Sincich Decl. ¶4); (2) Benavente never opened his car door nor indicatede that he would exit his car (**Exh 11, Vasquez-Lopez Video** at 01:00-01:15, to Sincich Decl ¶11; **Exh 18, Callahan Overlay** at 1-15, to Sincich Decl ¶18; **Exh 19, Callahan Slides** at 2, to Sincich Decl ¶19; **Exh 20, Callahan Stills** at 1-21, to Sincich Decl ¶20); and (3) a reasonable officer would not attempt to exit his vehicle if a subject vehicle is driving in the direction of the officer's vehicle (**Exh 1, Alvarado Depo** at 39:20-40:1, to Sincich Decl. ¶1).<br><br>• Alvarado previously stated, "I knew it wasn't a foot bail" because Varela did not get out of his vehicle. (**Exh 6, Alvarado Interview** at BATES 215:38, to Sincich Decl. ¶6.) And Varela did not get out of his vehicle on Beverly prior to the shots. (**Exh 26, Varela Video** at 01:40-01:50, to Sincich Decl ¶26.)<br>**Clark Decl** ¶8 – a reasonably trained officer would not have gotten out of his vehicle under these circumstances and would not believe this was going to be a foot pursuit. |

| | Defendants' Undisputed Material Fact and Supporting Evidence | Plaintiffs' Genuine Disputes of Material Fact |
|---|---|---|
| | | **Disputed** that Alvarado opened his car door and started to exit his vehicle as inferred to be prior to the impact to his unit. Defendants do not officer any support for this contention. Nevertheless, the video evidence shows Alvarado starting to exit his vehicle after the shots were fired, which is up to 4 seconds after the impact with his unit. (**Exh 11, Vasquez-Lopez Video** at 00:58-01:05, to Sincich Decl ¶11.) **Disputed** to the extent that Alvarado was "an experienced field training officer." Defendants do not officer any support for this contention. |
| 6. | When Benavente stopped for the second time, Corporal Alvarado did not know if he was going to run, surrender, or drive off again.<br><br>Moving Party's Evidence:<br>Alvarado Depo at 39. | **Undisputed** that Alvarado did not know the subjective state of mind of Benavente or Benavente's intent or motive, and undisputed that Alvarado did not know the future. **Disputed** as phrased regarding "stopped for a second time." Benavente had previously stopped according to Alvarado several times during the pursuit. (**Exh 1, Alvarado Depo** at 34:2-3, 35:15-16, 36:6-8, 37:9-15, 41:7-10, to Sincich Decl. ¶1; **Exh 3, Varela Depo** at 34:1-3, 36:13-25, 37:7-11, 39:18-20, 59:22-24, to Sincich Decl. ¶3; **Exh 6, Alvarado Interview** at BATES 215:32, 215:46-49, 215:51-52, 221:17-19, to Sincich Decl. ¶6; **Exh 9, Escobar Interview** at BATES 139:11-12, to Sincich Decl. ¶9.) **Disputed** as phrased. Alvarado stated, "I knew it wasn't a foot bail" because Varela did not get out of his vehicle. (**Exh 6, Alvarado Interview** at BATES 215:38, to Sincich Decl. ¶6; **Exh 10,** |

| | Defendants' Undisputed Material Fact and Supporting Evidence | Plaintiffs' Genuine Disputes of Material Fact |
|---|---|---|
| | | **Surveillance Video** at 00:00-00:05, to Sincich Decl ¶10.). |
| 7. | However, instead of surrendering himself, Benavente threw his car into reverse, revved his engine, accelerated backwards at a high rate of speed while significantly turning his vehicle directly toward Corporal Alvarado's patrol vehicle, striking both the front of Corporal Alvarado's patrol vehicle as well as the door Corporal Alvarado was standing behind.<br><br>Moving Party's Evidence:<br>Alvarado Depo at 12-13, 27; Vasquez Lopez Depo at 18-19; Varela Depo at 49, 52, 56, 58-59; *Exhibit* "G-2" at 0:01-0:06; see Exhibits "H", "I", and "J"; *Exhibit* "K" at 8-9. | **Disputed** that Benavente "threw his car into reverse" as opposed to placing the car in reverse. Defendants do not officer any support for this argument stated as fact.<br>**Disputed** that Benavente "revved his engine." Defendants do not officer any support for this contention. Defendants offer no testimonial support that the car was revving at any time and the videos do not support Defendants' contention either.<br>**Disputed** that Benavente accelerated backwards "at a high rate of speed." Defendants do not officer any objective support for this contention.<br>● Alvarado claims that the vehicle was moving approximately 20 mph (which is not "high-speed") but nevertheless is false. (*See* **Exh 1, Alvarado Depo** at 12:22-13:7, to Sincich Decl. ¶1.)<br>● Defendants' claim is contradicted by objective evidence and their own expert testimony. The car was slowing down prior to impacting Vasquez-Lopez's unit. (**Exh 2, Vasquez-Lopez Depo** at 10:18-20; **Exh 5, Callahan Depo** at 33:3-10, 61:8-11 (14-16 mph at impact with Escobar unit), 62:1-4 (8-10 mph at impact with Vasquez-Lopez unit); **Exh 17, EDR** at 5, to Sincich Decl ¶17.)<br>● The car had been stopped at the time of the shots. (**Exh 1, Alvarado Depo** at 27:5-9 (Alvarado claimed there was approximately 3 seconds from Alvarado seeing the car backing up to firing his |

