# "EXHIBIT 1"

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Albert Alvarado on 07/28/2023**

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   FRANK BENAVENTE; and NICOLE VENTRESS, )
                                          )
 5              Plaintiffs,               )
                                          )
 6              vs.                       )Case No.
                                          )5:23-CV-00266-SSS-KK
 7   ALBERT ALVARADO; CITY OF ONTARIO;    )
     and DOES 1 through 10,               )
 8                                        )
                Defendants.               )
 9   _____ )

10

11

12

13

14         REMOTE VIDEOCONFERENCE DEPOSITION OF

15                   ALBERT ALVARADO

16              FRIDAY, JULY 28, 2023

17

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  459584
```

```
1                          CALIFORNIA

2                   FRIDAY, JULY 28, 2023

3                        10:03 A.M.

4                    ALBERT ALVARADO,

5   called as a witness on behalf of the Plaintiffs, having been

6   first duly sworn remotely via videoconference, was examined

7   and testified as follows:

8                        EXAMINATION

9   BY MR. GALIPO:

10      Q.   Can you please state your name.

11      A.   My name is Albert Alvarado.

12      Q.   Can you hear me okay so far?

13      A.   I can.

14      Q.   If you have any trouble hearing me at any time, will

15  you please let me know?

16      A.   I will.

17      Q.   And I'll try to ask questions that are

18  understandable, but if you cannot understand any of my

19  questions, will you please let mow know so that I can try to

20  ask it in a better way?

21      A.   Yes.

22      Q.   How long have you been a police officer?

23      A.   I've been a police officer for approximately 14

24  years.

25      Q.   And how many times approximately have you testified
```

1    in court?

2       A.   I testified more than 30 times, approximately.

3       Q.   Now, the date of the incident we're here to talk

4    about, do you recall the date?

5       A.   Approximately, yes.

6       Q.   What was the date?

7       A.   February 22nd.

8       Q.   Of what year?

9       A.   2021.

10      Q.   About what time did the shooting happen?

11      A.   The shooting occurred at approximately 23:55

12   hours.

13      Q.   Is that about 11:55 at night?

14      A.   Yes, sir.

15      Q.   Where did it happen?

16      A.   It occurred in the city of Ontario.

17      Q.   Did it occur in a particular street?

18      A.   Yes, it did.

19      Q.   And what was the street's name?

20      A.   The street's name is Beverly Court.

21      Q.   Did you discharge your firearm during the

22   incident?

23      A.   I did.

24      Q.   What type of firearm did you discharge?

25      A.   I have a Glock 17, a 9-millimeter.

1      Q.   And how many shots did you fire?

2      A.   I fired approximately three shots.

3      Q.   When you say approximately, are you not sure?

4           Are you saying it could have been two or four, or do

5   you think it was three?

6      A.   No.  I apologize.  It was three.

7      Q.   Okay.  Do you know if a round count was done on your

8   weapon following the incident?

9      A.   Yes, sir.

10      Q.   And to your knowledge, was it verified that there

11   were three shots?

12      A.   Yes, there was.

13      Q.   And your 9-millimeter, is it a semiautomatic

14   weapon?

15      A.   Yes, it is.

16      Q.   So you had to press the trigger for each shot?

17      A.   Yes, I did.

18      Q.   Okay.  So you would have obviously pressed the

19   trigger three times?

20      A.   Yes.  To discharge three rounds.

21      Q.   And I understand you were shooting at the driver of

22   a vehicle; is that correct?

23      A.   I was shooting at -- yes, the driver of the vehicle,

24   yes.

25      Q.   What type of vehicle was the driver in?

1       A.      It was red compact sedan.

2       Q.      And when you fired your first shot, were you moving

3    or stationary?

4       A.      I was stationary.

5       Q.      Did you have the weapon in one hand or two?

6       A.      I believe it was in one hand.

7       Q.      What part of the vehicle were you shooting

8    through?

9       A.      Are you referring to Mr. Benavente's car?

10      Q.      I'm assuming you were shooting -- it's my

11   understanding you were standing somewhere outside of your

12   vehicle, and you were shooting into the red vehicle.

13      A.      Yes.

14      Q.      And you were trying to strike the driver of the

15   vehicle.

16      A.      I was trying to stop the threat which was the red

17   vehicle.

18      Q.      I understand that.  But were you trying to shoot the

19   driver to stop the threat?

20      A.      Yes, sir.

21      Q.      What I'm trying to get at, I don't know if your

22   first shot was through the front windshield, through the side

23   window, the back window.

24              I'm trying to find out, if you know, when you fired

25   your first shot, what part of the car were you firing through

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 9

```
 1    to strike the driver from your position.

 2         A.    I understand now.

 3         Q.    Okay.

 4         A.    When I started shooting I believe I was shooting at

 5    the -- towards the back driver's door, aiming at the driver's

 6    seat of the red compact sedan.

 7         Q.    Was it a two-door or four-door?

 8         A.    I believe it's a four-door.

 9         Q.    Do you know if the windows were up or down?

10         A.    The windows were up.

11         Q.    How far were you from the vehicle when you fired

12    your first shot, the red vehicle?

13         A.    I was approximately three to four feet away.

14         Q.    And what part of the red vehicle was closest to

15    you?

16         A.    The rear driver's quarter panel.

17         Q.    So were you close to the three to four feet from the

18    rear door on the driver's side?

19         A.    As the vehicle was going in a reverse manner, yes, I

20    was approximately -- when I first started firing, it was

21    three to four feet.

22         Q.    And three to four feet approximately from the rear

23    driver's door; does that sound right, the rear door on the

24    driver's side?

