# "EXHIBIT 2"

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

```
 1                 UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4   FRANK BENAVENTE; and NICOLE VENTRESS, )
                                          )
 5              Plaintiffs,               )
                                          )
 6              vs.                       )Case No.
                                          )5:23-CV-00266-SSS-KK
 7   ALBERT ALVARADO; CITY OF ONTARIO;    )
     and DOES 1 through 10, inclusive,    )
 8                                        )
                Defendants.               )
 9   _____)

10

11

12

13

14           REMOTE VIDEOCONFERENCE DEPOSITION OF

15                    KEVIN VASQUEZ LOPEZ

16                 THURSDAY, JANUARY 11, 2024

17

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  34657
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

```
 1                        CALIFORNIA

 2                THURSDAY, JANUARY 11, 2024

 3                        10:02 A.M.

 4                    KEVIN VASQUEZ LOPEZ,

 5  called as a witness on behalf of the Plaintiffs, having been

 6  first duly sworn remotely via videoconference, was examined

 7  and testified as follows:

 8                        EXAMINATION

 9  BY MR. GALIPO:

10      Q.   Can you please state your name.

11      A.   My name is Kevin, K-e-v-i-n, last name is two last

12  names, Vasquez Lopez, V-a-s-q-u-e-z, L-o-p-e-z.

13      Q.   Who do you currently work for?

14      A.   Currently work for the Ontario Police Department.

15      Q.   And when did you first start with them?

16      A.   August of 2017.

17      Q.   What type of work did you generally do before you

18  worked for Ontario?

19      A.   I worked for the San Bernardino County Sheriff's

20  Department.

21      Q.   When did you first go to the academy?

22      A.   I graduated in June of 2014.

23      Q.   And after graduating the academy, is that when you

24  went to work for the Sheriff's Department initially?

25      A.   Correct.
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

Page 7

```
1     A.   Yes, they did.

2     Q.   And where were you when you heard the shots?

3     A.   I was inside my vehicle.

4     Q.   Do you recall if you were in the process of getting

5   out when you heard the shots?

6     A.   Yes and no.

7     Q.   You want to explain that, please?

8     A.   My door was ajar attempting to get out, and then

9   there was a collision that occurred which made me stay inside

10   the vehicle.

11     Q.   The collision you're referring to, would that be

12   between your vehicle and the red vehicle?

13     A.   Correct.

14     Q.   And what part of the vehicles came in contact?

15          Would it be the front of your vehicle?

16     A.   Correct.

17     Q.   And the rear of the red car?

18     A.   Correct.

19     Q.   And are you saying that you heard the shots after

20   the impact?

21     A.   Correct.

22     Q.   And how long after the impact approximately did you

23   hear the shots?

24     A.   It was almost instantly.

25     Q.   Almost immediately after the impact?
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

Page 8

```
 1      A.   Correct.
 2      Q.   Do you have an estimate of the speed of your car at
 3   the time of the impact?
 4      A.   I do not.
 5      Q.   Do you have an estimate of the speed of the red car
 6   at the time of the impact?
 7      A.   I do not.
 8      Q.   Was your vehicle stopped immediately after the
 9   impact?
10      A.   Yes.
11      Q.   Was your vehicle stopped when you heard the shots?
12      A.   It wasn't immediately after the impact.
13           My vehicle might have been moving a little bit.
14           I don't recall.
15      Q.   So it was either stopped or moving just a little
16   bit?
17      A.   Correct.
18      Q.   How about the red car, do you know if it was moving
19   or stopped at the time of the shots?
20      A.   I can't recall.
21      Q.   Do you know if the red vehicle and your vehicle were
22   touching at the time of the shots?
23      A.   I couldn't tell.
24      Q.   Did you hear any verbal warning that shots were
25   going to be fired?
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

