"EXHIBIT 3"

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

```
 1                 UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4  FRANK BENAVENTE; and NICOLE VENTRESS, )
                                          )
 5                 Plaintiffs,            )
                                          )
 6                 vs.                    )Case No.
                                          )5:23-CV-00266-SSS-KK
 7  ALBERT ALVARADO; CITY OF ONTARIO;     )
    and DOES 1 through 10, inclusive,     )
 8                                        )
                   Defendants.            )
 9  _____)

10

11

12

13

14            REMOTE VIDEOCONFERENCE DEPOSITION OF

15                      ANDRES VARELA

16                FRIDAY, JANUARY 12, 2024

17

18

19

20

21

22

23  Reported Stenographically By:

24  Jinna Grace Kim, CSR No. 14151

25  Job No.:  34660
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 2

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4   FRANK BENAVENTE; and NICOLE VENTRESS, )
                                          )
 5                 Plaintiffs,            )
                                          )
 6                 vs.                    )Case No.
                                          )5:23-CV-00266-SSS-KK
 7   ALBERT ALVARADO; CITY OF ONTARIO;    )
     and DOES 1 through 10, inclusive,    )
 8                                        )
                   Defendants.            )
 9   _____)

10

11

12

13

14          The remote videoconference deposition of ANDRES

15   VARELA, taken on behalf of the Plaintiffs, beginning at 9:00

16   a.m., and ending at  10:39 a.m., on Friday, January 12, 2024,

17   before Jinna Grace Kim, Certified Stenographic Shorthand

18   Reporter No. 14151.

19

20

21

22

23

24

25
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

```
 1    APPEARANCES OF COUNSEL:

 2

      For the Plaintiffs:
 3
               LAW OFFICES OF DALE K. GALIPO
 4             BY:  DALE K. GALIPO, ESQ.
               BY:  MARCEL SINCICH, ESQ.
 5             21800 Burbank Boulevard, Suite 310
               Woodland Hills, California 91367
 6             Tel:  818-347-3333
               Fax:  818-347-4118
 7             E-mail:  dalekgalipo@yahoo.com
               E-mail:  msincich@galipolaw.com
 8

 9    For the Defendants:

10             JONES MAYER
               BY:  JAMES R. TOUCHSTONE, ESQ.
11             3777 North Harbor Boulevard
               Fullerton, California 92835
12             Tel:  714-446-1400
               Fax:  714-446-1448
13             E-mail:  jrt@jones-mayer.com

14

15

16

17

18

19

20

21

22

23

24

25
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 5

```
 1                        CALIFORNIA

 2                   FRIDAY, JANUARY 12, 2024

 3                         9:00 A.M.

 4                       ANDRES VARELA,

 5  called as a witness on behalf of the Plaintiffs, having been

 6  first duly sworn remotely via videoconference, was examined

 7  and testified as follows:

 8                        EXAMINATION

 9  BY MR. SINCICH:

10       Q.   Can you please state your full name and spell it for

11  the record.

12       A.   Andres, A-d-r-e-s, Varelas, V-a-r-e-l-a.

13       Q.   Have you had your deposition taken before?

14       A.   No.

15       Q.   Have you testified in court before?

16       A.   Yes.

17       Q.   How many times?

18       A.   Over ten times, maybe even over 20.

19            I couldn't give you an exact number.

20       Q.   Right.  I don't know if you are familiar with some

21  of the processes and rules for testifying in a court type

22  setting.

23            Do you understand that you have a duty to tell the

24  truth today?

25       A.   Yes.
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 8

1    question."  The "understood" got cut out, but I assumed you

2    said "understood," but okay.

3            MR. SINCICH:  All right.  Jim, is it cutting out for

4    you guys also, or are you guys understanding what I'm saying?

5            MR. TOUCHSTONE:  Seems a little better now for

6    whatever reason, so.

7            MR. SINCICH:  Okay.  I'll lean forward, make it

8    easier.

9            MR. TOUCHSTONE:  Yeah.  That's been my experience,

10   Marcel.  If you're far away from the mic and it's voice

11   activated, you get that cutting out a little bit at the

12   beginning and for whatever reason.

13           MR. SINCICH:  All right.  Yeah.

14   BY MR. SINCICH:

15       Q.  Do you understand that at the end of the deposition

16   our court reporter is going to be putting together a

17   transcript, and you'll be he able to review the transcript

18   and make any changes to your answers if you feel that that's

19   necessary?

20       A.  Yes.

21       Q.  I will caution you that if you do make any changes

22   to your responses, that that is something that we can comment

23   on either before the court or a jury.

24           Do you understand that?

25       A.  Yes, I do.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Andres Varela on 01/12/2024

Page 9

```
 1      Q.   Okay.  Is there any reason why you can't have your

 2   deposition taken today, give your best testimony?

 3      A.   No.

 4      Q.   Do you understand you're here to discuss the

 5   officer-involved shooting of Mr. Benavente?

 6      A.   Yes.

 7      Q.   Do you recall the date of the incident?

 8      A.   February 22 of 2021.

 9      Q.   And do you recall approximately what time it

10   occurred?

11      A.   Yes.

12      Q.   What time was it?

13      A.   Approximately 11:55 p.m.

14      Q.   Did you use any force during the incident?

15      A.   No.

16      Q.   Do you know if anyone else used force during the

17   incident?

18      A.   Can you clarify that?

19           Do you mean at the time or after reviewing my

20   body-worn?

21      Q.   Right.  As you sit here today, do you know if anyone

22   else used force during the incident?

23      A.   Yes.

24      Q.   Who was that?

25      A.   Corporal Alvarado.
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 10

| | | |
|---|---|---|
| 1 | Q. | And do you know what type of force he used? |
| 2 | A. | Yes. |
| 3 | Q. | What type of force? |
| 4 | A. | He discharged his firearm. |
| 5 | Q. | Is that classified as deadly force? |
| 6 | A. | Yes. |
| 7 | Q. | Do you know how many times he discharged his firearm |
| 8 | | as you sit here today? |
| 9 | A. | Yes. |
| 10 | Q. | How many? |
| 11 | A. | Three times. |
| 12 | Q. | During the incident do you know how many times he |
| 13 | | discharged his firearm? |
| 14 | A. | During the incident I believed it was two shots. |
| 15 | Q. | Is it fair to say that they occurred in rapid |
| 16 | | succession? |
| 17 | A. | Yes. |
| 18 | Q. | Did you review any documents in preparation for |
| 19 | | today? |
| 20 | A. | Yes. |
| 21 | Q. | What did you review? |
| 22 | A. | My transcript and body-worn camera. |
| 23 | Q. | By transcript, do you mean the transcript of your |
| 24 | | interview with the detectives? |
| 25 | A. | Yes. |

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

1    Q.   When did you give your statement with respect to the

2    incident --

3           MR. TOUCHSTONE:  I'm sorry, Marcel.  You froze.

4           We didn't get that.

5    BY MR. SINCICH:

6    Q.   When -- did you give your statement with respect to

7    the incident?

8    A.   You're pretty choppy at the beginning of that

9    sentence, sir.  I apologize.

10          Can you repeat the question.

11   Q.   No problem.  I hope it doesn't continue like that.

12          When did you give your statement with respect to the

13   incident?

14   A.   Three days after.  It was -- I believe it was

15   February 25, 2021.

16   Q.   And when was the last time you reviewed that

17   transcript?

18   A.   Last night.

19   Q.   What about the last time that you reviewed your

20   body-worn camera video?

