"EXHIBIT 4"

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4   FRANK BENAVENTE; and NICOLE VENTRESS, )
                                          )
 5               Plaintiffs,              )
                                          )
 6               vs.                      )Case No.
                                          )5:23-CV-00266-SSS-KK
 7   ALBERT ALVARADO; CITY OF ONTARIO;    )
     and DOES 1 through 10, inclusive,    )
 8                                        )
                 Defendants.              )
 9   _____)

10

11

12

13

14          REMOTE VIDEOCONFERENCE DEPOSITION OF

15                      ROBERT HANDY

16              MONDAY, FEBRUARY 19, 2024

17

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  50272
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 5

```
 1                        CALIFORNIA

 2                MONDAY, FEBRUARY 19, 2024

 3                        1:59 P.M.

 4                      ROBERT HANDY,

 5   called as a witness on behalf of the Plaintiffs, having been

 6   first duly sworn remotely via videoconference, was examined

 7   and testified as follows:

 8                      EXAMINATION

 9   Q.   Good afternoon.

10        Can you please state your full name and spell it for

11   the record.

12   A.   Sure.  It's Robert Handy, H-a-n-d-y.

13   Q.   Have you ever had your deposition taken before?

14   A.   Yes, sir.

15   Q.   How many times?

16   A.   I don't know exactly.  Maybe ten.

17   Q.   Okay.  And have you testified in court before?

18   A.   I have.

19   Q.   How many times?

20   A.   Dozens of times.  I'm not sure how many times.

21        As an expert, as a paid expert I have not.

22        I have as a police officer testified in court.

23   Q.   Okay.  As a police officer have you testified in

24   court over a 100 or under a 100 times?

25   A.   I would probably say over a 100 times.
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 25

```
 1      Q.   Right.  I guess I'm just thinking in what the
 2   general training is, that if we took all of the uses of
 3   deadly force as a category, those uses of deadly force would
 4   be most significant type of force that an officer can use as
 5   opposed to all of the other force that's less-lethal or
 6   impact weapon or personal weapons and things of that
 7   category; is that fair?
 8      A.   I would generally agree with that, yes.
 9      Q.   Do you agree that deadly force should only be used
10   in certain circumstances?
11      A.   You cut out.  I missed the middle part of that
12   question.
13      Q.   Would you agree that deadly force can only be used
14   in limited circumstances?
15      A.   It depends on the totality of the circumstances.
16           So it can't be used all the time.
17           I guess I'm not really understanding your question.
18           It's a little unclear to me.
19      Q.   Right.  There's specific criteria that officers are
20   trained that have to be met in order to use deadly force that
21   don't have to necessarily be met in order to use other levels
22   of force; is that fair?
23      A.   I think that is fair, but that's fair to say of all
24   uses of force.  There's criteria that limits all kinds of
25   force including deadly force, yes.
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 26

1    Q.   Okay.  And with respect to all types of force, the

2    force has to be objectively reasonable; right?

3    A.   It does.

4    Q.   And officers are trained that they can only use

5    deadly force in particular if the subject presents an

6    imminent threat of death or serious bodily injury?

7    A.   If the officer perceives that -- that threat.

8         So it's based on the perception of the officer,

9    yes.

10   Q.   Okay.  And that has to be an objectively reasonable

11   officer?

12   A.   Yes.

13   Q.   So if I were to rephrase, officers are trained that

14   they can only use deadly force if the officer reasonably

15   perceives that the subject is an imminent threat of death or

16   serious bodily injury?

17   A.   Is it imminent threat?  I think it's an imminent

18   threat.  It depends on the technical term and if you're

19   referring to the Penal Code or a court decision, but I think

20   essentially we're saying the same thing.

21   Q.   So that's correct whether or not if it's imminent or

22   immediate?

23   A.   Yes.

24   Q.   Okay.  And did Mr. Benavente in this case, did he

25   cause of death or serious bodily injury to any person during

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 27

1    this incident?

2        A.    He did not cause serious injury or death to any

3    person, but he certainly posed that risk, a substantial risk

4    of that.

5        Q.    Did Mr. Benavente ever verbally threaten any officer

6    or person in this incident?

7        A.    I don't believe he did verbally threaten anybody.

8        Q.    And I believe it's what we were alluding to, but

9    officers are trained that it has to be the objectively

10   reasonable officer standard under similar circumstances; is

11   that how use of force cases are evaluated?

12       A.    In general terms, yes.

13       Q.    Are officers trained that subjective fear alone is

14   insufficient to use deadly force?

15       A.    Yes.

16       Q.    Would you agree that sometimes -- strike that.

17           Would you agree that in a deadly force case such as

18   the case here, whether or not the force was reasonable or

19   appropriate depends on the facts?

20       A.    I think it depends on the totality of the

21   circumstances including facts and the officers'

22   perceptions.

23       Q.    Would you agree that sometimes in civil rights cases

24   like this, the facts are disputed?

25       A.    I would agree the facts are often disputed in cases

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 28

```
 1   like this.
 2       Q.   Is this your understanding that if this case were to
 3   go to trial, that a jury would decide the facts of the
 4   case?
 5       A.   Yes.
 6       Q.   Is it your understanding also if the case went to
 7   trial, that the jury would ultimately decide whether or not
 8   the force was reasonable or appropriate?
 9       A.   Yes.
10       Q.   Would you agree that if there was no objectively
11   reasonable perception that the subject was an imminent or
12   immediate threat of death or serious bodily injury in this
13   case, that deadly force would be inappropriate?
14       A.   I would say that any case where there is no
15   objectively reasonable fear that deadly force is imminent or
16   present, that it would be inappropriate to use deadly force.
17           I want to make sure I understood your question.
18           That's why I repeated that.
19       Q.   I think you did based off of your response.
20           Thank you.  When using deadly force are officers
21   trained to have reverence for human life?
22           MS. ROCAWICH:  Objection.  Vague and ambiguous.
23           You can answer.
24           THE WITNESS:  At all times we train officers to have
25   reverence for human life including the officers' lives.
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 29

```
 1   BY MR. SINCICH:

 2        Q.   Right.  Is that especially important in an

 3   officer-involved shooting case?

 4        A.   I think it's especially important in all of our

 5   work, but certainly when we're using force and especially

 6   deadly force, yes.

 7        Q.   In a shooting case, are officers trained that they

 8   are responsible to justify every shot fired?

 9        A.   Yes.  Every action and every use of force, yes.

10        Q.   Are officers trained to consider their backdrop when

11   using deadly force?

12        A.   They are, yes.

13        Q.   Does that include consideration of whether or not

14   there is potentially civilians in the backdrop?

15        A.   When ever it's feasible they're trained to -- to

16   take those things in the backdrop into consideration when

17   feasible, yes.

18        Q.   In a shooting at the driver of a vehicle case such

19   as this, are officers trained to consider the lives of the

20   passenger or passengers in the vehicle, if any?

21        A.   They're trained to consider everything, their own

22   lives, lives of innocent people around them or the lives of

23   the passengers.  They're trained to take in as many of those

24   factors that pose a risk that they can humanly possible.

