"EXHIBIT 5"

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Michael A. Callahan on 03/01/2024**

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5     FRANK BENAVENTE; and NICOLE   )
       VENTRESS,                     )
 6                                   )  Case No.
                Plaintiffs,          )  5:23-cv-00266-SSS-KK
 7                                   )
          vs.                        )
 8                                   )
       ALBERT ALVARADO; CITY OF      )
 9     ONTARIO and DOES 1 THROUGH    )
       10, inclusive,                )
10                                   )
                Defendants.          )
11                                   )

12

13

14        REMOTE DEPOSITION OF MICHAEL A. CALLAHAN

15                 TORRANCE, CALIFORNIA

16                 FRIDAY, MARCH 1, 2024

17

18

19

20

21

22     STENOGRAPHICALLY REPORTED BY:

23     Patricia L. Davis, RPR
       CSR No. 11521
24

25
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Michael A. Callahan on 03/01/2024**

Page 2

 1                    UNITED STATES DISTRICT COURT

 2                    CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5    FRANK BENAVENTE; and NICOLE     )
      VENTRESS,                       )
 6                                    )   Case No.
                 Plaintiffs,          )   5:23-cv-00266-SSS-KK
 7                                    )
          vs.                         )
 8                                    )
      ALBERT ALVARADO; CITY OF        )
 9    ONTARIO and DOES 1 THROUGH      )
      10, inclusive,                  )
10                                    )
                 Defendants.          )
11                                    )

12

13

14      REMOTE DEPOSITION OF MICHAEL A. CALLAHAN, TAKEN ON

15      BEHALF OF THE PLAINTIFFS, IN TORRANCE, CALIFORNIA,

16       COMMENCING AT 9:04 A.M. AND ENDING AT 11:28 A.M.

17        PACIFIC STANDARD TIME ON FRIDAY, MARCH 1, 2024,

18              BEFORE PATRICIA L. DAVIS, RPR,

19         CERTIFIED SHORTHAND REPORTER NO. 11521.

20

21

22

23

24

25

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Michael A. Callahan on 03/01/2024**

```
 1    APPEARANCES (VIA VIDEOCONFERENCE):

 2

 3    FOR PLAINTIFFS:

 4            LAW OFFICES OF DALE K. GALIPO
              BY:  MARCEL F. SINCICH, ESQ.
 5            21800 BURBANK BOULEVARD
              SUITE 310
 6            WOODLAND HILLS, CA  91367
              818-347-3333
 7            MSINCICH@GALIPOLAW.COM

 8

 9    FOR DEFENDANTS:

10            JONES MAYER
              BY:  DENISE L. ROCAWICH, ESQ.
11            3777 NORTH HARBOR BOULEVARD
              FULLERTON, CA  92835
12            714-446-1400
              DLR@JONES-MAYER.COM
13

14
      ALSO PRESENT:
15
              RICHARD LUCERO
16

17

18

19

20

21

22

23

24

25
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Michael A. Callahan on 03/01/2024**

Page 5

```
 1                    Torrance, California

 2                    Friday, March 1, 2024

 3                    ~~~ 9:04 a.m. PST ~~~

 4                         -oOo-

 5                    MICHAEL A. CALLAHAN,

 6          having been first duly sworn by the Certified

 7  Shorthand Reporter to tell the truth, the whole truth,

 8  and nothing but the truth, responded, "Yes," and

 9  testified as follows:

10

11                  EXAMINATION BY MR. SINCICH

12      Q   Good morning, Mr. Callahan.  Can you please

13  state and spell your name for the record.

14      A   Good morning.  It's Michael Callahan.

15  M-I-C-H-A-E-L, last name Callahan, C-A-L-L-A-H-A-N.

16      Q   Have you ever had your deposition taken before?

17      A   I have.

18      Q   Approximately how many times?

19      A   Approximately 50 times.

20      Q   And was that all with your work as an expert

21  witness for accident reconstruction?

22      A   Also in forensic video analysis, those two

23  disciplines.

24      Q   Okay.  And have you testified in court before?

25      A   I have.
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 15

1        So if there are comments about what's being

2    simply observed by a layperson with respect to the video

3    evidence, I may comment on that.  I haven't really

4    developed any of those opinions.  But those would relate

5    to visibility, line of sight, perception response,

6    things of that nature.

7        So there could be rebuttal opinions developed.

8    **Q    Did you submit a rebuttal report in this case?**

9    A    I have not.

10   **Q    Is it fair to say that two people can look at**

11   **the same video and interpret it differently?**

12   A    That's true.

13   **Q    Is it your understanding that in a case like**

14   this, if it goes to trial, the -- (audiovisual

15   distortion) -- will ultimately determine the facts of

16   the case?

17   A    Did you say the jury?  You cut out for one of

18   those key words.  I'm sorry.

19   **Q    Thanks for letting me know.  If that happens**

20   **again, just please go ahead and let me know or even**

21   **raise your hand if it freezes.**

22   A    All right.

23   **Q    Is it your understanding that in a case like**

24   **this, if it goes to trial, that a jury will determine**

25   **the facts of the case?**

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 30

1   mid 20s, maybe high 20s, something in that order.

2        Q   And in each of his tests accelerating in

3   reverse, did he go in a straight line in reverse?

4        A   For the most part, yes.

5        Q   Do you know if he ran any tests where he

6   simulated the performance of the Hyundai exemplar

7   turning in the manner that it turned in this case?

8        A   No.  I don't think he was using maximum

9   steering inputs.

10        Q   And just looking at Figure 2, and I think it

11   was described by other people in testimony, that the

12   trajectory of the Hyundai was kind of like an S curve?

13        A   Sort of, yes.

14        Q   Was there any tests in the performance of the

15   exemplar Hyundai in a similar style curve?