| | Defendants' Undisputed Material Fact and Supporting Evidence | Plaintiffs' Genuine Disputes of Material Fact |
|---|---|---|
| | | first shot), 48:25-49:2, 55:20-24, 56:7-9, 56:18-20 (the yellow marking identifies the three bullets that went through the driver's window of the red car), 56:21-23, 62:21-63:9, to Sincich Decl. ¶1; **Exh 2, Vasquez-Lopez Depo** at 7:11-21, 8:8-10, 22:4-8, 36:12-15 (after the shots, the red car was still touching Vasquez-Lopez's unit), 43:2-5 (was stopped immediately after the impact), to Sincich Decl. ¶2; **Exh 4, Handy Depo** at 80:3-6, 80:12-21 (shots fired 1-2 seconds after collision), 83:7-13, 121:7-11, 155:16-17 (After the collision, the 3 gunshots are heard from Vasquez-Lopez's video), 155:21-23 (the first time the car and Vasquez-Lopez's vehicle is shown in the video shows that the vehicles are stopped and still touching), to Sincich Decl. ¶4; **Exh 5, Callahan Depo** at 44:6-14, 50:14-51:2, 64:1-13, 65:3-5, to Sincich Decl. ¶5; **Exh 7, Vasquez-Lopez Interview** at BATES 1894:864-867 (the back bumper of the red car struck the front bumper of Vasquez-Lopez's vehicle), to Sincich Decl ¶7; **Exh 10, Surveillance Video** at 00:00-00:10 (3 seconds after beginning to reverse, the car is stopped), to Sincich Decl ¶10; **Exh 17, EDR** at 5-6, to Sincich Decl ¶17 (the EDR data shows the car coming to a stop for about 1 second from -0.5 to -0.4, then reversing at a slow speed at -0.4 while turning slightly to the right, then turn left, then turn right and engage the brakes for approximately 1 seconds prior to stopping).)<br>• From beginning to reverse on |

| | Defendants' Undisputed Material Fact and Supporting Evidence | Plaintiffs' Genuine Disputes of Material Fact |
|---|---|---|
| | | Beverly to stopping after the impact with Vasquez-Lopez's unit, Benavente moved about 50 feet in 4.2 seconds, which is an average speed of about 8.5 mph. (**Exh 5, Callahan Depo** at 54:13-24, to Sincich Decl. ¶5.)<br>• The car had been stopped at the time of the shots. (*See supra*, **PAMF** 69-70.)<br>**Disputed** that Benavente turned "his vehicle directly toward Corporal Alvarado's patrol vehicle." Defendants do not officer any support for this contention.<br>• Defendants' claim is contradicted by objective evidence and their own expert testimony. Alvarado saw both Benavente reversing and instructed Escobar to speed up. (**Exh 1, Alvarado Depo** at 38:3-5, 40:19-21, 47:23-25, to Sincich Decl. ¶1; **Exh 6, Alvarado Interview** at BATES 215:35-36, 216:18-19, 221:1-3, to Sincich Decl. ¶6; **Exh 9, Escobar Interview** at BATES 159:33-34, to Sincich Decl. ¶9.) Then the car turns right, consistent with avoiding a direct impact with Escobar's unit, and begins to break. (**Exh 5, Callahan Depo** at 59:4-19, 65:18-25.)<br>• The car had been stopped at the time of the shots. (*See supra*, **PAMF** 69-70.)<br>**Disputed** that Benavente struck Corporal Alvarado's door. Defendants do not officer any support for this contention.<br>• Alvarado aggressively kicked his door open striking the reversing car. Alvarado. (**Exh 6, Alvarado Interview** at BATES 223:45-46, to Sincich Decl. ¶6.)<br>• Alvarado did not even know his |