25         A.    Yes.  The rear driver's door and quarter panel.
```

```
 1      Q.   Okay.  And then your second shot, what part of the
 2  vehicle were you firing through?
 3      A.   At that time it was the driver's window.
 4      Q.   And how far were you from the driver's window at
 5  that point?
 6      A.   At that point I was approximately one to two feet.
 7      Q.   And how about your third shot?
 8      A.   It was the same.  Approximately one to two feet.
 9      Q.   And did you shoot the third shot through the
10  driver's window as well?
11      A.   I did.
12      Q.   And for your second and third shot, did you have the
13  gun in one hand or two?
14      A.   I believe it was in just one hand.
15      Q.   Do you know if any portion of the shooting was
16  caught on audio?
17      A.   Yes, it was.
18      Q.   Have you listened to that audio?
19      A.   I have.
20           MR. GALIPO:  Does the court reporter need a quick
21  break?  I notice that you're looking at something, and I
22  didn't want to interrupt you.
23           COURT REPORTER:  No.  I'm listening and writing.
24           I was just looking at the caption for this case.
25           But don't mind me.
```

1           MR. GALIPO:  Okay.  Let's just go off the record for

2    one moment, please.

3           (Brief pause in the proceeding.)

4    BY MR. GALIPO:

5           Q.    So how much time passed approximately from your

6    first shot to your last shot?

7           A.    It was approximately just one second.

8           Q.    And how much time passed from the time you got out

9    of your car to the time you fired your first shot?

10          A.    That was approximately three seconds.

11          Q.    Did you say anything in those three seconds in

12    between getting out of the car and firing?

13          A.    I did not because it wasn't feasible.

14          Q.    So, for example, did you give any commands or any

15    verbal warning that you were going to shoot?

16          A.    No.  It wasn't feasible because the windows were up

17    to that vehicle; the sirens were sounding; and the engine was

18    revving as he was crashing into several police cars.

19          Q.    Could you see the driver of the vehicle when you

20    fired your first shot?

21          A.    No, I could not.

22          Q.    Could you see the driver of the vehicle when you

23    fired your second shot?

24          A.    I could.

25          Q.    And also for the third shot, you could see the

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 12

1    driver?

2         A.   Yes, I could.

3         Q.   Did any part of the car ever strike you?

4         A.   At that time I was led to believe I was being struck

5    by the vehicle as I was being crushed in between my door and

6    the police vehicle due to Mr. Benavente's vehicle running

7    alongside the passenger side of my patrol vehicle.

8         Q.   What I'm saying, did any part of the car actually

9    strike you?

10        And if so, I'm going to want to know what part of

11   your body and whether you had any physical injuries.

12        MR. TOUCHSTONE:  Vague as to car, Dale.

13        Are you referring to Mr. Benavente's vehicle?

14        MR. GALIPO:  Yes.  Sorry, Jim.

15        MR. TOUCHSTONE:  Go ahead.

16        THE WITNESS:  Can you repeat that question again,

17   please.

18   BY MR. GALIPO:

19        Q.   Sure.  Did any part of the red vehicle actually

20   strike you?

21        A.   No, sir.

22        Q.   What would you estimate the speed of the red vehicle

23   when you fired your first shot?

24        A.   It was -- I estimate just to be a high rate of

25   speed.  I don't have a number to give.

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 13

1        Q.    Could you give any range?

2        A.    It would be an approximate, but it was just going at

3    a high rate of speed in a reversing manner towards our police

4    car.

5        Q.    What approximation would you give?

6        A.    An approximation I would give today would be more

7    than 20 miles-per-hour.

8        Q.    What was the speed of the vehicle when you fired

9    your second shot?

10       A.    It was continuing to accelerate.

11             So I believe it would have continued to be more than

12   20 miles-per-hour.

13       Q.    And what was the speed of the vehicle when you fired

14   your third shot?

15       A.    Again, it would continue being more than 20

16   miles-per-hour as it continued to accelerate backwards

17   essentially in the -- behind me -- not behind me, as it

18   continued in reverse.

19             That's what I meant to say.

20       Q.    So it sounds like when you fired your first shot,

21   you were kind of in line with the rear door on the driver's

22   side; is that correct?

23             MR. TOUCHSTONE:  Misstates his testimony.

24             But go ahead and answer.

25             THE WITNESS:  So I don't understand when you say in

 1   line with the rear door.

 2   BY MR. GALIPO:

 3       Q.   Like if you drew a line between yourself and the car

 4   like a perpendicular line at the time of your first shot, I

 5   thought you told me with you were like three or four feet

 6   from the rear door; that was the closest part of the car to

 7   you?

 8       A.   I was talking about the rear quarter panel, and as

 9   it's running alongside my patrol vehicle.

10       Q.   So the rear quarter panel, would that be in between

11   the rear door and the rear bumper?

12       A.   Yes.

13       Q.   So you were more in line with the rear quarter panel

14   when you fired the first shot?

15       A.   Yes.  That would be fair to say.

16       Q.   And then your second and third shot, you were more

17   in line with the driver's door?

18       A.   Yes.

19       Q.   So how much distance do you think the car traveled

20   between your first shot and your last shot?

21       A.   The distance would have been immediately.

22            So I guess I can't really give you an answer to that

23   one.

24       Q.   Well, how far do you think it is on that car from

25   the rear quarter panel to the driver's door?

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                        Page 15

1        A.   I think there would be an accurate measurement that
2    I don't want to make up a number.  If I would say in steps,
3    it's three to four steps in total from the rear quarter panel
4    to the driver's door.  I don't think it's very -- not very
5    much.
6        Q.   Did you have the impression as to whether any of
7    your shots struck him?
8        A.   I did have that impression, yes.
9        Q.   What was your impression?
10       A.   He was hurt once he slumped over.
11       Q.   And when he slumped over, did he slump over to the
12   right towards center console or in some other way?
13       A.   Towards the steering wheel.
14       Q.   Kind of forward?
15       A.   Yes, sir.
16       Q.   Which direction did the car go immediately after you
17   saw him slump over?
18       A.   In a northeast direction.
19       Q.   Would that be backwards or forwards?
20       A.   It would be forwards.
21       Q.   So the car is initially reversing; you fired three
22   shots; after your third shot, you saw him slump over and the
23   car started moving forward?
24       A.   No, sir.
25       Q.   What part of that is incorrect?

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 16

```
 1        A.   The part of after my last shot, the vehicles

 2   continued behind me, so in a reverse manner.  At that time I

 3   did not know that the red compact sedan had struck another

 4   patrol vehicle which stopped its movement, and then the

 5   vehicle start proceeding forward past me in a northeast

 6   direction.

 7        Q.   Did you shoot at the vehicle at that time?

 8        A.   No, I did not.

 9        Q.   Did you feel the vehicle was an immediate threat of

10   death or serious bodily injury to you at that time when it

11   went forward past you?

12        A.   No.  And that's because it was just rolling

13   slowly.

14        Q.   How far were you from the vehicle when it was

15   rolling forward slowly past you?

16        A.   I would approximate that to be four to five feet.

17        Q.   Did you ever fall to the ground?

18        A.   I did not.

19        Q.   Did you ever dive out of the way?

20        A.   I did not.

21        Q.   Did you ever take a step back to create more

22   distance between you and the vehicle?

23        A.   I did not.

24        Q.   Do you know if any other officers on-scene besides

25   you used deadly force?
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                            Page 17

```
1      A.   No, I did not.

2           MR. TOUCHSTONE:  Hang on a minute.

3           Do you understand that question?

4           He asked if any other officer used deadly force.

5           THE WITNESS:  Yeah.  No other officers used deadly

6      force.

7   BY MR. GALIPO:

8      Q.   Okay.  So let me just learn a little bit about your

9   background and then we'll talk more about the incident.

10          You mentioned you've been a police officer for 14

11   years; is that correct?

12     A.   Yes, sir.

13     Q.   When did you go to the academy?

14     A.   I began the academy in October of 2008.

15     Q.   What type of work did you generally do before you

16   went to the academy?

17     A.   A lot of random jobs, but the job before becoming a

18   police officer for that Chick's Sporting Goods which is a

19   sporting goods store.

20     Q.   I'm familiar with it.

21     A.   Yeah.

22     Q.   I worked at Big 5 Sporting Goods when I was going to

23   law school, but I must tell you, I think I was making

24   3-something an hour at the time, and by the time they took

25   out taxes, I was trying to figure out if there was another
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 18

```
 1   way that I could earn more money quicker.