Page 9

| | | |
|---|---|---|
| 1 | A. | From my recollection, no. |
| 2 | Q. | Did you hear any commands in the five seconds before |
| 3 | the shots? | |
| 4 | A. | My recollection, no. |
| 5 | Q. | Do you know now who fired the shots? |
| 6 | A. | Yes, I do. |
| 7 | Q. | And what is your understanding? |
| 8 | A. | His name? |
| 9 | Q. | Yes. |
| 10 | A. | His name is Corporal Alvarado. |
| 11 | Q. | And I'm assuming you had worked with Corporal |
| 12 | Alvarado before the date of the incident? | |
| 13 | A. | Correct. |
| 14 | Q. | You were familiar with what he looked like, |
| 15 | generally? | |
| 16 | A. | Correct. |
| 17 | Q. | Did you see Corporal Alvarado at any time, let's |
| 18 | say, in the ten seconds before you heard the shots? | |
| 19 | A. | No. |
| 20 | Q. | Did you see Corporal Alvarado during the shots? |
| 21 | A. | No. |
| 22 | Q. | Did you see Corporal Alvarado immediately after the |
| 23 | shots? | |
| 24 | A. | No. |
| 25 | Q. | Where was Corporal Alvarado when you first saw him |

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

Page 10

1   after the shots?

2      A.   I first saw him when we took cover behind one of the

3   patrol vehicles.

4      Q.   And where did you take cover?

5      A.   Behind his patrol vehicle.

6      Q.   Did Corporal Alvarado tell you that he had fired the

7   shots?

8      A.   No.

9      Q.   Did anybody call in "shots fired" at that time?

10     A.   They called in immediately, almost immediately after

11  the shots rang out.

12     Q.   Do you know who made that dispatch?

13     A.   I do not.

14     Q.   So just to make sure I'm understanding, at this

15  point you see the red car moving in your direction; is that

16  true?

17     A.   At one point, yes.

18     Q.   And at some point there is an impact between the

19  back of the red car and the front of your car?

20     A.   Correct.

21     Q.   Do you believe your car was still moving forward at

22  the time of the impact?

23         MR. TOUCHSTONE:  Objection.  Asked and answered.

24         Go ahead.

25         THE WITNESS:  I can't recall.

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Kevin Vasquez Lopez on 01/11/2024

Page 11

```
1    BY MR. GALIPO:

2        Q.   You don't recall if your car was stopped or moving

3    at the time of the impact?

4        A.   I can't recall.

5        Q.   And then almost immediately after the impact, you're

6    saying you heard the two or three shots?

7        A.   Correct.

8        Q.   Where was the red car when you first saw it?

9        A.   It was parked facing north on Beverly Court close to

10   the east curbline.

11       Q.   At some point was there a vehicle pursuit?

12       A.   Correct.

13       Q.   Were you in the vehicle pursuit?

14       A.   Correct.

15       Q.   And which car were you, if you know?

16            In other words, the second car back, the third car

17   back?

18       A.   The third car back.

19       Q.   Do you know who was in the first car following the

20   red car in the pursuit?

21       A.   I do not.

22       Q.   Do you know who was in the second car?

23       A.   I do not.

24       Q.   But you were in the third car?

25       A.   Correct.
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

Page 12

```
 1        Q.   Were you alone in your car?

 2        A.   Yes.

 3        Q.   Had you been in vehicle pursuits before that day?

 4        A.   Yes.

 5        Q.   Do you have an estimate as to how many?

 6        A.   I would say more than -- more than eight,

 7   approximately.

 8        Q.   More than eight, approximate?

 9        A.   More than eight, approximately.

10        Q.   That's just an estimate?

11        A.   Just an estimate.

12        Q.   Did you know the identity of the person in the red

13   car while you were in the pursuit?

14        A.   I did not.

15        Q.   Did you have any information that the driver of the

16   red car had a weapon like a gun or a knife?

17        A.   I did not.

18        Q.   Did you have any information that the driver of the

19   red car had a criminal history before that day?

20        A.   I did not.

21        Q.   Any information that the driver of the vehicle had

22   ever injured anyone before that day?

23        A.   I did not.

24        Q.   Any information that the driver was under the

25   influence of drugs or alcohol?
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

Page 13

| | | |
|---|---|---|
| 1 | A. | I did not. |

2   Q.   Did you know how many people were in the car?

3   A.   I did not.

4   Q.   It's my understanding from watching some of the

5   video footage, there was a female in the car that was -- that

6   left the car after the shooting; is that your recollection?