21   A.   I believe that was last week with my attorney.

22   Q.   Have you ever done a walk-through of the incident?

23   A.   Can you clarify that, sir.

24   Q.   Have you ever been back to the scene of the

25   incident?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 12

```
 1    A.   No.

 2    Q.   Did you or were you ever part of a debriefing like a

 3    tactical debrief of the incident?

 4    A.   No.

 5    Q.   Was there ever a meeting outside of a meeting with

 6    your attorney -- based off of work where there were the

 7    officers involved, a lieutenant, or some kind of supervisor

 8    discussing what occurred and what could be done better?

 9    A.   No.

10         MR. TOUCHSTONE:  Well, I'm going to interpose a

11    belated objection.  Lacks foundation.

12         That he was involved in?

13         MR. SINCICH:  Yes.

14         MR. TOUCHSTONE:  That you were involved in.

15         THE WITNESS:  Can you repeat the question?

16    BY MR. SINCICH:

17    Q.   Yeah.  Were you involved in any kind of discussion

18    about what occurred and what could have been improved upon

19    with supervisors?

20    A.   No.  We've always been advised that after an

21    officer-involved shooting not to discuss the incident

22    until -- unless we're speaking with our attorney.

23    Q.   And does that restriction of speaking of the

24    incident ever get released, to your knowledge?

25    A.   Can you repeat the question?
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 13

1      Q.   That restriction of not being able to speak about

2   the incident, does that ever get released, to your

3   knowledge?

4      A.   After an officer-involved shooting after

5   everything's been cleared and there is no more litigation, we

6   always review things just to better our tactics or what we

7   can do better on any situation.

8      Q.   Do you know if this OIS has been cleared yet?

9      A.   I believe it was because I received a letter from

10   the law firm that was presenting us.  I kind of got confused

11   because now they depo was happening, and that was cleared by

12   my attorney that this is on the civil.

13           So my understanding is the criminal side isn't

14   cleared.

15      Q.   What about any kind of Internal Affairs

16   investigation, do you know if that that's been concluded

17   yet?

18      A.   No.  I'm unaware of any Internal Affairs.

19           I was not involved in one.

20      Q.   Who do you currently work for?

21      A.   Ontario Police Department.

22      Q.   And is that who you worked for at the time of the

23   incident?

24      A.   Yes.

25      Q.   When did you graduate the academy?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

 1    A.   2014, September 11.

 2    Q.   It's easy to remember that one; right?

 3    A.   Yes, sir.

 4    Q.   And what was the first department that you worked

 5  for after graduating the academy?

 6    A.   The San Bernardino County Sheriff's Department.

 7    Q.   How long were you there?

 8    A.   Five years approximately.

 9    Q.   What was the highest rank you achieved there?

10    A.   Deputy.

11    Q.   At the academy did you study the POST Standards?

12    A.   We did.

13    Q.   And in San Bernardino were you also trained on the

14  POST Standards?

15    A.   I was.

16    Q.   I'm trying to do the math in my head, but maybe you

17  can help out.

18         At the time of the incident how long had you been

19  employed by Ontario?

20    A.   I reviewed my transcript and I believe my answer was

21  a year and approximately three months.

22    Q.   Do you believe that's accurate?

23    A.   Yes.

24    Q.   Did you have to go through any additional training

25  after you transferred?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 15

```
 1     A.   Yes.

 2     Q.   What kind of training did you have to do?

 3     A.   Just orientation to get acclimated with the ways of

 4  how Ontario Police Department operates.

 5          Every department is different.

 6     Q.   Despite the differences between the departments, is

 7  it your understanding that Ontario's policies are also based

 8  off the POST Standards?

 9     A.   Yes.

10     Q.   You were not on probation or anything at the time of

11  the incident, were you?

12     A.   No.

13     Q.   You were the driver of your vehicle?

14     A.   Yes.

15     Q.   And you were the only officer in your vehicle at the

16  time?

17     A.   Yes.

18     Q.   At the time were you assigned to be a patrol

19  officer?

20     A.   Yes.

21     Q.   Are you still a patrol officer?

22     A.   No.

23     Q.   What is your current role?

24     A.   I'm assigned to the Community Engagement Team.

25     Q.   Can you say that again?
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

```
 1     A.   I'm assigned to the Community Engagement Team.

 2     Q.   What is the Community Engagement Team do?

 3     A.   Various duties.  We reach out and give resources to

 4   the homeless.  Trying to think -- we provide housing, just

 5   some kind of umbrella encompassing all.  We have school

 6   resource officers involved in it.

 7          I'm part of a subsection of the community.

 8          I'm part of the Bike Team.  So I'm assigned to

 9   Downtown area of the Ontario City.  So just providing

10   resources up to security for city hall meetings, council

11   meetings and various other duties.

12     Q.   How long after the incident was it before you got

13   transferred to the Community Engagement Team?

14     A.   I'm recent to the team.  I joined -- I would

15   estimate September of 2023, I believe, I joined the team, the

16   detail, excuse me.

17     Q.   Have you ever had any military experience?

18     A.   No, sir.

19     Q.   At the time of the incident you had your firearm

20   with you; right?

21     A.   Yes.

22     Q.   Did you ever draw your firearm while you were in

23   your vehicle?

24     A.   No.

25     Q.   Did you ever draw your firearm at all during the
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

1  incident?

2     A.   Yes.

3     Q.   When did you draw your firearm, generally

4  speaking?

5     A.   When I got out of my vehicle at the end of our

6  pursuit.

7     Q.   Was that after Corporal Alvarado fired his shots?

8     A.   My understanding now, yes.

9     Q.   Did you have a ballistic vest on at the time?

10    A.   Yes.

11    Q.   Do you know if the officers' vehicles were equipped

12  with ballistic panels in their doors?

13    A.   They're not.

14    Q.   And I know you mentioned that you had body-worn

15  camera, but do you know if any of the vehicles were equipped

16  with dash cams at the time of the incident?

17    A.   No.

18    Q.   What about now?

19    A.   Yes.

20    Q.   Do you know how long after the incident the

21  department began to utilize dash cams?

22    A.   We have not utilized them.  They have only been

23  installed into the vehicles.  We need to get trained before

24  actually utilizing the body-worn cameras.

25         Excuse me.  The dashboard cameras to the vehicles.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 18

1    Q.   And then on your person I understand that you had

2   some other equipment and tools such as less-lethal options?

3    A.   Yes.

4    Q.   Can you go through those for me real quick.

5    A.   I also had my Taser, pepper spray which was both

6   items were located on my left thigh, and on my actual belt my

7   RCB which is known as a retractable collapsible baton.

8    Q.   Did you also have a hobble with you?

9    A.   Yes.  I apologize.

10        That was located around my left boot.

11   Q.   And a tactical knife?

12   A.   Yes.  In my left pocket. I apologize.

13   Q.   Yeah.  And you had your radio with you as well;

14  right?

15   A.   Yes.

16   Q.   Do officers typically utilize earpiece with their

17  radio so that they can continue to hear communication even

18  when they're out of the vehicle?

19   A.   Some utilize an earpiece.

20   Q.   If the officers are not utilizing an earpiece, can

21  they still hear the radio communication even when they're out

22  of the vehicle?

23        MR. TOUCHSTONE:  Objection.  Foundation.

24        THE WITNESS:  I do not know.  I use an earpiece.

25        I wouldn't be able to answer that.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 19

1   BY MR. SINCICH:

2       Q.    From the radio that you were issued at the time, if

3   you didn't use an earpiece, would radio communication

4   essentially come out kind of like on a speaker phone?

5       A.    Yes.

6       Q.    Where did you position your body-worn camera on your

7   body at the time of the incident?

8       A.    Position on my belt to the left of my belt buckle.

9       Q.    Do you know if there was any kind of policy or

10  training at the department as to where officers should

11  position their body-worn camera?

12      A.    It needs to be mounted on your body facing

13  forward.

14      Q.    Is there any guideline as to where it's better to

15  put it, for instance, on the middle of your chest, on the

16  belt, anything like that?

17      A.    I wouldn't be able so say verbatim.

18          I know they provide us an magnet so if need be, you

19  can put it on your chest.  And then we have another clip that

20  you can put it on your belt.

21          So I utilize a clip on the belt.

22      Q.    Was it your understanding that Corporal Alvarado was

23  the senior officer in the pursuit?

24      A.    That's -- will you be able to reword that question?

25          It's kind of difficult to answer that question.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Andres Varela on 01/12/2024

Page 20

1      Q.   Right.  Would you have considered him a supervisor

2   of the officers that were involved in the pursuit?

3      A.   Yes.

4      Q.   And he was the only corporal in the officers that

5   were involved in the pursuit; right?

6      A.   During that time, yes.

7      Q.   And the other officers that were involved, their

8   rank was officer?

9      A.   Yes.

10     Q.   What other officers were involved in the pursuit

11  besides you and Corporal Alvarado?

12     A.   From my knowledge during the pursuit or now?

13     Q.   Of what you know now.

14     A.   What I know now, Officer Escobar was driving his

15  unit and Corporal Alvarado was in the passenger seat of that

16  vehicle.  He was training Officer Escobar at that time, and

17  Officer Vasquez Lopez was driving the third vehicle by

18  himself.

19     Q.   And I take it you knew that Officer Escobar and

20  Corporal Alvarado were in the second unit?

21     A.   Yes.

22     Q.   Is it fair to say that you found out later that

23  Officer Vasquez Lopez was also involved in the pursuit?

24     A.   Yes.  At a later time.

25     Q.   Prior to the day of the incident, had you ever had

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 21

1    any interaction with Mr. Benavente before?

2        A.    No.

3        Q.    Just a foundational question.  I'm sure your good

4    attorney would have questioned it, but for foundation, is it

5    your understanding that the decedent of the officer-involved

6    shooting is Joseph Benavente?

7        A.    Can you repeat that question?

8        Q.    Yes.  I just wanted to make sure that if I ask

9    questions about Mr. Benavente, you knew who I was referring

10   to.

11       A.    Yes.

12       Q.    And is it your understanding that he was the driver

13   of the red car?

14       A.    Yes.

15       Q.    And you had never met him before the incident?

16       A.    No.

17       Q.    Have you had any occasion to see that particular red

18   car before the incident?

19       A.    No.

20       Q.    Did you have any information about his family

21   history?

22       A.    No.

23       Q.    Did you have any information of how, whether he had

24   been convicted of any crimes?

25       A.    No.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 22

1    Q.   Did you have any information about whether he had

2    ever been arrested?

3    A.   No.

4    Q.   Did you have any specific information as to whether

5    he was a gang member or not?

6    A.   No.

7    Q.   Did you know at the time of the incident whether he

8    had a history of drug use?

9    A.   No.

10   Q.   Did you know at the time whether or not he had

11   consumed drugs on the day of the incident?

12   A.   No.

13   Q.   Did you know if he had a history of alcohol use?

14   A.   No.

15   Q.   What about whether or not he had specifically

16   consumed alcohol on the day of the incident?

17   A.   No.

18   Q.   Did you ever see him Mr. Benavente point a gun at

19   you or any other officer during the incident?

20   A.   No.

21   Q.   Did you ever see a gun in Mr. Benavente's hand at

22   all during the incident?

23   A.   No.

24   Q.   I'm sorry.  I didn't catch your response.

25   A.   No.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 23

1      Q.   Did you ever see anything in the vehicle that you

2    thought was a gun or looked like a gun prior to the

3    shooting?

4      A.   No.

5      Q.   I know that you said you heard or you know that --

6    strike that.

7            I think earlier you said that at the time you

8    thought it was two shots fired?

9      A.   Yes.

10     Q.   Did you hear those shots being fired?

11     A.   I heard two pops which was unsure if they were

12   gunshots or what those pops could be.

13     Q.   I believe you mentioned in your statement that you

14   thought that they were potentially fireworks?

15     A.   It was a possibility just because the sound was not

16   distinct from all of my training and experience of training

17   off duty hearing a loud pop like a firearm.

18           So I expected that, but that was not the case that

19   day.

20     Q.   Do you have any idea what could account for the

21   difference of the sound of the shots?

22     A.   I would assume my siren being on, and I believe my

23   window was up.  I was unsure.  I usually drive with my window

24   up especially at night.  It's cold.

25     Q.   Right.  Did you see the shots being fired?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 24