25        Q.   Are officers --
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 30

```
 1     A.   Feasible --

 2     Q.   I'm sorry --

 3     A.   -- if feasible.

 4     Q.   Okay.  Are officers trained to give a verbal warning

 5   before using deadly force when feasible?

 6     A.   When feasible, yes.

 7     Q.   Are officers trained to give commands to a subject

 8   before using deadly force when feasible?

 9     A.   If feasible, yes.

10     Q.   Are officers trained to give the subject time to

11   comply with either warnings or commands prior to using deadly

12   force if feasible?

13     A.   If feasible.  And I guess if they wouldn't hinder

14   their defense of their own life or the life of another,

15   yes.

16     Q.   Are officers trained that even when they have

17   authority to use force, they can -- they should consider less

18   intrusive force options?

19     A.   Yeah.  I think we always train officers to consider

20   all options, and if you can use a different lesser means of

21   force, we would -- we would hope they would choose that.

22          We train them to choose that possible, if feasible,

23   I should say.

24     Q.   Okay.  Would you agree that whenever possible, peace

25   officer should attempt to generate voluntary compliance
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 31

1    without resorting to physical force?

2        A.    When feasible, yes.

3        Q.    Okay.  And generally, officers are trained to

4    de-escalate the situation?

5        A.    They are whenever possible or feasible.

6        Q.    Would you agree that de-escalation includes

7    effective communication with the subject?

8        A.    It's one of the -- one form of de-escalation, yes.

9        Q.    And proper tactics can be a form of de-escalation as

10   well?

11       A.    Proper tactic can be, yes.

12       Q.    Is part of proper tactics having effective

13   communication amongst the officers?

14       A.    It depends on the situation, but yes.

15            We -- we want officers to communicate effectively

16   whenever they can.  It's -- it's not always feasible.

17       Q.    Is part of the training on tactics that officers

18   should not be overly confident?

19            MS. ROCAWICH:  Objection.  Vague.

20            THE WITNESS:  I think -- I think your -- I guess

21   that's a very simple statement.  We -- we try to teach

22   officers not to be more confident than their abilities;

23   right?

24            So we train to a certain level of confidence, and we

25   want them to be confident in their training, but we don't

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 32

1   want them to be overconfident to the point where they can't

2   do things, you know, they can't accomplish what they think

3   they can accomplish.

4          I'm not sure I understand your question completely,

5   but that's a very general term.

6   BY MR. SINCICH:

7      Q.   Right.  I read in officer training that exact term

8   and it seemed kind of general to me as well.  That was the

9   reason why I asked if that was part of the training.

10          And then I was going to see what your understanding

11  of that is.

12     A.   Yeah.  We just -- we  try to teach them to have

13  confidence in their abilities and know their abilities and

14  limitations, and we don't want them to stretch beyond those.

15     Q.   Right --

16     A.   You know, they can't do something that's impossible

17  to try to save somebody else that's going to get somebody

18  else hurt.

19     Q.   Are officers trained to avoid poor planning?

20          MS. ROCAWICH:  Same objection.  Vague.

21          THE WITNESS:  Sure.  We teach our officers to avoid

22  anything that's poor.  We try to teach them for excellence

23  and train them you know to avoid mistakes or avoid poor

24  performance or poor planning.

25  BY MR. SINCICH:

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

1    Q.   And when you say we teach our officers, what are you

2    referring to specifically?

3    A.   Our industry, State of California.

4    Q.   Okay.  So that would apply to the officers at the

5    City of Ontario and involved in this incident?

6    A.   Yes.

7    Q.   And essentially, officers are trained to develop a

8    plan when they can?

9    A.   Yes.  When feasible, they're supposed to approach

10   situations either with the plan or according to how they have

11   been trained based on the facts and circumstances as they

12   unfold.

13   Q.   Is part of the training in tactics that officers

14   should not place themselves in an inappropriate position that

15   can lead them vulnerable?

16   A.   When feasible.  We try to teach them to avoid

17   vulnerable positions, yes.  But it's an inevitable part of

18   police work as well that you end up in vulnerable positions

19   at times.

20   Q.   Is part of the training is that officers should

21   create distance?

22   A.   Sometimes.  Sometimes we teach them to close the

23   distance.  It depends on the circumstances.

24   Q.   Right.  One of the tactics that officers have at

25   their disposal as part of their tactics in de-escalation is

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

1   to try to control the distance so that they have a position

2   of advantage?

3        A.   It could be.  It depends on the circumstances again.

4            So that's kind of a hypothetical.  You -- you may

5   expect them to close the distance in circumstances to gain

6   cover that might be a de-escalation way.

7            It just depends on the circumstances.

8        Q.   Are there circumstances where in the training,

9   officers would be recommended to create a greater distance?

10       A.   Yes.

11       Q.   And officers trained to have situational

12   awareness?

13       A.   Yes.

14       Q.   Why in that important?

15       A.   We want them to be aware of the facts -- not facts,

16   I guess, but the circumstances around them and the facts I

17   guess, but the circumstances around them and take in as much

18   of that information as possible.

19            Again, it's -- there is only so much as humanly

20   possible when these events unfold in a matter of seconds or

21   split seconds.

22       Q.   Okay.  And generally speaking, officers should when

23   working as a team know where their partner officers are?

24       A.   We like for them to, but that's impossible to always

25   know.  We do train them to try to work in teams where you

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 35

1   know where your partner is or what they're doing, but it's

2   not always feasible or possible even.

3       Q.   Okay.  And whenever feasible when working as a team,

4   officers should coordinate and task each other with I guess

5   particular roles for an incident?

6       A.   I'm not sure I agree with that.  I think a lot of

7   our roles in an incident are incorporated in to our training

8   and they're expected.  So if you and I are riding together

9   and we pull up on a felony stop, I expect you to do certain

10  things without me communicating to you what you should be

11  doing.  And you would expect certain things of me as the

12  passenger or the driver whichever role we have to do certain

13  things in accordance to our training.  And we wouldn't have

14  to communicate that, but we would still be acting out

15  according to a plan that's in accordance with our training.

16      Q.   Okay.  So officers are essentially -- they should

17  anticipate that their partners are going to follow their

18  training?

19      A.   That's a very general statement, but I think in

20  general terms we hope that they all follow the same training

21  or similar training, but everybody perceives things a little

22  differently.  But we try to make sure that the officers are

23  reading each other and communicating with each other and

24  acting in concert together in any kind of incident.

25      Q.   And part of a way to do that is for officers to also

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 36

1  verbally communicate with each other to make sure there is no

2  ambiguity?

3      A.   When they can or when it's feasible, but there is

4  also a lot going on in these situations.  A lot of times in a

5  critical incident it's not feasible to be communicating with

6  your partner exactly what's happening.

7      Q.   Okay.  Are officers trained in the concept of

8  tactical repositioning?

9      A.   Yes.

10      Q.   What does that mean in the training?

11      A.   It would be adjust your position.

12          We teach them to adjust and constantly evaluate your

13  position and adjust it if you can according to what is

14  happening.

15      Q.   And is there a particular purpose of adjusting the

16  position?

17      A.   It would really depend upon the circumstances and if

18  you can and if you should.  Sometimes like I said before, you

19  close the distance, sometimes you create distance, sometimes

20  you take cover, sometimes you come out from cover, sometimes

21  you communicate, sometimes you don't, sometimes we don't want

22  you giving commands, sometimes we want you giving commands.

23      Q.   Specifically with regard to tactical repositioning,

24  is generally the purpose is for the officer to constantly be

25  reevaluating their position so that they can put themselves

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 37

1  in both the safest and most advantageous position in order to

2  effectuate the mission?

3      A.   There is a lot in that question.

4           I think we expect an inordinate amount of things

5  that an officer consider during these circumstance that are

6  not humanly possible to consider them all equally.

7           Ideally, an officer will consider their position and

8  move or adjust if feasible.  But again, they're also

9  evaluating the totality of the circumstances.  They're

10 looking for bystanders, they're perceiving the threat that

11 poses to them, they're trying to figure out what their

12 partners are doing, they're trying to listen to the radio, on

13 and on.

14           I mean there is all kinds of things they're doing.

15     Q.   Right.  Is it fair to say that the more that officer

16 is trained, the easier it is to accomplish all of those

17 tasks?

18     A.   It depends on the type of training and how they're

19 trained.  Generally speaking, I would agree with that.

20     Q.   Are officers trained to seek cover when possible?

21     A.   Sometimes.  Again, sometimes they're trained to come

22 out from cover.  It depends on the circumstances.

23     Q.   And cover generally has a purpose of protecting the

24 officer; right?

25     A.   Cover does.  Sometime we teach them to go to

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 38

1   concealment which is just to hide their you know visibility

2   of them.  And other times, again, we teach them we want them

3   out in the open.

4       Q.   Right.  Have you ever heard of the equation in

5   training that distance plus cover equals time, and time

6   equals options?

7       A.   I don't know that I heard it exactly that way, but

8   the concepts, yes.

9       Q.   Are officers generally trained not to overreact when

10  using force?

11          MS. ROCAWICH:  Objection.  Vague as to overreact.

12          You can answer.

13          THE WITNESS:  We try to teach officer never to

14  overreact to anything.

15  BY MR. SINCICH:

16      Q.   For instance, officers shouldn't use anymore force

17  than what is necessary?

18      A.   Officers should not use anymore force than what is

19  required to stop the threat or take the person into custody.

20  I mean you can deem it in different ways.  I don't want to

21  use the term necessary as that is all encompassing all the

22  time.

23          We teach them to use force and to stop when the

24  threat is over or stop when the person is taken into custody.

25          Depends on the circumstances.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

1    Q.   In California when using deadly force, are officers

2  required to only use deadly force when necessary?

3    A.   Officers are required to only use deadly force when

4  they perceive the imminent threat of death or serious bodily

5  injury that's imminent.

6    Q.   Are you familiar with the Penal Code 835(a)?

7    A.   I am.

8    Q.   And in the Penal Code officers are required to

9  follow the Penal Code; correct?

10   A.   Yes.

11   Q.   Do you recall the Penal Code where it states that

12  deadly force should only be used when necessary?

13   A.   Yeah.  Again, it comes with the perception of the

14  officer, of a reasonable officer.

15   Q.   Right.  So included in defining of deadly force as

16  based on the reasonable perception of the officer only when

17  there is an imminent threat of death or serious bodily

18  injury, it also requires that the use of deadly force be

19  necessary; isn't that right?

20   A.   It does.  I don't know the extract verbiage and the

21  order of it off the top of my head, but it does.

22   Q.   Okay.  Are officers trained that they can only use

23  deadly force against -- strike that.  I think I said that

24  incorrectly.

25        Are officers trained that they can use deadly force

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 40

1   against the driver of a fleeing vehicle merely for fleeing?

2           MS. ROCAWICH:  Objection.  Improper, incomplete

3   hypothetical.

4           You can answer.

5           THE WITNESS:  So again, it would depend on the

6   circumstances.  I don't know that you gave enough

7   information.  If that person is poses a serious threat to

8   other people if they flee, I mean -- I mean there are

9   circumstances where an officer could use deadly force for

10  flight alone.

11  BY MR. SINCICH:

12      Q.   And in those circumstances that you're thinking

13  about, it's not the flight itself that they're using deadly

14  force; it's still the imminence of death or serious bodily

15  injury; right?

16      A.   To others if the person is not stopped immediately,

17  yes.

18      Q.   Right --

19      A.   Just mere flight alone with no other circumstances,

20  again, that's I think the hypothetical you posed which I

21  don't believe applies in this case, but yes, according to

22  that hypothetical.

23      Q.   It would be inappropriate to use deadly force?

24      A.   Yes.

25      Q.   Are officers trained that they can use deadly force

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

1   in order to prevent a crash?

2   　　　MS. ROCAWICH:  Same objection.  Incomplete, improper

3   hypothetical.

4   　　　You can answer.

5   　　　THE WITNESS:  So again, I don't know that there is

6   enough information, but if -- if based on your hypothetical

7   solely to prevent a crash no, you can't use deadly force

8   solely to prevent a crash.

9   　　　If you're preventing a crash that is going to likely

10  result in serious bodily injury or death, there might be an

11  argument that an officer can make.

12  BY MR. SINCICH:

13  　　　Q.   Do you have some kind of specific criteria in mind

14  as to whether a crash is likely to result in death or serious

15  bodily injury?

16  　　　A.   A person would be crushed by a car, it could.

17  　　　Q.   For instance, are you taking the speed of the

18  vehicle into consideration?

19  　　　A.   Yeah.  Even a low-level speed in that regard could

20  cause death or serious bodily injury, but yes, if the car is

21  not moving, of course, it doesn't, but even at a low speed

22  could cause death or serious bodily injury.

23  　　　Q.   And in order for even a low speed to potentially

24  cause death or serious bodily injury, it would be contingent

25  on the placement of the subject with respect to the

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 42

1   vehicle?

2          MS. ROCAWICH:  Objection.  Incomplete, improper

3   hypothetical; calls for speculation.

4          You can answer.

5          THE WITNESS:  I think any of the scenarios we're

6   talking about would -- it depends on the position of the

7   person.

8   BY MR. SINCICH:

9      Q.   Right.  For instance, if there is no person in the

10  path of the vehicle, then the vehicle wouldn't be posing a

11  threat of death or serious bodily injury; is that fair?

12     A.   It depends on the person who is perceiving that.

13     Q.   Okay.  So if it was framed as if the officer does

14  not reasonably perceive that a person is in the path of the

15  vehicle, then it would be inappropriate to use deadly force

16  against the driver of the vehicle?

17     A.   I'm not sure I understood that question.

18          I'm sorry.

19     Q.   It might have been a couple double negative in there

20  or something --

21     A.   -- I would hate to misunderstand.

22          Can you repeat the for me, please.

23     Q.   Right.  I'm going to try to rephrase it instead of

24  repeat it.  I don't want to confuse anybody even myself.

25          I was trying to use your terminology.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 43

1          Let me see.  Is it fair to say that if an officer

2   does not perceive, reasonably perceive that a person is in

3   the direct path of a vehicle, then that officer should not

4   use deadly force against the driver of that vehicle?

5          MS. ROCAWICH:  Objection.  Incomplete, improper

6   hypothetical.

7          You can answer.

8          THE WITNESS:  Based solely on that information and

9   no other perceived threat that's outside of that, I would

10  agree with that, yes.

11  BY MR. SINCICH:

12      Q.   Okay.  And you mentioned that even slow speeds of a

13  vehicle could potentially be a threat of harm.

14          Do you recall that?

15      A.   Yes.

16      Q.   What would you classify as slow speeds in that

17  regard?

18      A.   Couple miles-an-hour could crush a leg and femoral

19  artery or a head.  It depends, depends on what part of the

20  vehicle is hit or what part of the person is hit.

21          If you're crushed between two things, it depends on

22  any part of your body could cause serious injury, serious

23  bodily injury.

24      Q.   Okay.  And that would be contingent on a person

25  being essentially trapped in between two things?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 44