16        A   No.  That's wasn't necessary because we can

17   solve exactly what it did.  We can tell the trajectory

18   it achieved.

19        Q   How are you able to tell -- strike that.

20            When you perform a performance test on an

21   exemplar vehicle, do you anticipate that that's going to

22   be the exact results for every Hyundai, for instance?

23        A   No.

24        Q   Is it fair to say that some vehicles might

25   perform better and some vehicles might perform worse

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Michael A. Callahan on 03/01/2024**

1    than others?

2        A    Yes.

3        Q    Is there a standard deviation in your field for

4    running a test like this in terms of calculating the

5    speed and acceleration for a vehicle going in reverse?

6        A    I wouldn't say as standard.  I mean, you would

7    basically average test results at any given point in

8    time and look at the standard deviation and try to

9    understand why that is.

10       Q    Okay.  So you would run several tests and

11   attempt to calculate a standard deviation for that

12   particular set of tests?

13       A    That's right.

14       Q    Do you know if there's any -- because I saw

15   that you did some research on the Hyundai; right?

16       A    Correct.

17       Q    Do you know if there's any kind of publications

18   from the manufacturer on any of these tests for standard

19   deviation?

20       A    Not from the manufacturer, no.  There's

21   probably braking performance.  That's a pretty common

22   one.  Or straight line acceleration in first gear, you

23   know, going through the automatic transmission.

24            But nothing like a backing maximum acceleration

25   test, no, nothing like that.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 32

1     Q   Is it fair to say that in this case there was

2  variations of the speed that the Hyundai went from the

3  time that it first went in reverse until that final

4  impact?

5     A   That the speed varied?

6     Q   Yes.

7     A   Yes, that would be fair.

8     Q   Do you know if Mr. Tovar ran any tests with

9  those similar types of speed variations?

10     A   No.  There was no effort to re-create the

11  driver inputs that Mr. Benavente achieved on the date of

12  loss.

13     Q   Okay.  Did you review the videos from

14  Mr. Tovar's testing?

15     A   Yes.

16     Q   Did you ever see, for instance, the tires

17  spinning out or anything like that?

18     A   I do remember at least during some of the

19  portions there's slip, yes.

20     Q   And do you know which video shows the slip?

21     A   Not off the top of my head, no.  I remember a

22  pretty hard braking effort and some slip in that

23  direction.  I'm trying to remember if there was any

24  acceleration slip as well that we achieved in this test.

25     Q   Did you see in any of the tests any kind of

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 33

 1   tires smoking from the exemplar Hyundai?

 2        A   I don't believe so, no.

 3        Q   In this case, the Hyundai was slowing down

 4   immediately prior to the final crash; right?

 5        A   That's right.

 6        Q   And the throttle was being released at that

 7   point about a second prior?

 8        A   I would have to look at the exact timing, but

 9   he's definitely on the brakes at that impact and I think

10   he's braking shortly before as well.

11        Q   Okay.  I'm just scrolling down to your Video

12   Analysis section.  I believe in the documents you

13   reviewed there was over a thousand pages and a hundred

14   videos, something of that nature; right?

15        A   That's probably correct, yeah, it was a wide

16   file production.

17        Q   Did you actually review all of the documents

18   that were produced to you in the case?

19        A   I believe so, yes.  I think I've been through

20   the totality of it.

21        Q   And from what I understand from reading your

22   video analysis that despite all of the information that

23   you had, the primary sources of information to create

24   your simulation was, essentially, that surveillance

25   video and then the three body-worn camera videos?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 43

```
 1       A    Correct.

 2       Q    At 20 seconds the Hyundai impacts the tree and

 3   comes to a stop, comes to a resting point?

 4       A    That's about right, yep.

 5       Q    Okay.  And what you have is 1.2 seconds from

 6   the time that the Hyundai first went in reverse, it

 7   impacts the Varela vehicle?

 8       A    That's correct.

 9       Q    And then, approximately, 1 second after it

10   impacted the Varela vehicle, there was a hard left-hand

11   steer, and you say toward Unit 1024 in the report;

12   right?

13       A    Correct.

14       Q    Now, where was Unit 1024 at the time that the

15   Hyundai started making its left-hand steer?

16       A    That would be, gosh, I think probably 2 or

17   3 feet from its stopped position.  I think it's

18   basically stopped or almost stopped at that point.

19       Q    Is it fair to say that the Varela vehicle was

20   still moving when the Hyundai began to steer with this

21   left-hand steer?

22       A    No, I believe Varela's stopped already.

23       Q    After that it's approximately 1.3 seconds from

24   the left-hand steer that the Hyundai, you indicate,

25   impacts the Unit 1024 along with Alvarado's door?
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 44

1       A    That's correct.

2       Q    And then it was, as you indicate .7 seconds

3   after the impact with Unit 1024 that it impacted Officer

4   Vasquez-Lopez's vehicle?

5       A    That's correct.

6       Q    And then after the Hyundai impacted Officer

7   Vasquez-Lopez's vehicle, about 1.1 seconds later the

8   first shot was fired?

9       A    That's correct.

10      Q    And then .4 seconds later, the second shot was

11  fired?

12      A    That's right.

13      Q    And then .4 seconds, the third shot was fired?

14      A    That's correct.

15      Q    Okay.  Now, when we look at the EDR data -- did

16  you use the EDR data to help compile this information?

17      A    Not really.  This is -- the timeline is mainly

18  coming from video and audio evidence, I would say, as

19  well as vehicle positions and damage analysis.  The EDR

20  is sort of where does it fit into this data set,

21  basically a where do we get sort of EDR data overlapping

22  this.

23      Q    Okay.  Now, the EDR data as it reads, zero

24  seconds would be the moment of impact with Officer

25  Vasquez-Lopez's vehicle; right?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 45

```
 1            MS. ROCAWICH:  I think you're on mute now.