| Defendants' Undisputed Material Fact and Supporting Evidence | Plaintiffs' Genuine Disputes of Material Fact |
|---|---|
| | door contacted the car until after the incident. (**Exh 1, Alvarado Depo** at 29:4-8, to Sincich Decl ¶1.) **Disputed** that "Corporal Alvarado was standing behind" his door. Defendants do not officer any support for this contention. Alvarado was inside his vehicle. (*See supra*, **PAMF** 66-67.) **Clark Decl** ¶8. |
| **8.** As Corporal Alvarado stepped out of his car, he saw Benavente's reverse lights come on, but he had no time to get back in the car.<br><br>Moving Party's Evidence:<br>Alvarado Depo at 26, 46-48. | **Disputed** that "Corporal Alvarado stepped out of his car" then "saw Benavente's reverse lights come on." Defendants' contention is not possible.<br>• Alvarado's claim that he was out of his unit for 3 seconds prior to the shots is not possible. Three seconds prior to the first shot, Escobar's vehicle had not even stopped yet. (*See* **Exh 1, Alvarado Depo** at 11:8-10, 46:25-47:2, to Sincich Decl. ¶1; **Exh 10, Surveillance Video** at 00:00-00:05, to Sincich Decl ¶10.)<br>• Alvarado saw the car in the stopped position and saw the car reversing. (**Exh 1, Alvarado Depo** at 38:3-5, 39:7-9, 40:19-21, 47:23-25, to Sincich Decl. ¶1; **Exh 6, Alvarado Interview** at BATES 216:11-17, to Sincich Decl ¶6; **Exh 10, Surveillance Video** at 00:00-00:05, to Sincich Decl ¶10; **Exh 11, Vasquez-Lopez Video** at 00:58-01:05, to Sincich Decl ¶11; **Exh 18, Callahan Overlay** at 1-15, to Sincich Decl ¶18; **Exh. 19, Callahan Slides** at 2, to Sincich Decl ¶19.)<br>• Alvarado's sole focus was on the car. (**Exh 4, Handy Depo** at 73:5-8, to Sincich Decl. ¶4.)<br>• "By the time we got up to, we were going north bound Beverly, my attention |

| Defendants' Undisputed Material Fact and Supporting Evidence | Plaintiffs' Genuine Disputes of Material Fact |
|---|---|
| | was solely on [the] suspect vehicle." (**Exh 6, Alvarado Interview** at BATES 222:43-44, to Sincich Decl ¶6.) **Disputed** that Alvarado was out of his vehicle at the time of his shots. Alvarado was in his vehicle at the time of the shots. Alvarado was not about to be crushed by the car because he was in his unit, and was not in the threshold of the door, was not in the "V" of the door and was not standing outside his vehicle when he used deadly force. (*See supra*, **PAMF** 66-67.) **Disputed** that Corporal Alvarado had no time to reposition. Alvarado had time to perceive whether there was a potential threat and then react to his perceptions. (**Exh 4, Handy Depo** at 132:13-19, to Sincich Decl ¶4.) The first shot was fired 1.1 seconds after that impact. (**Exh 1, Alvarado Depo** at 27:5-9 (there was approximately 3 seconds from Alvarado seeing the car backing up to firing his first shot), to Sincich Decl ¶1; **Exh 2, Vasquez-Lopez Depo** at 7:11-21, to Sincich Decl ¶2; **Exh 4, Handy Depo** at 80:3-6, 80:12-21 (shots fired 1-2 seconds after collision), 155:16-17 (after the collision, the 3 gunshots are heard from Vasquez-Lopez's video), to Sincich Decl ¶4; **Exh 5, Callahan Depo** at 44:6-9, to Sincich Decl ¶5); **Exh 10, Surveillance Video** at 00:00-00:05 (3 seconds after beginning to reverse, the car is stopped), to Sincich Decl ¶10.) - The car had been stopped at the time of the shots. (*See supra*, **PAMF** 69-70.) **Clark Decl** ¶8. |

| | Defendants' Undisputed Material Fact and Supporting Evidence | Plaintiffs' Genuine Disputes of Material Fact |
|---|---|---|
| **9.** | Finding himself sandwiched between his open patrol car door and the frame of his vehicle, and believing he was about to be crushed to death, Corporal Alvarado fired three shots in rapid succession at Benavente's car from a distance of approximately one to four feet.<br><br>Moving Party's Evidence: Alvarado Depo at 6, 8, 12, 29, 48-49; Vasquez Lopez Depo at 6-7, 9, 36-38; Exhibit E; Varela Depo at 9-10; *Exhibit* "G-2" at 0:01-0:06; *Exhibit* "G-3" at 0:58-1:00; see *Exhibit* "K" at 8-9. | **Disputed** that Alvarado was in a position to be "sandwiched between his open patrol car door and the frame of his vehicle," disputed that Alvarado believed he was about to be crushed, and disputed that Alvarado fired from one to three feet.<br>• Alvarado was in his vehicle at the time of the shots; was not in the "V" of his door; was not standing outside his unit; Vasquez-Lopez did not see Alvarado outside his unit; Vasquez-Lopez stated Alvarado was in the unit; Alvarado was never struck, crushed, or harmed. (*See supra*, **PAMF** 66-67.)<br>• The car had been stopped at the time of the shots. (*See supra*, **PAMF** 69-70.)<br>• Alvarado was not in the path of the car when he used deadly force. (**Exh 13, Autopsy Report** at 263-64, 269, to Sincich Decl ¶13: gunshot wound to the right side of the neck, trajectory left to right and downwards; gunshot wound to the left upper chest trajectory left to right and downwards; and gunshot wound to the posterior aspect of the left arm, trajectory left to right and upwards); **Exh 14, Autopsy Photos** at 1-2, to Sincich Decl ¶14; **Exh 15, Incident Photos** at 9, to Sincich Decl ¶9; **Exh 16, Screenshots from Vasquez-Lopez Video** at 12-22, to Sincich Decl ¶16; **Exh 27, Alvarado Video** at 00:00, to Sincich Decl ¶27.)<br>**Disputed** that Alvarado fired from 1-3 feet away.<br>• Alvarado was not moving when Alvarado fired his weapon. (**Exh 1, Alvarado Depo** at 8:2-4 ("I was |