 2            MR. TOUCHSTONE:  I think you figured that out.

 3            MR. GALIPO:  I figured that out, Jim.

 4   BY MR. GALIPO:

 5       Q.   How about college, did you go to any college after

 6   high school?

 7       A.   I did.  I went for approximately two years to

 8   Chaffey College.

 9       Q.   Did you study anything in particular?

10       A.   No.  I am not a big school person.

11       Q.   Okay.  Just kind of like general studies?

12       A.   Yes, sir.

13       Q.   How about sports, did you play any sports in high

14   school?

15       A.   I did.

16       Q.   What sports did you play?

17       A.   I played basketball.

18       Q.   What position or positions did you play?

19       A.   At the time I was a catcher.

20       Q.   How tall are you?

21       A.   I'm approximately five-eight, seven inches.

22       Q.   How much do you currently weigh?

23       A.   I weigh about 180 pounds.

24       Q.   Was that about your weight at the time of the

25   shooting incident?
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                         Page 20

 1  Detective Bureau, and lastly, I have been working in the

 2  Traffic Division.

 3      Q.   What was your assignment at the time of this

 4  shooting incident?

 5      A.   I was a patrol officer.  Specifically, I was a

 6  corporal and a field training officer.

 7      Q.   And then when were you assigned to the Detective

 8  Bureau?

 9      A.   I was assigned in October of 2022, approximately.

10      Q.   And how about to Traffic, when did you receive that

11  assignment?

12      A.   Approximately in May of 2023.

13      Q.   Other than your 9-millimeter, did you have any

14  less-lethal on you at the time of this incident such as a

15  pepper spray, a Taser, or a police baton?

16      A.   I did.

17      Q.   What did you have?

18      A.   So I had my collapsible baton which is referred to

19  as ASP, A-S-P.  I had a Taser; I had a pepper spray; and I

20  believe that's what you're referring -- I think those are the

21  three items other than my firearm I had.

22      Q.   Okay.  What type of Taser did you have?

23      A.   At this time I can't remember the model of it, but

24  it's an AXON Taser.

25      Q.   Do you know if it was an X26 or an X2?

```
 1   to go with another officer when you can?

 2        A.   Yes.  When feasible, you should go with a backing

 3   officer.  But the Ontario Police Department automatically

 4   dispatches two officers to every call.

 5        Q.   Is there a reason in that call why you didn't wait

 6   for your backup officer before you detained one of the

 7   individuals?

 8        A.   I was essentially right down the street when the

 9   call came out as I was driving to the scene.  That's when --

10   I did detain the male outside the house believing it could

11   have been the suspect.

12        Q.   Was it the suspect?

13        A.   It ended up being his brother.

14        Q.   Does Ontario have any policies with respect to

15   shooting at moving vehicles?

16        A.   It does.

17        Q.   Were you familiar with those policies before the day

18   of the shooting we're here to talk about?

19        A.   I was.

20        Q.   And what does the policy generally say, if you

21   know?

22        A.   The policy states that, it suggests that shooting at

23   a moving vehicle typically doesn't work out.

24        Q.   What else does the policy say?

25        A.   That -- well, if you're asking me verbatim, I'm
```

```
 1   probably not going to be able --
 2        Q.    I'm not asking verbatim.  Just in general.
 3        A.    Essentially, you should try to avert the vehicle,
 4   the moving vehicle, get out of its way.
 5        Q.    Get out of the path, rather than shooting?
 6        A.    Doesn't say anything about not shooting.
 7              Just attempting to get out of the way unless it's an
 8   immediate imminent threat to the officer.
 9        Q.    Did you do anything in your mind to attempt to get
10   out of the way of the red car when it was backing up?
11        A.    The red car backing up was immediate.
12              There was nowhere I could have gone or done
13   differently to avoid that red car coming in the direction
14   where I was at.
15        Q.    I'm just wondering whether you tried to do anything
16   in your mind to get out of the way.
17        A.    It would have caused even more -- could caused even
18   more serious injury or even death if I would have moved in
19   any direction other than where I stayed.
20        Q.    So you're saying you didn't try to get out of the
21   way because you thought that might make it worse?
22        A.    It would have made it worse, but everything happened
23   immediately.  The speed of this red compact sedan coming at
24   our police car running along side the passenger side happened
25   so quickly.  I had nowhere to go.
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 27

```
 1      Q.   So when you first saw the vehicle backing up, was

 2   that the same spot you were in when you fired your first

 3   shot?

 4      A.   No.

 5      Q.   How much time passed from you seeing the vehicle

 6   backing up to you firing your first shot?

 7      A.   So that was when it was approximately three seconds

 8   from the red compact sedan striking my patrol vehicle along

 9   the passenger side and running alongside the passenger side.

10      Q.   Did you move anywhere in those three seconds?

11      A.   There was no time for me to move or to go

12   anywhere.

13      Q.   So that's what I was trying to get at.

14           Were you in the same position when you observed the

15   impact as you were when you fired your first shot?

16      A.   There was two impacts.  Are you referring to my

17   patrol vehicle, or are you referring to Officer Varela's

18   vehicle?

19      Q.   Well, how many impacts were there before you

20   fired?

21      A.   There was two.

22      Q.   Well, the first impact and the second impact, were

23   you in different positions?

24      A.   Yes.

25      Q.   So where were you at the time of the first impact?
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                Page 28

```
 1          MR. TOUCHSTONE:  And if you could describe what the
 2   first impact is so we're all clear.
 3          MR. GALIPO:  Thank you.
 4          THE WITNESS:  So the first impact is to the first
 5   patrol vehicle which is Officer Varela's vehicle.  At that
 6   time I'm already exiting my vehicle to get out of my car.
 7          That's when immediately within three seconds, the
 8   red compact sedan is striking our vehicle.
 9   BY MR. GALIPO:
10      Q.   So are you getting out of your car at about the time
11   you see the first impact?
12      A.   No.
13      Q.   Were you out of your car when you saw the first
14   impact?
15      A.   Yes.
16      Q.   Did you see the vehicle backing up before you got
17   out of your car?
18      A.   No.
19      Q.   And then where did you go between the first impact
20   and the second impact?
21      A.   I didn't go anywhere.  I was still -- I was standing
22   outside my passenger door.
23      Q.   And is that where you were when you fired the
24   shots?
25      A.   Yes, sir.
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 29