7   A.   I'm sorry, Counsel.  Could you rephrase it?

8   Q.   Yeah, I sure can.

9        There was a female passenger who got out of the car

10  after the shooting; is that correct?

11  A.   That's correct.

12  Q.   Did you see the female passenger in the car at any

13  time before you heard the shots?

14  A.   No.

15  Q.   Could you tell where the shots were coming from?

16  A.   Yes and no.

17  Q.   You want to explain that, please.

18  A.   Yes.  The first shot I could -- one of the shots I

19  could see a shell casing in the air.  So I knew that at least

20  one of those shots were from the police vehicle.

21       The other shots, I didn't know where they were

22  coming from, and there's multiple shots.  So there was a

23  possibility that the shots were also -- could be coming from

24  the red vehicle.

25  Q.   And the casing that you saw in the air, was that

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

Page 14

```
 1    where in relation to you?

 2            Was that to your left or ahead of you?

 3    A.   Ahead of me.

 4    Q.   But you know now that all the shots were fired by a

 5    fellow officer?

 6    A.   Correct.

 7    Q.   Did you fire any shots at any time?

 8    A.   I did not.

 9    Q.   Had you ever been present before for an

10    officer-involved shooting?

11    A.   Can you rephrase that?

12    Q.   Sure.  You were present at the time of this

13    officer-involved shooting; correct?

14            You were actually there and you heard the shots?

15    A.   Correct.

16    Q.   I'm wondering if you had ever been present before

17    that day for an officer-involved shooting.

18    A.   No.

19    Q.   Have you ever been present since for an

20    officer-involved shooting?

21    A.   Yes.

22    Q.   On how many occasions since this?

23    A.   One additional.

24    Q.   And in that incident did you fire, or other

25    officers, or both?
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

Page 16

1   Beverly Court?

2       A.   Correct.

3       Q.   And then where was the red vehicle when you saw it

4   again?

5       A.   When I saw it it was facing northbound on Beverly

6   Court closest to the east curbline.

7       Q.   And was your vehicle moving forward at that time?

8       A.   Correct.

9       Q.   And the red vehicle, at the time you regained visual

10  on it, was how far from you approximately?

11      A.   Maybe two car lengths.

12      Q.   And could you tell if the red vehicle was stationary

13  or moving when you saw it again?

14      A.   It appeared to me to be stationary.

15      Q.   And at that point when you saw the red vehicle

16  again, did you notice any other patrol vehicles in the

17  area?

18      A.   Yes.

19      Q.   And can you describe where you saw those vehicles?

20      A.   I could only see one other vehicle, police vehicle,

21  and it was parked to the left of the red vehicle, and it was

22  parked in a direction facing northeast the front bumper, and

23  the rear bumper was in the direction of a southwest

24  direction.

25      Q.   Do you know now whose vehicle that was?

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

Page 17

```
 1     A.   Yes.

 2     Q.   And what is your understanding now?

 3     A.   Corporal Alvarado and at that time his trainee.

 4     Q.   Do you have an understanding as to who was driving

 5   that vehicle, Corporal Alvarado or the trainee?

 6     A.   At the time of the pursuit, no.

 7     Q.   Do you know now?

 8     A.   Yes.

 9     Q.   And what is your understanding?

10     A.   The trainee was driving the vehicle.

11     Q.   So is it your understanding at least now that

12   Corporal Alvarado fired the shots from the passenger side of

13   his vehicle?

14     A.   Now I know that.

15     Q.   And is it your understanding at least now that he

16   fired those shots into the driver side of the red car?

17     A.    It appears that that's what happened during the

18   incident.

19     Q.   And at some point I'm going back to the time when

20   you regained visual on the red car when it was about two car

21   lengths ahead of you and it appeared stopped.

22          Are you with me time-wise?

23     A.   Yes, sir.

24     Q.   Did you then see the red vehicle at some point

25   coming back in your direction?
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Kevin Vasquez Lopez on 01/11/2024

Page 18

1      A.   Yes, I did.

2      Q.   And while it was coming back in your direction, were

3   you still moving forward, or had you already stopped?