```
1     A.   No.

2     Q.   Okay.  At the time of the incident -- strike that.

3          I'll be more specific.  During the pursuant, did you

4     get any updates, any information about Mr. Benavente?

5     A.   No.  I was the primary officer.  My sole duty, one

6     of my duties is to follow the -- pursue a vehicle, and my

7     second officer calls out the pursuit just so I can focus on

8     the driver.

9     Q.   Did you run the license plate of the red car?

10    A.   Can you be more specific on that?

11    Q.   For instance, did you relay over the radio what the

12    license plate was so that you can get a read-out of any

13    information about the owner?

14    A.   I did.

15    Q.   When did you do that?

16    A.   It was at Fourth and Boulder when I believed

17    Mr. Benavente was driving the red car, we wanted to pull

18    over.  That's when I was able to out that traffic to

19    dispatch.

20    Q.   And did you get any information back from dispatch

21    about the vehicle or the owner after you put out the license

22    plate?

23    A.   They put out the information.  I wasn't able to copy

24    it due to Mr. Benavente and failing to yield and started

25    driving at a fast pace.
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

1     Q.   When you say you were not able to copy, what do you

2  mean by that?

3     A.   When I pulled traffic on the red vehicle that

4  Mr. Benavente was driving, he pulled over to the side for a

5  moment and then continued to drive.

6          When we approached San Antonio Street, he failed to

7  stop at the stop sign, and that's when Corporal Alvarado

8  pulled out -- excuse me -- went over the radio saying failure

9  to yield, and that's when I took over.

10         So everything was happening very rapidly.

11    Q.   Right.  What I mean is, were you not able to hear

12  what dispatch said in response to you giving the license

13  plate?

14    A.   I believe just traffic was -- a lot of traffic was

15  going out.  So I was paying attention to Corporal Alvarado

16  when he said failure to yield.

17    Q.   Do you know now what dispatch said after you gave

18  the license plate, if anything?

19    A.   No, I do not.

20    Q.   All right.  Prior to the officer-involved shooting,

21  did you have any information that Mr. Benavente had ever

22  verbally threatened anybody?

23    A.   No.

24    Q.   Did you have any information that Mr. Benavente had

25  physically injured anybody?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 26

```
 1      A.   No.

 2      Q.   Is it fair to say that you don't know what

 3   Mr. Benavente was thinking at the time of the incident?

 4      A.   Yes.

 5      Q.   In other words, you didn't know what was going on in

 6   his state of mind at the time?

 7      A.   No.  Because my traffic stop was for a simple tinted

 8   window violation.  So most individuals pull over for that

 9   type of minor incident.

10           So I -- a million things were going through my

11   head.

12      Q.   Let me I guess go to that traffic stop.

13           Did you initiate the traffic stop?

14      A.   Yes.

15      Q.   Did Corporal Alvarado tell you to initiate the

16   traffic stop?

17      A.   No.

18      Q.   Do you recall Corporal Alvarado communicating with

19   you through the open windows of the patrol vehicles?

20      A.   I know we communicated.  I just don't recall the

21   conversation we had.

22      Q.   So was your patrol vehicle and the red car stopped

23   at a red light on Mountain and at the Fourth Street light?

24      A.   Yes.

25      Q.   Was the red car already next to you when Corporal
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 27

1    Alvarado pulled up to your left?

2        A.    No.

3        Q.    Okay.  So is it fair to say that you were the first

4    one to stop at the red light?

5        A.    Yes.

6        Q.    And then Corporal Alvarado's vehicle pulled up to

7    your left in the left-hand turn lane?

8        A.    Yes.

9        Q.    And then the red car pulled up to your right in the

10   right-hand turn lane?

11       A.    In the right-hand lane.  It wasn't a turn lane.

12             It was just the No. 2 lane.

13       Q.    In the No. 2 lane is where you can either go

14   straight or turn right?

15       A.    That's correct.

16       Q.    And then after the light turned green, the red car

17   turned right on Fourth Street?

18       A.    It was kind of simultaneous to me.

19             It appeared to me like he did a -- he failed to stop

20   completely at the red light, and then as it turned red, he

21   made that right turn.

22       Q.    Do you recall in your statement telling the

23   detectives that he turned right on the green light?

24       A.    Yes.

25       Q.    Did that mean at the time that from your perspective

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Andres Varela on 01/12/2024

Page 28

```
 1  he wasn't attempting to run the red light?

 2      A.   At the time he just -- I believe he just failed to

 3  stop at the red light.

 4      Q.   From your perspective, the light was green when you

 5  turned right; is that right?

 6      A.   It was like I said, it was simultaneous.

 7           It was red and he came to -- he didn't come to a

 8  complete stop, and then he was already making that turn as it

 9  turned green.

10      Q.   Is it fair to say that if the light didn't turn

11  green at that moment, you don't know if he would have

12  continued to slow down or stop or continued to go forward?

13      A.   I wouldn't know.

14      Q.   Why did you want to initiate the traffic stop?

15      A.   The tinted windows on the front driver window.

16      Q.   Is there a vehicle code in mind that you had that

17  that would have been a violation of?

18      A.   Yes.

19      Q.   What vehicle code was that?

20      A.   Right now I can't remember vehicle the code

21  verbatim.

22      Q.   Do you know the vehicle code number?

23      A.   I wouldn't want to go you the wrong number, but I

24  cited individuals for tinted windows in the past.

25      Q.   Is that -- you said it was a minor violation;
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 29

1   right?

2        A.   Yes.

3        Q.   Is that something that you recall a cite and release

4   violation?

5        A.   I would call it a cite.

6        Q.   That's not something you arrest somebody for?

7        A.   No.

8        Q.   Is that like a fix-it ticket?

9        A.   Yes.

10       Q.   What is your understanding of what that code

11   violation says?

12       A.   That you're not able to tint the front windows of a

13   vehicle.

14       Q.   Is it your understanding that there is no tint

15   allowed at all on the driver side window of a vehicle?

16       A.   On the front windows of the vehicle, not just the

17   driver side, the passenger side, also.

18       Q.   And when you say the front windows, you're not

19   talking about the windshield.

20            You're talking about the in the cabin, the two front

21   windows?

22       A.   Yes.  And you also are not allowed to tint your

23   windshield either.