```
 1              MS. ROCAWICH:  Objection.  Misstates testimony.
 2              THE WITNESS:  I think that's what we were referring
 3    to.  I don't know that it would be contingent upon that, but
 4    that's essentially what I was describing.
 5    BY MR. SINCICH:
 6         Q.   Right --
 7         A.   Yes.
 8         Q.   That's what I was just trying to clear up.
 9              That's what you were describing?
10         A.   Yes.
11         Q.   Okay.  And if someone gives you a set of facts,
12    would you be able to form an opinion as to whether or not
13    deadly force in that hypothetical situation was reasonable or
14    not?
15         A.   If I had enough facts, yes.
16         Q.   Okay.  Now, in your report you give a section after
17    you list a documents that's called incident summary; right?
18         A.   Yes.
19         Q.   As I review that incident summary, a couple things
20    popped into mind that I want to ask you about --
21         A.   Can I --
22         Q.   I'm sorry --
23         A.   Do you mind if I refer to it with you as you're
24    asking me?
25         Q.   Go ahead.  I don't mind at all.
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 65

1    Q.   Do you know if that civilian vehicle had slammed on

2    the brakes or swerved out of the way?

3    A.   I don't.

4    Q.   To your knowledge, were there any civilians injured

5    during this incident?

6    A.   I don't believe they were.

7    Q.   Up to the point that the subject vehicle came to a

8    stop on Beverly before it went into reverse, do you think it

9    would have been appropriate to use deadly force against

10   Mr. Benavente?

11   A.   Can you repeat the question.

12        MS. ROCAWICH:  Objection.

13   BY MR. SINCICH:

14   Q.   Up until the point where the subject vehicle came to

15   a stop on Beverly before it went into reverse, do you think

16   it would have been appropriate to use deadly force against

17   Mr. Benavente?

18        MS. ROCAWICH:  Objection.  Incomplete, improper

19   hypothetical; calls for speculation.

20        You can answer.

21        THE WITNESS:  Based on the limited information you

22   provided, I wouldn't think so absent other circumstances.

23   BY MR. SINCICH:

24   Q.   Right.  And what I'm asking is all of the

25   information that you reviewed in this case in forming your

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 66

1   opinions, just at the time that the vehicle first came to a

2   stop, knowing everything you know about the case up to that

3   point, would it be appropriate to use deadly force against

4   Mr. Benavente?

5       A.   I don't recall anything in there that -- in the case

6   that I reviewed that would have justified deadly force to

7   that point.

8       Q.   Let's say that after the car went into reverse and

9   impacted Officer Varela's vehicle and then came to a stop, do

10  you think then it would be appropriate or inappropriate to

11  use deadly force against Mr. Benavente?

12      MS. ROCAWICH:  Same objection.  Incomplete, improper

13  hypothetical.

14      You can answer.

15      THE WITNESS:  I think that would depend on the

16  officer's perceptions.  I didn't see anything that indicate

17  that there would be an objective reason for a reasonable

18  officer to use deadly force, but again, it depends on the

19  officers at the scene and their perspective.

20  BY MR. SINCICH:

21      Q.   Okay.  Let's say that if everything's the same in

22  this incident, after the vehicle went -- and then kept going

23  in reverse and made initial contact with Officer Escobar's

24  vehicle but stopped approximately where they were bumper to

25  bumper, and the officers reasonably perceive what I'm

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 68

1          Again, it would depend upon his perception or

2     Alvarado's perception or any of the other officers'

3     perceptions.

4     BY MR. SINCICH:

5          Q.   Okay --

6          A.   That contact with the second car is in proximity to

7     an officer out on foot and proximity of the open doorway, the

8     circumstances change from the previous one you gave me.

9          Q.   Okay.  Going back to the traffic collision that you

10    or, rather, the near traffic collision that you referenced

11    earlier during the pursuit, is it fair to say that there was

12    no traffic collisions with any vehicles including officer

13    vehicles during the pursuit?

14               And what I'm referencing is essentially before they

15    got to Beverly.

16         A.   I don't recall any traffic collisions before that.

17               I don't think there were any.

18         Q.   Did you review documents that referenced Officer

19    Varela nearly causing a traffic collision when he first began

20    to follow the subject vehicle?

21         A.   I don't recall that.  I'm not sure that I did.

22               There was a lot of documents and videos in this

23    case, but that doesn't ring a bell to me right away.

24         Q.   Do you recall Corporal Alvarado stating that he had

25    to yell at Officer Varela and tell him to stop because he

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 72

1   coming to a stop.

2       Q.   Do you know if the vehicle was actually stopped at

3   the time that Corporal Alvarado put boots on the ground?

4       A.   I don't know.

5       Q.   Does that detail inform on your opinions in any way

6   as to whether or not the force was reasonable?

7       A.   It doesn't because what I'm referring to if the car

8   was slightly rolling as it was coming to a stop because one

9   of the officers testified that opening the doors they were

10  coming to a stop.  Getting the door open and getting ready to

11  get out.

12           So whether a car was actually moving an inch or two

13  as his foot touched the ground, I don't know, and that

14  doesn't make a difference in my opinion in this case.

15       Q.   Are officers trained to exit the vehicle while their

16  patrol vehicle is still moving?

17       A.   Not specifically trained to do that.

18       Q.   As the chief of police would you essentially tell

19  your officers that that's an unsafe tactic and to refrain

20  from doing that?

21       A.   It depends.  If the tire is rolling an inch and the

22  officer's stepping out to engage a threat, it might not be an

23  unsafe practice.  We don't teach that generally to do that,

24  but I think it depends on the circumstances.

25           It's not uncommon for a passenger officer to be

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

1   opening the door and be ahead of the driver officer because

2   the driver officer is still engaged in the spotlight, engaged

3   in the vehicle, stopping the vehicle, positioning the

4   vehicle.

5           The passenger officer has a few less

6   responsibilities in that regard, and is typically more

7   focused on the person if there is going to be a foot chase or

8   something like that.

9       Q.   Okay.  According to your report you state, and it's

10  in that last paragraph of Page 5, about halfway through, "As

11  Corporal Alvarado was getting out of the car, the suspect

12  vehicle reversed and rammed into the first police car,

13  Officer Varela's car."

14          Do you see that?

15      A.   I do.

16      Q.   Were you indicating that Corporal Alvarado was

17  getting out of the car at the time that the red car impacted

18  Officer Varela's car?

19      A.   In general terms.  This is a summary.

20          This isn't, again, this is the whole summary.

21          So it's in general terms he was getting out of the

22  car.

23      Q.   And when you say in general terms getting out of the

24  car, you mean actually his body getting out of the car, or

25  just popping the door open?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

1   you're indicating?

2      A.   Where he had just stepped out, yes.

3      Q.   Okay.  So and there you cite the footnote 7 which is

4   a police officer report?

5      A.   Yes.

6      Q.   Okay.  So as far as you're concerned in terms of

7   analyzing the case, did you assume that for the purpose of

8   your opinions, that Corporal Alvarado had already stepped out

9   of the car on the street at the time that Benavente's car

10  struck Officer Escobar's vehicle?

11     A.   Yes.  From his testimony and the investigations.

12     Q.   Okay.  Now, when you referenced the S-turn that

13  Mr. Benavente made in the car, is one possible reason for

14  that S-turn is that, for instance, Mr. Benavente was trying

15  to circle around the back of Officer Varela's car, and then

16  when he saw Officer Escobar's vehicle approaching, he turned

17  to try to avoid contact with Officer Escobar's car?

18          MS. ROCAWICH:  Objection.  Lacks foundation; calls

19  for speculation.

20          THE WITNESS:  I guess you can say anything is

21  possible.

22  BY MR. SINCICH:

23     Q.   That's one of the possible things that could have

24  occurred?