 2            THE WITNESS:  Oh, sorry.  Let me pull that up

 3    if I can.  Thank you.

 4    BY MR. SINCICH:

 5        Q    Do you have it open?

 6        A    I'm getting it open.  It's providing me two

 7    versions and the text is really small, so I'm just

 8    making sure I'm looking at the right stuff here.

 9        Q    Yeah.  I'm looking at one document that's Bates

10    stamped No. 1957.

11        A    Okay.  I don't know if I have the same

12    numbering, but I'm looking at a document that's 21 pages

13    long.

14            Is that what you're looking at?

15        Q    Yes, and I'm on page 5 of 21.

16        A    Page 5 of 21, thank you.

17        Q    Yeah.  So in the precrash information, do you

18    see that?

19        A    I do.

20        Q    And so, essentially, it's kind of like counting

21    backwards from an impact; right?

22        A    Basically.

23        Q    Is it fair to say that the zero-second mark

24    from the EDR is the impact with Vasquez-Lopez's vehicle?

25        A    That's basically fair, yes.  Yeah.
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 46

1      Q    For instance, did the EDR calculate any kind of

2    event data utilizing the impact of either of the other

3    two officer vehicles as its reference point?

4      A    Right after the word "event" your audio cut

5    out, and I'm still looking at this chart so I couldn't

6    read what you said there.  Can you just repeat that last

7    question.

8      Q    Sure.  What I'm wondering is if you reviewed

9    any event data recording whereby the impact of Officer

10   Varela's vehicle was the reference point.

11     A    I understand.

12          No.  I don't think -- I don't think actually

13   either the interaction with the Varela vehicle or really

14   Alvarado's -- I think Escobar's driving that vehicle --

15   either of those two is sufficient to record event data.

16   I think it records the final, which is probably the

17   highest magnitude impact.

18     Q    Okay.  Is it fair to say that the EDR only

19   starts recording the significant impacts and not minor

20   impacts?

21     A    Not exactly.  I guess maybe a little background

22   in EDR is probably a good idea.

23          The way that an EDR works is it's looking for a

24   change in speed or really an acceleration or

25   deceleration within an amount of time.  And when that

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 47

1   reaches a certain slope or trajectory that it thinks

2   it's going to go on, it says this might be important

3   data, let me capture the five seconds before that.  And

4   that's kind of how this works.

5        So there's a bunch of speeds and RPMs and

6   things in a buffer, and when it detects, hey, I might

7   need to wake up some of my safety systems, it says let

8   me grab that five seconds basically.

9      Q   Is there any other indication, for instance,

10  like whether or not there's an airbag deployment, is

11  that an indication of whether or not it's going to

12  capture that five seconds prior to impact?

13     A   The way that modern EDRs are set up, basically

14  all of the time if you get an airbag deployment, you

15  will get event data.

16     Q   Would you ever get any event data if there was

17  no airbag deployment?

18     A   Very frequently, yes.

19     Q   Okay.  So as I look back on that bottom of

20  page 5 of 21, at zero seconds on page 5 of 21 would

21  correspond with the 4.2 seconds of your timeline of

22  events?

23     A   Basically, yes.

24     Q   Okay.  And then what figure on this table of

25  the EDR would correspond with what you've indicated as

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 48

1    3.5 seconds after moving in reverse the Hyundai impacts

2    Unit 1024?

3        A   Where in this data is impact with Unit 1024, is

4    that what you're saying?

5        Q   Yes, sir.

6        A   It's going to be in the order of -5.  So you've

7    got to equal zero being approximate impact with

8    Vasquez-Lopez, so it's going to be about a half second

9    before that.

10       Q   Okay.  And then what you've indicated in your

11   timeline as 2.2 seconds Hyundai hard left-hand steer,

12   what would that be when looking at the EDR data in terms

13   of the time sequence?

14       A   The easiest place to see it is going to be the

15   first sort of large steer we're seeing in here which is

16   when it goes from, I believe, -55 to positive 250.  So

17   that's a left-hand steer that's happening, and that's

18   going to span -3 to -2 in this data table.

19       Q   Okay. -3 to -2 in the EDR table?

20       A   Correct.

21       Q   Okay.  Now, just looking at your data, your

22   timeline between 4.2 seconds and 2.2 seconds, that's

23   2 seconds flat; right?

24       A   Correct.  I'm trying to look at the same two

25   things at once.  Just give me one more second, if you

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

1   can.

2          Okay.  What was your question one more time,

3   sir?

4      Q    So in your Figure 5, the difference between our

5   impact with Vasquez-Lopez's vehicle and that hard left

6   steer, you have indicated as 2 seconds flat; right?

7      A    Approximately, without me spelling out all of

8   the issues for this vehicle EDR data.  But, yeah, that's

9   about right in this data table.

10     Q    Okay.  And so is it fair to say the EDR data

11  table shows that the Hyundai began to steer left at

12  3 seconds before the impact of Officer Vasquez-Lopez's

13  vehicle?  Which corresponds with negative 55 on the

14  steering input that you mentioned earlier.

15     A    You're asking me if it's 2 seconds before the

16  impact with the Vasquez-Lopez vehicle in this data

17  table?  Is that what you're asking me?

18     Q    Well, I believe my question is a little bit

19  different.

20     A    Sorry, I'm trying --

21     Q    Oh, no, I understand.  I have both of them open

22  because I'm trying to figure it out as well.

23          Is it fair to say that your timeline starts at

24  zero and counts up until the end of the event?