| Defendants' Undisputed Material Fact and Supporting Evidence | Plaintiffs' Genuine Disputes of Material Fact |
|---|---|
| | stationary"), to Sincich Decl ¶1.)<br>• The car had been stopped at the time of the shots. (*See supra*, **PAMF** 69-70.)<br>• Alvarado was not about to be crushed by the car because he was in his unit, and was not in the threshold of the door, was not in the "V" of the door and was not standing outside his vehicle when he used deadly force. (*See supra*, **PAMF** 66-67.)<br>**Disputed** as phrased. Alvarado erroneously claimed he was standing at the car's rear driver's quarter panel, aiming north, between the rear door and rear bumper, when he shot "towards the back driver's door, aiming at the driver's seat" but all shots were actually through the driver window.<br>• **Exh 1, Alvarado Depo** at 9:4-6 ("towards the back driver's door, aiming at the driver's seat"), 9:11-16, 14:10-12, 28:4-6, 28:10-15, 28:19-22, 29:16-21, 30:9-12, 62:1-6 (pointing north), to Sincich Decl. ¶1.<br>• **Exh 1, Alvarado Depo** at 56:18-20 (yellow marking identifies the three bullets that went through the driver's window of the red car), 56:21-23, 62:21-63:9, to Sincich Decl. ¶1.<br>• **Exh 11, Vasquez-Lopez Video** at 00:58-01:05, to Sincich Decl ¶11.<br>• **Exh 13, Autopsy Report** at 263-64, 269, to Sincich Decl ¶13: gunshot wound to the right side of the neck, trajectory left to right and downwards; gunshot wound to the left upper chest trajectory left to right and downwards; and gunshot wound to the posterior aspect of the left arm, trajectory left to |

| | Defendants' Undisputed Material Fact and Supporting Evidence | Plaintiffs' Genuine Disputes of Material Fact |
|---|---|---|
| | | right and upwards.<br>• **Exh 14, Autopsy Photos** at 1-2, to Sincich Decl ¶14.<br>• **Exh 15, Incident Photos** at 9, to Sincich Decl. ¶15.<br>• **Exh 16, Video Screenshot** at 12, to Sincich Decl. ¶16.<br>• **Exh 27, Alvarado Video** at 00:00-00:01, to Sincich Decl ¶27.<br>**Undisputed** that Corporal Alvarado fired three shots at Benavente.<br>**Undisputed** that Corporal Alvarado was not about to be crushed to death, but merely unreasonably claims to believe he was.<br>**Undisputed** that Corporal Alvarado fired three shots at Benavente. |
| 10. | Corporal Alvarado fired because he was trying to stop the threat.<br><br>Moving Party's Evidence: Alvarado Depo at 8. | **Disputed** that there was an immediate threat of death or serious bodily injury justifying deadly force.<br>• A threat here requires (1) that Alvarado is in the "V" of the door, and (2) that the vehicle was moving. (**Exh 4, Handy Depo** at 132:21-133:1, 140:8-17, to Sincich Decl ¶4; **Exh 5, Callahan Depo** at 74:7-13, to Sincich Decl ¶5.)<br>• Alvarado was in his vehicle at the time of the shots. (*See supra*, **PAMF** 66-67.)<br>• The car had been stopped at the time of the shots. (*See supra*, **PAMF** 69-70.)<br>• Alvarado was not in the path of the car when he used deadly force. (*See* Plaintiffs' Response to DUMF 9 above.)<br>• **Exh. 15, Incident Photos** at 1-15, to Sincich Decl ¶15.<br>**Clark Decl** ¶¶9, 10. |