```
 1      Q.   Was your door opened or closed when you fired the
 2  shots?
 3      A.   It was open.
 4      Q.   Do you know if the door of your vehicle was
 5  struck?
 6      A.   I learned that it was struck.
 7      Q.   And how did you learn that?
 8      A.   Reviewing photos.
 9      Q.   Did you realize it was struck prior to you firing
10  your shots?
11      A.   When that situation was occurring, I -- everything
12  about me was telling me that my passenger door was being
13  struck, and I was being crushed by my passenger door into my
14  police car because I'm being sandwiched by the red compact
15  sedan.  So my -- the door was struck.
16      Q.   Were you in the "V" of your door when you fired your
17  shots?
18      A.   I was in that general vicinity.
19      Q.   General vicinity of what?
20      A.   So just as anybody would get out of their vehicle
21  and stand outside the door, that's where I was standing.
22      Q.   Well, I'm not so sure if everyone gets out of their
23  vehicle the same way and stands the same way.
24           But what I'm trying to figure out, sometimes
25  officers open their door and they stay in the "V" of the door
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 30

```
1    for some cover.

2              I don't know if you were in the "V" of your door or

3    you were somewhere else.

4              That's what I'm trying to figure out.

5         A.   So I don't want to say that I'm standing at the "V"

6    of the door because I would call that more like the -- I

7    don't even know if it's the appropriate word, the apex, where

8    they both meet.

9              No.  I would just say I'm standing at the door frame

10   of my door.

11        Q.   Okay.

12        A.   The frame that outlines my door, I'm in that area.

13        Q.   So was your door in between you and the red car?

14        A.   Yes.  Because the door's open.

15        Q.   Did you have any visible injuries from this

16   incident?

17        A.   No, I did not, sir.

18        Q.   Do you know if you had any rips or tears to your

19   uniform?

20        A.   No, I did not.

21        Q.   What was the nature of the call that you were

22   responding to, initially?

23        A.   This was a result of a traffic stop.

24        Q.   And were you in your patrol vehicle when you

25   initially heard the dispatch related to this call?
```

```
 1              MR. TOUCHSTONE:  Assumes facts not in evidence.

 2         Explain how --

 3    BY MR. GALIPO:

 4         Q.   Let me ask you this.

 5              Where was the red vehicle when you first saw it?

 6         A.   So the totality of this red car started at 4th and

 7    Mountain where we observed it, and then we started assisting

 8    Officer Varela for the traffic stop.

 9         Q.   Where did the traffic stop initially take place?

10         A.   Fourth, east of Mountain.

11         Q.   Do you know what the reason for the stop was?

12         A.   No.  Not at that time, I did not.

13         Q.   In other words, did you have any information that

14    the occupant of the vehicle had committed a serious crime?

15         A.   No.  But I guess I want to correct my last statement

16    where the red car had ran the red light as it made a

17    eastbound turn on 4th Street from Mountain Avenue because

18    that light was red.

19         Q.   Did you observe that?

20         A.   Yes.  As I'm looking over, yes.

21         Q.   Did you have a body cam on at the time?

22         A.   I had a body cam, yes.  It was on.

23         Q.   Does your body cam capture parts of the shooting?

24         A.   Yes.  Parts of it, yes.

25         Q.   And do you know if your body cam captured the
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 32

 1   vehicle running the red light?

 2        A.   No, it would not.

 3        Q.   Did you have a dash cam in your vehicle at the

 4   time?

 5        A.   No, sir.

 6        Q.   And what I was getting at, I understand that some

 7   people may think running a red light is a serious crime.

 8             But other than that, did you have information that

 9   the driver of the vehicle had committed some violent crime

10   against another crime?

11             MR. TOUCHSTONE:  Vague as to time.

12             Are you referring to the initial contact, Dale?

13             MR. GALIPO:  Yeah.  At any time.  I guess at any

14   time before he saw it reversing.

15             MR. TOUCHSTONE:  Okay.

16             Do you understand the --

17             THE WITNESS:  It -- it was a totality of events that

18   occurred after he ran that red light.  He ran that red light,

19   and we followed Officer Varela with the traffic stop to being

20   his backing officer.

21             At the time we were not driving at a high rate of

22   speed, but there was such movements of that car that were

23   just so obvious, and I called it fidgeting.

24             And it led me to believe something was occurring in

25   that car.  I have a lot experience in the field and our

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                        Page 33

 1   training that we do in briefing and classes I've attended.

 2   While my experience in the field and what I've been through

 3   in other events led me to believe that he could have been

 4   reaching for a weapon, he could have been trying to discard

 5   evidence.

 6          It just kept happening over and over where he --

 7   he's fidgeting in the car, and I'm seeing this from the

 8   steering wheel because he's going in the east direction to

 9   the car behind the north, south direction, and it was very

10   obvious to me.

11          And then in totality, once we get to San Antonio, he

12   takes off at a high rate of speed.  So now I know that there

13   is a pursuit that is going to occur.  The pursuit continues

14   northbound on San Antonio, and in turn we get to about 5th or

15   6th Street, and there is a car -- and I'm going to call it an

16   innocent truck or civilian just driving on the street, and

17   the red compact sedan almost collides into it.

18          Almost it looks like it was going to be T-boned.

19          And I knew that something -- the propensity of

20   violence was going to occur or was heightened because that's

21   what happens in pursuits especially with what I had seen, my

22   experiences.  I almost saw that T-bone.  He didn't go on the

23   back side of the car.  So I knew that the truck had stopped

24   in the middle of the road.

25          The red compact sedan had passed him in the front,

```
 1    and the pursuit continued on.
 2              And once we got up to the 10 Freeway, he pulled over
 3    to the right side of the road, and it was one of those things
 4    I thought that he was going to give up or it was going to
 5    lead into an ambush style situation because of what I have
 6    seen, like I go back to my training and experience.
 7        Q.   Okay.  Let me just stop you for one moment.
 8              So up until the time he pulled over, you said on the
 9    10 Freeway?
10        A.   Pulled over, yeah, that was the first time he pulled
11    over.
12              MR. TOUCHSTONE:  Well, was he on the 10 Freeway?
13              There's a clarity here --
14              THE WITNESS:  Yeah.  It was a 10 Freeway bridge --
15              MR. GALIPO:  Okay.   Thank you.
16    BY MR. GALIPO:
17        Q.   Up to that time, did you know the name of the
18    driver?
19        A.   No.
20        Q.   Did you have any information, for example, he had a
21    criminal history?
22        A.   No.
23        Q.   Any specific information he was under the influence
24    of drugs or alcohol?
25        A.   No.
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 35

1      Q.   Any information that he had ever physically harmed

2   another person?

3      A.   Well, if we're talking about get into the 10

4   Freeway, from that time frame, yeah, he almost T-boned an

5   innocent motorist.

6      Q.   Yeah.  I'm not asking about almost.

7           I'm asking actually harmed.

8      A.   No.  At that time he did not hurt anybody at the

9   time.

10      Q.   And then after, take me from the stop on the 10

11   Freeway.

12      A.   The 10 Freeway, he stops, and it led me to think --

13   led me to think it's a possible ambush situation and/or he

14   was just giving up.  The moment we drove up, the red compact

15   sedan made a U-turn.  And what I started noticing was the

16   acceleration and the sudden stopping, meaning the braking, of

17   the red compact sedan where I was leading to believe that he

18   was trying to get Officer Varela to smash into his unit.

19           Well, that heightened my senses that this was

20   becoming much more violent and/or closing that gap due to an

21   ambush situation.