4      A.   Moving forward.

5      Q.   And so at some point as you continue to move forward

6   and it's coming back in your direction, there would be the

7   impact we discussed earlier?

8      A.   No.  There was an additional impact.

9      Q.   Okay.  Can you explain that to me, please.

10      A.   Yes.  The red vehicle began backing up and made what

11   appeared to me at the time an S motion where its rear bumper

12   turned in the direction of Corporal Alvarado's vehicle.

13           And then there was that collision between the red

14   car and Corporal Alvarado's vehicle.

15      Q.   If I call that Collision 1, will you know what I'm

16   referring to?

17      A.   Yes, sir.

18      Q.   And just so that I'm clear in that Collision 1, what

19   part of the red car impacted what part of Corporal Alvarado's

20   vehicle?

21           MR. TOUCHSTONE:  Objection.  Lacks foundation.

22           You can answer.

23           THE WITNESS:  At the time it appeared that the rear

24   driver side of the red vehicle contacted the front panel on

25   the passenger side of the police unit Corporal Alvarado's was

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

Page 22

1   pursuit, and I opened my door to ajar it.  At the time the

2   collision occurred, I'm not sure if that door slammed back

3   closed, or if I closed it, but the door ended up closing.

4       Q.   Okay.  And after the impact, so this would be after

5   the impact between the red car and the front of your car, do

6   you recall your car moving further forward or backwards?

7       A.   From my perspective at the time after the collision,

8   my car was stationary.

9       Q.   And how about the red car, do you -- did you see it

10  moving forward or backwards in between the time of the impact

11  and the shots?

12       I realize it was very close in time, but did you see

13  it moving at all before the shots after the impact?

14      A.   From my recollection of the time of the incident

15  during the incident, when I got out it, it appeared that the

16  car was starting to move forward.

17      Q.   Moving forward away from you?

18      A.   Moving towards north direction.

19      Q.   But would that be before or after the shots?

20      A.   That would be after.

21      Q.   I was wondering whether you saw it moving further

22  backwards or forward before the shots, after the impact, but

23  before the shots.

24      A.   I could not tell.

25      Q.   And where did you go?  I'm assuming you saw the red

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

Page 24

1    A.   Commands were, if I remember correctly, it was "let

2    me see your hands, let me see your hands, put your hands on

3    the dash."

4    Q.   When you saw -- I'm going to back up just for a

5    minute.

6         When you saw the vehicle, the red vehicle initially

7    stopped at Beverly Court when it was about two car lengths

8    from your vehicle, do you recall that time frame?

9    A.   Yes.  Before Collision 1 occurred?

10   Q.   Correct.

11   A.   Okay.

12   Q.   Did you see anybody outside the red car, either in

13   front of it, to the side of it, or behind it?

14   A.   No.

15   Q.   When the red car was going in the direction of

16   Corporal Alvarado's vehicle, did you see anyone behind the

17   car out of their car?

18   A.   No.

19   Q.   At the time of Collision 1, did you see anyone out

20   of their vehicle, either behind, to the side of, or in the

21   front of the red car?

22   A.   No.

23   Q.   And then in between Collision 1 and your collision

24   which we called Collision 2, did you see anybody outside of

25   their car as the red car was coming in your direction?

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

Page 25

1     A.   No.

2     Q.   Your understanding at that time and belief was

3  everyone was inside their car, still?

4     A.   Yes.

5     Q.   And you were getting prepared it sounds like in case

6  the driver took off on a foot bail pail to get out and pursue

7  him?

8     A.   This was as I was entering Beverly Court?

9     Q.   Yes.

10    A.   Yes.

11    Q.   So would it be correct to say during the movements

12  of the red car that you saw leading up to Collision 1 and

13  Collision 2, you did not see anybody out of their vehicle on

14  Beverly Court; is that a fair statement?

15    A.   Yes.

16    Q.   And the female, did they eventually get out of the

17  vehicle?

18    A.   She did eventually get out of the vehicle.

19    Q.   Do you know who the name of the trainee was, do you

20  know that now?