24       Q.   Right.  Did you feel that this windshield was tinted

25   when you saw him at the red light?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

```
 1          MR. TOUCHSTONE:  The windshield; is that what you
 2   said?
 3          MR. SINCICH:  Yeah, the windshield.
 4          THE WITNESS:  I saw the front driver window being
 5   tinted.  I'm not sure about the windshield.
 6   BY MR. SINCICH:
 7      Q.  I could be wrong.  I thought that there was some
 8   kind of percentage of tint that was allowed on the driver and
 9   passenger front windows.
10          Do you recall if that's allowed or not?
11      A.  I don't recall.
12      Q.  So your intent was to pull him over and to give him
13   the ticket for having the tint on his windows?
14      A.  No.  My intent was to pull him over and advise him
15   about the tinting, possibly give him a ticket.  I didn't make
16   that decision yet.
17          I just saw the tint.  I was going to pull him over.
18   I always give individuals tickets for tinted windows.
19      Q.  And I believe you said you were the primary vehicle
20   in the pursuit; right?
21      A.  Yes.
22      Q.  And I know you mentioned that your focus has been on
23   the subject vehicle.
24          But what are the responsibilities of the primary
25   vehicle?
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 31

1     A.    Am I solo, or are there other officers?

2     Q.    Considering that here we had a secondary vehicle,

3    meaning Corporal Alvarado and Officer Escobar's vehicle,

4    under this kind of scenario, what was the primary vehicle's

5    responsibilities?

6     A.    To follow the vehicle and with regard to the safety

7    of the public, and if anything that is pertinent I should put

8    out.

9     Q.    And did you put out any radio traffic during the

10   pursuit?

11    A.    No.

12    Q.    What are the responsibilities of the secondary

13   vehicle in a vehicle pursuit, just generally  speaking?

14    A.    To call out the traffic, if there is light traffic,

15   heavy traffic, the conditions of the road, the weather, how

16   the driver is -- suspect driver is driving, their speeds,

17   anything -- if something's been thrown out, they can prep the

18   secondary to put that out.  If they don't put that out, I can

19   assist them saying, hey, something's been thrown out through

20   the driver window or the passenger window, just pertinent

21   information.

22    Q.    Is it fair to say that in the pursuit the primary

23   vehicle has a better view of the subject vehicle than any of

24   the units behind it based on your training and experience?

25    A.    Yes.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 32

1      Q.   Do you know how long the pursuit lasted

2   approximately?

3      A.   I would estimate maybe five to seven minutes.

4      Q.   And when you say five to seven minutes, for what

5   location are you starting that kind of mental timer?

6      A.   From Fourth and San Antonio, I would probably

7   estimate.

8      Q.   So from Fourth and San Antonio until the

9   officer-involved shooting, that was between five and seven

10   minutes, approximately?

11      A.   I would estimate that.

12      Q.   And I'm not as familiar with the area.

13           Are you familiar with that area?

14      A.   Yes.

15      Q.   Do you know approximately the distance between those

16   two locations from Fourth and San Antonio to the location of

17   officer-involved shooting accounting for the fact that you

18   guys went up to the bridge and then made the U-turn?

19      A.   I wouldn't be able to give you distance, the amount

20   of distance for that.

21      Q.   Could you give me an approximate distance?

22           I mean was this several hundred yards, or was it

23   several -- do you know?

24      A.   I can just give you it started from San Antonio and

25   Fourth all the way up to the bridge of just north of Sixth

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

1  Street on San Antonio and back down Street, I don't want to

2  say a mile, but it was only 700 yards or something to that

3  effect.

4         I could only give you distance of streets.

5         From Fourth Street all the way to the bridge of San

6  Antonio which is just north of Sixth Street back down Sixth

7  Street and then east possibly two streets over to Beverly

8  Court with we then proceeded northbound to I would say maybe

9  50 yards to Beverly Court.

10     Q.   Both combined -- with San Bernardino and Ontario,

11  had you been in vehicle pursuits before outside of this

12  one?

13     A.   Yes.

14     Q.   Approximately how many?

15     A.   I would say an estimate of more than seven.

16     Q.   Did you use deadly force on any of those other

17  vehicle pursuits?

18     A.   No.

19     Q.   Did any other officers if there were any other

20  officers with you use deadly force on any of those other

21  pursuits?

22     A.   No.

23     Q.   Did you ever give Mr. Benavente any commands during

24  the pursuit?

25     A.   No.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 34

1    Q.   I understand that he stopped on the bridge that goes

2    over the 10 Freeway on San Antonio; is that correct?

3    A.   Momentarily, yes.

4    Q.   And when he stopped on the bridge, did you also have

5    occasion to stop behind him?

6    A.   I'm sorry.  You broke up.

7         Can you repeat that.

8    Q.   After he stopped on the bridge, did you also have

9    occasion to stop behind him?

10   A.   Momentarily, yes.

11   Q.   And did you shine your spotlight on him?

12   A.   Yes.

13   Q.   Did you exit the vehicle at that time?

14   A.   No.

15   Q.   Why not?

16   A.   Because he ended -- Mr. Benavente continued in the

17   red car to make a U-turn and never had a chance to exit the

18   vehicle.

19   Q.   How long was he stopped on San Antonio on the

20   bridge?

21   A.   Sorry.  You broke up.

22        San Antonio and what?

23   Q.   How long was he stopped for on the bridge on San

24   Antonio?

25        MR. TOUCHSTONE:  Let me clarify.  There is no bridge

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

1  on San Antonio, Marcel.  There is a bridge over San Antonio

2  that's the 10 Freeway just so you're aware.

3          In other words, there is not a bridge on the street

4  of San Antonio.  There is an overpass, a highway overpass

5  over San Antonio, the 10 Freeway.

6  BY MR. SINCICH:

7      Q.   **So for clarity, when you stopped were you underneath**

8  **the freeway, or on top of the freeway?**

9      A.   No.  I was on top of the freeway on top of the

10  overpass.

11      Q.   **Right.  That's my understanding as well.**

12          MR. SINCICH:  Jim, I don't know.

13          Was it -- was my question confusing on how I phrased

14  it, or --

15          MR. TOUCHSTONE:  Well, no.  Maybe it's my

16  understanding, Marcel, based on my familiarity with the

17  area.

18  BY MR. SINCICH:

19      Q.   **I looked at a map, and in Google maps it looks like**

20  **there is some construction at the time.**

21          **Is there currently construction going on in that**

22  **area?**

23      A.   From the last time I recall, there's been

24  construction for a few years now in that area.

25      Q.   **At the time of the incident, was there construction**

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 36

1   as well?

2       A.    No.  There was no construction at the time.

3       Q.    And the red car had stopped on the north side of the

4   bridge; right?

5       A.    Can you clarify that?

6             You mean lanes of travel, or what do you mean by

7   north side?  What do you mean by that?

8       Q.    The 10 Freeway is approximately how many lanes that

9   are going underneath that bridge?

10      A.    I'm confused by that question.  I'm sorry, sir.

11      Q.    No problem.  I'm just trying to make sure we're on

12  the same page.

13            I remember reading in someone's statement that the

14  red vehicle stopped on the north side of the bridge.

15            Does that sound accurate?

16      A.    If the bridge we're referring to is the overpass, I

17  would clarify that with they stopped on the northbound lanes

18  of travel on the overpass closest to the east curbline of

19  that overpass.

20      Q.    So when you say the northbound lanes of travel, are

21  you talking about northbound on San Antonio?

22      A.    That's correct.

23      Q.    So he's on San Antonio, and he pulled over to the

24  right which is the east side of the street?

25      A.    Correct.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 37

1      Q.   But when he pulled over on the bridge, would it have

2   been on the south side of the bridge -- more towards the

3   north of the bridge -- does that make sense?

4         COURT REPORTER:  Sorry, Marcel.  You broke up

5   towards the very end there.

6   BY MR. SINCICH:

7      Q.   Okay.  I said was it like on the south side of the

8   bridge, towards the middle of the bridge, or towards the

9   north side of the bridge?

10     A.   I would estimate it to be probably middle of the

11   bridge of the overpass.

12     Q.   Sorry.  So I want to make sure I'm using the right

13   language.

14         If the 10 Freeway has both east and west moving

15   traffic or lanes; is that correct?

16     A.   Yes.

17     Q.   It would have stopped approximately on the overpass

18   between those lanes; does that make sense?

19     A.   Are you referring to the center median of east and

20   west traffic of the 10 Freeway?

21     Q.   Right.  I'm just trying to get a visual.

22     A.   I would estimate it possibly may be close to the

23   center median of the 10 Freeway.

24     Q.   Let me see if I can make this easier for us.

25     A.   I apologize, sir.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 38

```
 1       Q.    No. I'm trying to describe it, but --

 2             MR. TOUCHSTONE:  Marcel, just -- it was my bad.

 3             I had another intersection with the 10 in mind.

 4             You're correct.  It's an overpass there.

 5   BY MR. SINCICH:

 6       Q.    Yeah.  I'm saying bridge and overpass.

 7             So I apologize.  Those to me are kind of synonymous.

 8             Is that kind of your understanding as we were

 9   talking, Officer Varela?