25     A.   I don't know.  I would have to look at exactly how

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 80

1        Do you see that?

2    A.   I do.

3    Q.   And when you say close in proximity in terms of

4    time, what are you referencing there?

5    A.   That the shots were fired immediately after the

6    collision, almost simultaneously, but not quite.

7        You can see the distinction on the video.

8    Q.   Can you also -- well, strike that.

9        Which video are you referring to?

10    A.   I believe it was Officer Vasquez-Lopez's body-worn

11   camera video.

12    Q.   Okay.  And on Officer Vasquez-Lopez's body-worn

13   video, can you hear the collision between the car and Officer

14   Vasquez-Lopez's vehicle?

15    A.   Yes.

16    Q.   And then can you subsequently hear the three shots

17   being fired by Corporal Alvarado?

18    A.   Yes.

19    Q.   Is it fair to say that there is some gap in between

20   the collision and the first shot being fired?

21    A.   There is a gap, but it's a second or maybe two.

22        I don't know.  It's very, very small amount of

23   time.

24    Q.   What is your understanding of what the car was doing

25   immediately after the collision with Officer Vasquez-Lopez's

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 82

1    Q.   Okay.  And then your final three opinions

2    essentially are with regard to what occurred essentially

3    after the vehicle started going into reverse on Beverly;

4    right?

5    A.   I think No. 4 has a little bit again the tactics of

6    it at the end of the pursuit, but yes.

7    Q.   Okay.  Is one of your opinions whether the force was

8    reasonable or not?

9    A.   Yes.

10   Q.   How many officers used force in this incident?

11   A.   Actually, I take it back.  Opinion about the deadly

12   force was consistent with his training as a police officer in

13   the State of California and consistent with the standards of

14   practices.

15   Q.   Right.  That's your Opinion 6?

16   A.   Yes.

17   Q.   And your Opinion 5 is that the use of force deadly

18   force was reasonable under the totality of the

19   circumstances?

20   A.   Yes.  I'm sorry.  I was looking at 6 when you asked

21   me that other question.

22   Q.   Okay.  How many officers used force in this

23   incident?

24   A.   Just Alvarado used deadly force.

25   Q.   Did --

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 83

1      A.   Handcuffing Ms. Briones and putting her on her

2   knees, that type of thing, but outside of that, no other --

3   none of the officers used force to my recollection.

4      Q.   And how many officers were on Beverly at the time

5   the force was used?

6      A.   Four.

7      Q.   And the force that was used by Corporal Alvarado,

8   that's categorized as deadly force?

9      A.   Yes.

10      Q.   And it was from shooting his firearm?

11      A.   Yes.

12      Q.   And how many shots did he fire in total?

13      A.   Three, I believe.

14      Q.   Would you categorize those as rapid succession, or

15   did you understand there to be a pause in between the

16   shots?

17      A.   I would say that's rapid succession.

18      Q.   When you reviewed the records of, for instance,

19   Officer Vasquez-Lopez driving north on Beverly, did you

20   review him indicating that he was going north on Beverly as

21   the red car was going into reverse?

22      A.   I would have to look at his testimony to be sure

23   exactly if he was pulling up as the car was going in reverse.

24   It's quite possible based on the timing of the camera that I

25   mentioned earlier that I saw the third car pull in.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 87

1    Q.   And the second opinion has to do with the officers'

2    decision to actually pursue the vehicle?

3    A.   Yes.

4    Q.   And then you mentioned earlier the third opinion has

5    to do with the tactics to stop, detain, and apprehend

6    Mr. Benavente?

7    A.   Yes.

8    Q.   Okay.  Referring to that section of your report and

9    the bases for your opinions, is it your understanding -- what

10   is your understanding of the purpose of the initial attempts

11   to stop the vehicle?

12   A.   I think there was two purposes.

13        One was the tinted windows, and the other was the

14   red light violation.

15   Q.   Okay.  And what standard must be met in order for

16   officers to attempt to stop a vehicle?

17   A.   Reasonable suspicion.

18   Q.   And that's reasonable suspicion of unlawful

19   activity?

20   A.   Or that a traffic infraction occurred.

21   Q.   Right.

22   A.   Reason to believe a traffic infraction occurred.

23   Q.   Is there a term that law enforcement officers use

24   when an officer does not have reasonable suspicion, but

25   attempts to stop a vehicle anyway?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 89

1   stop the car.

2       Q.   Right.  You would still have to have reasonable

3   suspicion of some form of unlawful activity, though; right?

4       A.   In general terms.

5       Q.   Okay.  Now, in rendering your opinion did you

6   consider Officer Varela's deposition testimony where he

7   stated that the car turned right onto Fourth Street at a

8   green light?

9       A.   There was some conflicting testimony of whether the

10  light was red or not, but yes.

11      Q.   Okay.  But in your report you concluded that he did

12  run a red light; is that fair?

13      A.   Both the officers testified in the end that he ran

14  the red light.  So there was statements from both the

15  officers that they observed him not stopping from the traffic

16  signal, the red traffic signal.

17      Q.   But Officer Varela stated that he turned right on a

18  green light; correct?

19      A.   In one place.

20      Q.   Okay.  And if he turned right on a green light, and

21  that was true, would it be fair to say that he did not commit

22  a red light violation?

23      A.   Well, if it were true.  If he didn't stop -- I'm

24  sorry -- if the light was green and he made a right turn on

25  the green, and there was no red light violation, there

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 96

1   when the pursuit began, but yes.  In general terms, the

2   initial failure to yield was right before the stop sign, but

3   I think Officer Varela in his mind when he went through the

4   stop sign, he knew then he was intentionally evading him and

5   not stopping.

6       Q.   And when you say the failure to yield occurred

7   before then, what was the attempt to yield the vehicle before

8   that stop sign?

9       A.   I think the lights were turned on before then.

10          I would have to go back and review Alvarado's and

11  Escobar's testimony, but at some point the lights were on.

12          I don't know if it was before the first stop sign

13  was run or the second one, but there was a description of a

14  failure to yield to the lights.

15      Q.   Okay.  And while the car was driving on Fourth

16  Street including initial failure to yield, it was generally

17  driving within the speed limit and safe according to the

18  officers?

19      A.   I think initially.  Then it got up to speed of 50 to

20  70 miles-an-hour and was driving erratically.

21      Q.   Is there any video that shows the red car driving 50

22  to 70 miles-an-hour?

23      A.   Not to my knowledge.

24      Q.   Is there any video that shows the red car driving

25  erratically?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 97

1      A.   Not that I reviewed.

2      Q.   From your calculation, the pursuit was approximately

3   two minutes; right?

4      A.   Yeah.  That's a rough estimate, yes.

5      Q.   What did you base your rough estimate on?

6      A.   I would have to go look at that section again, but I

7   think it was the radio transmissions.

8      Q.   Okay.

9      A.   And the officers' descriptions.

10      Q.   And from what location to location or when to when

11   is that two-minute time frame that you're referring to?

12      A.   Right when they started to initiate the traffic stop

13   on Fourth and then to the time it stopped on Beverly.

14      Q.   When you're saying initiate the traffic stop on

15   Fourth, what location -- where on Fourth were they?

16           Was that when they were at the stop sign when the

17   pursuit occurred?

18           I'm just trying to get a visual of when the two

19   minutes began from your perspective.

20      A.   From my perspective it's when they try to stop the

21   car on Fourth right after they turned off of Mountain.

22      Q.   And how far did they get down Fourth after turning

23   on Mountain did Officer Varela put his lights on to initiate

24   the traffic stop?

25      A.   I'm not certain of exactly where.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 98

1      Q.    Okay.  And then when you said that the pursuit two

2    minutes ends on Beverly, do you mean it ends before the

3    vehicle went in reverse, or are you stopping the pursuit at

4    the time that like after the officer-involved shooting

5    occurred?

6      A.    They were all within a few seconds.

7            So I didn't differentiate.

8      Q.    Okay.  Do you know the approximate distance of the

9    pursuit?

10     A.    I don't.

11     Q.    Besides the one civilian car that you referenced

12   where there was almost a collision, was there any other

13   civilian cars on the road driving according to your review of

14   the records?

15     A.    I don't recall any that were stated on the record.

16     Q.    Some of the officers testified that there was very

17   light traffic at the time -- bless you.

18     A.    Excuse me.  Could you repeat your question?

19     Q.    Yeah.  Bless you.

20           In rendering your opinions, did you consider the

21   officers' testimony that there was light traffic at the

22   time?

23     A.    Yes.

24     Q.    Now, referring to your next set of opinions, Opinion

25   4 has to do with the officers when the pursuit ended;

FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL
Robert Handy on 02/19/2024

Page 99

1  right?

2      A.   Yes.

3      Q.   And that we mentioned earlier that Opinion 5 is

4  whether the use of deadly force was reasonable?

5      A.   Yes.

6      Q.   And then Opinion 6 is whether the use of force was

7  consistent with training?

8      A.   Yes.

9      Q.   Now, we covered earlier a little bit about the

10 defining of what rapid means when you reference the vehicle

11 going rapidly in reverse.

12         And I believe we discussed from the black box data

13 that the vehicle was approximately top speed of 15

14 miles-an-hour?

15     A.   Rapidly also can refer to acceleration.

16         You can go -- if you're going 15 in a very short

17 period of time in proximity to a passenger, that might be

18 rapidly.

19     Q.   Right.  So at some point in time the vehicle had to

20 have started at zero miles-per-hour, got up to 15

21 miles-per-hour, and then stopped at zero miles-per-hour after

22 the impact of Officer Vasquez-Lopez's vehicle; is that

23 fair?

24     A.   Yeah, I think that's fair.

25     Q.   And then you go on in your bases for your opinions

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

1          THE WITNESS:  I'm not sure I do either.

2          An officer could perceive that.

3    BY MR. SINCICH:

4     Q.    Right.  Would you expect a reasonable officer to be

5    paying attention to the subject vehicle in a vehicle pursuit

6    just like this?