25     A    That's right.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 50

1      Q    And then the EDR is actually starting at the

2    impact, and it kinds of counts in reverse what happened?

3    It's negative seconds?

4      A    Correct.

5      Q    Because of that opposite, I'm just trying to

6    link some of those time sequences together.

7      A    Yeah, I think the easiest way to understand

8    this -- and it's actually kind of hard for a layperson

9    and I'll do my best to help you understand it.

10          There's about 4.2 -- so the 4.2 seconds that

11    you see in Figure 5, that basically goes from T=zero to

12    between -4 and -5, 4.5 in this precrash information.

13      Q    Okay.

14      A    So we initially see in this -- in this precrash

15    data, we're initially seeing the vehicle, the Hyundai,

16    actually in drive still coming forwards.  He's stopped

17    for a second, maybe a little bit less, and puts it in

18    reverse in that time, and then floors it in reverse.

19    And that's where you see -- I think in this data you can

20    see it's -5.  The service brake is on and there's

21    deceleration going on.

22          By the time we get to -4 in the EDR data, we're

23    fully on the throttle, we're at a low speed, and that's

24    sort of the start of when we start to see some steer

25    action.  So, more or less, from -4.5 on is what the

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 51

 1   simulation is going to encompass.  It's the rearward

 2   movement of the Hyundai.

 3       Q   Okay.

 4       A   Does that make sense?

 5       Q   Yes, it does.

 6           And then just for reference, when I see on the

 7   steering input a negative number, does that correlate

 8   with moving clockwise or counterclockwise on the

 9   steering wheel?

10       A   Let me go back to that data.

11       Q   As a matter of fact, if you go to page 11 of

12   21, there's the individual chart of the steering input

13   and there's a note down there for reference.

14       A   Right.  Sorry.  On page 11 you said?

15       Q   Page 11 of 21.  And it's Bates stamped 1963.

16       A   Right.  So a positive value's counterclockwise

17   which is going to be left steer, and negative value's

18   going to be clockwise which is a right-hand steer.

19       Q   Okay.  So when we're seeing, for instance --

20   still on page 11 -- when he goes from at 2 seconds --

21   excuse me, at 4.5 seconds to 3 seconds before the impact

22   and his steering input goes from zero to -55, does that

23   mean that he's turning his wheel to the right?

24       A   Yes, slightly.  So he's going to have probably

25   3 degrees of steering the tires to the right over that

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 52

1   period of time.

2       Q   And that's approximately the time frame when he

3   first starts going in reverse; right?

4       A   That's about right, yes.

5       Q   Okay.  Is that consistent with a driver trying

6   to avoid the impact to what would be Officer Varela's

7   vehicle?

8           MS. ROCAWICH:  Objection.  Calls for

9   speculation.  Lacks foundation.

10          You can answer.

11          THE WITNESS:  I can't really get inside the

12  head of Benavente.  I can tell you that that, you know,

13  3 degrees of steering at the tires is going to be --

14  more or less, it's pretty close to straight-line

15  backing.

16          You know, there's going to be a little bit of

17  angle to it, but 3 degrees of steer at the tires is very

18  close to backing straight up, if that makes sense.

19  BY MR. SINCICH:

20      Q   When you say 3 degrees, what are you

21  referencing?  Because I see --

22          (Simultaneous speaking.)

23          (Reporter clarification.)

24  BY MR. SINCICH:

25      Q   I see numbers -5, -15 and -55 on the chart.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 53

1      A    Right, right, right.  So if you have to think

2   of about where the source of angle is coming from,

3   right, because the tires -- for every time you turn the

4   steering wheel, the tires don't do a full turn as well,

5   right.  So there's a steer ratio that's involved.

6            So I'm in my head doing quick math saying a

7   20-to-1 ratio, 55 degrees of 60 degrees of steer would

8   be like 3 degrees of the tires.  So that's the kind of

9   quick conversion that I'm doing in my head.

10           I can tell you what I believe the steer ratio

11  is that we got.  Let me see if I can find that for you.

12     **Q    I understand the calculation that you made.  I**

13  **don't think I need a precise number there.**

14     A    Okay.  Yeah, I can dig it up if it helps, but

15  it will be something between, basically, 15 and 20 to 1.

16     **Q    Okay.  Now, if you're turning your steering**

17  **wheel to the right as you're going in reverse, that's**

18  **moving the tail end of the car to the right; right?**

19     A    Not exactly.  So if I'm steering my tires to

20  the right, let's -- yes, my vehicle's corner wheel will

21  go to the right as a result.

22     **Q    Okay.  Would you say that's the opposite of**

23  **turning into Officer Varela's vehicle in this case?**

24     A    I would agree.  Varela's on his left.  You

25  know, they're sort of laterally aligned like this, so

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 54

1   that they're sort of -- right side of Varela is left

2   side of his vehicle, Benavente's vehicle.

3            So yes, I mean, I think a right steer is ever

4   so slightly away from his vehicle.

5            MR. SINCICH:  Okay.  Why don't we take a

6   five-minute break.  We've been going just about an hour,

7   maybe a little bit over.  So I want to make sure that

8   our court reporter has a break.

9            Let's go off the record.

10           (Break taken from 10:16 a.m. to 10:22 a.m.)

11           MR. SINCICH:  We're back on the record.

12  BY MR. SINCICH:

13       Q   Now, as the Hyundai goes in reverse, you found

14  that it went approximately 50 feet?

15       A   Something of that order.  I think from the

16  point that it stopped until probably the point that it

17  impacts Vasquez-Lopez.

18       Q   Okay.  And you found that it was approximately

19  4 seconds from its stopped position in front of its

20  vehicle to its stopped position upon impact of

21  Vasquez-Lopez?

22       A   Roughly.  I think 4.2 seconds was my exact

23  number, approximately 4 seconds from the time it starts

24  accelerating to the time it starts impacting.