| | Defendants' Undisputed Material Fact and Supporting Evidence | Plaintiffs' Genuine Disputes of Material Fact |
|---|---|---|
| **11.** | Benavente's car continued backwards and struck a second patrol care almost simultaneously.<br><br>Moving Party's Evidence: Alvarado Depo at 27, 63; Lopez Depo at 7, 19; see *Exhibits* "H", "I", and "J". | **Disputed** as phrased. Defendants' contention is not possible.<br>• Defendants' contention is based on the erroneous testimony of Alvarado that he fired while the car was still moving and then it continued to reverse. (*See* **Exh 1, Alvarado Depo** at 13:8:18, 63:11-13, to Sincich Decl. ¶1; but see **Exh 10, Surveillance Video** at 00:00-00:05, to Sincich Decl ¶10.)<br>• The car had been stopped at the time of the shots. (*See supra*, **PAMF** 69-70.) |
| **12.** | At this point, Benavente appeared hurt and slumped forwards toward the steering wheel.<br><br>Moving Party's Evidence: Alvarado Depo at 15. | **Undisputed** that Benavente was hurt; undisputed that the officers knew Benavente was hurt; undisputed that Benavente slumped over after being shot.<br>**Disputed** to the extent that Benavente is described as "slumped forwards towards the steering wheel." Benavente was slumped forward and to the right towards the passenger seat, generally over the center consol. (**Exh. 11, Vasquez-Lopez Video** at 08:10-08:35, to Sincich Decl ¶11.) |
| **13.** | Benavente's car, however, was still operation, was placed in drive, and began to roll forward before coming to rest against a sidewalk curb and tree.<br><br>Moving Party's Evidence: Vasquez Lopez Depo at 23; *Exhibit* "G-2" at 0:14-0:21; *Exhibit* "G-3" at 1:08-1:15. | **Disputed**. Defendants do not support their contention that the car was still operational or that the car was "placed in drive." Defendants cite two videos that merely show the vehicle slowly rolling forward and coming to rest on the curb, and Vasquez-Lopez's deposition describing the same. (*See* Defendants' Evidence.)<br>**Undisputed** that the car rolled slowly forward and came to rest against a sidewalk curb and tree. |
| **14.** | After clearing Benavente's car of a passenger and securing the | **Disputed** that the scene was not secure.<br>• Alvarado knew his shots struck |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | Defendants' Undisputed Material Fact and Supporting Evidence | Plaintiffs' Genuine Disputes of Material Fact |
|---|---|---|
| | scene, Officers made repeated calls for Benavente to exit the vehicle.<br><br>Moving Party's Evidence:<br>*Exhibit* "G-3" at 2:04-6:04. | Benavente. (*See supra*, **PAMF 87**.)<br>• Varela described it as the officers playing "a waiting game." (**Exh 8, Varela Interview** at BATES 110:28, to Sincich Decl ¶8.)<br>**Undisputed** that officers only have commands to Benavente after the use of deadly force. |
| 15. | After approximately four minutes and seeing no response from Benavente, the officers approached and observed that Benavente had been shot through the neck.<br><br>Moving Party's Evidence:<br>Vasquez Lopez Depo at 28-30; *Exhibit* "G-3" at 7:37-8:29. | **Disputed** that officer approached the red car approximately four minutes after the shooting. Disputed that the officers promptly summoned medical care and monitored Benavente in accordance with their policy and law. Officers took over 7 minutes to approach the red car.<br>• Alvarado knew his shots struck Benavente. (*See supra*, **PAMF 87**.)<br>• The shooting occurred at about 00:59-01:00 of **Exh 11, Vasquez-Lopez Video**, to Sincich Decl ¶11.<br>• Officer approached and opened Benavente's door at 08:13 of **Exh 11, Vasquez-Lopez Video**.<br>• Officers remove Benavente from the car by pulling his limp body by his left arm causing his head to hit the ground, then dragging his body across the ground at 08:42-08:45 of **Exh 11, Vasquez-Lopez Video**.<br>• Officers put Benavente's hands behind his back and handcuffed Benavente at 08:50-08:55 of **Exh 11, Vasquez-Lopez Video**.<br>• Officers searched Benavente at 09:03 of **Exh 11, Vasquez-Lopez Video**.<br>• Alvarado instructed his subordinate to "just leave him there" at 09:05-09:09 of **Exh 11, Vasquez-Lopez Video**. |

| Defendants' Undisputed Material Fact and Supporting Evidence | Plaintiffs' Genuine Disputes of Material Fact |
|---|---|
| | • Officers finished searching the car and announced it was clear at 09:10-09:11 of **Exh 11, Vasquez-Lopez Video**. |
| | • Officers turned Benavente over and continued to search him at 09:15 of **Exh 11, Vasquez-Lopez Video**. |
| | • After searching Benavente, the officer stood by and ignored Benavente, never taking his vital signs or monitoring him, never attempting to slow or stop his bleeding, and removed gloves with no intention of attempting medical aid or monitoring him at 09:30-12:10 of **Exh 11, Vasquez-Lopez Video**. |
| | • Fire allowed to approach at 12:10 (over eleven minutes after shooting) of **Exh 11, Vasquez-Lopez Video**. |
| | • OPD policy requires officer "to be trained to provide emergency medical aid" and that officer "should take appropriate steps to provide initial medical aid (e.g., first aid, CPR, use of automated external defibrillator (AED)) in accordance with their training." (**Exh 26, OPD Medical Aid and Response Policy** at 1, to Sincich Decl ¶26.) |
| | **Disputed** that officers only saw that Benavente was unresponsive once they approached the red car. |
| | - Alvarado knew his 3 shots struck Benavente, saw the injuries on Benavente's body, and knew Benavente needed medical help. (*See supra*, **PAMF** 87.) |
| | **Undisputed** that officers saw Benavente's wounds and knew he required immediate medical care. |