22           Typically, my experiences have led me to know that

23   people that lead the police on vehicle pursuits want to get

24   away, but given that the gap is closing, my training is

25   telling me that propensity of violence is there.

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 36

```
 1      Q.   Right now I'm just trying to -- I appreciate you

 2   adding in about your training and propensity for violence.

 3           But I'm really trying to figure out how the pursuit

 4   went from the 10 Freeway to where the car ended up where you

 5   saw it reversing.

 6      A.   So San Antonio is a large thoroughfare through the

 7   city of Ontario where it does go over the 10 Freeway.

 8           There is a bridge that goes over the 10 Freeway, if

 9   not, actually on the freeway.

10      Q.   Okay.  How much time do you think passed from the

11   time the vehicle was stopped in that area in the 10 Freeway

12   and the time you fired your shot?

13      A.   I would say approximately less than a minute.

14      Q.   Who was calling out the pursuit?

15      A.   So at the time it was my training officer, Officer

16   Escobar.

17      Q.   Was your training officer driving your vehicle?

18      A.   Forgive me.  He's not my training officer.

19           He was my trainee.  So I'm the training officer.

20           He is my trainee.  Yes, he is the driver of the

21   vehicle.

22      Q.   What documents have you reviewed in preparation for

23   the deposition?

24      A.   Documents would be my statement and my public safety

25   statement.
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 37

1      Q.   How about the radio dispatch, have you listened to

2   that?

3      A.   Yes.  So I did listen to the radio dispatch.

4      Q.   How about body cams?

5      A.   I have reviewed body cams, yes.

6      Q.   What body cams have you reviewed?

7      A.   I have reviewed myself, Officer Escobar, Officer

8   Varela, and Officer Lopez.

9      Q.   Now, towards the end of the pursuit does the red car

10   go three or four houses north of 6th Street?

11     A.   Yes, it does, sir.

12     Q.   And does he -- I'm sorry?

13     A.   Sorry.  On Beverly Court.

14     Q.   Right.  And does he stop along the east curb?

15     A.   Yes.

16     Q.   And is it Officer Varela, V-a-r-e-l-a?

17     A.   Yes, sir.

18     Q.   And was Officer Varela's car behind the red car?

19     A.   Yes, it was.

20          MR. TOUCHSTONE:  Vague as to behind.

21   BY MR. GALIPO:

22     Q.   Can you describe the relative positions?

23     A.   The red compact sedan is closest to the east curb,

24   and Officer Varela is most offset to the red compact sedan.

25          So the best way to describe it would be his

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 38

```
 1   passenger side is aligning with the driver's side of the red
 2   compact sedan.  So it's further west into the street.
 3       Q.   And then you observed that as your vehicle is
 4   driving up to that location?
 5       A.   I did.
 6       Q.   And that's when you start popping your door?
 7       A.   Yes, sir.
 8       Q.   And when you start popping your door, you see that
 9   they're both stopped?
10       A.   Yes.
11       Q.   And did you see the reverse lights of the red car on
12   at all before you got out of your car?
13       A.   No.
14       Q.   If you would have seen the reverse lights on, I'm
15   assuming you would have stayed in your car?
16       A.   I think that is an assumption, but it could have
17   been that he's put in the car to park.  So I probably would
18   have still got out of the vehicle.
19       Q.   So you think you would have got out of the car even
20   if you saw the reverse lights on?
21       A.   Each situations's different.  At the time that I saw
22   that car stopped and the reverse lights were not on.
23       Q.   I understand that.  I'm just wondering, are you
24   telling me, though, even if you had seen the reverse lights
25   on, you still would have got out of your car?
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 39

```
1      A.   Every situation is different.

2           I don't understand what you're saying --

3      Q.   I'm trying to talk about this situation --

4      A.   I understand what you're saying, but the

5   circumstance -- that's not what the circumstances that had

6   occurred at that moment.  So I just -- I --

7      Q.   I guess what I'm getting at is, you told me that he

8   had stopped before, but then ended up taking off again?

9      A.   Yes.

10     Q.   So when he stopped this time, you were not sure

11  whether he was going to foot bail, surrender, or maybe take

12  off again; is that fair?

13     A.   Yes.  That's a fair description, sir.

14     Q.   And we know he ended up backing up at some point,

15  true?

16     A.   True.  But I wouldn't use the word "backing up."

17     Q.   Okay.  He reversed at, I think you described, a

18  fairly high rate of speed?

19     A.   Yes, sir.

20     Q.   So what I'm trying to get at, I take it if you would

21  have seen him reversing, actually moving backwards, and you

22  were still in your car, then for safety reasons, you would

23  have stayed in your car; is that fair?

24     A.   Yes.  Given your description, seeing that he's

25  already reversing and the car's already in motion towards my
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                              Page 40

1   car, yes, I would not be getting out of my car.

2       Q.   Okay.  And when you started popping your door to get

3   out, was your car still moving?

4       A.   Yes.

5       Q.   And how far was the red car from you when you

6   started popping your door to get out?

7       A.   Well, it's still in front of Officer Varela's

8   vehicle.  So given what my car, that's approximately two or

9   more car lengths.

10      Q.   Okay.

11           MR. GALIPO:  Jim, we've been going for about an

12   hour.

13           Is this a good time for a ten-minute break?

14           MR. TOUCHSTONE:  Sounds good, Dale.

15           MR. GALIPO:  Is that good, Jinna?

16           COURT REPORTER:  Yes, sounds good.  Thank you.

17           (Recess taken.)

18   BY MR. GALIPO:

19      Q.   So did you see the red car actually come to a stop

20   along that curb line past 6th Street?

21      A.   Yes.

22      Q.   And when you saw it come to a stop, was Officer

23   Varela's car the closest car to it?

24      A.   Yes, it was.

25      Q.   And where were you?

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 41

```
 1              Were you somewhere behind Officer Varela?

 2       A.   Yes.  So we were driving -- well, when I say we,

 3  Officer Escobar was driving up, and he was also offset to

 4  Officer Varela's vehicle.

 5              So we were actually a little bit further west into

 6  the street which would be Beverly Court.

 7       Q.   Okay.  And would the front of the red car as it was

 8  stopping along the curb line or close to the curb line, be

 9  facing north?

10       A.   Yes, sir.

11       Q.   And Officer Varela's vehicle would have been behind

12  it, but offset to the left slightly west of it?

13       A.   Yes.

14       Q.   And your vehicle who was driven by your trainee was

15  further west in the street.  So you would have been

16  approaching somewhat offset to Officer Varela's west or

17  left?

18       A.   Yes.  You're correct.

19       Q.   And would it be correct to say when you saw the red

20  car come to a stop on the curb line, you were not sure

21  whether he was going to give up, foot bail, or maybe try to

22  take off again?

23       A.   Yeah.  Those were my assessments going on at the

24  time.