21    A.   I do.  But it slips my mind right now.

22    Q.   That's okay.

23    A.   Escobar.  Just came to me, sir.

24    Q.   So Escobar was the trainee for Corporal Alvarado?

25    A.   Correct.

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Kevin Vasquez Lopez on 01/11/2024

Page 26

1    Q.   And you already told me you were alone in your

2    vehicle?

3    A.   Correct.

4    Q.   And I think you told me earlier that you believed

5    you were the third vehicle back in the foot pursuit?

6        MR. TOUCHSTONE:  Foot pursuit, Dale?

7        MR. GALIPO:  I mean vehicle pursuit.  Sorry.

8        THE WITNESS:  Yes.  On the vehicle pursuit.

9    BY MR. GALIPO:

10   Q.   Vehicle pursuit.  I apologize.

11       I think I was just talking about foot pursuits, and

12   my mind was thinking one thing, and my mouth was saying

13   something different.

14       Do you know who was in that other vehicle now?

15   A.   Yes.

16   Q.   And who was in the other vehicle?

17   A.   Officer Varela.

18   Q.   So at the time the shots were fired, to your

19   knowledge, were there four officers there, Alvarado, Escobar,

20   yourself, and the other officer you just mentioned?

21   A.   I believe there was at least four officers, yes.

22   Q.   In three different cars?

23   A.   Yes.

24   Q.   Do you know where the other patrol vehicle was at

25   the time of the impacts or the shooting?

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Kevin Vasquez Lopez on 01/11/2024

Page 28

1      Q.    Who else approached with you?

2      A.    And this was for the rescue.  It was Officer

3   Bernette, Officer Medina, myself, Alex Roldan [phonetic.].

4            I can't remember who else was behind her.

5      Q.    Okay.  Can you spell the last name of the last

6   officer you mentioned?

7      A.    R-o-l-d-a-n.

8      Q.    Okay.  It sounds like other officers arrived

9   on-scene after the shooting?

10     A.    Yes.

11     Q.    And did you observe the driver at some point when

12   you approached the red car?

13     A.    Yes.

14     Q.    And where was the driver when you observed him when

15   you approached?

16     A.    He was seated in the driver seat of the vehicle.

17     Q.    Okay.  And what was his position, if you recall?

18           Was he slumped over to one side or the other?

19     A.    At that point he was slumped over towards the front

20   passenger seat.

21     Q.    Was he the only one remaining in the vehicle at that

22   point?

23     A.    Correct.

24     Q.    Do you have an estimate as to how much time passed

25   in between the shooting and you approaching and making this

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Kevin Vasquez Lopez on 01/11/2024

Page 30

1  talking about the time frame after the red vehicle moved

2  forward, after it came to a stop, after the female got out,

3  after she was detained.

4      A.   Okay.  And we went to do the rescue?

5      Q.   Correct.

6      A.   Okay.  What was your question?

7           I'm sorry.

8      Q.   I'm just wondering what observations you made

9  regarding the driver after you approached.

10     A.   He was slumped over towards the front passenger

11 side.

12     Q.   Did you make any further observations later like

13 when he was taken out of the vehicle or anything else?

14     A.   Yes.

15     Q.   Can you explain that, please.

16     A.   It appeared that he had a gunshot wound to somewhere

17 in the neck area.

18     Q.   What did you see in that regards?

19     A.   It just looked like a small hole.

20          At that time it appeared to me to possibly be an

21 entry wound.

22     Q.   Did you see some blood associated with that wound?

23     A.   There was from my perspective, there was no blood in

24 that area.