10       A.    Yes, sir.

11       Q.    Let me just show you this map real quick to see if

12   it makes any sense.

13             Can you see my screen?

14       A.    Yes.

15       Q.    And this is -- is it fair to say that -- of where

16   San Antonio goes over the 10 Freeway?

17       A.    I'm sorry.  Can you repeat that?

18             You broke up.

19       Q.    Is it fair to say that this is a Google Map image of

20   where San Antonio Avenue goes over the 10 Freeway?

21       A.    Yes.

22       Q.    And so I'm just trying to -- can you see my arrow?

23       A.    I can.

24       Q.    I was just trying to figure where about did the red

25   vehicle stop?  Was it more towards the -- and I'm talking
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 39

1   about San Antonio.

2           Was it the south of San Antonio going over the

3   freeway, the middle would have been of this area, or the

4   north end over here to your recollection?

5       A.   I would estimate it to be the middle of San Antonio

6   right there, maybe closer to this a little bit south of that

7   where the blue and -- right there, that's what I would

8   estimate where Mr. Benavente pulled over for a moment in the

9   red car.

10      Q.   So if I -- I can't mark this or anything like that,

11  but it would have been equivalent to looking on this Google

12  Map image of -- east side of San Antonio which is equivalent

13  to kind of where the "A" and "N" is over San?

14      A.   I would estimate that, yes.

15      Q.   I just wanted to get a visual of that.

16           I'm sorry to go --

17      A.   I apologize.

18      Q.   So at that time that he stopped on San Antonio, how

19  long do you recall that he stopped for?

20      A.   No more than two seconds.  It was very brief.

21      Q.   Did he stop for more or less time when he stopped on

22  Beverly before going on reverse?

23      A.   Can you repeat the question?

24      Q.   Based on your recollection, did the red car stop for

25  more or less time on Beverly before going in reverse as

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 40

```
 1   compared to the amount of time that it stopped on San

 2   Antonio?

 3       A.   From my recollection it was on Beverly.

 4            The red vehicle stopped for less time.

 5       Q.   Approximately how long did the red vehicle stop for

 6   on Beverly to your recollection?

 7       A.   I would say a second.  It was pretty quick.

 8       Q.   All right.  Now back on San Antonio how long were

 9   you able to stop for before the U-turn occurred?

10       A.   I possibly stopped for two seconds, maybe two and a

11   half to estimate.

12       Q.   And when you had your on the vehicle, were you able

13   to see inside the cabin of the vehicle?

14       A.   I was.

15       Q.   Were you able to identify any persons inside the

16   vehicle?

17       A.   I was only able to see Mr. Benavente, the driver of

18   the vehicle, and I described him as a Hispanic male or white

19   while with tattoos on his face.

20       Q.   And then after -- if you were able to see his face,

21   is it was after he already made the U-turn; correct?

22       A.   I'm sorry.  You broke up.

23       Q.   If you were able to see his face, that was after you

24   already -- after he already made the U-turn?

25       A.   After he is in the middle of that U-turn.
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 41

```
 1      Q.   Prior to making the U-turn, were you able to see

 2   anybody inside the vehicle with your spotlight shining on the

 3   vehicle?

 4      A.   Prior to the U-turn, no.

 5      Q.   When you were stopped for that two or two and a half

 6   seconds on San Antonio, did you give Mr. Benavente any

 7   commands?

 8      A.   No.

 9      Q.   Based on your training is it appropriate to give a

10   person commands, for instance, over the PA system after a

11   pursuit if the person stops?

12           MR. TOUCHSTONE:  Objection.  Incomplete hypothetical

13   question; lacks foundation; calls for speculation.

14           You can answer.

15           THE WITNESS:  Can you repeat the question, sir.

16   BY MR. SINCICH:

17      Q.   So based on your training and experience, if you're

18   in a vehicle pursuit and then the person pulls over, would it

19   be appropriate as an officer to give them commands through

20   the PA system?

21           MR. TOUCHSTONE:  Same objections.

22           THE WITNESS:  If feasible if we had time.

23           In that situation we had not time.

24           I had no time to give announcements over the PA.

25   BY MR. SINCICH:
```

FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL
Andres Varela on 01/12/2024

Page 42

1    Q.   Okay.  What did you do for the two or two and a half

2    seconds after you gave --

3    A.   When he stopped momentarily, I didn't know if he was

4    going to get out of the car and run.  I didn't know what his

5    plan was.  So I kind of was waiting for Mr. Benavente to

6    decide on what his next plan was so I could react to that.

7         So when he made the U-turn, that's when I realized,

8    okay, now we're going to continue driving southbound on San

9    Antonio.

10   Q.   Okay.  And after you made a U-turn to continue

11   driving southbound on San Antonio, did you pass Corporal

12   Alvarado's vehicle?

13   A.   Yes.

14   Q.   Did you pass sergeant -- not sergeant.

15        I'm sure he got a promotion -- Officer Vasquez

16   Lopez's vehicle?

17   A.   No.

18   Q.   After you -- strike that.

19        Prior to turning left on Sixth Street, are you with

20   me?  This is after you made a U-turn.

21   A.   Yes.

22   Q.   And you're right about to turn left on Sixth Street,

23   did you only pass one officer vehicle, Corporal Alvarado's

24   vehicle at that point?

25   A.   From what I recall.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 43

```
 1      Q.   And at that time just before you're turning left on

 2   Sixth Street, did you see any other patrol vehicles coming

 3   north on San Antonio?

 4      A.   I don't recall.

 5      Q.   Did you know at the time based off of your training

 6   and experience in that vehicle pursuit that was being put out

 7   over the radio, that there was going to be additional

 8   officers joining as backup?

 9      A.   Yes.  I was aware more officers were going to

10   assist.

11           And did you ever hear any officers over the radio

12   state that they were going to -- come.

13      A.   I don't recall, but I do recall the MDC our mobile

14   data computer seeing a lot of people getting added to the

15   call.  So I knew people were coming.  We have CADS our call

16   log for officers and their call sign.  So I knew additional

17   officers were being -- were heading over to my direction, to

18   my location.

19      Q.   Is that a large patrol area that you guys were in

20   charge of?

21      A.   Yes.

22      Q.   For instance, when you saw other officers being

23   added to the call, did you anticipate that they would be able

24   to join the call within a matter of a minute or so?

25           MR. TOUCHSTONE:  Objection.  Foundation;
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 44

```
 1   speculation.

 2          THE WITNESS:  I would not be able to answer that.

 3          Just because I don't know where they were coming

 4   from.  We have a large city.  So I don't know if they were

 5   nearby or if they were coming from a station which would be a

 6   very far distance.

 7   BY MR. SINCICH:

 8      Q.   Right.  At the time of the incident did Ontario have

 9   air support for things such as a vehicle pursuit?

10          MR. TOUCHSTONE:  Foundation; speculation.

11          THE WITNESS:  Yes.

12   BY MR. SINCICH:

13      Q.   Do you know if air support was ever called during

14   this vehicle pursuit?

15      A.   I don't recall.

16      Q.   I take it you didn't call for air support, though?

17      A.   I did not.

18      Q.   Is one of the options in a vehicle pursuit that

19   officers can call air support and then back off and allow the

20   air support to follow and put out the location of travel?

21      A.   Yes.  If -- when the air support is on-scene, at

22   that point there was no air support.

23      Q.   Right.  Is that part of your training, though, is

24   that if air support shows up to assist on a vehicle pursuit,

25   that one tactic is that officers can back off and try to
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 45

1    attempt to get the pursuit to slow down and just maintain

2    visual with the air support?

3         A.   That's a tactic.  However, during the pursuit the

4    red vehicle that Mr. Benavente was driving at a high rate of

5    speed on northbound on San Antonio.  So he almost collided

6    into a civilian that was driving westbound.

7            So at this point I was unsure if he was under the

8    influence of drug or if he was just committed a crime an

9    trying to get away from me for some reason.

10           Because again, it was just a simple vehicle code

11   violation.  So my -- as an officer, if the pursuit doesn't

12   exceed my driving capabilities, I continue the pursuit and

13   then usually a supervisor, if they deem, to make that

14   decision and start, hey, well, if we have an area overhead,

15   then possibly, they can say we're going to cancel the pursuit

16   or fall back and have the air unit visually watch the car.

17           However, I do -- in my experience, I do know when

18   we have cars -- we have pursuits that people that are driving

19   at high rates of speed almost collide into individuals which

20   Mr. Benavente was doing and driving on the wrong side of the

21   road on Sixth Street, driving to oncoming traffic.

22           Usually we start taking into account possibly maybe

23   he's under the influence of alcohol or drugs.  So with those

24   types of pursuits, we don't usually cancel those pursuits or

25   let our air unit follow because just the danger to the

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 46

1    public.

2        Q.   Right.  And I think you mentioned earlier that you

3    didn't have any specific information about alcohol or drugs;

4    right?

5        A.   No.  That was just an assumption just the way

6    Mr. Benavente was driving the red vehicle at a high rate of

7    speed at residential areas and almost colliding into another

8    vehicle and driving into oncoming traffic and swerving trying

9    to evade, so --

10       Q.   Right.  So you were thinking that could have been

11   one possibility, but there could have been other

12   possibilities as well?

13       A.   Yes, there could have been.

14       Q.   Based on your training and policy, is it true that

15   as a primary vehicle, if you felt a pursuit was getting too

16   dangerous either for you or the public, that you can cancel

17   the pursuit on your own?

18       A.   Yes, that's correct.

19       Q.   And this pursuit wasn't cancelled, though; right?

20       A.   No, it was not.

21       Q.   Did you say it was almost midnight?

22            I thought you said it was 11:55 or 10:55.

23            I couldn't remember.

24       A.   11:55.

25       Q.   Is it fair to say that there wasn't many, if any,

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 47

```
 1    people, pedestrians on the road during this pursuit?