7     A.    Well, they might be paying attention to the

8    occupants of the vehicle and not looking at the lights of the

9    vehicle.  They might be focused on the driver or the

10   passenger or kids on the street or anything else.

11         They could be focused on all kind of things.

12    Q.    Okay.  Are officers trained in the vehicle pursuit

13   to pay attention to the lights of the vehicle in order to

14   establish whether or not they're braking or going in reverse,

15   for instance?

16    A.    In a pursuit, typically, no.

17         You're trained to look at other things.

18         So do officers -- are they trained specifically to

19   look at backup lights, no.

20         Are they trained to evaluate all of the

21   circumstances and everything going on around them in this

22   critical incident, yes.

23    Q.    And everything that's going around them includes the

24   lights of the vehicle indicating whether or not it's going

25   backwards; is that fair?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 113

```
1              And I think that is a reasonable perspective.
2      Q.   And does the time frame, it matters in a case like
3  this?
4              MS. ROCAWICH:  Objection.  Vague.
5  BY MR. SINCICH:
6      Q.   On whether or not the force was reasonable, the
7  timing of the events?
8      A.   The timing --
9              MS. ROCAWICH:  Objection.  Vague.
10             THE WITNESS:  Everybody has different perspectives
11 of timing of what is occurring when.
12 BY MR. SINCICH:
13     Q.   Okay.  I'm going to give a hypothetical.
14             If the officer sees the red car come to a stop at
15 the end of the pursuit, then the car goes rapidly in reverse,
16 it collides with the first patrol vehicle, and then
17 immediately continues to go rapidly in reverse towards the
18 second patrol vehicle in which this subject officer is
19 sitting in the passenger seat, but had not yet struck the
20 second patrol vehicle.
21             Are you with me so far in the hypothetical?
22     A.   I am.
23     Q.   Is it your opinion that it would be appropriate for
24 the passenger officer to open the door and attempt to get out
25 of the patrol vehicle?
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 114

1      A.   It if occurred exactly as you said with the detail

2   in which you said it in and it was factual, I don't think you

3   should get out of the car.

4      Q.   And why not?

5      A.   Because they're not doing a felony stop or is not

6   engaging in a foot pursuit.

7      Q.   Okay.  Is it also fair to say that it would be

8   unsafe for the officer to get out of the car if he saw a

9   suspect vehicle reversing -- strike that.  Let me be more

10   specific.

11           Would it be fair to say that it's unsafe for the

12   passenger in a patrol vehicle, passenger officer, to exit the

13   passenger side of the patrol vehicle when the officer is

14   perceiving the vehicle reversing along the passenger side

15   lane of the patrol vehicles?

16           MS. ROCAWICH:  Objection.  Incomplete, improper

17   hypothetical; calls for speculation; lacks foundation.

18           THE WITNESS:  If the officer stepping out of the car

19   perceived that, I would agree with you, that it wouldn't be

20   safe.

21   BY MR. SINCICH:

22      Q.   And I'm going to change the hypothetical slightly.

23           If everything in the case is exactly the same

24   except, and I'll be specific as to with regard to on Beverly,

25   the officer on the passenger side of the second vehicle sees

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

1   think that matters in an officer-involved shooting case.

2       Q.   Why did Corporal Alvarado get out of the vehicle to

3   your understanding in this case?

4       A.   He was preparing for a foot pursuit or a felony

5   stop.

6       Q.   Okay.  So let's say everything is the same in this

7   case, but assume for the purpose of this hypothetical

8   Corporal Alvarado is still in the vehicle as the red car

9   reverses and collides with Officer Escobar's vehicle, and

10  everything in this case is the same, meaning the reason why

11  Corporal Alvarado wants to get out of the car is prepping for

12  a foot pursuit and a felony stop.  And he reasonably

13  perceives the red car moving in reverse rapidly and striking

14  Officer Escobar's vehicle.

15          Would it be appropriate in that circumstance for

16  Corporal Alvarado to get out of the car?

17          MS. ROCAWICH:  Same objection.  Incomplete, improper

18  hypothetical.

19          THE WITNESS:  If he had no other perspective of why

20  he was getting out of the car.  If it was solely based on a

21  foot pursuit or a felony stop, then I would think it is not

22  appropriate to get out of the car if the car is coming

23  towards you or just collided into you.

24          If he felt trapped in the vehicle or other things or

25  had different perspective, felt he was more vulnerable in the

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 118

1   car and needed to get out, there is other reasons

2   potentially.

3        But again, without that information just strictly as

4   you gave the hypothetical, I would say he shouldn't have got

5   out of the car.

6   BY MR. SINCICH:

7        Q.   Okay.  And I want this for the purpose of this

8   hypothetical to be the exact mindset of Corporal Alvarado of

9   the reason why he got out of the car of what he perceived,

10  just assume this hypothetical that he saw the red car rapidly

11  going into reverse, and then strike Officer Escobar's

12  vehicle.

13       Would it be appropriate for him to exit the

14  passenger side of Officer Escobar's vehicle?

15       MS. ROCAWICH:  Objection.  Asked and answered; lacks

16  foundation; improper, incomplete hypothetical.

17       THE WITNESS:  If the only reason that he's exiting

18  the car is for a felony stop or a foot pursuit, I don't think

19  it's the best move he could make.

20       Whether it's unreasonable or not, I don't know.

21  BY MR. SINCICH:

22       Q.   And is that the only reasons why Corporal Alvarado

23  got out of the vehicle based on your review of the record in

24  this case?

25       A.   That's what he's saying, and he's saying he got out

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

1   him?

2       A.   It may have.  I don't know.

3       Q.   Corporal Alvarado's statements was he thought he was

4   going to get crushed; right?

5       A.   The statement was he felt like he was being

6   crushed.

7       Q.   Okay.  And when you say that he fired into the

8   driver's window, is it fair to say that the red car was

9   essentially parallel more or less with the Officer Escobar's

10   vehicle?

11      A.   More or less.

12      Q.   So Corporal Alvarado would have been essentially to

13   the -- well, right in front of the driver side window in

14   order to shoot into the driver side window; right?

15      A.   He could have been slightly in front or behind it.

16      Q.   Did you consider the autopsy report in rendering

17   your opinions?

18      A.   I did.

19      Q.   Did you notice the trajectory of the rounds in the

20   autopsy report?

21      A.   I did.

22      Q.   Did you consider the strikes to the window in

23   conjunction with the trajectory of the rounds in the autopsy

24   report in forming your opinions?

25      A.   I'm not a bullet trajectory expert, but in general

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 122

```
 1  terms, yes.
 2       Q.   In general terms is it fair to say that Corporal
 3  Alvarado was essentially perpendicular to the red car when he
 4  fired his shots?
 5       A.   Essentially.  Again, he could have been slightly one
 6  side or the other.  The angle of the shots was down and left
 7  to right if I remember correctly.
 8       Q.   And when you say slightly, we're talking a matter of
 9  certain inches?
10       A.   Yes.
11       Q.   Did Corporal Alvarado issue a verbal warning prior
12  to using deadly force?
13       A.   I believe he testified it wasn't feasible.
14       Q.   And the reasons why one of them was because the
15  sirens were on?
16       A.   He did say something to that effect, yes.
17       Q.   The officers controlled whether or not the sirens
18  were on; right?
19       A.   Well, all the officers present, yeah.
20            Different ones had different control of that.
21       Q.   And another reason was engine revving?
22       A.   Yes.  I think he did say that.
23       Q.   What engines were revving immediately prior to and
24  during the shots?
25       A.   I believe the Benavente's vehicle.
```

FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL
Robert Handy on 02/19/2024

Page 123

1    Q.   Could you hear the engine revving when you were

2    analyzing Officer Vasquez-Lopez's video?

3    A.   I'm not sure.  I don't recall.

4    Q.   Did you hear the engine revving in any videos?

5    A.   I don't recall.

6    Q.   There is something like 50 videos in this case or

7    something like that; right?

8    A.   There is a bunch.

9    Q.   Did you take notice none of the officers'

10   depositions or statements stated that the red car's engine

11   was revving at the time of the shots?

12   A.   I think Officer Benavente said the engine was

13   revving.  I don't know that he described which one or which,

14   but he said engines revving.

15   Q.   Did you mean Corporal Alvarado?

16        You said Mr. Benavente Officer Benavente --

17   A.   Sorry.  Corporal Alvarado --

18   Q.   Someone's getting promoted --

19   A.   Sorry.

20   Q.   Right.  And I also recall that there was a statement

21   of engines revving.

22        My question is just a little bit more specific.

23        Did you recall anybody actually stating that the

24   engines were revving at the time the shots were fired?

25   A.   No.  I just was saying that Corporal Alvarado stated

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 124

1   that as a reason, one of the reasons that a warning was not

2   feasible, and just based on the context of that statement, it

3   seemed in close proximity to the shot.

4       Q.   Okay.  And another reason was that the vehicle

5   windows were up?

6       A.   He did say that.

7       Q.   Don't officers typically speak through closed

8   windows to drivers of vehicles?

9       A.   At times they can.  They can yell out or use a PA

10  system.  This is all happening extremely rapidly within

11  seconds.

12      Q.   And after the officer-involved shooting the window

13  was still up; right?

14      A.   Yes.

15      Q.   And did you recognize that the officers were

16  starting to yell commands at Mr. Benavente and the passenger

17  after the shooting?

18      A.   Yes.

19      Q.   If the engine was not revving on Mr. Benavente's

20  vehicle, and the red car was stopped after the collision with

21  Officer Vasquez-Lopez's vehicle, would it be feasible to

22  issue a warning prior to using deadly force even though the

23  window were up and the sirens were on?

24          MS. ROCAWICH:  Objection.  Calls for speculation;

25  incomplete hypothetical; lacks foundation.

FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL
Robert Handy on 02/19/2024

Page 125

```
 1              THE WITNESS:  I don't know if it's feasible or not.
 2         Depends on what the officers are going through.
 3              You're asking if they could have issued a warning or
 4    not.  If they feel like they're being crushed, it might not
 5    be feasible for them to issue a warning.
 6    BY MR. SINCICH:
 7         Q.   Right.  In this hypothetical the vehicle was
 8    stopped.  So it was no longer -- if it was in a motion of
 9    potentially crushing Corporal Alvarado because of the motion
10    of the red car in contact with the driver's door, in this
11    hypothetical, the vehicle stopped so the door is no longer
12    moving.
13              Are you with me in that hypothetical?
14         A.   I am.
15         Q.   Would it be feasible to issue a warning prior to
16    using deadly force?
17              MS. ROCAWICH:  Same objections.  Calls for
18    speculation; incomplete hypothetical.
19              THE WITNESS:  It could be.  It could be feasible
20    depending on the circumstances.  Again, I don't know what the
21    officers' perspective is.  I don't know what else the
22    officers are going through.  Absent any other circumstances
23    and just strictly as you described it, it seems like it could
24    be feasible.
25    BY MR. SINCICH:
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 126

1    Q.   Are officers trained that police officers may only

2    use deadly force to prevent the escape of a fleeing suspect

3    only if the officer has probable cause to believe that the

4    suspect poses a significant threat of death or serious bodily

5    injury?