25       Q   Is it fair to say that that's approximately

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 55

```
1    8-1/2 miles per hour average speed?

2         A    I haven't done that calculation, but if you

3    have, then I will trust your work.

4         Q    I don't want you to do that.  You were so good

5    with --

6              (Audiovisual distortion.)

7              (Reporter clarification.)

8              (Discussion held off the record.)

9    BY MR. SINCICH:

10        Q    I was just mentioning that I didn't know if you

11   could make that conversion in your head, but that's

12   okay.

13             So you also state in your report -- and I'm on

14   your Reconstruction Analysis portion -- that the first

15   impact was of minor severity, and that was a sideswipe

16   between the Hyundai and the front right bumper of the

17   Varela vehicle?

18        A    That's correct.

19        Q    At the time of that impact, did you find that

20   the Hyundai was going between 8 and 10 miles per hour?

21        A    I believe that's correct, yes.  I'm trying to

22   look for the section where I write about it.

23        Q    Page 6, last paragraph.

24        A    Page 6, last paragraph.

25             That's correct.
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 56

1      Q    Okay.  And that's, approximately, the time that

2  he was slightly turning away from Officer Varela's

3  vehicle?

4      A    In that vicinity, yes, I think there's some

5  slight right steer.

6      Q    And then you have about 5 feet away from the

7  Escobar vehicle is where Mr. Benavente made the hard

8  right steer.  Do you see that indication?

9      A    I do.

10     Q    Okay.  And then do you know how many seconds

11  prior to the final impact that you're referencing at

12  that point in time?

13     A    Final impact being with the Vasquez-Lopez

14  vehicle?

15     Q    Yes, sir.

16     A    About a second before impact.

17     Q    Okay.

18     A    About a second, more specifically, before

19  impact with Vasquez-Lopez, that final impact.

20     Q    Okay.  What portion of the Hyundai came into

21  contact with the Escobar vehicle based on your review?

22     A    Escobar vehicle is the Unit 1024 I believe?

23     Q    Yes.

24     A    So it's twofold.  You have the left rear bumper

25  of the Hyundai contacting the open door, right passenger

FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL
Michael A. Callahan on 03/01/2024

Page 57

1   door of Unit 1024.  So that's one contact.  And sort of

2   simultaneously as the vehicle steers left, it swings

3   into the right front conner of 1024 with its really left

4   driver door and fender.

5        So as it's backing up, it hits the bumper into

6   the door, and then also the driver's door of Benavente's

7   vehicle hits the right front rear corner area.

8   **Q   Are you able to tell, based on your analysis of**

9   **all of the information in this case, as to whether or**

10  **not the Hyundai came into contact with Escobar's**

11  **vehicle, Hyundai's driver door to bumper, was that**

12  **before or after the Hyundai's left rear bumper to the**

13  **Escobar passenger door?**

14  A   I believe they're basically simultaneous.  I

15  think they're within .05 seconds of each other.  When

16  I'm dealing in sort of tenth of a second level accuracy,

17  I would call those basically simultaneous.

18  **Q   Okay.  Now, in the hard left steering input**

19  **that Mr. Benavente made prior to the impact with the**

20  **Escobar vehicle, if he continued with that steering**

21  **input, would it have created a direct impact with**

22  **Escobar's vehicle?**

23  A   It's a hypothetical that I'm trying to help you

24  with.  If he continues steering left after he's already

25  impacted it, will he continue to impact it, is that what

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 58

1    you're asking me?

2         Q    No.  So if we went into, for instance -- and

3    that's I think why I wanted to download your slide, so I

4    could show you what slide number it is, but --

5         A    Okay.

6         Q    Let me see if you have it on your -- can you

7    look in Figure 6.

8         A    Six.

9         Q    And that's page 7 of your report?

10        A    All right.

11        Q    Okay.  So the middle image of Figure 6, that's

12   depicting Benavente making the clockwise steering input

13   on his steering wheel so that the vehicle is moving to

14   the left; right?

15        A    Correct.  He might be that middle image being

16   the sort of third from the left, he's probably just

17   starting to input a left steer at that point in time.

18   He's definitely not achieving any left steering, I

19   think, yet.

20        Q    Okay.  So if he continued in that direction

21   based on your image, would he, essentially -- would

22   there be a direct impact with the Escobar vehicle?

23        A    According to the figure we're talking about --

24   so Figure 6, Image 3 from the left -- if he continued

25   just straight back, would there be a direct impact, is

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 59

1    that what you're asking me?

2        Q   Yes.

3        A   Yes.

4        Q   So then on the fourth kind of slide of Figure 6

5    from the left, it shows that the red vehicle, the

6    Hyundai, turned to its right?  It's going in reverse to

7    the right?

8        A   So we're backing up. . .

9        Q   So what it would take on the steering input is

10   for Mr. Benavente to turn the steering wheel clockwise

11   with a hard steering input in order to move the vehicle

12   to the right; is that correct?

13       A   That's correct.

14       Q   And is that consistent with avoiding a direct

15   impact on the Escobar vehicle?

16            MS. ROCAWICH:  Objection.  Calls for

17   speculation.  Lacks foundation.

18            You can answer.

19            THE WITNESS:  Yeah, I would say it is.  I mean,

20   I don't think it results in a direct impact.  It results

21   in a sort of slap because of its changing heading angle.

22   So instead of a bumper hit to the side of that vehicle,

23   you end up with a different impact configuration.

24   BY MR. SINCICH:

25       Q   Would you consider the impact with Escobar's

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

```
 1    things of that nature.