| | Defendants' Undisputed Material Fact and Supporting Evidence | Plaintiffs' Genuine Disputes of Material Fact |
|---|---|---|
| **16.** | Benavente was removed from the car, handcuffed, and searched for weapons.<br><br>Moving Party's Evidence: Lopez Depo at 31; Varela Depo at 69; *Exhibit* "G-3" at 8:40-9:29. | **Undisputed** that removed Benavente from the car, handcuffed Benavente, and searched him for weapons instead of providing him with medical care and delaying his obviously required medical need.<br>**Disputed** that the officers promptly summoned medical care and monitored Benavente in accordance with their policy and law. (*See* Plaintiffs' Response to DUMF No. 15 above.) |
| **17.** | Benavente was subsequently pronounced dead at the scene by responding paramedics.<br><br>Moving Party's Evidence: Alvarado Depo at 49-50; *Exhibit* "G-3" at 11:46-17:08. | **Undisputed** that Benavente was pronounced dead at the scene by responding paramedics over eleven (11) minutes after the shooting.<br>**Disputed** that the officers promptly summoned medical care and monitored Benavente in accordance with their policy and law. (*See* Plaintiffs' Response to DUMF No. 15 above.) |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' CONCLUSIONS OF LAW**

Plaintiffs object to Defendants Conclusions of Law as Defendants fail to specify which claim it corresponds to in accordance with this Court's Civil Standing Order. (Doc. 10 at 18:13-15.)

1.   **DEFENDANTS' CONTENTION**: A Motion for Summary Judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L. Ed. 2d 202 (1986).

a.   **PLAINTIFFS' RESPONSE**: Defendants' Motion must be denied because there are genuine issues of material fact and Defendants cannot show that there are no genuine disputes, and a jury can rule in favor of Plaintiffs. "The court shall grant summary judgment *if the movant shows* that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). "More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

2.   **DEFENDANTS' CONTENTION**: It is the moving party's burden to show it is entitled to summary judgment — that "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511; see also *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998); *Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.,* 707 F.2d 1030, 1033 (9th Cir. 1983).

a.   **PLAINTIFFS' RESPONSE**: the moving party must show in a "properly supported motion for summary judgment" that there are no disputed issues of material fact. *Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(a).

3.     **DEFENDANTS' CONTENTION**: The burden then shifts to the non-moving party to show that there is a genuine issue of material fact that must be resolved at trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 256, 106 S. Ct. at 2514. The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial. *Anderson,* 477 U.S. at 252.

a.     **PLAINTIFFS' RESPONSE**: The burden only shifts to the non-movant if the moving party shows in a "properly supported motion for summary judgment" that there are no disputed issues of material fact. *Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(a).

4.     **DEFENDANTS' CONTENTION**: Even though evidence on summary judgment must be viewed in light most favorable to the non-moving party, plaintiffs must do more than simply make allegations that defendants acted improperly in order to survive summary judgment. Fed. R. Civ. P. 56(e)(2); *Jeffers v. Gomez,* 267 F.3d 895, 907 (9th Cir. 2001). The non-moving party must make this showing with admissible evidence. *See Celotex,* 477 U.S. at 324.

a.     **PLAINTIFFS' RESPONSE**: Federal Rule of Civil Procedure 56(e)(2) does not support Defendants contention of law; it states, "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: … (2) consider the fact undisputed for purposes of the motion." In ruling on summary judgment, the Court must view the evidence *and draw all reasonable inferences therefrom* in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970); *Lake Nacimiento Ranch Co. v. San Luis Obispo Cnty.*, 841 F.2d 872, 875 (9th Cir. 1987). Importantly, in a deadly force case such as this, where Benavente cannot testify, the Court must carefully examine all evidence in the record to determine whether the officer's story is internally consistent and consistent

with known facts. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794-95 (9th Cir. 2014). The Court must examine circumstantial evidence that, if believed, would tend to discredit the police officer's story, all to "ensure that the officer[s] [are] not taking advantage of the fact that the witness most likely to contradict [their] story—the person shot dead—is unable to testify." *Id.*