25       Q.   Did you have any conversation with your trainee in
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                                           Page 42

```
 1   the vehicle as to what the tactical plan was going to be?

 2        A.   I did have tactical considerations, but they were

 3   being verbalized to my trainee.

 4        Q.   What tactical considerations did you have that were

 5   not verbalized?

 6        A.   Well, there is a number of tactical considerations

 7   that occur during what we call a high-risk stop or felony car

 8   stop in such situations.  One of them is the voluntary

 9   compliance where we do order the occupants out of the vehicle

10   and we have additional officers there where they have several

11   items which could be less-lethal weapons, per se.

12           With having additional officers, we also have

13   officers that are trained negotiators.  Given that level of

14   compliance and they just don't want to get out of the car,

15   we can have then the officers negotiate with the officers up

16   to bringing a K-9.

17           So we do have available resources such as using a

18   40-millimeter.  We don't use bean bags within our department.

19   We do have pepper ball guns.  We do have -- yeah, the pepper

20   ball gun.  Given that the -- again, what I had spoke about,

21   earlier, given that we believed that he does have a weapon,

22   Mr. Benavente, we could have -- we had resources to call in a

23   BearCat.  We had a number of them where we could have

24   adjusted the vehicles, the BearCats to get his compliance so

25   to exit that vehicle.
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 44

```
 1      A.   No.  That's not what I'm saying at all.

 2      Q.   Okay.  So now when you brought your car to a stop,

 3   you were about two car lengths behind Varela's vehicle?

 4      A.   Yes, sir.

 5      Q.   And then Officer Escobar also came to a stop?

 6      A.   I'm seated in the passenger vehicle of the car.

 7           Officer Escobar is driving.

 8      Q.   I see.  I get.  That's your car.

 9           Okay.  I'm looking at your statement, and I

10   apologize.  I forgot that Escobar was your trainee.

11      A.   Yes, sir.

12      Q.   And you say in your statement, "Escobar comes almost

13   to a stop.  I don't know why, but he comes to a stop."

14           Do you remember saying that?

15      A.   Yes.

16      Q.   What were you referring to there?

17           You didn't know why he came to a stop?

18      A.   Well, due to the circumstances of the red compact

19   sedan stopping, typically, the second vehicle positioned

20   itself, aligned with the first vehicle to essentially what we

21   tactically call a felony car stop.

22           Well, my partner trainee chose to stop behind, and

23   that's why I said I didn't know why he was stopping behind

24   Officer Varela, rather than beside him.

25      Q.   Well, you had training on those felony car stops,
```

1   don't you?

2        A.   We do.

3        Q.   And part of the training is the positioning of the

4   vehicles; correct?

5        A.   Yes, you're correct.

6        Q.   Part of that training is exactly what you said, that

7   the second car should position to the side of the first

8   car?

9        A.   Yes, you're correct.

10        Q.   Had you ever advised your trainee during the time

11   with him that second car should be positioned to the side of

12   the first car?

13        A.   During that particular incident I don't think we

14   were verbalizing that, but he's a very experienced officer,

15   so he knows.

16        Q.   Your trainee is a very experienced officer?

17        A.   Yeah.

18        Q.   Had you ever, before the date of the incident, had

19   you ever spoke to him about the positioning of the second car

20   in a felony stop?

21        A.   Yes.  It would be something that we brought up.

22        Q.   Did you tell him on the day of the incident, "why

23   are you stopping here" or "pull up to side" or words to that

24   effect?

25        A.   No.

1      Q.    So in your statement when you said you didn't know

2   why Escobar was stopping there, that's what you were

3   referring to?

4      A.    Yes.

5      Q.    And how far was the position where Escobar was

6   stopping your vehicle, how far was that from the position

7   that you thought he was going to stop to the side of Varela's

8   car?

9      A.    Sir, are you asking the distance from the front of

10  Varela's car to the front of my -- or the back of Officer

11  Varela's car to the front of my car?

12     Q.    Yeah.  Essentially, how far forward more were you

13  expecting Escobar to stop the car?

14     A.    I just assumed that we were going to park along side

15  Officer Varela.

16     Q.    And much further was that from where you actually

17  stopped?

18           Was it two-car lengths ahead?

19     A.    I would say yeah, about a car length and a half.

20     Q.    But you don't recall saying anything to Escobar at

21  the time as to why he's stopping there or telling him to pull

22  forward?

23     A.    No.  I didn't -- we didn't talk about any of that

24  when that was occurring.

25     Q.    Where were you when you saw the reverse lights first

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                      Page 47

1   come on?

2        A.   I was outside my passenger door.

3        Q.   How far outside?

4        A.   I had just stepped out.  I don't want to say I just

5   stepped out.  I was outside my door within the door frame --

6   within the frame of the car and my door being wide open.

7        Q.   Did you ever consider getting back in the car?

8        A.   At that time there was -- there was nothing stating

9   I needed to get back in the car.

10       Q.   And this includes when you saw the reverse lights

11  coming on?

12       A.   Well, the moment the reverse lights came on, that's

13  when everything immediately began to happen.

14       Q.   Right.  That's what I'm wondering.

15            When you saw the reverse lights, did you consider

16  getting back in your car?

17       A.   There was no time to get back in that car.

18       Q.   I'm just wondering whether you considered it as an

19  option, but then thought, I don't have enough time.

20       A.   No.  There was -- there was no time of how quickly

21  the vehicle was reversing and colliding into our cars.

22            It had been immediately.

23       Q.   And at some point you see the impact with Officer

24  Varela's car; correct?

25       A.   Here, yes, sir.

1      Q.   Did you hear the red car make impact with your car

2   before you shot?

3      A.   I think it's more than that.  It's -- you hear it

4   and you see it.  Everything's happening right in front of

5   me.

6      Q.   What parts of the car is impacted, the red car and

7   your car, before you shot that you heard and saw?

8      A.   Well, it would be the rear driver's side bumper and

9   quarter panel, and then collided into our front passenger

10  fender headlight, but that's just when the initial collision

11  occurred.

12         Once the vehicle began reversing running alongside

13  the passenger side of our police vehicle, that's when the

14  discharging -- I started discharging my firearm as it ran

15  alongside the passenger side of our police car.

16     Q.   And I think you've already told me this, but your

17  first shot, you could not see the driver; is that correct?

18     A.   No, sir.

19     Q.   Is that correct?

20     A.   Yes, yes, you're correct.

21     Q.   But your second and third shots, you could see the

22  driver because you were shooting through the driver's side

23  window at the driver?

24     A.   Yes.

25     Q.   Obviously, you were to the side of the car for the

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                              Page 49

```
 1   second and third shots?

 2       A.   Well, I am to the side of the car being crushed,

 3   believing I'm being crushed by his vehicle and to my vehicle.

 4       Q.   Right.  But you would at least agree you ended up

 5   not being crushed?

 6       A.   I would agree after the fact, yeah, I was not

 7   crushed.

 8       Q.   Okay.  Was there a passenger in that red car?

 9       A.   Yes, there was.

10       Q.   And that was a female?

11       A.   Yes, yes, sir.

12       Q.   And she was setting in the right front seat?

13       A.   Yes, sir.

14       Q.   Did you know that when you fired your two shots at

15   the driver?