25     Q.   Did you see blood anywhere else?

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

Page 31

```
 1     A.   Yes.  I could see some blood somewhere around the

 2  front of his pants pocket, like in front of his pants.

 3     Q.   Do you know if he was handcuffed at some point?

 4     A.   Yes.

 5     Q.   And was he?

 6     A.   Yes.

 7     Q.   Do you know who handcuffed him?

 8     A.   I believe it was myself and Officer Wilbur

 9  [phonetic.].

10     Q.   Was he still alive when you handcuffed him?

11     A.   I could not tell.

12     Q.   I'm assuming he was taken out of the vehicle before

13  he was handcuffed?

14     A.   Yes.

15     Q.   Who took him out of the vehicle?

16     A.   It was myself and Officer Wilbur.

17     Q.   Did you have any weapons on him?

18     A.   From my recollection, no.

19     Q.   Do you know when the ambulance and the paramedics

20  got to him?

21     A.   A time frame, I do not.

22     Q.   Would it be -- were they on the scene when he was

23  handcuffed?

24     A.   They were not on the scene at the scene where the

25  incident occurred, but it appeared to me from dispatch that
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Kevin Vasquez Lopez on 01/11/2024

Page 35

1       A.   It looks open, yes.

2       Q.   The time stamp on this I think is 23:56 and 43

3    seconds.

4            MR. GALIPO:  Can we go to Exhibit 3, please.

5            (Exhibit 3 was marked for identification.)

6    BY MR. GALIPO:

7       Q.   Again, we can see the portion of the front of your

8    vehicle and the red vehicle?

9       A.   I could see that.

10      Q.   And it looks like the -- can you tell if the red

11   vehicle's touching your patrol vehicle in this shot, or it's

12   hard to tell?

13      A.   It's hard to tell.

14      Q.   Would you agree they look like they're either

15   touching or very close?

16      A.   Very close.

17      Q.   And in this image also at 23:56:43, now we could

18   what appears to be a portion of Corporal Alvarado in the open

19   door area?

20      A.   I could see from this picture, yes, the male subject

21   appears to be Corporal Alvarado.

22      Q.   But if I understand your testimony, you did not see

23   Corporal Alvarado in that area prior to the shots?

24      A.   That's correct.

25      Q.   Okay.

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

Page 36

1          MR. GALIPO:  Can we go to Exhibit 4, please.

2          (Exhibit 4 was marked for identification.)

3   BY MR. GALIPO:

4      Q.   This is at 23:56:44.

5          Again, we can see the red car in the front of your

6   car?

7      A.   Yes.

8      Q.   And it appears that we can see at least someone in

9   the red car in this image?

10     A.   In that image you can tell that there is somebody on

11  that corner towards the front passenger side.

12     Q.   And at least in this image, again, it looks like the

13  red car is either touching the front of your car or very

14  close to it?

15     A.   Touching or very close.

16     Q.   And the door on the passenger side of Alvarado's

17  vehicle, again, looks open?

18     A.   Correct.

19     Q.   Okay.

20          MR. GALIPO:  Can we go to the next Exhibit 5,

21  please.

22          (Exhibit 5 was marked for identification.)

23  BY MR. GALIPO:

24     Q.   Again, this is at 23:56:44.

25          The back of the read car and the front of your car

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

Page 39

1      Q.   And generally, if there is an immediate threat of

2   death or serious bodily injury to the officer or others, you

3   can use deadly force?

4      A.   Correct.

5      Q.   And is the opposite of that true; if there is not an

6   immediate threat of death or serious bodily injury, you

7   should not use deadly force?

8      A.   Can you rephrase that?

9      Q.   Sure.  Were you trained that if there is not an

10   immediate or imminent threat of death or serious bodily

11   injury, then you should not use deadly force?

12      A.   Correct.

13      Q.   Now, do you also have a policy with the Department

14   that deals with shooting into motor vehicles?

15      A.   Correct.

16      Q.   And does the policy generally discourage officers

17   from doing that?

18      A.   They say -- the policy states it's rarely effective,

19   and other considerations should be taken into account.

20      Q.   Do you know if the policy talks about staying out of

21   the path of the vehicle and moving out the path if you can

22   instead of discharging a weapon at the vehicle?

23      A.   It mentions in paraphrasing that if a vehicle's

24   coming, the officers should take if feasible actions to move

25   out of the path of the traffic, threat.

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

Page 40

1    Q.   Does it also reference that the officer should move

2    out of the path rather than discharge the weapon at the

3    vehicle?

4    A.   It says if it's feasible to so, then yes.

5    Q.   And how are officers trained on their policy?

6         Is that part field training, or they're just given

7    copies online?

8         How does that work so that the officer could become

9    familiar with the policies of the Department?

10   A.   This department is really good in training.

11        We go through physical scenarios, real life

12   scenarios, also classroom instructions, as well as giving you

13   a paper copy, or -- I'm sorry -- everything's online now, on

14   online version on that.

15        During the trainings in person, most of the times

16   they will hand you a paper copy of the policies.

17   Q.   And that particular policy about shooting at moving

18   vehicles, you believe was discussed thoroughly in training?

19   A.   Yes.

20   Q.   Okay.

21        MR. GALIPO:  Jim and Jinna, is this a good time to

22   take our break?

23        MR. TOUCHSTONE:  Sounds good.

24        MR. GALIPO:  How about if we go to about 11:10?

25        MR. TOUCHSTONE:  Works for me.

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
**Kevin Vasquez Lopez on 01/11/2024**

Page 42

1    prior to the shots or during the shots?

2       A.   My focus was on the vehicle.  So I was focused on

3    that.  I couldn't see or my focus was not on this side, but

4    now reviewing that video, it appeared to me that he was

5    outside and nearly me almost being crushed by that red car.

6       Q.   But you never saw that at the time?

7       A.   At that time, no.

8       Q.   And when you observed the impact between the red car

9    and the Corporal's vehicle, you didn't see Alvarado outside

10   the car at that point?

11      A.   At that point during the incident, no.

12      Q.   It sounds like you didn't even see Alvarado's door

13   open prior to the shooting; is that fair?

14      A.   During the incident I did not see the door.

15      Q.   And what type of car was your vehicle?

16           Do you recall?

17      A.   It should have been a standard issued Ford Explorer

18   police unit.

19      Q.   Would it be fair to say that your vehicle was larger

20   than the red car?

21      A.   That's fair to say.

22      Q.   And I take it that the red car was not pushing your

23   car backwards; is that also fair to say?

24      A.   At the time I couldn't tell because of the other

25   collision.  I don't know if it could have pulled my car back

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Kevin Vasquez Lopez on 01/11/2024

Page 43