 2             MR. TOUCHSTONE:  Objection.  Vague and ambiguous.

 3             THE WITNESS:  There was light traffic.  At that

 4    point I patrolled that area that was my beat for about six

 5    months.  So usually, it's light traffic, but I have seen

 6    pedestrian walk the streets at night walking their dogs,

 7    walking in groups --

 8    BY MR. SINCICH:

 9        Q.   Right.  During this pursuit did you see any

10    pedestrians on the road?

11        A.   I only saw the vehicle that he almost collided to in

12    between Fourth Street and Sixth Street that was traveling

13    westbound.  I'm not sure which street that collision almost

14    occurred on.

15        Q.   And that's the only civilian vehicle that you saw on

16    the road at the time?

17        A.   There were others, but that was the only one that

18    almost got collided into.

19        Q.   Okay.  And there was no crash with that vehicle with

20    the red car; correct?

21        A.   No collision.

22        Q.   No information that any civilians were hurt in this

23    incident obviously outside of the people inside of the red

24    car?

25        A.   To my recollection, there were no other injuries.
```

FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL
Andres Varela on 01/12/2024

Page 48

1      Q.   Beverly Street, is it fair to say there was no

2   pedestrians -- and when I say pedestrians, I mean people not

3   in the vehicle but actually on foot.

4           There was no pedestrians on Beverly; is that fair to

5   say?

6      A.   I don't recall.  My focus was on the red vehicle

7   that Mr. Benavente was driving.

8      Q.   After the officer-involved shooting occurred, did

9   you have occasion to look around to see if anybody was hurt

10   or anything like that?

11      A.   Can you repeat that question, sir?

12      Q.   Right.  After the officer-involved shooting did you

13   look around on Beverly to see if there was any civilians, any

14   pedestrians?

15      A.   I -- my attention was on the red vehicle and the

16   backdrop which was a residence house that was -- the front

17   door was facing west.  I didn't see anybody in the backdrop

18   behind the red vehicle.

19      Q.   Okay.  I believe you told the detectives something

20   to the effect of you didn't see any people that could have

21   been witnesses to the officer officer-involved shooting.

22           Do you recall that?

23      A.   I do.

24      Q.   Is that fair to say that's because you didn't see

25   any civilians in that area on Beverly?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 49

1      A.   Yes.   On my backdrop I was looking at, I didn't see

2   anybody.

3      Q.   And was there any people in vehicles on Beverly?

4      A.   Not to my knowledge.

5      Q.   When you were on --

6           MR. TOUCHSTONE:  You cut out, Marcel.

7           I'm sorry.

8   BY MR. SINCICH:

9      Q.   Oh, no problem.

10          When you were on Beverly, is it fair to say that the

11   red car stopped about halfway down Beverly towards the

12   cul-de-sac?

13     A.   I would estimate that.

14     Q.   And I believe I don't know if it was your statement

15   or someone else's.  They said it was approximately four

16   houses counting the houses on the right-hand side, four

17   houses down?

18     A.   I wouldn't be able to say if it was four houses or

19   not.

20     Q.   When you first turned on Beverly, you didn't know it

21   was a dead end cul-de-sac?

22     A.   Initially, no.

23     Q.   How far down Beverly did you get before you were

24   able to identify that it was a dead end cul-de-sac?

25     A.   I would say as soon as I made that turn, I didn't

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 50

```
 1   know it was a dead end street -- excuse me -- cul-de-sac

 2   street.  And as soon as I made that turn, I realized it was a

 3   cul-de-sac street.

 4          And I'm pretty familiar with the area.  So I

 5   could -- it dawned on me that there is no crossing on that

 6   street.

 7     Q.   Right.  Because if you continued north, that's where

 8   the freeway is?

 9     A.   That's correct.

10     Q.   Right.  Did you see the red vehicle come to a stop

11   on Beverly?

12     A.   Yes.

13     Q.   And what was the distance between you and the red

14   car when you first saw it come to a stop?

15          MR. TOUCHSTONE:  Vague and ambiguous as to distance

16   between the cars.

17          I mean -- estimate that, behind, offset, at an

18   angle --

19          MR. SINCICH:  I guess distance.

20   BY MR. SINCICH:

21     Q.   Do you understand the question?

22     A.   Can you repeat that, sir?

23     Q.   Sure.  So I just want you to picture in your mind

24   that when the red car first stopped on Beverly, your vehicle

25   was still moving forward; correct?
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

1      A.   Yes.

2      Q.   Okay.  But when the red car first stopped, what was

3   the distance, for instance, between his back bumper and your

4   front bumper?

5      A.   As I was driving up?

6      Q.   Correct.

7      A.   I -- that would be hard to say.  I know I was

8   driving up, and I could only give an estimate when I stopped

9   my vehicle.

10      Q.   When you first stopped could you give an estimate as

11   to how many car lengths in front of you he was?

12      A.   No.

13      Q.   Okay.  Were you able to basically maintain a safe

14   distance during the pursuit while on Beverly?

15           MR. TOUCHSTONE:  Vague and ambiguous as to safe

16   distance; argumentative.

17           Go ahead.

18           THE WITNESS:  Yes.

19   BY MR. SINCICH:

20      Q.   And maybe I can clarify.

21           For instance, did you feel like on Beverly that he

22   was getting away that he was gaining too much distance on

23   you?

24      A.   No.  Because when I made that turn I instantly knew

25   it was a dead end.  So he had nowhere else to go other than

FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL
Andres Varela on 01/12/2024

Page 52

1   to my -- I would assume he was going to either exit, get out

2   the vehicle and run or make another U-turn.

3       Q.   Okay.  And approximately what was the distance that

4   you stopped from the red car on Beverly?

5       A.   I would estimate it to be 15 feet, possibly 20

6   feet.

7       Q.   Okay.  Approximately -- strike that.

8            When you stopped on Beverly was the red car still

9   stopped?

10      A.   Yes.

11      Q.   And at some point after you stopped, did the red car

12  go in reverse?

13      A.   Yes.

14      Q.   Approximately how long when you stopped for before

15  the red car went in reverse?

16      A.   I would estimate a second.

17      Q.   Okay.  And approximately how long was it from the

18  time that you first saw the red car stopped to the time that

19  you came to a stop?

20      A.   Can you repeat that?  I'm sorry.

21      Q.   Yeah.  From the time that you saw the red car come

22  to a stop to the time that you came to a stop, approximately

23  how much time passed?