6        A.   Essentially, yes.

7        Q.   And the reason why Corporal Alvarado used deadly

8    force in this case is because he thought that he was going to

9    be crushed by the vehicle door?

10       A.   That's what he articulated.   It doesn't mean that

11   there is another -- that there is not another justification

12   of deadly force.

13       Q.   When you're analyzing the reasonableness of Corporal

14   Alvarado's decision to use deadly force, are you basing it

15   off of the perspective of Corporal Alvarado at the time?

16       A.   Well, I am.   But that doesn't mean there is not

17   other reasons that could be factors.

18           It's just like if you arrest somebody on an assault,

19   but they also committed a robbery or you arrest them on the

20   wrong charge, that doesn't mean the one is invalid.

21           So I think there is another potential perspective

22   that deadly force could have be used here to stop a fleeing

23   felon.

24       Q.   Do you think this was a fleeing felon case?

25       A.   I don't know that it was.   I didn't hear that

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 127

1  articulated, but I think that one could make an argument for

2  that.

3      Q.    Do you have an opinion as to whether or not it's a

4  fleeing felon case or not?

5      A.    I don't believe that the officers articulated that

6  that was their justification.

7      Q.    If the officers did not articulate that that was

8  their justification, is it fair to say that this is not a

9  fleeing felon case?

10     A.    It still could be.  They could still be justified in

11  using deadly force in the scenario that they didn't

12  articulate that specific reason at the time they were

13  interviewed or at the time of their deposition.

14          They still could be legally justified in using it.

15     Q.    In order for an officer to use deadly force in a

16  fleeing felon situation, doesn't the officer have to have

17  reasonably perceived that the subject would cause death or

18  serious bodily injury if not immediately apprehended by the

19  use of deadly force?

20     A.    They do.  And I don't know that the officers were

21  asked that.

22     Q.    Well, the officers gave a statement to the

23  detectives; right?

24     A.    They did.

25     Q.    And the purpose of the statement based on your

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 129

1   a lot of the factors that go into their interviews that

2   they're not always you know as you would write out on paper

3   you and I would write out on a paper in a table top

4   exercise.

5       Q.   Do you recall that Mr. or rather that Corporal

6   Alvarado was asked in deposition why he used deadly force?

7       A.   I do.

8       Q.   And in his response did he mention anything about

9   the criteria that would otherwise qualify as a fleeing

10   felon?

11       A.   I don't recall him mentioning that, no.

12       Q.   Essentially, the crux of a fleeing felon deadly

13   force shooting is that the officer believes that if the

14   subject escaped, he would be a threat to somebody else,

15   meaning, not that officer; is that fair?

16       MS. ROCAWICH:  Objection.  Asked and answered.

17       THE WITNESS:  Not that officer, but it could be

18   future officer, it could be the passenger in the car or the

19   other people, the public in general.

20   BY MR. SINCICH:

21       Q.   Right.  And in this case Corporal Alvarado stated

22   repeatedly that he used deadly force because he was in fear

23   of his own life being at risk; is that fair to say?

24       A.   He did state that.

25       Q.   When Corporal Alvarado states that he believed he

FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL
Robert Handy on 02/19/2024

Page 130

1    was being crushed by the car, the door of his car from

2    pressure of the red car, would that be essentially contingent

3    on him standing in the "V" of the door?

4            MS. ROCAWICH:  Objection.  Vague as to contingent.

5            THE WITNESS:  I think that's how he described it.

6            I don't know if it's contingent on that.  I think

7    you can probably feel like you're about to be crushed if

8    you're sitting in the passenger seat and the car is running

9    into you, your passenger side.

10   BY MR. SINCICH:

11       Q.   Well, this wasn't like a T-bone type collision;

12   right?  The vehicle, the red car wasn't threatening to crush

13   the passenger of a vehicle if they were sitting in the seat.

14            That's fair to say; right?

15       A.   Generally, I think that's fair to say.

16       Q.   So essentially, the fear of being crushed by the

17   door would be because the officer's standing in the "V" of

18   the door; is that fair?

19       A.   He could have a leg out the door, he could have his

20   hand in the door.

21            Again, there could be other circumstances.

22       Q.   Right.  So maybe he's not standing in the "V" of the

23   door, but part of his body is in the "V" of the door; is that

24   fair?

25       A.   Seems reasonable.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 132

1   your training and experience?

2   A.   I don't -- I think it's different.  It's different

3   in many cases.  I don't know that there is a standard set

4   amount of seconds or portions of a second.

5   Q.   Right.  And that's what I was asking in the previous

6   question is, is there some form of range based on your

7   training as to where a reasonable officer would fall in terms

8   of their perception reaction to a potential threat?

9   A.   I don't know a specific range.

10   Q.   Do you know how fast Corporal Alvarado can perceive

11   a threat and then react to it?

12   A.   Specifically, no.

13   Q.   In this case is it fair to say that given the time

14   frame, it's possible for Corporal Alvarado to have perceived

15   a threat and then reacted to it?

16        MS. ROCAWICH:  Objection.  Vague and ambiguous.

17        THE WITNESS:  I think that's what he said, that he

18   perceived the threat and he reacted to what he perceived was

19   the threat.  I believe that was his testimony.

20   BY MR. SINCICH:

21   Q.   Okay.  And so there is kind of two components of him

22   feeling like he was about to be crushed that we covered.

23        One of them is that the vehicle is moving, and

24   another one is that he had some kind of bodily portion of his

25   body, or he was standing in the "V" of the door; right?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 133

1        A.   In hypotheticals, yes.

2        Q.   Okay.  So Hypothetically, if Corporal Alvarado was

3    able to step back from the "V" of his door, is it your

4    understanding that he would be outside of the threat zone of

5    being crushed by the door?

6             MS. ROCAWICH:  Objection.  Lacks foundation;

7    improper, incomplete hypothetical; calls for speculation;

8    vague as to step back.

9             THE WITNESS:  Maybe not crushed by the door, but he

10   is still in danger of being crushed by the vehicle.

11   BY MR. SINCICH:

12       Q.   Was the vehicle pressing up against any other

13   portion of Corporal Alvarado's patrol vehicle other than the

14   door immediately prior to or during the shots?

15       A.   I think that the proximity of the vehicle down the

16   side of the patrol car is reasonable to feel like that's a

17   threat.  Whether you're in the "V" of the door or whether

18   you're behind the "V" of the door, a car coming that close to

19   you at a rapid rate whether it's 15 miles-an-hour or 5,

20   whatever it is, I don't know, could be perceived as a threat

21   reasonably.

22       Q.   But at that time Corporal Alvarado was potentially

23   standing if he was standing, he would have been to the side

24   of the red vehicle; right?

25             MS. ROCAWICH:  Vague as to time.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

1          Sorry.  Go ahead.

2          THE WITNESS:  Yes.  But he testified that the car

3  was like basically scraping the side of the patrol car.

4          So whether he is in the "V" or not in the "V," I

5  think it's reasonable for him to feel that substantial risk

6  of great bodily injury or death from that car whether he is

7  in the car or standing alongside the passenger door that's

8  closed.

9  BY MR. SINCICH:

10     Q.   What is your understanding of whether or not the red

11  car was in contact with any portion of the patrol vehicle at

12  the time of the shots if the patrol vehicle's door was

13  closed?

14          MS. ROCAWICH:  I'm going to object as vague.

15          I'm not sure what you're getting at with that one.

16          Are you talking about the first shot?

17  BY MR. SINCICH:

18     Q.   Do you understand what I'm saying Mr. Handy?

19     A.   I don't.

20     Q.   I'm going to pull up an image and maybe I could help

21  us, but let me just finish really quickly with the rest of

22  your report here.

23          You do put in that the policy paragraph at least

24  with regard to Policy 300.4.1; right?

25     A.   Is that the Moving Vehicle Policy?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 135

1    Q.   Right.  It's shooting at or from a moving vehicle.

2         I have it on Page 15.

3    A.   Yes.

4    Q.   Is it your understanding that this policy despite

5    the name applies even if the subject vehicle is stopped?

6    A.   Then it won't be moving.  The policy applies to

7    being in a moving vehicle or shooting into a moving

8    vehicle.

9    Q.   Okay.  Is there a policy --

10   A.   -- into a stationary vehicle.

11        I'm not sure what you mean.

12   Q.   Is there a policy in the City of Ontario for

13   shooting into a stationary vehicle that was once moving, it

14   was once moving, but now it's stopped?

15   A.   Not that I know of.  I would have to look at their

16   policy.

17   Q.   Is there any training through POST or that the City

18   of Ontario provides its officers as to guidance on when an

19   officer should use deadly force against the driver of a

20   vehicle that was once moving, but is in a stopped position?