 2            So there's a difference in those two positions,

 3    and that's a result of the impact.  So we have sort of

 4    preimpact and postimpact positions.

 5       Q    Which video are you referencing that shows the

 6    position of the headlights preimpact?

 7       A    That would be the home-based DVR system.

 8       Q    Okay.  And you found that the impact with the

 9    Escobar vehicle, the Hyundai was moving approximately 14

10    to 16 miles per hour?

11       A    I believe that's correct.

12       Q    And then the final impact with the

13    Vasquez-Lopez vehicle, approximately how fast was the

14    Hyundai moving at the moment of impact?

15            MS. ROCAWICH:  I'm just going to clarify for a

16    second.  Vague as to impact.

17            Are we still talking about the first impact, or

18    are we talking about the second impact?

19            MR. SINCICH:  Well, I'm just speaking of the

20    impact with Vasquez-Lopez's vehicle.

21            MS. ROCAWICH:  Okay.  Sorry.

22    BY MR. SINCICH:

23       Q    Just for clarity, Mr. Callahan, there was only

24    one impact to Officer Vasquez-Lopez's vehicle; right?

25       A    That's my understanding.
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 62

1       Q    Okay.  So how fast was the Hyundai moving at

2    the moment that it impacted Officer Vasquez-Lopez's

3    vehicle?

4       A    It looks like between 8 and 10 miles an hour.

5       Q    Did the Hyundai change its direction of travel

6    in the 1 second prior to that impact?

7       A    It did.

8       Q    Did you say it did, affirmatively?

9       A    Yes.

10      Q    And what change to its direction of travel did

11   the Hyundai make in the second before the impact with

12   Vasquez-Lopez's vehicle?

13      A    So a second before the impact with

14   Vasquez-Lopez, the Hyundai's oriented such that the

15   bumper's headed towards the right front occupant

16   compartment of Unit 1024.

17           And over the next second, that orientation

18   changes such that it would be pointed sort of to the

19   curb line of Beverly Court on the right-hand side there.

20   So it kind of goes from pointing at the far curb to the

21   near curb in that second.

22      Q    Okay.  Now, I'm looking at on the EDR page 11

23   of 21 still.  Are you with me there?

24      A    I am trying to get with you there.

25           Yes, I'm with you.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 63

1      Q    Okay.  So 1 second prior to the impact of

2  Officer Vasquez-Lopez's vehicle, the steering input is

3  negative 250; right?

4      A    Correct.

5      Q    And that steering input does not change for

6  that 1 second up until the impact according to the EDR

7  data?

8      A    That's right.

9      Q    Okay.  Now, did you find that the Hyundai moved

10  at all after the impact of Officer Vasquez-Lopez's

11  vehicle?

12     A    It did.

13     Q    And where did it move?

14     A    I would say the first movement, it sort of

15  happens in phases.  The first movement is going to be

16  basically rebound.

17          So there's compression for an impact to the

18  rear bumper, and then there's a little bit of rebound.

19  It will rebound a lot, separate a lot, so it's going to

20  be moving probably very slowly.

21          And then over the next, let's call it, 10,

22  maybe 15 seconds it starts to actually be passively

23  driven such that it ends up hopping up on a curb and

24  hitting a tree.  So that's sort of the totality of the

25  postimpact movement.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 64

1      Q    Okay.  And approximately how long was the

2  rebound after the impact that you were describing?

3      A    It's immediate.  Yeah, so, I mean, as soon as

4  the two vehicles hit each other, they'll reach common

5  velocity.  That would be a delta-v.  And then they'll

6  begin to separate to some extent.

7          So that rebound will happen within a couple

8  10ths of a second, the vehicles will settle, and then

9  the next things will happen.

10     Q    Is it fair to say that after the impact,

11  generally the Hyundai was stopped for about seven

12  seconds until --

13     A    Sorry.  That is correct.

14     Q    And then when you say it was passively driven

15  when it went forward into the tree, is that,

16  essentially, as though the vehicle was in neutral and

17  just rolled forward?

18     A    No, sir.

19     Q    What do you mean by that?

20     A    So this vehicle, being Benavente's vehicle, at

21  some point before Benavente's incapacitated by the

22  shots, he has shifted that vehicle into drive.  So he's

23  at basically a point of rest postimpact with

24  Vasquez-Lopez, and he puts his vehicle into drive.

25          There's shots that transpire, and his vehicle,

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 65

1    a combination of idles, and gets throttled, I believe,

2    into that area above the curb.

3        Q   Okay.  And Corporal Alvarado fired his three

4    shots into the driver's window of the Hyundai?

5        A   That's my understanding.

6        Q   And those shots occurred approximately the

7    second after the impact of Officer Vasquez-Lopez's

8    vehicle?

9        A   I believe that's correct.

10       Q   And I think you mentioned earlier that the

11   sequence of those three shots took approximately 1.2

12   seconds to accomplish?

13       A   That's right.

14       Q   Now, in your Discussion portion, you mention,

15   for instance, the Hyundai is using maximum acceleration

16   while backing.  Do you recall that?

17       A   I do.

18       Q   Is it fair to say that in the approximate

19   second prior to the impact with Vasquez-Lopez's vehicle,

20   the Hyundai was not in maximum acceleration?

21       A   That would be fair.

22       Q   In fact, during that time period the Hyundai

23   was -- well, Mr. Benavente was depressing the brake of

24   the Hyundai; right?

25       A   That's correct.  I think about a half second or

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 66

1    so before Vasquez-Lopez's impact, he's on the brakes.

2         Q    Now, you mention in your discussion and then

3    later in one of your opinions that there was a

4    significant risk of catastrophic injury or death.  Do

5    you see that or recall that?