5.   **DEFENDANTS' CONTENTION**: In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court held that an excessive force claim is properly analyzed under the Fourth Amendment's objective reasonableness standard. *Id.* at 388. The Graham court set forth a non-exhaustive list of factors to be considered in evaluating whether the force used to effect a particular seizure is reasonable: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resists detention or attempts to escape. *Id.* at 394-395. The test is an objective one, viewed from the vantage of a reasonable officer at the scene, and is highly deferential to the police officer's need to protect himself or others. *Id.* at 396-397.

a.   **PLAINTIFFS' RESPONSE**: The Court must carefully balance "the nature of the harm and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010) (*quoting Graham*, 490 U.S. at 396); *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002) ("Force is excessive when it is greater than is reasonable"). That is, the use of deadly force must be balanced against the purported need for it. *See Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946-47 (9th Cir. 2017). Government interest factors to balance against the type of force used include "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight," *Graham*, 490 U.S. at 396, (4) the availability of alternative methods to effectuate an arrest

or overcome resistance, *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005), and (5) the giving of a warning prior to the use of force, *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012); *see Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011); *see also Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001). The Ninth Circuit has cautioned that "[b]ecause such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [it has] held on many occasions that summary judgment…in excessive force cases should be granted sparingly." *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003). Further, it reaffirmed that "summary judgment is not appropriate in §1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1133 (9th Cir. 2019) (noting genuine doubts about officer credibility regarding perceptions as compared to other evidence).

6.      **DEFENDANTS' CONTENTION**: Probable cause exists where the facts and circumstances within an officer's knowledge of which they had reasonably trustworthy information are sufficient in themselves to warrant a mean of reasonable caution in the believe that an offense has been or is being committed. *Carrol v. United States,* 267 U.S. 132, 162 (1925). Probable cause means less than evidence that would justify a conviction. *Brinegar v. United States,* 338 U.S. 160, 175 (1949). Even an acquittal would not be evidence of a lack of probable cause. *Id.* Thus, the mere fact that a prosecution was unsuccessful does not mean that it was not supported by probable cause. *Freeman v. City of Santa Ana,* 68 F.3d 1180, 1189 (9th Cir. 1995).

a.      **PLAINTIFFS' RESPONSE**: here the pertinent issue is whether there was reasonable suspicion to effectuate a vehicle stop in the first place, not whether there was probable cause to make and arrest after decedent's Fourth Amendment rights were already violated. Reasonable suspicion is

required "before initiating an investigatory stop," and must be based on "a particularized and objective basis for suspecting [that] an individual may be involved in criminal activity." *United States v. Martinez*, 910 F.3d 1309, 1313 (10th Cir. 2018); *see also Terry v. Ohio*, 392 U.S. 1, 21 (1968).

7.    **DEFENDANTS' CONTENTION**: Allegations of denial of medical care immediately following arrest are also analyzed under the Fourth Amendment's reasonableness standard. See *Tatum v. City and Cnty. of S.F.*, 441 F.3d 1090, 1098 (9th Cir. 2006). The reasonableness inquiry in this context is whether the officer's actions with regard to medical care were "'objectively reasonable' in light of the facts and circumstances confronting" the officer. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). "Just as the Fourth Amendment does not require a police officer to use the least intrusive method of arrest, neither does it require an officer to provide what hindsight reveals to be the most effective medical care for an arrested suspect." *Tatum*, 441 F.3d at 1098. An officer satisfies the Fourth Amendment reasonableness standard by summoning the necessary medical assistance for an injured arrestee. *Tatum*, 441 F.3d at 1099; see also *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986).

    a.    **PLAINTIFFS' RESPONSE**: In *Tatum*, 441 F.3d at 1098-99, the Court's ruling was that it was reasonable there, a death from cocaine toxicity case, for an officer to promptly summon necessary medical assistance and monitor the decedent. Both are necessary for the holding. The Court also instructed; it would be a constitutional violation with "evidence in the summary judgment record that the officers ignored [the subject's] deteriorating medical condition." *Id*. at 1098. In a matter, as here, where the officer used unreasonable force that caused "clear injuries," with additional signs of injury, the Ninth Circuit is clear "that ignoring those needs could violate a suspect's constitutional rights," "even under a deliberate indifference" standard. *Est. of Cornejo ex rel. Solis v. City of Los Angeles*,

618 F. App'x 917, 921 (9th Cir. 2015). "Whether an officer behaved reasonably and sufficiently promptly in rendering or summoning medical care for a detainee depends partly on the length of the delay and the seriousness of the need for medical care." *Regalado v. Riverside Cnty.*, No. ED-cv-201578-JGB-KKX, 2021 WL 945249, at *4 (C.D. Cal. Jan. 15, 2021) (citation omitted); *see also Henderson v. City of Torrance*, No. CV 18-3918-MWF (EX), 2020 WL 8024351, at *9 (C.D. Cal. Dec. 14, 2020) (denying summary judgment where officers "prevented medical personnel from providing immediate treatment"). The Supreme Court has held that the Fourth Amendment (pursuant to *Graham* as it was previously under the Fourteenth Amendment) requires the police "to provide medical care to persons, such as [Benavente], who have been injured while being apprehended by the police." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983).