16       A.   Yes, I knew that, yes.

17       Q.   And you were aware if one of your shots missed the

18   driver, she could be struck?

19       A.   Yeah.  I took that to full consideration, but at

20   that time immediately my life was in danger of serious bodily

21   injury or I would not be here today.  Death was -- was felt

22   like it was going to be imminent.

23       Q.   That's the worst type of death, imminent.

24            And speaking of death, were you aware that the

25   driver died?
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 50

1      A.    I am aware.

2      Q.    And I take it you were aware that using deadly force

3    shooting someone in their upper body, was likely to cause

4    death or serious bodily injury?

5      A.    So -- I'm sorry.  I just didn't understand whether

6    you're asking me a question or -- I didn't understand the

7    parts of that.

8      Q.    That's okay.  I'll rephrase it.

9            You wear a ballistic vest when you're on duty;

10   correct?

11     A.    I do.

12     Q.    And that's to protect you against gunshots,

13   hopefully, to your chest and abdomen?

14     A.    Yes, sir.

15     Q.    Because you're trained if someone takes gunshots to

16   their upper body, it may cause of death or serious bodily

17   injury?

18     A.    I understand.

19     Q.    And you knew that when you were shooting him in his

20   upper body?

21     A.    It was not a concern of where I was shooting.

22           It was a concern of stopping the threat which was

23   the vehicle trying to crush me.

24     Q.    Do you even know if he saw you before you shot?

25     A.    I think he knew that he saw the police lights and

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 51

```
 1   the car.

 2       Q.   No.  But do you even know if he saw that you got out

 3   of your car?

 4       A.   I would not be able to know that.

 5       Q.   Right.  Were you trained that you should only use

 6   deadly force if there is an immediate threat of death or

 7   serious bodily injury?

 8       A.   Yes.  But there is more to that.

 9            It has to be imminent to myself or to somebody

10   else.

11       Q.   Right.  And that deadly force should only be used

12   when there are no other reasonable options?

13       A.   Yes, sir.

14       Q.   And you were also trained to give a verbal warning

15   before using deadly force when feasible?

16       A.   Yes, sir.

17       Q.   And you were trained to justify -- you have to

18   justify each of your shots?

19       A.   Yes, I do.

20       Q.   And you were trained to take into consideration your

21   background or backdrop before firing?

22       A.   Yes, sir.

23       Q.   Were you trained on the concept of reverence for

24   human life?

25       A.   Yes, of course.
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 52

1        Q.    And were you trained if there is not an immediate or

2    imminent threat of death or serious bodily injury to yourself

3    or others, you should not use deadly force?

4        A.    Yes, you're correct.

5        Q.    Now, at some point the female comes out of the

6    car?

7        A.    Yes, she does.

8        Q.    And did she tell you that someone was on the phone

9    with their mother?

10        A.    She expressed that her -- I think the driver's mom,

11    was on the phone, Mr. Benavente's.

12        Q.    With the driver?

13        A.    It was more less the phone was on bluetooth, and Ms.

14    Briona stated it was his mom.

15        Q.    And you heard a female voice?

16        A.    I did.

17        Q.    And could you make out anything the female voice was

18    saying?

19        A.    No, I did not.

20        MR. GALIPO:  I want to show you a few exhibits that

21    I'm hoping we can share screen on, Jim, and we'll send these

22    to Jinna and Jim right after the depo just so you have these.

23        Let's try showing Exhibit 1.

24        Alejandro is going to try to assist me.

25        Is there a way to see it so we can see it more full

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 55

```
 1      Q.   Okay.  Let's look at Exhibit 2, please.

 2           (Exhibit 2 was marked for identification.)

 3  BY MR. GALIPO:

 4      Q.   Does that look to be a photograph taken at some

 5  point following the shooting?

 6      A.   Yes.  I believe that's after the shooting, yes.

 7      Q.   The police vehicle we see on the left-hand side, do

 8  you know if that was in that position prior to the shooting

 9  or not?

10      A.   So you're asking if this vehicle in the left, the

11  police car, was positioned as such during?

12      Q.   Yes, if you know.

13      A.   I don't know because that -- that police car was not

14  the focus of my attention.

15      Q.   Do you recognize any of the officers in this

16  exhibit?

17      A.   Due to kind of how grainy it is, I would be just be

18  guessing, and I don't want to guess for you, sir.

19      Q.   That's fair enough.

20           Let's look at Exhibit 3.

21           (Exhibit 3 was marked for identification.)

22  BY MR. GALIPO:

23      Q.   This is another photograph of the red vehicle?

24      A.   Yes, sir.

25      Q.   And it's a little bit of a closer shot of the
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                          Page 56

```
 1   window.

 2           You see those two yellow markings on the window?

 3           MR. TOUCHSTONE:  Misstates the evidence.

 4           But go ahead.

 5           THE WITNESS:  I do.

 6   BY MR. GALIPO:

 7       Q.   Do you know what those represent?

 8       A.   I had learned they're used to identify what they

 9   believe is a gunshot.

10       Q.   Are they yellow, or am I color blind?

11       A.   No.  You're correct.

12       Q.   They are yellow because I thought maybe I'm

13   color-blind.

14           MR. TOUCHSTONE:  Well, you said there were two,

15   Dale.  That's why I was objecting.

16           But go ahead.

17   BY MR. GALIPO:

18       Q.   Well, how many yellow markings do you see?

19           Do you see two or three?

20       A.   I have seen other photographs where there's three.

21       Q.   Okay.  So is it your understanding now that all

22   three of your shots went through the driver's side window?

23       A.   That's my understanding, yes.

24       Q.   Do you have an understanding as to how many of those

25   shots struck the driver?
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 57

```
 1      A.    I did learn, yes.

 2      Q.    What is your understanding?

 3      A.    I learned that he was struck three times.

 4      Q.    Okay.  Let's look at Exhibit 4, please.

 5            (Exhibit 4 was marked for identification.)

 6   BY MR. GALIPO:

 7      Q.    Does this show the resting position of the red

 8   car?

 9      A.    Yes.  As far as I can recall, yes, sir.

10      Q.    And the vehicle behind it with the door open, do you

11   know whose vehicle that is?

12      A.    Based on my recollection, I believe that's to be our

13   vehicle, mine and Officer Escobar's.

14      Q.    Okay.  Let's look at -- oh, and in Exhibit 4 we can

15   also see some of the damage to the driver's side window from

16   the shooting; correct?

17      A.    Yes, sir.

18      Q.    Let's look at Exhibit 5, please.

19            (Exhibit 5 was marked for identification.)

20            MR. GALIPO:  So is it possible to -- yes.

21            Thank you.

22   BY MR. GALIPO:

23      Q.    I want to look at the bottom, the shooting at or

24   from moving vehicles.