```
1   with the momentum that it was going.

2      Q.   But after the impact you didn't feel your car being

3   pushed backwards afterwards, did you?

4      A.   We were both collided, and it appeared that both

5   cars were stopped.

6      Q.   Okay.  And it appeared to you that both cars were

7   stopped at the time you heard the shots?

8      A.   Can you rephrase that?

9      Q.   Yes.  It appeared to you that both cars were stopped

10  at the time you heard the shots?

11        MR. TOUCHSTONE:  Objection.  Asked and answered.

12        Go ahead.

13        THE WITNESS:  I couldn't tell.  It was almost

14  instant.  It was crash, and then bang, bang, bang.

15        It was extremely, extremely fast.

16  BY MR. GALIPO:

17     Q.   Right.  But I thought you just told me that after

18  the impact, it appeared to you that both cars were stopped?

19     A.   I don't know if the momentum was still going, but it

20  appeared that both of them were stopped after the impact.

21     Q.   Right.  And I thought you told me that you heard the

22  shots almost immediately after the impact?

23     A.   After the crash, the crunch, and then it was almost

24  instantly after the bang, bang.

25     Q.   And you didn't see the red car moving forward either
```

**FRANK BENAVENTE, ET AL. vs ALBERT ALVARADO, ET AL.**
Kevin Vasquez Lopez on 01/11/2024

Page 44

```
 1   right before the shots, did you?

 2        A.   Before the shots, the vehicle appeared to be heading

 3   in my direction, reversing.

 4        Q.   I guess what I'm saying, after the impact you didn't

 5   see it move, start to move forward again before you heard the

 6   shots, did you?

 7        A.   I -- say that again?  I'm sorry.

 8        Q.   Sure.  That's okay.

 9             After the impact with your car, did you see the red

10   car move forward again before the shots?

11        A.   I didn't see it.

12        Q.   Okay.  I think that's all I have.

13             MR. GALIPO:  Do you have any questions for the

14   officer today, Jim?

15             MR. TOUCHSTONE:  No, I do not.

16             Thank you, Dale.

17             MR. GALIPO:  Okay.  Let's go off the record.

18             (Discussion held off the record.)

19             (Deposition proceeding concluded at 11:20 a.m.)

20                           *   *   *

21

22

23

24

25
```