24      A.   Short amount of time.  I would say no more than two

25  seconds, maybe even a second.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 53

```
 1     Q.   Okay.

 2          MR. SINCICH:  We've been going for about an hour.

 3          I don't have a whole lot more, but I do have to --

 4     we can go off the record.

 5          (Discussion held off the record.)

 6          (Recess taken.)

 7   BY MR. SINCICH:

 8     Q.   Officer Varela, we kind of left off when you were

 9     stopped and the red car stopped on Beverly.

10          Do you recall that conversation?

11     A.   Yes.

12     Q.   Now, when you first came to a stop, did you also put

13     your spotlight on the red vehicle again?

14     A.   Yes.

15     Q.   Did you see any movement in the car after you put

16     your spotlight on the red car on Beverly?

17     A.   No.  Everything happened pretty instantaneously.

18          So when I turned it had on, I believe the car, the

19     red car was already reversing.

20     Q.   Okay.  Now, after you stopped your car but before

21     the red car reversed, did you get out of your vehicle?

22     A.   No.

23     Q.   Why not?

24     A.   I didn't have time to.

25     Q.   Was that part of your plan, to get out of your
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 54

1  vehicle?

2      A.   It was an option.  I didn't know if Mr. Benavente

3  was going to foot bail or, again, make a U-turn which he

4  already did previously.

5      Q.   Right.  Was that going through your mind that since

6  on San Antonio he had stopped briefly and then continued

7  after you a U-turn and knowing that this was a dead end

8  street, was that going through your mind that he was probably

9  going to do that again?

10     A.   I was -- one of the assumptions I had made a U-turn

11  for him foot bail -- excuse me -- exiting his car.

12     Q.   And then after you saw that his vehicle was going in

13  reverse, is it fair to say you knew he wasn't going to foot

14  bail at that point?

15     A.   At that point I was in fear that he was trying to

16  disable my vehicle or try to hurt me.

17     Q.   But you didn't feel like he was going to foot bail

18  at that point after he went in reverse; right?

19     A.   No.

20     Q.   When you first saw the vehicle going in reverse, did

21  you actually see the white lights come on the vehicle before

22  you saw the vehicle going in reverse?

23     A.   I remember seeing the reverse lights as it was all

24  happening at the same time.

25     Q.   Okay.  So you were able to see the reverse lights

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

 1   and the actual vehicle moving in reverse?

 2        A.   Yes.

 3        Q.   When you saw -- the vehicle moving in reverse, did

 4   you attempt to exit your vehicle?

 5        A.   Can you repeat the first part?

 6             You broke up.  I'm sorry.

 7        Q.   When you saw the red car going into reverse, did you

 8   attempt to exit your vehicle?

 9        A.   No.

10        Q.   Why not?

11        A.   I didn't have a chance to.

12        Q.   What do you mean you didn't have a chance to?

13        A.   In reverse it was out about a second.  So I didn't

14   have a chance to react.  I was just sitting.  I was in my

15   car.  I didn't have time to react.  I just realized the car

16   was coming at me.  That's the only thing I was able to --

17   that's the only thing I had -- my understanding was going on.

18   My mind was just kind of taking all the information as it was

19   coming at that time.

20        Q.   And at some point the red car was going in reverse

21   and sort of parallel to your vehicle; is that right?

22        A.   After he swerved in and hit the front passenger

23   bumper, he, Mr. Benavente's red vehicle was momentarily

24   parallel with my -- our windows were momentarily parallel

25   with each other.

FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL
Andres Varela on 01/12/2024

Page 56

1    Q.   Did you attempt to get out of your vehicle at that

2    point in time?

3    A.   No.

4    Q.   Why not?

5    A.   At that point I wasn't looking at my -- through the

6    passenger window of my vehicle at the red car that

7    Mr. Benavente was driving.

8    Q.   And then the red car continued to go in reverse?

9    A.   Yes.

10   Q.   Did you get out of your vehicle after it continued

11   to go in reverse when it was no longer directly parallel with

12   you?

13   A.   No.

14   Q.   Why not?

15   A.   Because as he was parallel and he drove past me, I

16   was able -- he went out of the sight.  Mr. Benavente's red

17   vehicle was out of view, out of sight, and I instantly heard

18   what I assumed to be -- he collided into Officer Escobar and

19   Alvarado's vehicle and followed up by two quick pops.

20   Q.   Is it fair to say that what was going through your

21   mind at the time that you saw the red vehicle continuing to

22   reverse past your vehicle was that he was going to continue

23   to flee in the vehicle?

24   A.   I assumed he was trying to disable my vehicle or

25   hurt me, and when he continued and I heard the second

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 57

1   collision, I -- in my mind he was intentionally trying to ram

2   officers' vehicle trying to disable our vehicles.

3        Q.   Based on -- strike that.

4             Do you have any training that a small sedan would be

5   able to disable an officer SUV driving in reverse from 15 or

6   20 feet away --

7        Q.   Can you repeat that.

8             You're choppy again.  I'm sorry.

9        Q.   Do you have any training that a small sedan vehicle

10  is capable of disabling a police SUV vehicle from a stopped

11  position from only 15 or 20 feet away?

12             MR. TOUCHSTONE:  Objection.  Small sedan, vague and

13  ambiguous.

14             Go ahead.

15             THE WITNESS:  No training.  Just personal experience

16  of I've been in accidents before and seen other in my

17  training I've seen other vehicles being disabled by small

18  vehicles.  It's not uncommon.

19  BY MR. SINCICH:

20       Q.   Have you ever seen a sedan disable a police vehicle

21  with both of the vehicles being stopped 15 or 20 feet away?

22       A.   It's a pretty specific incident.

23             I wouldn't be able to say yes or no.

24       Q.   Right.  And that's what I'm trying to figure out.

25             You said you had some experience and you've seen

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

1   vehicles getting disabled.

2           Is it fair to say that you've probably seen vehicles

3   being disabled if they got into a traffic collision on the

4   freeway?

5   A.   On the freeway or on the streets.

6   Q.   And typically, those occurrences happen when both

7   vehicles are traveling at a high speed?

8           MR. TOUCHSTONE:  Vague and ambiguous as to high

9   speed.

10          THE WITNESS:  Not typically.  I've seen some pretty

11  odd collisions where there's been parking -- private parking

12  lots where a parked car gets disabled by a car just the

13  angle.  I'm not a mechanic, but I have seen it.

14          It's been very -- so it's odd.

15  BY MR. SINCICH:

16  Q.   Okay.  Approximately how fast would you estimate the

17  red vehicle was going in reverse from the stopped position

18  until the time that it impacted your vehicle?

19  A.   After reviewing my transcript, I estimated to be 20

20  miles to 30 miles-per-hour.

21  Q.   Outside of reviewing your transcript, do you have a

22  recollection of how fast you believe it was going?

23  A.   Can you say it one more time?  I'm sorry.

24  Q.   Outside of reviewing your transcript, do you have a

25  recollection of how fast you believe it was going?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 59

```
 1      A.   Yes.

 2      Q.   How fast do you think it was going?

 3      A.   Approximately 20 to 30 miles.

 4      Q.   It's your belief that the vehicle went from the

 5  stopped position to 30 miles-per-hour in approximately 15

 6  feet?

 7           MR. TOUCHSTONE:  Assumes facts not in evidence; it's

 8  also an incomplete hypothetical question as phrased; lacks

 9  foundation; calls for speculation.

10           You can answer.

11           THE WITNESS:  It was an estimation.  Anywhere

12  between 20 miles-per-hour and 30 because the -- when he --

13  when the red vehicle reversed, it came at a high rate of

14  speed and hit me instantly -- that collision was very

15  instant.

16  BY MR. SINCICH:

17      Q.   Okay.  Now what portion of the red vehicle came into

18  contact with your vehicle?

19      A.   The red vehicle's rear bumper area, rear panel

20  driver side panel area hit with my passenger I would say

21  headlight of my vehicle.

22      Q.   So let me back up.  The red vehicle stopped on the

23  east side of Beverly; is that fair?

24      A.   Yes.  East curbline.

25      Q.   And you were attempting to park at an offset in
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

 1   order to make this traffic stop; correct?

 2       A.   That's correct.

 3       Q.   So you were not trying to park directly behind him;

 4   is that fair?

 5       A.   I did not park directly behind him.

 6       Q.   Is it fair to say that the passenger side of your

 7   vehicle was sort of in line with the driver side of the red

 8   car?

 9       A.   No.  You still would have to make a turn into my

10   vehicle to collide into it.

11       Q.   So I just want to understand your testimony

12   correctly.

13            As a visual, based on your recollection, if the red

14   car went straight back after you stopped --

15            MR. TOUCHSTONE:  I'm sorry, Marcel.

16            You froze on several words there.

17   BY MR. SINCICH:

18       Q.   No problem.  So as both the red car is stopped and

19   your vehicle is stopped, if the red car parked on the east

20   side of the road went straight backwards, do you believe that

21   it would have impacted your vehicle?

22       A.   You broke up, but I believe you were asking if the

23   vehicle, the red vehicle reversed straight back, it would not

24   have impacted my vehicle.

25            Is that what you're asking?

FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL
Andres Varela on 01/12/2024

Page 61

1    Q.    That's what I'm asking.

2    A.    I believe it would not have impacted me if he just

3    went straight back.

4    Q.    Okay.  And how much distance if it was going

5    straight back, how much distance would it have between your

6    passenger door and the red driver's door if it was

7    straight?

8    A.    Can you clarify?

9    Q.    Can you give me an estimate of what the offset

10   that --

11   A.    You broke up.  I'm sorry.

12   Q.    I'm trying to get an estimate of what the offset was

13   of where you parked in relation to the red car.

14   A.    Just to clarify, are you saying if we were both the

15   red car and my police vehicle were parallel to each other,

16   what would be the distance in between if there is a gap?