21   A.   It depends on the nature of the threat.

22        I don't -- I'm not sure I understand your

23   question.

24   Q.   I'm trying to figure out if there is any kind of

25   policy or training that City of Ontario police officers have

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 136

1   with regard to shooting at the driver of a vehicle in a

2   stopped vehicle.

3       A.   Depends on the reason they're shooting at the

4   driver.

5       Q.   What is the policy or training that would apply, to

6   your knowledge?

7       A.   So within seconds of the vehicle stopping, I think

8   that the shooting into a moving -- the Policy 300.4.1 would

9   likely apply.

10          Otherwise, it's just a general deadly force

11  policy.

12      Q.   Okay.  So in this case if the vehicle was moving

13  within one or two seconds of the officer-involved shooting,

14  the threat was actually stopped immediately prior to and at

15  the time of the officer-involved shooting, based on your

16  experience and law enforcement, would this policy still apply

17  to this scenario?

18      A.   I believe it would, yes.

19      Q.   And in this policy the first sentence says that

20  shots at or from a moving vehicle are rarely effective and

21  may involve additional considerations and risks?

22      A.   Yes.

23      Q.   What are the additional considerations and risks

24  that it's referring to, to your knowledge?

25      A.   I don't know.  I didn't write the policy.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 137

1          There are other risks.  That's an opinion, not a

2     policy.  It's kind of weird that it's in there like that.

3          You don't typically see a policy like that.

4          This is a Lexipol policy, and it looks to me like

5     that's added language from Ontario PD that is not Lexipol's

6     language.

7     Q.   As an officer for the City of Ontario reading this

8     policy, what am I do decipher from the additional

9     considerations and risks if I'm reading the policy?

10         MS. ROCAWICH:  Objection.  Calls for speculation;

11    lacks foundation.

12         THE WITNESS:  You may miss.  You may not stop the

13    car.  I mean there is a list of things.  There is always

14    risks in every shooting, but you can list any risk elated to

15    a vehicle.

16    BY MR. SINCICH:

17    Q.   There could be a ricochet of the round?

18    A.   Pardon me?

19    Q.   There could be a ricochet of the round?

20    A.   Could be.

21    Q.   You can miss and hit a passenger in the vehicle?

22    A.   Possibly.

23    Q.   You can strike the driver of the vehicle and the

24    driver could then lose control and unintentionally crash?

25    A.   Possibly.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 138

1    Q.   The next sentence is when feasible, officers should

2    take reasonable steps to move out of the path of an

3    approaching vehicles instead of discharging their firearm at

4    the vehicle or any of its occupant; right?

5    A.   It does say that.

6    Q.   As it applies to this case, would that essentially

7    mean that when feasible, Corporal Alvarado should take

8    reasonable steps to move out of the area that he thought he

9    was getting crushed instead of discharging his firearm at

10   Mr. Benavente?

11   A.   If it was feasible.

12   Q.   Right.  And that the policy is?

13   A.   That's what the policy says.

14   Q.   Okay.  And if feasible, some of the options that

15   Corporal Alvarado may have had was to get back in the vehicle

16   if he was standing in the "V?"

17        MS. ROCAWICH:  Objection.  Calls for speculation;

18   lacks foundation; assumes facts.

19        THE WITNESS:  Possible if he had time.

20   BY MR. SINCICH:

21   Q.   Based on your understanding of the facts, could

22   Corporal Alvarado still have been sitting in the vehicle with

23   part of his body hanging out at the time of the shots?

24   A.   I guess it could be possible.  I'm not sure.

25        I don't know if the patrol car window was down.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 140

1    Q.   And the general deadly force policy still applies to

2    even Policy 300.4.1; correct?

3    A.   Yes.

4    Q.   Meaning, the imminent threat of the vehicle still

5    has to be an imminent threat of death or serious bodily

6    injury?

7    A.   Yes.

8    Q.   As that portion of the policy applied to this case,

9    is it fair to say that Corporal Alvarado should only

10   discharge his firearm at Mr. Benavente if Corporal Alvarado

11   reasonably believes that there are no other means to avert

12   being crushed by the car door that he perceives as an

13   imminent threat of death or serious bodily injury?

14   A.   The car door or the vehicle.  The vehicle is the

15   crushing, not the car door.  So I think -- and it depends on

16   his perspective, but yes.  I guess in general terms, I'm

17   saying yes, but I'm qualifying that it's not the door.

18          It's also the car, and it depends on his

19   perspective.

20   Q.   Right.  So essentially, that portion of the policy

21   is instructing officers that they should exhaust all

22   reasonable alternatives prior to using deadly force in a

23   shooting at a vehicle situation?

24   A.   Yes.  Given the facts and circumstances at the time,

25   not given hindsight, but yes.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 141

1    Q.   Okay.  And part of the reasonable alternatives is

2   tactical repositioning like we discussed?

3    A.   Could be if there is time.

4    Q.   So hypothetically, if everything in this case was

5   exactly the same, but assume in this hypothetical that

6   Corporal Alvarado was still seated in the patrol vehicle with

7   the door popped open, and only his arm was extended out at

8   the time of his use of deadly force, do you believe it would

9   be appropriate to use deadly force in that hypothetical?

10    A.   It depends how he perceived the threat.

11    Q.   If everything in this case was exactly the same?

12    A.   I think it's reasonable.  If he perceived that he

13   was about to be crushed by the vehicle which is stated in

14   this case, this is testimony in this case.

15       So if he is seated in the vehicle with the door open

16   and still believes he's going to be crushed by the vehicle, I

17   think it's reasonable.

18    Q.   Do you feel that that was a reasonable belief if he

19   was still seated in the vehicle, that he was going to be

20   crushed?

21    A.   If his arm is out, it could be.  Depends how he

22   perceives the vehicle coming at him.  Again, it depends on

23   his perception.

24    Q.   Okay.  So whether his perception is reasonable,

25   depends on his perception?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

 1          That's what I'm trying to understand.

 2     A.   Depends what he's articulating.  So you're giving me

 3  a hypothetical absent his mindset.  And I can't give you an

 4  answer absent his mindset.

 5     Q.   Right.  And I'm partially trying to assess the

 6  reasonableness of his mindset.

 7     A.    In hindsight.  I don't think that's fair or

 8  reasonable to do to the officer.  I don't think that's how

 9  we're supposed to do these things.

10     Q.   I understand.  So hypothetically, if everything in

11  this case is the same, but for this hypothetical assume that

12  Corporal Alvarado was able to move out of the "V" of the

13  vehicle and was no longer about to be crushed by the door, in

14  that hypothetical, would you agree that the use of deadly

15  force would be inappropriate?

16          MS. ROCAWICH:  Objection.  Incomplete hypothetical;

17  calls for speculation.

18          THE WITNESS:  If Corporal Alvarado was able to move

19  out of the way and not feel threatened any longer, then

20  correct, I would agree with that.

21  BY MR. SINCICH:

22     Q.   In your report you also mentioned methamphetamine a

23  couple times or other drug use.

24          Do you recall that?

25     A.   I do.

Page 144

1   BY MR. SINCICH:

2       Q.   Well, let me ask you this.

3            Had you ever seen any images from Mr. Callahan's

4   report?

5       A.   I don't know who Mr. Callahan is.

6            I don't believe so.

7       Q.   Fair enough.  If I purport or if I represent to you

8   that Mr. Callahan is another expert from the Defense who

9   created a reconstruction of this incident and also wrote a

10  report including images that I'm going to mark as Exhibit 2

11  an image from his report.

12           All right.  Can you see my screen?

13      A.   Yes, I can.

14      Q.   Okay.  Now, on Exhibit 2 this is an image that's

15  from Mr. Callahan's report that purports to be a

16  reconstruction aerial view of the red car's movement as it

17  went to reverse up until the time of the shots.

18           Based on your reviewing this image, is that a fair

19  description of what is being depicted?

20           MS. ROCAWICH:  I'm going to object as vague and

21  outside the scope of this witness's designation.

22           I'm not sure where you're getting at with this one.

23           THE WITNESS:  Is this a traffic reconstruction

24  expert?  I'm not a 100 percent sure because I only see one

25  vehicle, obviously, in the first two slides or two lanes,

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

**Page 147**

1   BY MR. SINCICH:

2       Q.   Okay.  So if you assume that the center image is an

3   accurate depiction of what occurred during the incident,

4   would it be reasonable for Corporal Alvarado reasonably

5   perceiving the events that are occurring at this time to get

6   out of the passenger door of Officer Escobar's vehicle?

7           MS. ROCAWICH:  Objection.  Vague as to time; lacks

8   foundation.

9           THE WITNESS:  Depends what perceives.

10          Doe he perceive the car coming at him, does he

11   perceive the car stopping.

12   BY MR. SINCICH:

13       Q.   He perceives the car going rapidly in reverse.

14       A.   In your hypothetical if he perceives the car coming

15   rapidly in reverse right at him, I wouldn't think he would

16   step out of the vehicle.

17       Q.   Are officers trained in any regard with respect to

18   whether their use of deadly force is reasonable if they

19   create the peril that puts them at risk?

20       A.   Well, we train officers to avoid putting themselves

21   in peril.

22       Q.   Do you have an understanding as to whether or not if

23   there is any training or instruction to officers that their

24   use of deadly force will not be deemed reasonable if the

25   officer placed themselves in the position that caused the

Case 5:23-cv-00266-SSS-DTB   Document 32-9   Filed 04/12/24   Page 65 of 74   Page ID
#:713
FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL
Robert Handy on 02/19/2024

Page 148

1    threat?

2              MS. ROCAWICH:  Objection.  Calls for a legal

3    conclusion.

4              THE WITNESS:  We train them the tactics leading up

5    to it.  If they're improper or proper but could be a factor

6    be in whether or not the force was reasonable.

7    BY MR. SINCICH:

8        Q.   Okay.  And I'm going to make as Exhibit 3 to the

9    deposition a video, the first 30 seconds approximately of the

10   surveillance video that's Bates 01745.