6         A    I do.

7         Q    Do you have any kind of medical training or

8    anything to render opinions about catastrophic injury?

9         A    I have background in accident reconstruction

10   and testing involving pedestrians, dummies, and applying

11   forces to determine what sort of kinematics happen.  So

12   injury mechanism, I guess, is not something I would get

13   super specific into, but kinematics and probability of

14   serious injury based on how much energy there is, that's

15   absolutely something I could comment on.

16        Q    Okay.  Do you believe that the Hyundai posed a

17   significant risk of catastrophic injury or death at the

18   moment that it impacted Officer Vasquez-Lopez's vehicle?

19        A    I guess it's sort of broad.  With respect to

20   who in particular?

21        Q    Anyone.

22        A    Anyone?

23        Q    Yep.

24        A    I suppose taking a freeze-frame and knowing

25   where everyone is at this point in time, you know, so I

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 67

1    would say with hindsight, probably not.

2         Based on the facts we know about the case and

3    how the vehicle's being driven, I think that there is

4    significant risk of serious injury or death.

5         Q    Who is threatened of serious injury or death at

6    the moment of impact between the Hyundai and

7    Vasquez-Lopez's vehicle?

8         A    I believe Alvarado still is.  He's still in a

9    position where he's in the threshold of the door.  He

10   has no knowledge that this impact is going to happen

11   between Vasquez and Benavente.  And if Benavente

12   continues to arc his vehicle and swing his vehicle the

13   way that it is, he is going to be crushed by that door.

14        So he doesn't have knowledge that Benavente's

15   going to stop, so I still believe there's an active risk

16   to Alvarado from his perspective.

17        Q    Okay.  And what you just described is,

18   essentially, the moments prior to the impact; right?

19        MS. ROCAWICH:  Objection.  Vague as to impact.

20        Go ahead.

21   BY MR. SINCICH:

22        Q    Yeah, not knowing if the vehicle, if the

23   Hyundai was going to stop, from Alvarado's perspective,

24   that is occurring in the moments just before the impact

25   of Vasquez-Lopez's vehicle; correct?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 74

 1   or 2 seconds after the shooting occurred.

 2          And in my mind, I don't think that's very

 3   probable.  I think it's most probable that it happens

 4   according to the evidence and consistent with his

 5   testimony that he's standing in that area or has his

 6   feet in that area.

 7      Q    Okay.  Whether or not Alvarado was at risk of

 8   any injury in this instance would be dependent on

 9   whether or not he was located in a position in that

10   threshold of his door; right?

11      A    I believe, again, that's what the evidence

12   shows, that's what I've analyzed, and if he is in that

13   area, he's at risk of injury for sure.

14      Q    Okay.  And another, I guess, requirement for

15   Alvarado to be at risk of injury is if the Hyundai was

16   moving such that it was pushing his passenger door;

17   right?

18          MS. ROCAWICH:  Objection.  Misstates testimony.

19   Misstates evidence.

20          You can answer.

21          THE WITNESS:  Correct.  If he's being crushed

22   by his door, there's risk of injury if that's what

23   you're saying.

24   BY MR. SINCICH:

25      Q    Is it fair to say that if Alvarado was not in

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 75

1   the threshold of his door, that he would not be at risk

2   of injury in this matter?

3        A    I probably wouldn't say it so loosely.

4   Injury's pretty broad.  But when I'm talking about

5   injury specifically in this report, I'm talking about,

6   like, severe traumatic injury, so tens of thousands of

7   pounds of force.

8             If he's sitting in the vehicle and his door is

9   closed, you might see things like spine injuries from a

10  lateral impact, things like that.  I don't think you'll

11  see severed limbs and things like that, if that makes

12  sense.  There's sort of a difference on the spectrum of

13  injury.

14       Q    Okay.  Is it fair to say that if Alvarado was

15  not in the threshold of his door at the time that he

16  fired his shots, that he would not be at risk of serious

17  injury or death?

18            MS. ROCAWICH:  Objection.  Calls for

19  speculation.

20            You can answer.

21            THE WITNESS:  I think I generally agree with

22  that.  I think the threat of serious injury is a

23  function of, in particular, where he is.

24  BY MR. SINCICH:

25       Q    Would you agree that if the Hyundai was not

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 76

1    moving, given Alvarado's position -- for instance, in

2    the threshold of the door -- if the Hyundai's not

3    moving, he would also not be at risk of serious bodily

4    injury or death?

5              MS. ROCAWICH:  Same objection.

6              THE WITNESS:  In complete hindsight, I would

7    probably agree with you.  If the vehicle is stopped and

8    he's standing there, then the vehicle, by definition,

9    can't impart any force.

10   BY MR. SINCICH:

11        Q   Is it fair to say that in this case the only

12   person that was catastrophically injured was

13   Mr. Benavente?

14        A   That's my understanding.

15        Q   Did you see any records that indicated that

16   Corporal Alvarado was injured at all?

17        A   I did not.

18        Q   How do you explain the fact that he was not

19   injured with your opinion that the Hyundai was a risk of

20   significant catastrophic injury or death?

21        A   I guess in layman's terms, I think he got lucky

22   that he didn't get crushed in that area.  The vehicle

23   changed trajectory at the very last second and instead

24   of getting crushed, he had his door get pushed into him

25   and that's the way the event unfolded.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 77

1        Q    Is there any indication other than

2    Corporal Alvarado's statement that specifically shows

3    you as an expert that he was being crushed?

4             MS. ROCAWICH:  Objection.  Misstates evidence.

5             THE WITNESS:  I don't think he actually

6    describes being crushed.  I believe he thought, I felt

7    like I was going to be crushed, you know, and I'm in my

8    head sort of sorting through statements and deposition

9    testimony of Alvarado.  But I don't think he ever

10   testified that he was crushed.