8.     **DEFENDANTS' CONTENTION**: Qualified immunity protects government officials from suit under federal law claims if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson v. Callahan*, 555 U.S. at 230.

a.     **PLAINTIFFS' RESPONSE**: To determine that the law was clearly established, the Court need not look to a case with identical or even "materially similar" facts. *Hope v. Pelzer*, 536 U.S. 730, 739-41, 754 (2002); *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1136-37 (9th Cir. 2003); *see also Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004). Further, the Supreme Court "has firmly rejected the notion that 'an official action is protected by qualified immunity unless the very action in question has previously been held unlawful.'" *Lopez*, 871 F.3d at 1018; *Brosseau*, 543

U.S. at 206 (Stevens, J., dissenting) ("The Court's search for relevant case law applying the *Garner* standard to materially similar facts is both unnecessary and ill advised.") (quoting *Anderson*, 483 U.S. at 640). In fact, even "[c]losely analogous preexisting case law is not required to show that a right was clearly established." *White v. Lee*, 227 F.3d 1214, 1238 (9th Cir. 2000). "Otherwise, [officials] would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Deorle*, 272 F.3d at 1285. In other words, there may be no published cases with facts exactly like these because of the obviousness of the illegality. *See Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002); *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990) ("The easiest cases do not even arise. There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances."). Accordingly, the "standard is one of fair warning: where the contours of the right have been defined with sufficient specificity that a state official had fair warning that her conduct deprived a victim of his rights, she is not entitled to qualified immunity." *Haugen v. Brosseau*, 339 F.3d 857, 873 (9th Cir. 2003); *see also Hope*, 536 U.S. at 740 n.10. Qualified immunity "focuses on the objective legal reasonableness of an official's acts," as the Court "provides no license to lawless conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Id*.

9.      **DEFENDANTS' CONTENTION**: To evaluate qualified immunity, a court must first decide whether the facts show that the governmental official's

conduct violated a constitutional right. *Jackson v. County of Bremerton*, 268 F.3d 646 (9th Cir 2001). Second, a court decides whether the governmental official could nevertheless have reasonably but mistakenly believed that his or her conduct did not violate a clearly established right. *Id*. However, the court may skip the first step and proceed to the second. *Pearson v. Callahan*, 555 U.S. at 227.

    a.    **PLAINTIFFS' RESPONSE**: First, disputed issues of material fact preclude granting qualified immunity on summary judgment. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995); *Glenn*, 673 F.3d at 870, fn. 7 (citing *Espinosa v. Cty. & Cnty of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010)); *Cunningham v. City of Wenatchee*, 345 F.3d 802, 809 (9th Cir. 2003); *Santos*, 287 F.3d at 855, n.12 (declining to decide the qualified immunity issue "because whether the officers may be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom"); *Knox v. Southwest Airlines*, 124 F.3d 1103, 1109 (9th Cir. 1997) (no qualified immunity where there are triable issues of fact); *Brosseau*, 543 U.S. at 206, (Stevens J., dissenting) (the reasonableness of an officer's belief is a quintessential fact question for the jury, not a question as a matter of law); *Anderson*, 483 U.S. at 641; *Wilkins*, 350 F.3d at 956 ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate).

    10.    **DEFENDANTS' CONTENTION**: The U.S. Supreme Court has recently clarified that a governmental official is entitled to qualified immunity from suit/liability where, at the time of the conduct, there was no prior precedent or case law with facts specifically and substantially identical to the facts of the incident at issue which would have put the defendant on notice that his or her conduct was unconstitutional. *White v. Pauly*, 580 U.S. 73, 79 (2017) ("clearly established law"

1  should not be defined "at a high level of generality" but must be "particularized" to

2  the facts of the case).

3          a.    **PLAINTIFFS' RESPONSE**: *See* Response to 8 and 9 above.

4      11.    **DEFENDANTS' CONTENTION**: Under the doctrine of qualified

5  immunity, if a government official's mistake as to what the law requires is

6  reasonable, the government official is entitled to qualified immunity. *Davis v.*

7  *Scherer*, 468 U.S. 183, 205 (1984). Moreover, this doctrine is sweeping in scope and

8  designed to protect "all but the plainly incompetent or those who knowingly violate

9  the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

10          a.    **PLAINTIFFS' RESPONSE**: *See* Response to 8 and 9 above.

11

12  DATED:  April 12, 2024        **LAW OFFICES OF DALE K. GALIPO**

13

14  By:        *Marcel F. Sincich*
           Dale K. Galipo, Esq.

15             Marcel F. Sincich, Esq.
           *Attorney for Plaintiffs*

16

17

18

19

20

21

22

23

24

25

26

27

28