25            This looks to be part of the Ontario Police
```

1    Department use-of-force policy?

2         A.   Yes, sir.

3         Q.   And 300.4 deals with deadly force applications?

4         A.   Yes, sir.

5         Q.   And 300.4.1 at the bottom of this exhibit deals with

6    shooting at or from moving vehicles?

7         A.   Yes, sir.

8         Q.   So I'm going to read this, and you just tell me if

9    that was your understanding of the policy at the time of our

10   shooting incident.

11              "Shots fired at or from a moving vehicle are rarely

12   effective and may involve additional considerations and

13   risk."

14              Was that part of the policy?

15        A.   Yes, sir.

16        Q.   "When feasible, officers should take reasonable

17   steps to move out of the path of the an approaching vehicle

18   instead of discharging their firearm at the vehicle or any of

19   its occupants."

20              Was that also part of the policy at the time of this

21   incident?

22        A.   Yes, sir.

23        Q.   "An officer should only discharge a firearm at a

24   moving vehicle or its occupants when the officer reasonably

25   believes there are no other reasonable means available to

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                   Page 59

1   avert the imminent threat of the vehicle or if deadly force

2   other than the vehicle is directed at the officer or others."

3           Was that also part of the policy?

4       A.   Yes, sir.

5       Q.   And then it says, "An officer may also use deadly

6   force to apprehend a person fleeing in a vehicle if in

7   compliance with Section 300.4(b) of this policy."

8           Was that also part of the policy?

9       A.   Yes, sir.

10      Q.   And 300.4(b) deals with the issue of a fleeing

11  felon; correct?

12      A.   Yes, sir.

13      Q.   Okay.  Thank you.

14          Can we look at Exhibit 6, please.

15          (Exhibit 6 was marked for identification.)

16  BY MR. GALIPO:

17      Q.   I believe this was taken after the shooting

18  occurred, but do you know the vehicles I'm looking at in

19  addition to the red car, three police vehicles in this?

20      A.   You're asking?

21      Q.   Can you see three police vehicles in this exhibit?

22      A.   Yes, I can.

23      Q.   Okay.  The vehicle furthest to the right as you're

24  looking at this exhibit, do you know whose vehicle that is?

25      A.   Further to the right -- well, do we have the same

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 62

1      Q.    So where were you pointing your weapon?

2            Were you pointing through the window?

3            Above the window?

4            Where did you have your weapon trained?

5      A.    So I had my handgun pointed in a north direction

6   just like where that arrow's pointing at.

7      Q.    Where was your handgun in relation to the window?

8            Was the window below your handgun?

9            To the left of your handgun?

10           To the right of your handgun?

11     A.    So the window and the door frame was not my vision

12   of sight.  So I don't know what -- where -- it was not in my

13   sight picture.

14     Q.    The window door frame was not in your sight

15   picture?

16     A.    That window door frame, yes, just the window where

17   it kind of does a backward "D" almost, it was not in my sight

18   picture.  So I don't -- I would -- I don't want to make

19   something up to say where my handgun was pointed at the

20   time.

21     Q.    Okay.  So I'm just envisioning if you're firing your

22   three shots that now appears to be through the driver's side

23   window as the vehicle is reversing, then it seems like the

24   driver's side window would have been in line with your

25   position when you fired the shots; is that fair?

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 63

1      A.   The driver's -- are you saying the driver's side

2    window would have been --

3      Q.   Of the red car, would have been in line with your

4    position when you were firing?

5           MR. TOUCHSTONE:  When you say in line, Dale, are you

6    saying perpendicular?

7           MR. GALIPO:  Yes.

8           MR. TOUCHSTONE:  Do you understand the --

9           THE WITNESS:  Yes, yes, it was right beside me, yes.

10   BY MR. GALIPO:

11     Q.   Okay.  And then you're saying after you fired your

12   three shots, the vehicle continued to go backwards?

13     A.   Yes.  At a high rate of speed.

14     Q.   Did it make an impact?

15     A.   Yes.  I heard another impact.

16          I did not know there was another patrol car behind

17   us.

18     Q.   And we see a patrol car behind you in this photo;

19   correct?

20     A.   Yes, sir.

21     Q.   Okay.  Have you ever seen any photo showing the

22   trajectory of the shots in the person's body?

23     A.   No, I have not.

24     Q.   Those are my next two exhibits, but I think I'm

25   going to spare you from having to look at those today.

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 64

1       A.   I do appreciate that.  Thank you.

2       **Q.   You're welcome.**

3       A.   Okay.  I think I'm done.

4            MR. TOUCHSTONE:  Jim, I'm just going to take three

5   minutes and talk to my colleagues, and they'll probably tell

6   me I forgot to ask all the important questions.

7            But I think I have a general idea of what happened.

8            MR. TOUCHSTONE:  All right.  Sounds good, Dale.

9            MR. GALIPO:  I'll be right back.

10           (Recess taken.)

11  BY MR. GALIPO:

12      **Q.   I'm looking at your statement, and you were asked**

13  **whether you thought you had one or two hands on your gun when**

14  **you fired.**

15           **And you said, "I believe two hands."**

16           **Do you remember saying that in your statement?**

17      A.   I do remember saying that, yes.

18      **Q.   Were your arms somewhat outstretched from your chest**

19  **when you were firing?**

20      A.   Yeah, they were in front of me.

21      **Q.   Did the vehicle ever hit your gun?**

22      A.   No.

23      **Q.   And you're saying at the time you fired, you were**

24  **not aware there was a vehicle behind you?**

25      A.   Yes, I was not aware of it.

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                    Page 65

```
 1      Q.   And to your knowledge, you were the only person
 2  outside of the vehicle at that time?
 3      A.   Yes, sir.
 4      Q.   When did you give your statement in relation to the
 5  incident?
 6           Was it the same day or some other time?
 7      A.   It was some other time, sir.
 8      Q.   How much time after the incident did you give your
 9  interview?
10      A.   I want to say it was approximately two to three days
11  after.
12      Q.   Did you at anytime approach the driver of the
13  vehicle after the shooting?
14      A.   I approached with the team, yes.
15      Q.   And did he still appear to be alive at that time?
16      A.   I knew he needed medical help.
17      Q.   How did you know that?
18      A.   Because I saw that he did have injuries to him or he
19  had injuries on his body.  So I knew he needed help.
20      Q.   Could you tell if he was still breathing or moving
21  after the shooting?
22      A.   I didn't get up-close personal with him to look at
23  those type of signs.
24      Q.   Did you hear him moaning at all after the
25  shooting?
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Albert Alvarado on 07/28/2023                                        Page 66

1      A.   Well, after the shooting, again, everything was so

2  loud because the sirens were still blaring, and people were

3  yelling.  So I didn't hear any kind of moaning.

4      **Q.   Did you have any conversation with the girlfriend or**

5  **the female who got out of the car?**

6      A.   I did not.

7      **Q.   Okay.  That's all I have.**

8           MR. GALIPO:  Jim, do you have any questions today?

9           MR. TOUCHSTONE:  No questions, Dale.

10          (Deposition proceeding concluded at 11:56 a.m.)

11                          *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25