17         Is that what you're asking?

18   Q.    Correct.

19   A.    That would be hard to say.

20         I would estimate a foot or less.

21   Q.    Did you stop in the middle of the road on Beverly?

22   A.    Approximately, something in the middle of the road

23   at Beverly, yes.

24   Q.    Now, -- strike that.

25         Were you able after the incident to see if there was

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 62

```
 1   any damage to your vehicle?

 2       A.   Can you repeat that question?

 3       Q.   After the incident were you able to see if there was

 4   any damage to your vehicle?

 5       A.   No.  Not that I recall.

 6       Q.   Are you saying there was no damage to your vehicle

 7   or you never looked?

 8       A.   I don't recall looking at my vehicle, seeing if

 9   there was any damage.

10       Q.   As you sit here today, do you know if there was any

11   damage to your vehicle?

12       A.   Yes.

13       Q.   What damage vehicle existed from this incident?

14       A.   My police vehicle had a push bar mounted to the

15   front bumper of the vehicle.  The passenger side of the push

16   bar was scraped at minimum.  I didn't look into it if it was

17   bent at all, but I knew there was some paint transfer on that

18   push bar on the front passenger side of the push bar.

19       Q.   Is that all the damage that you know that occurred

20   to your vehicle, is the paint transfer of the push bar?

21       A.   Again, I'm not sure if the push bar was bent or

22   pushed in from that collision.

23       Q.   Is it fair to say that the damage to your vehicle

24   was minor?

25       A.   Yes.  I would say so.  I believe the vehicle was
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 63

1   still operational because I was able to drive it after the

2   collision.

3        Q.   Right.  And the red car didn't hit your car and then

4   go forward and attempt to hit your car a second or a third

5   time?

6        A.   After the red car reversed into my car, I heard the

7   second collision.  I ended up driving forward --

8        Q.   Right --

9        A.   -- I had to remove myself for that -- for that

10  opportunity not to be present to be hit again.

11       Q.   Right.  Before the red car went forward -- continued

12  backwards?

13       A.   Say it again?  You broke up.

14       Q.   Yeah.  I'm just saying that the red car didn't

15  continue to try to disable your vehicle by going forward and

16  backward and hitting your vehicle multiple times; right?

17       A.   That's correct.

18       Q.   And do you recall if your car moved at all during

19  that collision?

20       A.   Yes.  There was a jolt.

21            From that jolt I suffered a minor injury to my

22  back.

23       Q.   What minor injury did you suffer?

24       A.   It was tightness after I was -- the adrenaline, but

25  I had tightness in my back, and the best way I can describe

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 64

```
1   it that night was I felt like somebody need to crack my back,

2   and I went to Kaiser Ontario to get it checked out, and I was

3   cleared.

4       Q.   And when you say you were cleared, did they find

5   that you were not injured?

6       A.   They prescribed me Ibuprofen.  I'm not sure if

7   that's -- they said I was okay to go back to work.

8            So I would assume that would be minor.

9       Q.   Okay.  Did that need to crack your back last longer

10  than the night of the incident?

11      A.   Lasted -- I couldn't tell you.

12           It didn't last very long, a day or two, maybe.

13      Q.   Did you take the Ibuprofen for the day or two?

14      A.   No, sir.

15      Q.   Did you feel like you needed --

16      A.   I generally stay away from medication unless I am at

17  a pain level of nine or ten which I was not at.

18      Q.   What was the pain level that you were --

19      A.   Two.

20      Q.   And you said that it was a slight jolt?

21      A.   Yes.

22      Q.   Did you feel that your patrol vehicle got pushed,

23  meaning the tires had moved other than a slight jolt?

24      A.   I would describe it as a shake or a jolt.

25      Q.   And then you said that you heard a second crash?
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

1    A.   What I assumed to be a second collision, yes.

2    Q.   And at the time you didn't know that Officer Vasquez

3    Lopez's car was the third vehicle that was there?

4    A.   At the time, no, I did not.

5    Q.   After your review of the body-worn cameras and

6    things of that nature, are you aware now that the second

7    crash that you heard was between the red car and Officer

8    Vasquez Lopez's patrol vehicle?

9    A.   After reviewing the body-worn camera, I would be

10   safe to assume that I heard was Offer Vasquez Lopez's

11   vehicle.

12   Q.   Okay.  And then after the traffic collision between

13   the red car and Officer Vasquez Lopez's patrol vehicle, after

14   that, is that when you heard the pops?

15   A.   Can you repeat that question?  I'm sorry.

16   Q.   After the collision between Officer Vasquez Lopez's

17   vehicle -- and the red car?

18   A.   I apologize, sir.  You broke up again.

19   Q.   Sure.  After the collision between Officer Vasquez

20   Lopez's and the red car, Vasquez Lopez's patrol vehicle and

21   the red car, after that, is that when you heard the two

22   pops?

23   A.   Yes.  After hearing the collision of the second

24   collision when I didn't know at the time who it was, I heard

25   the two pops right after.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 66

1      Q.    Approximately how much time passed from the

2    collision to your hearing the two pops?

3      A.    I would probably -- under a second.

4            It was very rapid.  It was very quick.

5            I would say instantaneously.

6      Q.    Before hearing the two pops, did you hear any

7    officers give any commands to Mr. Benavente?

8      A.    No.  No officers were able to give those commands.

9      Q.    Did you hear any officers give a warning to

10   Mr. Benavente?

11     A.    No.  None of the officers were able to give that

12   warning.  The incident happened so quickly.

13     Q.    You're not saying that you knew what the other

14   officers were capable of doing, are you?

15     A.    No.  I'm saying that the incident from Mr. Benavente

16   driving the red car hit me and hitting the other car, that

17   whole time frame was I would say a second, maybe a second and

18   a half.  It was very quick.

19     Q.    Right.  And in that second and a half you didn't

20   hear any commands or warnings given?

21     A.    No.

22     Q.    After you heard the pop you made a U-turn and faced

23   your vehicle towards the red vehicle?

24     A.    I made a U-turn and I noticed that the red vehicle

25   was now at the east curbline up on the curb on a tree with

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 69

1   to the time that Benavente was pulled out of the red car?

2        A.   I am unsure.  I would estimate from me exiting my

3   vehicle and officers developing a tactical plan, that whole

4   incident -- five to seven minutes.

5        Q.   After Mr. Benavente was pulled out of the vehicle,

6   did any officer render medical aid?

7             MR. TOUCHSTONE:  Vague and ambiguous as to medical

8   aid.

9             Go ahead.

10            THE WITNESS:  Can you clarify that, sir.

11  BY MR. SINCICH:

12       Q.   You got training in providing medical aid POST

13  Learning Domain 30 --

14       A.   Can you repeat that?  You kept breaking up.

15            I'm sorry.

16       Q.   You received training in providing medical aid

17  through POST Learning Domain 37; correct?

18       A.   Yes.  We received training.

19       Q.   Did any officer provide medical aid as trained after

20  Mr. Benavente was pulled from the vehicle?

21       A.   I did not see anybody.

22       Q.   Did Mr. Benavente was handcuffed and searched,

23  though; correct?

24       A.   Yes.

25       Q.   Okay.  How long after Mr. Benavente was pulled from

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 70

1   the vehicle did the fire department show up?

2       A.   That slips my mind right now.  I just recall us

3   asking for fire department to stage, and they after being

4   asked to respond, they showed up on-scene I would say five

5   minutes.

6       Q.   Were you ever trained on the equation, distance plus

7   cover equals time?

8       A.   Yes.

9       Q.   And time equals options; is that part of your

10   training?

11      A.   Yes.

12      Q.   Are officers generally trained to maintain cover

13   whenever possible?

14      A.   Every situation is different, but yes, we're trained

15   to give us some advantage and cover.

16      Q.   And to maintain a cover of advantage, officers are

17   also trained to tactically reposition; right?

18      A.   If feasible.

19      Q.   And based on your training and experience, tactical

20   repositioning is not a retreat; is that fair?

21      A.   That's fair.

22      Q.   Have you ever been in a officer-involved shooting

23   before?

24      A.   No.

25      Q.   And I mean you as the officer, just for clarity, as

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Andres Varela on 01/12/2024**

Page 71

1  you as the shooting officer for clarity?

2      A.    No.

3      Q.    How many times have you been a witness to an

4  officer-involved shooting other than this incident with

5  Ontario Police Department?

6      A.    Zero.

7      Q.    All right.  Well, as I promised, I have no further

8  questions at this time.

9          MR. SINCICH:  Jim, do you have anything?

10          MR. TOUCHSTONE:  I have nothing.

11          Thank you, Marcel.

12          MR. SINCICH:  No problem.

13          Let's go off the record.

14          (Deposition proceeding concluded at 10:39 a.m.)

15                      *   *   *

16

17

18

19

20

21

22

23

24

25