11             (Exhibit 3 was marked for identification.)

12   BY MR. SINCICH:

13       Q.   Can you see my screen?

14       A.   Yes.

15       Q.   And is this the surveillance video that you reviewed

16   in your review of the case?

17       A.   Yes.

18       Q.   In this surveillance video is essentially the

19   smaller car, the red suspect vehicle, and behind it Officer

20   Varela's vehicle?

21       A.   It may be Officer Varela's vehicle.

22             I didn't view this in a paused setting.  I mean this

23   is a still shot from there.  And I'm not sure whose vehicle

24   that is.  It could be Officer Varela's.

25       Q.   Okay.  Well, we know Officer Varela was the primary

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

1   vehicle in the pursuit; right?

2       A.   We do.

3       Q.   So let me just press play and I'll go back.

4            (Video playing.)

5            (Video paused.)

6   BY MR. SINCICH:

7       Q.   All right.  I stopped it at two seconds into this

8   video.

9            Is it fair to say that from your perception of these

10  first two seconds, the red car went in reverse passing

11  Officer Varela's vehicle?

12      A.   About that, yes.

13      Q.   Okay.  So I want to go back to 0000 seconds, the

14  very start of Exhibit 3.

15           At this point in time we have the red car and

16  Officer Varela's vehicle shown; correct?

17      A.   Yes, I believe so.

18      Q.   And Officer Escobar's vehicle is not depicted in the

19  image; right?

20      A.   Yeah.  I don't see another police vehicle.

21      Q.   Okay.  I'm going to go -- I'm going to press play

22  and I'm going to try press stop and see what my perception

23  reaction is.

24           Okay.  It hasn't even hit one second.

25           Do you see how there's some lights behind the tree

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 150

1    that are on arrival?

2         A.   I do.

3         Q.   Is it fair to say based on what you know about this

4    incident, that that's Officer Escobar's vehicle that's

5    approaching?

6         A.   It would be, yes, likely.

7         Q.   And at this point in time where I pressed pause, and

8    it's still 00 and 00 seconds, the red car is already moving

9    in reverse?

10        A.   Yes.

11        Q.   And it appears to be approximately the time that the

12   red car comes into contact with Officer Varela's vehicle?

13        A.   Approximately.  You can't tell if it's slightly

14   before or after or during the contact, but it's close.

15        Q.   Right.  I'm going to press play and stop briefly

16   again.

17             (Video playing.)

18             (Video paused.)

19   BY MR. SINCICH:

20        Q.   Okay.  I pressed stop, and it's at one second into

21   the video.

22             Do you see that now in the video of Exhibit 3, the

23   red car is essentially parallel side by side with Officer

24   Varela's vehicle?

25        A.   Yes.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 151

1      Q.   And Officer Escobar's vehicle is still

2   approaching?

3      A.   I don't know if it's still approaching, but you can

4   barely see it, yes.

5      Q.   Okay.  And it's approached closer than the lights

6   were depicted previously; right?

7      A.   Yes.

8      Q.   And I'm going to press play and stop again really

9   quickly.  I stopped it at two seconds into the video.

10          Do you see at this time the red car appears to be

11   kind of changing angles almost in that S-turn that you

12   described earlier?

13      A.   Yes.

14      Q.   And this is approximately the time that Officer

15   Escobar's vehicle came to a stop; is that fair to say?

16      A.   Roughly yes.

17      Q.   And the red car is mostly already passed Officer

18   Varela's vehicle as Officer Escobar's vehicle is coming to a

19   stop?

20      A.   Hard to tell if he's passing just with the flash of

21   the light, but he is either just passed or just about to

22   pass.

23      Q.   Okay.  I have the ability to go frame-by-frame here.

24          I'm going to click this frame-by-frame on this VLC

25   player.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 153

1          And as I go from one second to two seconds, do you

2     see Officer Escobar's vehicle coming to a stop?

3          A.   Yes, I think so.

4          Q.   And it comes to a stop from the perspective of this

5     surveillance camera where you could see the front bumper and

6     the two headlights in between the tree kind of leaves to the

7     left and the tree -- what is it, the not the branch, but --

8          A.   The trunk.

9          Q.   The trunk of the tree to the right side?

10         A.   Yes.

11         Q.   So in between the trunk and those kind of bushes is

12    the front of Officer Escobar's vehicle?

13         A.   Appears to be.

14         Q.   And at approximately two seconds that's of this

15    video, that's when Officer Escobar's vehicle is coming to a

16    stop?

17         A.   It appears to be.  I don't know what's going to

18    happen when you hit play again.

19         Q.   As I hit play the red car continues in reverse.

20              Officer Escobar's vehicle doesn't move, and then

21    Officer Varela's vehicle does a three-point turn; is a fair

22    to say?

23         A.   I actually think Officer Escobar's car moved when

24    the other car hit him when Benavente's car hit him.

25         Q.   Did you see it shift a little bit?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 155

```
 1   for reference purposes Officer Vasquez-Lopez video.

 2           And I'll start at about 58 seconds, and I'm going to

 3   share my screen with you.

 4           Can you see my screen?

 5   A.    Yes.

 6   Q.    Okay.  I'm going to press play for about five

 7   seconds, and go back at starting at 58 seconds.

 8           That's about five seconds.  I stopped at one minute

 9   and three seconds.

10           Do you see that?

11   A.    Yes.

12   Q.    Is it fair to say that what was depicted in that

13   time frame is you can hear the collision between the red car

14   and the Officer Vasquez-Lopez's vehicle?

15   A.    Yes.

16   Q.    And then you can hear the three gunshots?

17   A.    Immediately after, yes.

18   Q.    And then Officer Vasquez jumps out of his vehicle

19   immediately?

20   A.    With the second or two, yes.

21   Q.    And as we can see here, the red car is essentially

22   still touching Officer Vasquez-Lopez's vehicle?

23   A.    Yes.

24   Q.    And it has not rolled forward yet; right?

25   A.    It appeared it hasn't.
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 156

1    Q.    Now, as I stopped this as one minute and three

2    seconds, do you see Corporal Alvarado's hand protruding from

3    his patrol vehicle?

4    A.    Yes.

5    Q.    And is it fair to say that at this point in time, he

6    is not standing near the door?

7    A.    I don't know if his legs are out of the car or not.

8         It's hard to tell.

9    Q.    Is it fair to say he's not standing --

10   A.    He is not standing upright, but his legs may be out

11   of the car.

12   Q.    As I click forward, do you see Officer or rather

13   Corporal Alvarado starting, his face starting to come out of

14   the car from this body-worn camera?

15        And I'm still at one minute, three seconds.

16   A.    I do.  And I think that's his right thigh there,

17   too.

18   Q.    And I'm going to continue going forward.

19        Did you see how his body position dropped as though

20   he was standing on the ground, and now I'm still at one

21   minute and three seconds?

22   A.    I saw it come down a little bit, but it looked to me

23   like his thigh was out the whole time as he came up.

24   Q.    At one minute and three seconds, and I know that we

25   stopped at several times at one minute and three seconds, but

FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL
Robert Handy on 02/19/2024

Page 157

1    at this point in time, is it fair to say that Officer

2    Vasquez-Lopez is standing approximately next to his front

3    headlights?

4        A.   He is near it, but he is behind it.

5        Q.   Okay.  As Officer Vasquez-Lopez was moving from his

6    car door to near his front headlight, from what we saw in his

7    body-worn camera, is it fair to say that Corporal Alvarado

8    was exiting his patrol vehicle?

9        A.   I don't know if he was exiting or standing back

10   up.

11       Q.   Did you ever hear any testimony or read anything

12   that Corporal Alvarado was knocked down?

13       A.   No.  But I referenced that earlier.

14            It seem to me that he may have been, his feet may

15   have been out of the car, that he may have been trying to

16   avoid the collision and sat back.

17            I don't know.  I'm speculating, but I did not see

18   any testimony that he was knocked down.

19       Q.   Matter of fact, Corporal Alvarado specially stated

20   that he was standing in the street at the time the shots were

21   fired; right?

22       A.   Yes.  And his feet may have very well been on the

23   ground.

24       Q.   And that was his justification for using deadly

25   force because since his feet were on the ground, he thought

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 158

1  that he was going to be crushed by the door because the red

2  car was closing the door on him?

3      A.   Again, that was his perception, and again, his

4  perception versus the reaction to the perception, the

5  reaction to the threat were all talking within two seconds

6  here.

7      Q.   As I put forward in the video, and I'm going to stop

8  at one minute and four seconds, can you see Corporal Alvarado

9  continuing to step down out of his vehicle?

10      A.   I don't know that he's continuing to step, but he is

11  out.

12      Q.   Okay.  And is fair to say that his body position as

13  depicted at one minute and four seconds is in the "V" of the

14  door?

15      A.   I would say that's fair to say.

16      Q.   And this body position is different than what his

17  body position was a second earlier?

18      A.   His upper body.  Again, I can't tell.

19          To me it look like his leg was out of the car as you

20  came up on it.

21      Q.   So this is at one minute and two seconds.

22          I'm stopping at one minute and two seconds in

23  Officer Vasquez-Lopez's body-worn camera.

24          Officer Vasquez-Lopez is still standing behind the

25  driver door of his vehicle?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 160

1  two seconds.

2     Q.   Okay.  Nevertheless, as Officer Vasquez-Lopez gets

3  closer, is it pretty clear that Corporal Alvarado is coming

4  further out from his patrol vehicle?

5     A.   So as you advance the frames, you can tell that that

6  was his leg that was out of the car which I saw earlier, and

7  he did come upright out of the vehicle with his torso, yes.

8     Q.   All right.  I'm going to stop my screen share right

9  there.

10        All right.  Is it all right if I don't ask you any

11  more questions today?

12     A.   It's okay with me.

13     Q.   All right.  Let's go off the record.

14        (Deposition proceeding concluded at 6:02 p.m.)

15                        *   *   *

16

17

18

19

20

21

22

23

24

25