11   BY MR. SINCICH:

12       Q    Okay.  Now, moving on to your opinions, I think

13   I covered some of the things I wanted to talk to you

14   about in No. 1.  In No. 2, you state that, A direct

15   vehicle impact to the area Corporal Alvarado was

16   positioned (between the open door and the vehicle) would

17   have been significant to cause thousands of pounds of

18   crushing force and catastrophic injury.

19            That's your second opinion?

20       A    That's correct.

21       Q    And is that, essentially, contingent on whether

22   or not the Hyundai was still moving?

23       A    It is.  This would be either using the

24   Hyundai's reconstruction speed, so I think at vehicle

25   contact he's in the ballpark of 14 or 15 miles an hour.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 78

1   So it would be using his reconstructed speed, and if he

2   never puts in an extra steer input, he just basically

3   continues and impacts this vehicle at speed, that would

4   be in the order of about 20,000 pounds of crushing

5   force.

6       **Q    Out of your approximate 1500 cases that you've**

7   **evaluated in your career, how many of those involved**

8   **vehicle crashes of approximately 15 miles per hour or**

9   **less?**

10      A   That's a really hard one to quantify.  Maybe a

11   third of them.

12      **Q    So out of the approximate 500 cases where the**

13   **impact was approximately 15 miles per hour or less, how**

14   **many of those cases that you've reviewed resulted in**

15   **death to a person?**

16      A   I guess it's sort of a broad question because

17   there's a lot of vehicle-to-vehicle context in that.

18   You didn't ask me, like, pedestrian impacts or sort of

19   focus it on the facts of this case.

20         But I can't think of, gosh, more than a couple

21   that were 15 miles an hour closing speeds that would

22   have resulted in death.

23      **Q    Out of that couple, were any of those**

24   **vehicle-to-pedestrian, or were they vehicle-to-vehicle**

25   **crashes?**

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Michael A. Callahan on 03/01/2024**

1    A    Vehicle-to-ped or vehicle-to-scooter would be

2  some of those to ped.

3        **Q    And how many of those couple that resulted in**

4  **death were vehicle-to-pedestrian or vehicle-to-scooter?**

5        A    Virtually all of them.  Yeah, when the

6  pedestrian or, you know, bicycle rider or exposed human

7  is subject to speeds of 15 miles an hour from a vehicle,

8  you can see some pretty horrible stuff happen.

9        **Q    And of those few where a death occurred, were**

10  **they direct impacts between a vehicle and a pedestrian**

11  **or scooter driver?**

12        A    Yes.

13        **Q    Of the 1500 cases that you've analyzed, have**

14  **any of them included a crush injury similar to what**

15  **Alvarado was in fear may have happened to him?**

16        A    I've not worked this direction of door impact,

17  meaning the door impact I've more often worked is

18  somebody standing in the threshold and their door being

19  hit from the same direction of travel, so them being

20  clipped and the door being pulled open.

21            I would say the crushing types of injuries

22  would be more like someone standing behind their vehicle

23  loading something into the trunk and a vehicle

24  rear-ending them, something like that.  So that's a case

25  I've worked a bunch.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 80

1     Q   Approximately how many crush injury cases?

2     A   Crush injuries, probably 30 to 40 files.

3     Q   Out of the 30 and 40 files, approximately how

4  fast was the vehicle going at the moment of the crush?

5     A   I really don't have a way to quantify that.

6  All realms of speeds.  Once you have a 3000-pound object

7  crushing against another, there's a lot of force.  So

8  they could be parking lot level or they could be freeway

9  level impacts.

10     Q   Okay.  Your third opinion is that the Hyundai,

11  essentially, impacted that bumper and the door

12  simultaneously; right?

13     A   That's right.

14     Q   And your fourth opinion is that Alvarado's door

15  was pushed into his body in part.  Do you see that?

16     A   I do.

17     Q   And you're getting that from Alvarado's

18  statement?

19     A   In part his positioning where he states he's

20  standing, the vehicle position, the contact patch to the

21  door, so where the door's impacted, and the position we

22  see him in immediately after shots are fired.

23     Q   Is there any physical evidence that shows

24  Alvarado's position at the moment he fired?

25     A   No.  I think the closest to that would be

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Michael A. Callahan on 03/01/2024

Page 81

```
 1    within one to 2 seconds.

 2         Q    Also in your Opinion 4 was that Alvarado was

 3    knocked partially into the threshold of his vehicle.  Do

 4    you see that?

 5         A    I do.

 6         Q    And we covered a little bit -- maybe I was

 7    using a different word earlier, but did you ever see

 8    Alvarado testify that he was knocked into the threshold

 9    of his vehicle?

10         A    No.  He describes, I think, contact and

11    thinking he will be crushed but not actually being

12    crushed.  And the contact I believe he's describing is

13    the door being pushed into him.

14         Q    Based on your training and experience, is it

15    possible for a person to have their hand on a door and

16    use their strength, essentially, to prevent the door

17    from shutting with a vehicle kind of sideswiping that

18    door at approximately 15 miles an hour?

19              MS. ROCAWICH:  Objection.  Calls for

20    speculation.  Outside scope.  Improper, incomplete

21    hypothetical.

22              You can answer.

23              THE WITNESS:  You could certainly attempt to.

24    You could attempt to react to the force of a 100-pound

25    door swinging shut on you at high speed, but it will
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Michael A. Callahan on 03/01/2024**

Page 99

1    THE REPORTER:   Electronic okay?

2    MS. ROCAWICH:   Yes, that's fine.   Thank you.

3    THE REPORTER:   Off the record?

4    MR. SINCICH:   Thank you.

5    (End of record, 11:28 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25