1  James R. Touchstone, SBN 184584
   jrt@jones-mayer.com
2  Denise L. Rocawich, SBN 232792
   dlr@jones-mayer.com
3  JONES & MAYER
   3777 North Harbor Boulevard
4  Fullerton, CA 92835
   Telephone:  (714) 446-1400
5  Facsimile:  (714) 446-1448

6  Attorneys for Defendant CITY OF ONTARIO
   and ALBERT ALVARADO
7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10             EASTERN DIVISION – RIVERSIDE

11

12  FRANK BENAVENTE; and NICOLE         Case No.:  CV23-00266 JGB (SP)
    VENTRESS,                           Judge: Hon. Sunshine S. Sykes
13
                                        **NOTICE OF MOTION AND
14           Plaintiffs,                MOTION IN LIMINE TO
        vs.                             PRECLUDE IMPROPER
15                                      OPINIONS FROM PLAINTIFF'S
                                        POLICE PRACTICE EXPERT
16  ALBERT ALVARADO; CITY OF            ROGER CLARK; DECLARATION
    ONTARIO; and DOES 1 through 10      OF DENISE LYNCH ROCAWICH**
17  inclusive,
                                        **[Motion in Limine # 1]**
18           Defendants.

19                                      **Date: July 26, 2024
                                        Time: 2:00 p.m.
20                                      Ctrm: 2**

21

22

23

24

25

26

27

28

- 1 -

1    PLEASE TAKE NOTICE that on July 26, 2024, at 2:00 p.m., or as soon

2    thereafter as counsel may be heard, in Courtroom "2" of the United States

3    District Court, located at 3470 Twelfth Street, Riverside, California 92501-3801,

4    Defendants CITY OF ONTARIO and ALBERT ALVARADO, will and hereby do

5    move this Court for an Order precluding any reference to, testimony, and opinions

6    from Plaintiffs' police practice expert Roger Clark that are speculative, conclusory,

7    contain principles not grounded in law, and do not assist the trier of fact.

8    Specifically:

9        1.    Legal conclusions that invade the province of jury, including Mr.

10   Clark's opinions that the officers used excessive force or that Corporal Alvarado

11   lacked a reasonable belief of imminent threat of death or serious physical harm.

12   See Fed. Evid. Code § 702 and <u>Nationwide Transp. Fin. v. Cass Info. Sys., Inc.</u>,

13   523 F.3d 1051, 1058 (9th Cir. 2008) and <u>Sanfilippo v. Foster</u>, 2012 U.S. Dist.

14   LEXIS 119898, *6-7 [citing multiple cases].

15       2.    Opinions that are speculative, factual determinations that invade the

16   province of the jury, opinions on witness credibility, opinions on Defendants'

17   subjective knowledge or opinions on Decedent's intent. <u>See</u> Fed.R. Evid. 702,

18   <u>Goldman v. United States</u>, 245 U.S. 474 (1918), <u>Long v. Johnson</u>, 736 F.3d 891,

19   896 (9th Cir. 2013) and <u>Sanfilippo v. Foster</u>, 2012 U.S. Dist. LEXIS 119898 at *4-

20   5 (E.D. Cal. August 23, 2012).

21       3.    Opinions that are beyond his expertise, including accident

22   reconstruction and/or medical issues. <u>See</u> Fed. R. Evid. 702 and <u>Valtierra v. City of</u>

23   <u>Los Angeles</u>, 99 F.Supp.3d 1190, 1196 (C.D. Cal. Apr. 13, 2015);

24       4.    Opinions that are likely to mislead the jury and confuse the issues and

25   those that contain inaccurate statements of law and fact. <u>See</u> <u>United States v.</u>

26   <u>Geston</u>, 299 F.3d 1130, 1136 (9th Cir. 2002).

27   //

28   //

1        This Motion is based on this Notice of Motion and Motion, the

2   accompanying Memorandum of Points and Authorities, the Declaration of Denise

3   Lynch Rocawich, and on any other matters properly before the Court. This motion

4   is made following the conference of counsel pursuant to Local Rule 7-3.

5

6

7   Dated:    June 21, 2024               Respectfully submitted,

8

9                                       JONES & MAYER

10                                      By:

11                                        JAMES R. TOUCHSTONE

12                                        DENISE L. ROCAWICH
                                          Attorneys for Defendants City of

13                                        Ontario and Corporal Alvarado

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.   **INTRODUCTION**

Shortly before midnight on February 22, 2021, recent parolee Joseph Benavente led multiple members of the Ontario Police Department on a high-speed chase in which he drove on the wrong side of the road, almost t-boned a civilian motorist, stopped suddenly, and then performed a U-turn in order to attempt to escape. After attempting to evade the officers for approximately five to seven minutes, Benavente pulled into a cul-de-sac, found himself trapped, and came to an abrupt halt. Believing that a foot pursuit was about to ensue, Corporal Albert Alvarado, an experienced field training officer, opened his car door and started to exit his vehicle. However, instead of surrendering himself, Benavente threw his car into reverse, revved his engine, and accelerated backwards at a high rate of speed, striking Corporal Alvarado's patrol vehicle at a speed estimated to be between 14 and 16 mph.

Finding himself in the terrifying position of being sandwiched between his open patrol car door and the frame of his vehicle – and believing he was about to be crushed to death – Corporal Alvarado fired three shots at Benavente's car from a distance of approximately one to four feet in an attempt to stop the threat. Benavente's car continued backwards striking another patrol. At this point, Benavente appeared hurt and slumped forwards towards the steering wheel. His car, however, was still operational, was placed into drive and began to roll forward slowly before coming to rest against a tree. The tires continued spinning while the vehicle was pinned against the tree.

After clearing Benavente's car of a passenger and securing the scene, Officers approached and observed that Benavente was slumped over and had been shot. Benavente was removed from the car, handcuffed, and searched for weapons. Medical care, which had been staged until Benavente was safely taken into custody evaluated Benavente and subsequently pronounced him dead at the scene.

1     Defendants make this motion to limit the opinions of Plaintiff's retained

2     police practices expert, Roger Clark. In his report, Mr. Clark offers opinions that

3     are speculative, conclusory, not supported by sufficient facts or expertise,

4     impermissible opinions on witness credibility and the Defendants' subjective

5     knowledge, and legal conclusions. <u>See</u> Declaration of Denise Lynch Rocawich

6     ("Decl. Rocawich") at Exhibits "A" and "B". Indeed, Mr. Clark's Report is rife

7     with legal conclusions, credibility and factual determinations, blatant speculation

8     and inflammatory language. For all these reasons, Clark's testimony should be

9     limited or excluded.

10

11    **II.    <u>EVIDENCE AT ISSUE</u>**

12    The entirety of Mr. Clark's Rule 26 Report is attached as Exhibit "A" to

13    Decl. Rocawich. The specific portions of Mr. Clark's Report that are at issue and

14    objectionable are attached as Exhibit "B" to Decl. Rocawich.

15

16    **III.   <u>ARGUMENT</u>**

17    Federal Rule of Evidence 702 provides that an expert may testify "in the

18    form of an opinion or otherwise" if his or her "specialized knowledge will assist

19    the trier of fact to understand the evidence or determine a fact in issue." Fed. R.

20    Evid. § 702(a). Rule 702 safeguards against irrelevant opinions. <u>Finjan, Inc. v.</u>

21    <u>Blue Coat Sys., Inc.</u>, 2015 WL 4272870, at *1 (N.D. Cal. July 14, 2015).

22    In Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993), the

23    Supreme Court, in addressing admissibility of "scientific expert evidence," held

24    that FRE 702 imposes a "gatekeeping" obligation on the trial judge to "ensure that

25    any and all scientific testimony ... is not only relevant, but reliable." In <u>Kumho</u>

26    <u>Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999), the Supreme Court "clarified that the

27    gatekeeping function is not limited to 'scientific' expert testimony, but applies to

28    all expert testimony." <u>United States v. Hankey</u>, 203 F.3d 1160, 1167 (9th

Cir.2000). <u>See</u>, e.g., <u>Valtierra v. City of Los Angeles</u>, 99 F. Supp. 3d 1190, 1196 (C.D. Cal. 2015) [testing reliability of police practice expert opinions].

Here, many of Mr. Clark's opinions do not assist the trier of fact as they (1) invade the province of the jury by opinion on ultimate issues, (2) are based on speculation and conclusions, (3) are misleading or otherwise based on incorrect statements of law or fact and are (4) outside the scope of his expertise.

### A.  Opinions that Contain Legal Conclusions Invade the Province of the Jury and are Properly Excluded

"Expert testimony should be excluded if it concerns a subject improper for expert testimony, for example, one that invades the province of the jury." <u>United States v. Lukashov</u>, 694 F.3d 1107, 1116 (9th Cir. 2012) [internal quotations omitted]. "'[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law. Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court.'" <u>Nationwide Transp. Fin. v. Cass Info. Sys.</u>, 523 F.3d 1051, 1058 *citing* <u>Hangarter v. Provident Life & Accident Ins. Co.</u>, 373 F.3d 998, 1016 (9th Cir. 2004); <u>see also</u> <u>Berra v. Lyons</u>, 2014 WL 585008, at *13–14 (E.D.Wash. Feb. 14, 2014) [holding, in an excessive force case, that ***expert could not opine as to what was objectively reasonable***, as doing so would be opining as to an ultimate legal conclusion and thereby invading the province of the jury]; <u>Hygh v. Jacobs</u>, 961 F.2d 359, 363–65 (2d Cir. 1992) [expert's legal opinion, that told the jury whether the conduct of the defendant was "justified," invaded the province of the jury and was improper]; <u>Schmidt v. City of Bella Villa</u>, 557 F.3d 564, 569–70 (8th Cir. 2009) [proposed expert testimony ***regarding the reasonableness of certain police procedures*** was properly excluded as representing a legal conclusion].

Here, Mr. Clark has indicated he intends to offer opinions that the officers used excessive force on Decedent, that Corporal Alvarado lacked a reasonable

belief of imminent threat of death or serious physical harm and that Corporal
Alvarado's actions were unreasonable. See Exhibit "B" to Decl. Rocawich at
Opinions (3)-(17) and (20)-(22). Each of these opinions contain improper legal
conclusions that invades the province of the jury. Plaintiffs' claim for excessive
force requires that the *jury* determine whether or not the officers' use of force was
excessive. Model Jury Instructions 9.25. As such, Roger Clark's opinions on the
matter clearly invade the province of the jury and Mr. Clark must be precluded
from testifying as to them. Woods v. Lecureux, 110 F.3d 1215, 1219–21 (6th Cir.
1997) [an expert opinion that essentially would tell the jury what their conclusion
should be regarding the verdict or a factual issue in the case, was not helpful to the
jury and was properly excluded].

As Mr. Clark has previously been instructed:

> ***Whether the officers' actions were "objectively reasonable" in
> light of the facts and circumstances confronting them is, however,
> a question for the jury*** or, if no material facts are in dispute, for the Court.
> See Scott v. Henrich, 39 F.3d 912, 916 (9th Cir.1994). Although the Court
> finds that Clark is qualified to opine as to whether the officers' use of force
> was excessive or unreasonable, the Court concludes that such testimony
> should be explored through hypothetical questioning so as to avoid invading
> the province of the jury. Valtierra, 99 F. Supp. 3d at 1198 [emphasis added].

Mr. Clark's opinions that Defendants' use of force was "excessive" is an
improper legal conclusion. See Valtierra, supra 99 F. Supp. 3d at 1198 [finding
Roger Clark's opinion regarding use of force as "excessive" constituted an
impermissible legal conclusion.]  His use of the terms "excessive," "unlawful,",
"unreasonable", "inappropriate", "unnecessary", "unjustifiable", "reckless" and
"deliberate and gross departure" in his Report here are all completely improper, for
which he has been precluded from testifying to previously.

As to the use of legal phrases, such as those noted above, the Ninth Circuit
has repeatedly affirmed that expert witnesses cannot give opinions as to legal

1  conclusions in such a way that "attempts to substitute the expert's judgment for the

2  jury's." United States v. Diaz, 876 F.3d 1194, 1196-99 (9th Cir. 2017). An expert's

3  use of words with "specialized meaning" in the law may therefore be

4  impermissible. Id.; see also Holley v. Gilead Scis., Inc., No. 18-CV-06972-JST,

5  2023 U.S. Dist. LEXIS 43145, 2023 WL 2469632, at *4 (N.D. Cal. Feb. 27, 2023).

6  "Deliberate indifference" is obviously a phrase with specialized legal meaning, so

7  it should be excluded. See M.H. v. County of Alameda, No. 11-CV-02868-JST,

8  2015 U.S. Dist. LEXIS 445, 2015 WL 54400, at *2 (N.D. Cal. Jan. 2, 2015)

9  [excluding the use of "deliberate indifference" and citing cases].

10       Opinions as to whether a defendant's  actions were "reasonable" are also to

11  be excluded, as they would impermissibly intrude on the province of the jury in

12  this case. As noted above, Mr. Clark's opinions previously have been excluded by

13  courts on these exact same bases. See Olson as Next Friend of H.J. v. City of

14  Burnet Tex., 2021 U.S. Dist. LEXIS 69851, 2021 WL 1289376, at *4 (W.D. Tex.

15  2021). There, the court ordered:

16          "In conclusion, Clark's opinions that anything Butler did

17          was "criminal" or "constitute[s] excessive force" are
            inadmissible. Clark's opinions that anything that occurred

18          in this case violates any constitutional rights are
            inadmissible. Clark's opinion that the shooting was "needless

19           and senseless" is inadmissible. Provided he is able to support

20           this conclusion, Clark may testify that Butler's actions fell
            short of police officer standards, but he may not phrase his

21          opinions as a legal conclusion (for instance, "Butler's actions

22          were objectively unreasonable, because...").

23

24       In that same vein, Mr. Clark has two opinions containing blatant legal

25  conclusions on the issue of Monell liability. See Exhibit "B" to Decl. Rocawich at

26  Opinions (18) and (19). Specifically, Mr. Clark opines that OPD "ratified and

27  approved Cpl. Alvarado's use of inappropriate and unnecessary force" and that

28  "OPD's custom and practice is to fail to enforce their training and policies by

ratifying inappropriate force." Id. Again, Mr. Clark's opinions previously have been excluded by courts on these exact same bases. In Olson, supra, the court ordered: "Clark may not opine that the City of Burnet's "custom and policy was to ignore the use of potentially deadly force" as that is the exact legal conclusion the jury must decide in holding the City liable." Olson, 2021 U.S. Dist. LEXIS 69851 at *4.

Mr. Clark also repeatedly opines as to the state of mind of Corporal Alvarado and/or Decedent and as to what the video evidence "clearly shows" or "appears to show both of which are inappropriate and both of which Clark has been previously adjudged by a court to be inappropriate. See Exhibit "B" to Decl. Rocawich at Opinions (1), (2), (5), (28), (30), (32), (49), (50); see also Olson, 2021 U.S. Dist. LEXIS 69851 at *4 ["Clark may not opine as to the intent or state of mind of Brandon Jacque... Clark may not opine that video from the body camera is "clear and without ambiguity" as that information is unhelpful to the jury."] For all these reasons, the above mentioned Opinions should be excluded.

### B. Mr. Clark's Speculative Opinions, Factual Determinations, Opinions Regarding Witness Credibility and Subjective Knowledge or Intent Invade the Province of the Jury and/or Do Not Assist the Trier of Fact and are Properly Excluded

Expert opinions are excludible as unhelpful if based on speculative assumptions. In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988, 37 F.3d 804, 824 (2nd Cir. 1994) [overruled on other grounds by Zicherman v. Korean Air Lines Co., Ltd., 516 U.S. 217 (1996)]; Guidroz-Brault v. Missouri Pac. R. Co., 254 F.3d 825, 829 (9th Cir. 2001) ["Rule 702 requires that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs."]. Expert evidence is admissible only "if the principles and methodology used by the expert proffering it are

1   grounded in the methods of science." <u>Domingo ex rel. Domingo v. T.K.</u>, 289 F.3d

2   600, 605 (9th Cir. 2002).

3       "Expert testimony is admissible under [Rule 702] if it addresses an issue

4   'beyond the common knowledge of the average layperson.'" <u>United States v.</u>

5   <u>Hanna</u>, 293 F.3d 1080, 1086 (9th Cir. 2002) *quoting* <u>United States v. Morales</u>, 108

6   F.3d 1031, 1039 (9th Cir. 1997) [en banc]. <u>See</u> Fed. R. Evid. 702(a) [expert

7   testimony must help the trier of fact to understand the evidence or determine a fact

8   at issue]. "Weighing the credibility of witnesses and resolving factual matters is

9   not outside the common ability or knowledge of a layperson; it is the precise role

10  that the law assigns solely to a layperson as a juror." <u>Sanfilippo v. Foster</u>, 2012

11  U.S. Dist. LEXIS 119898, *4-5.

12      Here, Mr. Clark intends to offer opinions that are based purely on

13  speculation and conjecture about Decedent's thought process or the Officers'

14  conduct, repeatedly interjects his own subjective beliefs, repeatedly weighs the

15  evidence and draws inferences, repeatedly makes factual determinations, and

16  repeatedly offers opinions that require a determination of credibility. <u>See</u> Exhibit

17  "B" to Decl. Rocawich at Opinions (1)-(17), (20)-(54). For example, Mr. Clark

18  boldly opines "Cpl. Alvarado was not in the path of the red car at the time or

19  immediately prior to the shots", "Cpl. Alvarado was not even outside the patrol

20  vehicle at the time of the shots", "no person was in the path of the red car", "Cpl.

21  Alvarado was still seated in his patrol vehicle and shot through his open door", "I

22  can conclude that Cpl. Alvarado was not in the path of the red car (or even the

23  potential path of red car) at the time of the shots." <u>Id.</u> at (3) (4), (5), (15), (24)

24      Mr. Clark also purports to know Decedent's thought processes opining that

25  maneuvers made by Decedent during the incident were "an effort to U-turn in

26  reverse" and as "an effort to avoid a direct collision" rather than an attempt to kill

27  or injure Corporal Alvarado – something only Decedent would know. <u>Id.</u> at (26),

28  (27) and (23). Even more boldly, Mr. Clark opines that "Mr. Benavente was

- 10 -

1    merely trying to get away from a minor traffic stop." Id. at 46. As these type of

2    speculative opinions and conjecture about thought processes, one court recently

3    noted in excluding Roger Clark's similar attempt, "[Mr. Clark's] credentials do not

4    place him in a better position than the jury to evaluate (someone's) state of mind."

5    Olson v. City of Burnet, 2021 U.S. Dis. LEXIS 69851, *9-10 (W.D. Tx. 2021).

6         Similarly, credibility is a matter that a jury must decide, not an expert

7    witness. United States v. Good, 814 F.2d 1353, 1355 (9th Cir. 1987). Numerous of

8    Mr. Clark's opinions attempt to discredit Corporal Alvarado's testimony even

9    flatly opining that the event did not occur in the way Corporal Alvarado testified.

10   Mr. also impermissibly weighs the evidence and draws inferences, which in in the

11   province of the jury. Courts have regularly excluded similar opinions offered by

12   Mr. Clark. See Cooke v. City of Stockton, 2017 WL 6447999, at *6 (E.D. Cal.

13   Dec. 18, 2017) [[B]ecause a jury is capable of weighing the evidence and drawing

14   these inferences without Clark's expertise, his opinion 'would merely tell the jury

15   what result to reach,"]  see Rule 704, Advisory Committee Note (1972), and would

16   not "help the trier of fact to understand the evidence or to determine a fact in

17   issue," Cooke at *6. Telling the jury what result to reach is exactly what Clark does

18   throughout his report. See Exhibit "B" to Decl. Rocawich at Opinions (1)-(17),

19   (20)-(54). In addition, it is inappropriate for an expert to attempt to create a

20   question of fact as to what the Defendants officers actually know. See Cotton v.

21   City of Eureka, 2011 WL 4047490, at *2 (N.D. Cal. Sep. 8, 2011) quoting Gobert

22   v. Caldwell, 463 F.3d 339, 348 n. 29 (5th Cir. 2006)). Numerous of Mr. Clark's

23   Opinions cited above do exactly that.

24        For all these reasons, the Court should preclude Mr. Clark from offering

25   opinions that impermissibly infringe on the role of the jury, including factual

26   determinations, including opinions on credibility, and including the motivations of

27   Plaintiff and the subjective knowledge of the Defendant officers.

28

**C.     Opinions Beyond Mr. Clark's Expertise Should be Excluded**

As stated above, Rule 702 provides that expert opinion is admissible "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion . . ."

Here, it is anticipated that Mr. Clark intends to offer opinions on medical issues and accident reconstruction issues that are beyond the scope of "police practices" opinions. See Exhibit "B" to Decl. Rocawich at Opinions (31) through (35), (37) through (38) and (55). Mr. Clark is not a medical expert, medical examiner or forensic pathologist nor is he an expert in accident reconstruction. See Exhibit "A" to Decl. Rocawich at pp. 34-43. He is not qualified to render opinions in those fields. Indeed, other courts have excluded Mr. Clark's medical opinions. See, e.g. Valtierra v. City of Los Angeles, 99 F.Supp.3d 1190, 1196 (C.D. Cal. Apr. 13, 2015); LeBlanc v. City of Los Angeles, 2006 WL 4752614, at *9 (C.D. Cal. Aug. 16 2006).

Mr. Clark is a self-proclaimed expert on "police practices," although he has not worked as a peace officer in any capacity since 1993. His opinions about medical/forensic issues and accident reconstruction issues do not satisfy the requirements that he have medical knowledge, skill, experience, training, or education to render any opinions about Decedent's autopsy or to render any opinions about principles of physics or about analysis of the physical, electronic, video, audio, and testimonial evidence from a crash. For these reasons, the above mentioned Opinions should be excluded.

**D.** **Opinions that are likely to Mislead the Jury and Confuse the Issues and Those that Contain Inaccurate Statements of Law and Fact Should be Excluded**

"In addition to determining whether [an expert's] testimony and opinions are based on sufficient facts or data, the Court must make a preliminary assessment of whether [the expert's] reasoning and methodology are scientifically valid. [citation.] The Court examines [the expert's] conclusions to determine whether those conclusions logically derive from the stated bases." Newkirk v. ConAgra Foods, Inc., 727 F. Supp. 2d 1006, 1018 (E.D. Wash. 2010), aff'd, 438 F. App'x 607 (9th Cir. 2011).

Here, Mr. Clark makes several claims in his Report that are likely to confuse and mislead the jury because the contain inaccurate statements of policy and law. For example, Mr. Clark purports to have reviewed POST standards and offers many opinions on those standards; however, his Report contains incorrect statements regarding those standards. For example, Clark opines: "It cannot be overstated that according to the POST standards (and training and policies), the law enforcement officers involved in this incident were required to take a position of safety -- "cover" -- take sufficient time as events unfolded for the next expected step in the process -- "decompression."" See Exhibit "B" to Decl. Rocawich at Opinion 56.

Interestingly, no POST learning domain contains the word decompression which Mr. Clark uses multiple times in his Report. More problematic though, is that POST standards do not "require" cover rather Learning Domain 33 directs officers to "Be aware of the location of cover.  Use, be ready to use, and/or move to cover when necessary.  The use of available cover continues to be a basic tactical consideration." Exhibit "C" to Decl. Rocawich at pg. 1-6. Moreover, POST recognizes several different forms of cover meaning its very arguable that Corporal Alvarado, behind the door of his cruiser, *was* in a position of cover. Id. at pg. 1-7.

1   Mr. Clark also misstates POST standards opining: "Officers, including Cpl.
2   Alvarado, are trained and know that they cannot shoot a person merely for fleeing.
3   To do so would constitute inappropriate, unnecessary, and unjustifiable force."
4   Exhibit "B" to Decl. Rocawich at Opinion 57. However, Learning Domain 20 has
5   an entire section on when use of deadly force on a fleeing person is appropriate.
6   See Exhibit "D" to Decl. Rocawich at p. 4-5 through 4-6. Indeed, Clark's Opinion
7   57 also misstates the law. Under Tennessee v. Garner, 471 U.S. 1, 11, 85 L. Ed. 2d
8   1, 105 S. Ct. 1694 (1985) the fourth amendment permits use of deadly force to
9   apprehend a fleeing felon where there is "probable cause to believe the suspect
10  poses a threat of serious physical harm". It is arguable that, upon backing toward
11  Corporal Alvarado, the Decedent committed the felony of attempted murder. Still
12  in a vehicle, he continued to pose a threat to the Officers and public. Accordingly,
13  Clark's Opinion is, at best, misleading and, at worst, plain incorrect.

14          Similarly, Mr. Clark's Opinion 59 discussing pre-shooting tactics is
15  inaccurate or misleading statement of the law when this case has no state law claim
16  for negligence. "While California state law does factor pre-shooting conduct into
17  whether an officer acts 'reasonably when using deadly force,' '[t]he Fourth
18  Amendment is narrower and places less emphasis on pre[-]shooting conduct,'"
19  Hart v. City of Redwood City, 99 F.4th 543, 554 citing Hayes v. County of San
20  Diego, 57 Cal. 4th 622, 689 and Vos v. City of Newport Beach, 892 F.3d 1024,
21  1037. "And though the events leading up to the shooting, such as the officer's
22  tactics, are encompassed in the facts and circumstances a court can consider, one
23  cannot establish a Fourth Amendment violation based merely on bad tactics that
24  result in a deadly confrontation that could have been avoided." Hart supra 99 F.4th
25  at 554 [internal citations omitted]. For all these reasons, Clark's incorrect or
26  misleading Opinions on POST standards and/or caselaw should be excluded.
27
28

1  **IV.    <u>CONCLUSION</u>**

2          For the foregoing reasons, Defendants respectfully requests that the Court

3  limit Mr. Clark's testimony to the admissible opinions provided in his Expert

4  Report and exclude Opinions identified as (1) through (59) in Exhibit "B" to the

5  Declaration of Rocawich.

6

7   Dated:    June 21, 2024                    Respectfully submitted,

8                                              JONES & MAYER

9

10                                             By:_____

11                                                JAMES R. TOUCHSTONE
                                                  DENISE L. ROCAWICH
12                                                Attorneys for Defendants City of
                                                  Ontario and Corporal Alvarado
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF DENISE LYNCH ROCAWICH IN SUPPORT OF MOTION IN LIMINE TO LIMIT OR EXCLUDE CERTAIN OPINIONS BY PLAINTIFF'S EXPERT ROGER CLARK**

I, Denise Lynch Rocawich, declare:

1.      I am an attorney licensed to practice law in the State of California.  I am a partner in the law firm of Jones & Mayer, counsel of record for Defendants, City of Ontario and Albert Alvarado.  This Declaration is submitted in support of Defendants' Motion in Limine to Limit or Exclude Certain Opinions by Plaintiff's Expert Roger Clark. I have personal knowledge of the following facts and, if called as a witness, I would and could competently testify thereto.

2.      Plaintiff served his Initial Expert Disclosures on February 2, 2024 which includes the Rule 26 Report of Expert Roger Clark. I received these disclosures via email. Attached hereto as Exhibit "A" is a true and correct copy of Expert Clark's entire Rule 26 Report minus his fee schedule and testimony list.

3.      The specific portions of Mr. Clark's Report that are at issue and objectionable are attached hereto as Exhibit "B". These portions are direct quotes from Mr. Clark's Report.

4.      Mr. Clark purports in his Report to have reviewed and relied upon POST Learning Domain 33 – Arrest and Control. Attached hereto as Exhibit "C" are true and correct copies of relevant pages of POST Learning Domain 33.

5       Mr. Clark purports in his Report to have reviewed and relied upon POST Learning Domain 20 – Use of Force/Deescalation. Attached hereto as Exhibit "D" are true and correct copies of relevant pages of POST Learning Domain 20.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 21st day of June, 2024, at Redondo Beach, California.

_____
Denise Lynch Rocawich, Esq.

# EXHIBIT "A"

# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458, rclark9314@aol.com

February 2, 2024

Marcel F. Sincich, Esq.
Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367

**Regarding:   *Frank Benavente and Nicole Ventress v. City of Ontario and Albert Alvarado*, Case No.: 5:23-cv-00266-SSS-KK.**

Dear Mr. Sincich:

Thank you for retaining me to analyze and render opinions regarding the December 22, 2021, use of force and shooting death inflicted on Mr. Joseph Benavente (Mr. Benavente) by City of Ontario Department (OPD) Corporal Albert Alvarado (Cpl. Alvarado). Pursuant to the requirements of Rule 26, I have reviewed the complaint, OPD investigative reports, interviews, deposition transcripts, video recordings policies, and other material (as listed below) provided to me thus far regarding this case.  I am informed that depositions have not yet been completed.  Please be advised that if/when any additional information is submitted (including additional deposition transcripts) , a supplemental report expressing additional opinions and/or refining my opinions will be necessary.

It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.  That is, where there are differences in the events proffered by the Defendants, and/or witnesses, versus the testimony proffered by Plaintiffs and any other witnesses, I do not opine for the trier of fact regarding who are the more believable witnesses.  I consider in this report that the resolution of any such conflicts is the purview of a jury to decide.

Additionally, it is necessary to state that I am not a lawyer nor a public official who hears and decides cases brought in court.  My opinions rest on the training given to every POST certified California Law Enforcement Officer and the reasonable professional standard of

Page 1 of  43

care as expressed and required pursuant to the training provided to every California certified Law Enforcement Officer, including Cpl. Alvarado, by POST. Additionally, my opinions are based on my own knowledge, skill, experience, training, and education as well as my review of the materials listed below.

**Materials Reviewed Thus Far:**

1.      Stipulated Protective Order.

2.      Plaintiffs' First Amended Complaint for Damages.

3.      Court's Civil Trial Order.

4.      Defendant City of Ontario's Responses to Frank Benavente's Requests for Admission, Set One.

5.      Defendant City of Ontario's Responses to Frank Benavente's Requests for Production, Set One.

6.      Defendant City of Ontario's Responses to Frank Benavente's Interrogatories, Set One.

7.      Video Recordings: BATES 1649-1654, 1656-1660, 1662, 1669-1670, 1672, 1677-1682, 1754-1750.

8.      Transcripts:
   a.      Deposition of Cpl. Albert Alvarado with exhibits.
   b.      Deposition of Officer Andres Varela.
   c.      Deposition of Officer Kevin Vasquez-Lopez with exhibits.
   d.      BATES 105-129 – OPD Report, Officer Andres Varela Statement.
   e.      BATES 132-161 – OPD Report, Officer Alex Escobar Statement.
   f.      BATES 184-241 – OPD Report, Transcription of Audio and Video.
   g.      BATES 209-233 – Transcription Corporal Albert Alvarado Statement.

      h.     BATES 1753-1915 – Transcripts.

9.    Audio Recordings:
    a.     BATES 1645 – Radio Traffic.
    b.     BATES 1646 – OFD Radio Traffic.
    c.     BATES 1647 – OFD Phone Calls.
    d.     BATES 1648 – OIS.
    e.     BATES 1916, 1917, 1933, 1934 – Officer Kevin Vasquez Lopez admonishment and statement.
    f.     BATES 1919-1921, 1935-1937 – Cpl. Albert Alverado admonishment and statement.
    g.     BATES 1923, 1924, 1949-1952 – Officer Alex Escobar admonishment and statement.
    h.     BATES 1925-1927, 1929-1931 – Officer Andres Varela admonishment and statement.

10.    Investigative Records:
    a.     BATES 1-104, 130-131, 162-183, 242-244 – OPD Investigation Reports.
    b.     BATES 202-205 – Summary of Cpl. Alvarado's BWC Video.
    c.     BATES 238-239 – Summary of Nicole Ventress Phone Call w-Det. D.Lauritzen.
    d.     BATES 245-255 – CAD Report
    e.     BATES 245-255 – Call Log.
    f.     BATES 256-257 – Event History.
    g.     BATES 285-330 – SBDA Public Release Memo.
    h.     BATES 331 – SBDA Letter to COP re OIS.
    i.     BATES 1953-1973 – EDR Hyundai.
    j.     BATES 1974-1975 – Event Recording.
    k.     BATES 1987-1990 – MIAT Supplemental.

11.    Photographs:
    a.     BATES 1129-1178 – Patrol Vehicle PHOTOS.
    b.     BATES 1179-1194 – Aeriel PHOTOS.
    c.     BATES 1195-1391 – Scene PHOTOS.
    d.     BATES 1392-1539 – Autopsy PHOTOS.
    e.     BATES 1540-1566 – Decedent Vehicle PHOTOS.
    f.     BATES 1567-1579 – Decedent Clothing PHOTOS.

g.    BATES 1580-1592 – Officer Weapon PHOTOS.
h.    BATES 1593-1621 – Officer PHOTOS.
i.     BATES 1622-1629 – Witness PHOTOS.
j.     BATES 1630-1644 – Home with Video PHOTOS.
k.    BATES 1982 – Drone PHOTOS.

12.    Medical Reports:
a.    BATES 258-261 – Prehospital Care Report.
b.    BATES 262-269 – Autopsy Protocol.
c.    BATES 275-284 – Coroner Investigation Report.

13.    Policies and Training:
a.    BATES 332-1114 – OPD Policy Manual.
b.    BATES 1115-1128 – OPD Officer Training Activity.

14.    POST Basic Learning Domains:
a.    #00 "Becoming an Exemplary Peace Officer."
b.    #1:  "Leadership, Professionalism & Ethics."
c.    #2:  "Criminal Justice System."
d.    #3:  "Policing in the Community."
e.    #5:  "Introduction to Criminal Law."
f.     #15: "Laws of Arrest."
g.    #16: "Search and Seizure."
h.    #18: "Investigative Report Writing."
i.     #19: "Vehicle Operations." Version 6.3j
j.     #20: "Use of Force."
k.    #21: "Patrol Techniques."
l.     #22: "Vehicle Pullovers."
m.   #23: "Crimes in Progress."
n.    #30: "Crime Scenes, Evidence, and Forensics."
      Version 5.0
o.    #33: "Arrest Methods/Defensive Tactics."
p.    #35: "Firearms/Chemical Agents."
q.    #36: "Information Systems."

15.    Demonstrative presentation of incident.

**Brief Overview of Events and Commentary:**

On February 22, 2021, Ontario Police Department (OPD) Corporal Albert Alvarado (Cpl. Alvarado), passenger, and his partner and patrol vehicle driver, trainee Officer Alex Escobar (Officer Escobar) drove north on Mountain Ave. approaching the 4th Street red light in the City of Ontario.  At the red light, Cpl. Alvarado saw Officer Andres Varela (Officer Varela), the solo occupant of another patrol vehicle stopped at the red light along with a red compact sedan.  Cpl. Alvarado instructed Officer Escobar to pull to the left side of Officer Varela so that he could communicate with Officer Varela through his open window.

On 4th Street and Mountain Ave., Cpl. Alvarado did not know the reason for a traffic stop of the red car.  (Alvarado Deposition, Page 31).  Cpl. Alvarado also stated that the red car "ran the red light and it made an eastbound turn on 4th Street from Mountain Avenue because that light was red."  (Alvarado Deposition, Page 31)

Officers are trained that pursuant to California Vehicle Code section 21452(b), "Except when a sign is in place prohibiting a turn, a driver, after stopping … facing a steady circular red signal, may turn right."  There was no sign on Mountain Ave. and 4th Street prohibiting a turn.  According to Officer Varela, the red "car ends up making the right turn on the green light."  (Varela Statement, Page 7).  According to Officer Varela, the red car passed his patrol vehicle, and made a right going eastbound on 4th Street, when Officer Varela noticed that it had tinted windows.  (Varela Statement, Page 5).

As Officer Varela turned east from the center lane on a green light, he hearly created a traffic collision with a civilian vehicle that was approaching in the right lane.  Cpl. Alvarado had to yell out to Officer Varela, "Hey, stop!" to prevent an accident. (Alvarado Statement, Page 31)

The vehicles proceeded east on 4th Street initially without any additional report of a vehicle code violation.  However, after passing Palmetto Ave., Officer Varela called out the traffic stop over the radio.  Then after he passed Boulder Ave. Cpl. Alvarado in the two-vehicle position claimed to see the driver of the red car fidgeting.  (Alvarado Deposition, Page 32).

Seeing the fidgeting, Cpl. Alvarado already decided that there was going to be a vehicle pursuit.  Cpl. Alvarado activated the code-three lights and sirens as they approached San Antonio Ave.  (Alvarado Statement, Page 32)

According to Officer Varela, up to San Antonio Ave., the red car drove at a normal speed. (Varela Statement, Page 5).  Officer Varela called in the license plate of the red car at 4th

Street and Boulder Ave.  (Varela Statement, Page 5).  Then officers reported that the red car ran the stop sign at 4th Street turning northbound on San Antonio Ave., at which time a vehicle pursuit ensured for that violation and for failure to yield.  Officer Vasquez-Lopez, in a separate patrol vehicle, joined the pursuit as the pursuit while north on San Antonio Ave.

The vehicle pursuit continued north on San Antonio Ave. until the red car reached the north side of the 10-freeway bridge at which time it stopped momentarily on the east curb line.

Officer Varela stopped his patrol vehicle behind the red car and activated his spotlight. Believing there may be a foot-bail situation, and because Officer Escobar fell behind in the pursuit, Cpl. Alvarado instructed Officer Escobar to speed up to assist.  However, the red car made a U-turn on San Antonio Ave. and proceeded south towards 6th Street.  The red car came to a stop at the San Antonio Ave. and 6th Street intersection then proceeded eastbound on 6th  Street.  (Varela Statement, Page 5; Alvarado Statement, Page 32).

The red car then turned northbound on Beverly Ct., which is a dead-end, cul-de-sac street, proceeded north and stopped approximately in front of the second and third house on the east side of the street, between 1514 and 1522 Beverly Ct.

Next, approximately at the same time that Officer Varela's patrol vehicle came to a stop, the red car began to reverse generally along the passenger side of Officer Varela's patrol vehicle.  At the time Cpl. Alvarado's vehicle was still driving north on Beverly Ct. Approximately at the time that the red car was passing behind Officer Varela's patrol vehicle, Cpl. Alvarado's patrol vehicle (driven by Officer Escobar) came to a stop. The red car appears to have corrected its direction of travel in order to avoid a direct collision with the front of Cpl. Alvarado's vehicle.  It appears that the red car made a concerted effort to continue to reverse to the passenger side of the officers' vehicles.

As the red car reversed, Officer Vasquez-Lopez drove directly into the red car causing a direct traffic collision and stopping any additional rearward movement by the red car. Almost immediately after the red car stopped, nearly parallel with Cpl. Alvarado's patrol vehicle, Cpl. Alvarado fired three shots into the driver's window of the red car.  It appears from my review of the evidence that Cpl. Alvarado was still seated in his patrol vehicle and shot through his open door.

It appears to me from review of the video evidence and officer statements that Mr. Benavente had previously stopped before turning around and continuing to flee in the vehicle, that Mr. Benavente stopped realizing that he was on a dead-end cul-de-sac street. Then it appears that the red car went in reverse and began to conduct a clockwise circle

around Officer Varela's patrol vehicle (I took this as an effort to U-turn in reverse). During the process, it appears that Cpl. Alvarado's patrol vehicle rapidly approached at which point the red car changed course (I took this as an effort to avoid a direct collision with Cpl. Alvarado's patrol vehicle). The red car continued to reverse alongside Cpl. Alvarado's patrol vehicle until it was stopped by a collision with Officer Vasquez-Lopez's patrol vehicle.

Neither Mr. Benavente nor Cpl. Alvarado's subjective intent was relevant to my analysis. The facts related to the vehicle movements and Cpl. Alvarado's actions were the focus of my analysis. I frame my opinions on what an objectively reasonable officer would and is expected to observe based on the information known and circumstances presented to Cpl. Alvarado at the time of his use of deadly force.

Cpl. Alvarado stated to investigators that "when Officer Escobar comes almost to a stop … he comes to a stop where I was able to get out of the car. We're out, now I'm outside the passenger door…. I'm out and then I see the reverse lights to the red compact sedan turn on." (Alvarado Statement, Page 33)

    Q.    Did you see the vehicle backing up before you got out of your car?
    A.    No. (Alvarado Deposition, Page 28)

It appears that Cpl. Alvarado (based on his statement to investigators) exited the patrol vehicle after the patrol vehicle came to a stop and did not see the reverse lights or the red car backing up until he got out of the vehicle.

I note that the video evidence clearly shows that the red car was going in reverse prior to Cpl. Alvarado's patrol vehicle coming to a stop (i.e., prior to Cpl. Alvarado exiting his patrol vehicle). Based on the positions of Officer Varela and Cpl. Alvarado's patrol vehicles, approximately in the middle of the street, and the position of the red car, reversing along the right side of the street, any reasonable officer in Cpl. Alvarado's position (front passenger seat) and under the circumstances (focusing on the red car as the subject of the vehicle pursuit) would have recognized that the red car was moving in reverse prior to Cpl. Alvarado's patrol vehicle coming to a stop and prior to exiting the patrol vehicle. It is my opinion that no reasonable officer would fail to perceive what direction a subject vehicle is moving during a vehicle pursuit (here the red car) when the same officer (here Cpl. Alvarado) saw the subject vehicle come to a stop on the street and saw the subject vehicle contact the point vehicle (here Officer Varela's patrol vehicle).

    Q.    So what I'm trying to get at, I take it if you would have seen him
          reversing, actually moving backwards, and you were still in your car,
          then for safety reasons, you would have stayed in your car; is that

> fair?
> A.    Yes. Given your description, seeing that he's already reversing and
>       the car's already in motion towards my car, yes, I would not be
>       getting out of my car.  (Alvarado Deposition, Page 39)

Failure to perceive the red car going in reverse along the right side of the street prior to a
patrol vehicle coming to a stop under these circumstances is a substantial tactical error
that can only be rationally explained by a lack of situational awareness or complacency.

Failure to assess the position and movement of the subject red car under these
circumstances prior to attempting to exiting a patrol vehicle is also a substantial tactical
error that can only be rationally explained by a lack of situational awareness or
complacency.  Assuming Cpl. Alvarado's statement and testimony in this regard are true,
it is my opinion that Cpl. Alvarado's gross tactical errors created the scenario which he
testified existed to justify his use of deadly force (being out of the patrol vehicle and
believing he would be crushed).

Knowing that the red car was reversing along the right side of the road (on the passenger
side of the patrol vehicles), Cpl. Alvarado chose to exit his patrol vehicle's passenger
door and/or remain in the "V" of the passenger door.

> Q.    Were you in the "V" of your door when you fired your shots?
> A.    I was in that general vicinity.
> Q.    General vicinity of what?
> A.    So just as anybody would get out of their vehicle and stand outside
>       the door, that's where I was standing.  (Alvarado Deposition, Page
>       29)

Assuming that Cpl. Alvarado only exited the patrol vehicle after it came to a stop as he
testified, it appears from my review of the video evidence that the red car was to the side
of the patrol vehicle at the time Cpl. Alvarado exited the patrol.

Whether Cpl. Alvarado was in his patrol vehicle or outside his patrol vehicle at the time
of the shots, the following remains the same.  There are no shots fired through the rear
window of the red car.  There are no shots fired through the rear driver's side window of
the red car.  There were no shots fired through the front windshield of the red car.  All
three shots fired by Cpl. Alvarado were through the driver's side window of the red car.
Thus, it is clear from the physical evidence that Cpl. Alvarado was to the side of the red
car when he fired three shots at Mr. Benavente.

It is apparent that the red car was not moving forward at the time of the shots and that no
officer was directly in front of the red car at the time of the shots.  It is apparent to me

Page 8 of 43

from review of the audio of Officer Vasquez-Lopez's body-worn camera video that the collision occurred prior to the three shots. Given that after Officer Vasquez-Lopez exited his vehicle, the red car was still in contact with Officer Vasquez-Lopez's patrol vehicle (after the shots and prior to the red car slowly rolling forward and to the right into the tree), I conclude and assume for the purposes of my opinions that the red car was not moving at the time of the shots.

Additionally, the trajectory of the three shots to Mr. Benavente were left to right anatomically. Specifically, the gunshot wound to Mr. Benavente's neck entered the left side of the neck and exited the right side of the neck with a left to right direction of travel, and downward with no significant front/back deviation (see autopsy photos orange trajectory rod). The gunshot wound to Mr. Benavente's chest entered his left upper chest and the bullet was recovered from the right side of his back with a path of front to back, left to right, and downwards (see autopsy photos pink trajectory rod). The gunshot wound to Mr. Benavente's left arm entered the top of the left shoulder, with a back to front, left to right, and upwards direction of travel (see autopsy report photos green trajectory rod).

Further, the pattern of Cpl. Alvarado's three shots that struck Mr. Benavente after penetrating the intermediary object of the window is relevant to my analysis. Two shots are nearly key holed, and all three shots create a shot grouping that demonstrates to me that the shots were fired rapidly, and that the vehicle was not moving at the time of the shots (keeping in mind that Cpl. Alvarado remained in the same position for all shots).

During his initial statement, Cpl. Alvarado's justification for using deadly force was because he was afraid he would "get his by the car or I was going to be crushed by my door" or "ready to be ran over" by the red car. (Alvarado Statement, Page 41)

> Q.   Okay. So is it your understanding now that all three of your shots went through the driver's side window?
> A.   That's my understanding, yes. (Alvarado Deposition, Page 56)

From this information, I can conclude that Cpl. Alvarado was not in the path of the red car (or even the potential path of the red car) at the time of the shots. No officer was about to be struck by the red car at the time of the shots, no officer was about to be run over by the red car at the time of the shots, and no officer was about to be harmed by the red car at the time of the shots.

During his initial statement, Cpl. Alvarado's justification for using deadly force was

because he was afraid he would "get his by the car or I was going to be crushed by my door" or "ready to be ran over" by the red car.  (Alvarado Statement at 41)

> Q.     Right. But you would at least agree you ended up not being crushed?
> A.     I would agree after the fact, yeah, I was not crushed.  (Alvarado Deposition, Page 49)

It is undisputed that Cpl. Alvarado did not get hit by the red car, Cpl. Alvarado did not get run over by the red car, and the red car did not cause Cpl. Alvarado to get crushed by his patrol vehicle door.

> "An "imminent" threat of death or serious bodily injury exists when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the officer or another person. An officer's subjective fear of future harm alone is insufficient as an imminent threat. An imminent threat is one that from appearances is reasonably believed to require instant attention (Penal Code § 835a)."  (Ontario Police Department Police Manual, Policy 300.4)

An officer's subjective fear of future harm alone is insufficient as an imminent threat, as trained, there must be objective facts from which a reasonable officer in the same situation would believe that there is an immediate threat of death or serious bodily injury. The objective facts here, as explained above, are Cpl. Alvarado was not in the path of the red car at the time of or immediately prior to the shot shots.  Therefore, no reasonable officer would believe that they were about to be hit or run over by the red car under these circumstances.  Standing to the side of the red car when Cpl. Alvarado fired three shots eliminates the present ability or opportunity for the red car to immediately cause death or serious bodily injury to Cpl. Alvarado.

Cpl. Alvarado stated to detectives, "As I'm believing I'm getting crushed by the car, that's when I was like, that's when I, that's when I'm discharging my, my handgun when I'm believing I'm getting crushed by the car."  (Alvarado Statement, Page 33)

It is not reasonable for an officer to believe that they are getting crushed when they are not getting crushed.  There are no objective facts to support this subjective fear.  The patrol car door was not crushing Cpl. Alvarado, the video appears to show that Cpl. Alvarado was not even outside of his patrol vehicle at the time of the shots, and Cpl. Alvarado did not know that his patrol vehicle door was struck by the red car at the time of

the incident.  Cpl. Alvarado discovered this later upon review of photographs.

> Q.     Do you know if the door of your vehicle was struck?
> A.     I learned that it was struck.
> Q.     And how did you learn that?
> A.     Reviewing photos.  (Alvarado Deposition, Page 29)

It is also not reasonable for an officer to believe they are going to be crushed by their patrol vehicle door under these circumstances.  As stated above, the red car came to a stop prior to Cpl. Alvarado firing his three shots and Officer Vasquez-Lopez's patrol vehicle was blocking the red car from making any further movement backwards.  Any reasonable officer, especially a corporal who is a field training officer and the senior officer by rank in the pursuit incident, and not being distracted by the task of having to drive the patrol vehicle or operate the radio (as these were tasked to Officer Escobar), would have the situational awareness of knowing that there was a third patrol vehicle following closely behind in pursuit (here Officer Vasquez-Lopez), and that the third patrol vehicle had just collided with the subject vehicle causing a loud noise.  Assuming that Cpl. Alvarado was outside of his patrol vehicle as he testified, with his focus on the subject vehicle to his east, any reasonable officer in that position would know that a third patrol vehicle was rapidly approaching from the south.

Even if Cpl. Alvarado subjectively believed he was going to be crushed by his patrol vehicle door because of the backward moving red car (which is only possible if Cpl. Alvarado opened his door, exited his vehicle, and kept his door open), the appropriate tactical decision under in his situation would be to move so that Cpl. Alvarado no longer feels like he is going to be crushed.  This could be done by taking one step to the south so that Cpl. Alvarado was outside the "V" of the door.  Cpl. Alvarado also had time to reposition in order to elevate even the subjective fear of being crushed.

> Q.     How much time passed from you seeing the vehicle backing up to
>        you firing your first shot?
> A.     So that was when it was approximately three seconds from the red
>        compact sedan striking my patrol vehicle along the passenger side
>        and running alongside the passenger side.  (Alvarado Deposition,
>        Page 27)

Ontario Police Department Policy and basic officer training mandates that an officer reposition, move out of the way, if the officer believes he or she will be harmed by a moving vehicle.

Q.     Does Ontario have any policies with respect to shooting at moving
       vehicles?
A.     It does.
Q.     Were you familiar with those policies before the day of the shooting
       we're here to talk about?
A.     I was.
Q.     And what does the policy generally say, if you know?
A.     The policy states that, it suggests that shooting at a moving vehicle
       typically doesn't work out.  (Alvarado Deposition, Page 25)
A.     Essentially, you should try to avert the vehicle, the moving vehicle,
       get out of its way.
Q.     Get out of the path, rather than shooting?
A.     Doesn't say anything about not shooting.  Just attempting to get out
       of the way unless it's an immediate imminent threat to the officer.
       (Alvarado Deposition, Page 26)

The Department policy is specifically directly towards a shooting incident:

300.4.1 SHOOTING AT OR FROM MOVING VEHICLES
Shots fired at or from a moving vehicle are rarely effective and may involve
additional considerations and risks.  When feasible, officers should take
reasonable steps to move. out of the path of an approaching vehicle instead
of discharging their firearm at the vehicle or any of its occupants.  An
officer should only discharge a firearm at a moving vehicle or its occupants
when the officer reasonably believes there are no other reasonable means
available to avert the imminent threat of the vehicle, or if deadly force other
than the vehicle is directed at the officer or others.  An officer may also use
deadly force to apprehend a person fleeing in a vehicle if in compliance
with section 300.4(b) of this policy.

Officers should not shoot at any part of a vehicle in an attempt to disable
the vehicle.  (Ontario Police Department Police Manual, Policy 300.4.1)

It appears from Cpl. Alvarado's statement that he is unfamiliar with the requirements
imposed by the Department on him through policy regarding shooting at moving vehicles.
As a corporal and leader of offices and specifically as a field training officer at the time
of the incident, I am highly critical of Cpl. Alvarado's lack of understanding of
Department policy.

As stated above, this was not a shooting at a moving vehicle situation because the red car

was not moving at the time of the shots, which is why deadly force under these circumstances was unnecessary.  Nevertheless, assuming in arguendo that the red car was still moving in reverse at the time of the shots, and assuming that Cpl. Alvarado was out of his vehicle at the time of the shots, then Cpl. Alvarado was already out of the path of the vehicle because he fired all three from the side of the vehicle and the patrol vehicle door was not in the process of crushing Cpl. Alvarado.

It is important to note that generally the path of a reversing vehicle is to the rear of the vehicle.  Still, a reasonable officer pursuant to basic officer training and with this Department policy, under these circumstances, would take reasonable steps to move out of the path, move out of the potential path of the vehicle, and move away from the door the officer fears may crush him, instead of discharging their firearm.

Here, the reasonable steps begin first by directing one's trainee to position the patrol vehicle properly, second by properly and accurately assessing the situation (i.e., the red car's movement) prior to exiting the patrol vehicle, third by remaining inside the patrol vehicle in consideration of the red car reversing along the right side of the road on the same side of the officer's exiting door, fourth (if the officer already mistakenly created the potential danger by exiting patrol vehicle) to immediately reenter the patrol vehicle as the best cover available under these circumstances, and fifth (if the officer already mistakenly created the potential danger by remaining outside of the patrol vehicle) to reposition to the read of the patrol vehicle to utilize the patrol vehicle as cover under these circumstances.  Tactical repositioning and other de-escalation tactics are not a retreat.  (PC 835a(d), "For the purposes of this subdivision, "retreat" does not mean tactical repositioning or other deescalation tactics.").

> Q.  I'm just wondering whether you tried to do anything in your mind to get out of the way.
> A.  It would have caused even more -- could caused even more serious injury or even death if I would have moved in any direction other than where I stayed.  (Alvarado Deposition, Page 26)

Cpl. Alvarado did nothing to tactically reposition himself in order to avert the subjective fear of the door potentially crushing him.  It appears that from Cpl. Alvarado's perspective, if he would have moved, he believed would create a risk of serious injury or death.  It is not disputed that Cpl. Alvarado was not seriously injured and did not die during the incident.  Therefore, it is reasonable to conclude that from Cpl. Alvarado's perspective, remaining in the same position was advantageous because there he was not in immediate risk of death or serious bodily injury from that position.  It is my opinion that any reasonable officer knowing that a vehicle is reversing for three seconds has enough

Page 13 of 43

time to reposition as stated above if the officer believed it was necessary to do so.  Failing to attempt to reposition here demonstrates to me that Cpl. Alvarado did not believe it was necessary to do so under these circumstances.

From Cpl. Alvarado's perspective, he had three seconds after recognizing that the red car was backing up to the time of his first shot.  This testimony is consistent with the video evidence and that a reasonable officer would have perceived the red car beginning to reverse and that the shot was fired approximately three seconds after the red car began to go in reverse but after the red car stopped from the collision with Officer Vasquez-Lopez's patrol vehicle.

> "Once the vehicle began reversing running alongside the passenger side of our police vehicle, that's when the discharging -- I started discharging my firearm as it ran alongside the passenger side of our police car."  (Alvarado Deposition, Page 48)

Additionally, Cpl. Alvarado knew that there was a female passenger in the front passenger seat and failed to consider her life in his decision-making process.

> Q.    Okay.  Was there a passenger in that red car?
> A.    Yes, there was.
> Q.    And that was a female?
> A.    Yes, yes, sir.
> Q.    And she was setting in the right front seat?
> A.    Yes, sir.
> Q.    Did you know that when you fired your two shots at the driver?
> A.    Yes, I knew that, yes.
> Q.    And you were aware if one of your shots missed the driver, she could be struck?
> A.    Yeah.  (Alvarado Deposition, Page 49)

Key known facts that should have determined whether Cpl. Alvarado should have used deadly force, which I assume to be true for the purposes of my opinions, based on my review of the evidence above includes:

- Mr. Benavente was not alone in the vehicle (an innocent civilian present).
- Mr. Benavente's vehicle was not moving at the time of the shots.
- Mr. Benavente was shot from the side of the vehicle.
- Mr. Benavente did not verbally threaten anyone.
- Mr. Benavente was not armed with a gun and officer had no

information about a gun in the red car.

- Officer Alvarado had reasonable less intrusive alternative options available.
- Officer Alvarado did not give a verbal warning.
- Officer Alvarado had the ability to move, including reenter his vehicle.
- Officer Alvarado does not appear to have assessed between shots.
- Officer Alvarado was not injured or exhausted prior to the shots.
- Officer Alvarado did not see Mr. Benavente attempting to access a weapon.
- Officer Alvarado had the benefit of his weapon mounted tactical light as well as patrol vehicle lights illuminating the area.
- Officer Alvarado had been a police officer for over 10 years at the time of the incident.
- Officers were not responding to a serious or violent crime to initiate the pursuit.
- Officers had no information about whether Mr. Benavente was under the influence of drugs or alcohol.
- Officers had no information about Mr. Benavente's mental state or capacity.
- Officers had no information about Mr. Benavente's physical, mental or developmental disabilities.
- Officers had no information about Mr. Benavente's ability to understand and comply with commands and did not assess that ability.
- Officers had no prior contact with Mr. Benavente or awareness of whether he had a propensity for violence.
- The red car was blocked from moving rearward at the time of the shots.
- There were people's homes in the background of the shooting.
- There were three patrol vehicles and four officers in the pursuit.
- No passenger in the vehicle presented a threat to the officers.
- No person was in the path of the vehicle at the time of the shots.
- No person was about to be hit, run over, or crushed by the red car.
- There are no shots fired through the rear window, front windshield, or rear driver side window of the red car.
- All three shots were fired in a close pattern by Cpl. Alvarado were through the driver's side window of the red car, resembling a "failure drill."

**Professional Standards and Training Considerations Regarding the Use of Deadly Force:**

**Law enforcement officers in California are trained that**:

- The use of deadly force is the most serious decision a peace officer may ever have to make.  Such a decision should be guided by the reverence for all human life (including the officer's life and others that may be in imminent danger) and, used only when other means of control are unreasonable or have been exhausted.  (POST Learning Domain #20: "Use of Force.")
- Deadly force applied by a peace officer is force that creates a substantial risk of causing death or serious bodily injury.  (POST Learning Domain #20: "Use of Force.")
- Reverence for all life is the foundation on which the use of deadly force rests.  The authority to use deadly force is an awesome responsibility given to peace officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.  (POST Learning Domain #20: "Use of Force.")
- An officer may use deadly force to protect oneself or others when the officer has the objective and reasonable belief that his/her life, or the life of another, is in imminent danger of death or serious physical injury based upon the totality of the facts known to the officer at the time.  (POST Learning Domain #20: "Use of Force.")

The decision of whether or not to use deadly force may be influenced by the officer's:

- training and experience
- judgment
- mental alertness
- emotional maturity
- existing facts and circumstances
- understanding of the law as it relates to agency policies concerning the use and amount of force that is objectively reasonable to achieve the law enforcement mission (POST Learning Domain # 20: "Use of Force.")

**<u>Law enforcement officers employed by Ontario Police Department are trained that:</u>**

- Deadly force - Any use of force that creates a substantial risk of causing death or serious bodily injury, including but not limited to the discharge of a firearm (Penal Code § 835a).  (Ontario PD Policy Manual 300.1.1)
- De-escalation - De-escalation is the process of using strategies and techniques intended to decrease the intensity of the situation.  (Ontario PD Policy Manual 300.1.1)
- The use of force by law enforcement personnel is a matter of critical concern, both to the public and to the law enforcement community. (Ontario PD Policy Manual 300.2)
- Officers must have an understanding of, and true appreciation for, their authority and limitations.  This is especially true with respect to overcoming resistance while engaged in the performance of law enforcement duties. (Ontario PD Policy Manual 300.2)
- The Department recognizes and respects the value of all human life and dignity without prejudice to anyone.  Vesting officers with the authority to use reasonable force and to protect the public welfare requires monitoring, evaluation and a careful balancing of all interests.  (Ontario PD Policy Manual 300.2)
- Officers shall use only that amount of force that he or she reasonably believes is proportional to the seriousness of the suspected offense or the reasonably perceived level of actual or threatened resistance, given the facts and totality of the circumstances known to or perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose. (Ontario PD Policy Manual 300.3)
- That the ultimate objective of every law enforcement encounter is to avoid or minimize injury.  (Ontario PD Policy Manual 300.3)
- Tactical repositioning or other de-escalation techniques are not retreat. (Ontario PD Policy Manual 300.3.1)
- As set forth by Penal Code 835a, an officer may use deadly force only when necessary in defense of human life.  (Ontario PD Policy Manual 300.4)
- In determining whether deadly force is necessary, officers shall evaluate each situation in light of the particular circumstances of each case, and shall use other available resources and techniques if reasonably safe and feasible to an objectively reasonable officer.  (Ontario PD Policy Manual 300.4)
- If an officer chooses to discharge a firearm as a form of deadly force, the officer shall consider their surroundings and potential risks to bystanders, to the extent reasonable under the circumstances, before discharging the

firearm.  (Ontario PD Policy Manual 300.4)

•      Vehicular pursuits require officers to exhibit a high degree of common sense and sound judgment. Officers must not forget that the immediate apprehension of a suspect is generally not more important than the safety of the public and pursuing officers.  (Ontario PD Policy Manual 314.1)

•      Officers must remember that the most important factors to the successful conclusion of a pursuit are proper self-discipline and sound professional judgment.  (Ontario PD Policy Manual 314.1)

•      Both the federal and state Constitutions provide every individual with the right to be free from unreasonable searches and seizures.  (Ontario PD Policy Manual 322.1)

Early on in the POST Basic Academy, the seriousness of the unique powers imbued on Law Enforcement Officers is stressed with the required responsibility they have to use them with "great care".  It is clear that there is no room for unprofessional, immature and/or hot-headed individuals in the law enforcement profession.  This is best expressed in Learning Domain # 2: "Criminal Justice System:"

> "The criminal justice system gives law enforcement two extraordinary powers:
>
> •      the power of arrest
> •      the power to use deadly force
>
> The authority to do so does not come from the rule of an authoritarian dictator.  Rather it comes from the will and consent of the people who put their trust in law enforcement to use that power with the utmost of care and restraint.  This is why it is important to emphasize that peace officers do not confer "police powers" on themselves.  These powers come to the criminal justice system from the people they serve."  (Learning Domain #2: "Criminal Justice System," page 1-4. Emphasis added.)

Additionally, POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of circumstances."

Officers are trained that they are not allowed to inflict excessive force on persons that they arrest and that they must calculate their use of force based on the credible threat(s) evident in the totality of the circumstances.

**POST Re-evaluation of Force Requirement:**

"Peace officers must use the force option(s) appropriate for the situation as conditions may change rapidly.  Officers must continually reevaluate the subject's actions and the practical considerations involved in the situation and must be prepared to transition as needed to the appropriate force options (deescalate or escalate), so as to always remain within the bounds of conduct which is objectively reasonable under the circumstances."  (POST Learning Domain 20, page 3-7.)


**Considerations Regarding the Use of Deadly Force:**

The use of deadly force is the most serious decision a peace officer may ever have to make.  Such a decision should be guided by the reverence for all human life (including the officer's life and others that may be in imminent danger) and used only when other means of control are unreasonable or have been exhausted.  Because reverence for all life is the foundation on which the use of deadly force rests, the authority to use deadly force is an awesome responsibility given to peace officers by the people who require peace officers to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, and accountable.  Firing a firearm at a human being is different from all other peace officer use of force option and requires a specific set of facts before lethal force is justified.

Deadly force applied by a peace officer is force that creates a substantial risk of causing death or serious bodily injury.

Reverence for all life is the foundation on which the use of deadly force rests.  The authority to use deadly force is an awesome responsibility given to peace officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

An officer may use deadly force to protect oneself or others when the officer has the objective and reasonable belief that his/her life, or the life of another, is in immediate danger of death or serious physical injury based upon the totality of the facts known to the officer at the time.  (LD 20: Chapter 3 – Use of Deadly Force, pages 4-3 & 4-4.)

Page 19 of  43

Officers are trained that in order to understand the aspects of the use of deadly force, peace officers need to become familiar with the following terms:

Serious bodily harm or injury means a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness, concussion, bone fracture, protracted loss or impairment of function of any bodily member or organ, a wound requiring extensive suturing, and serious disfigurement.  (Penal Code Section 243(f)(4).)

Reasonable necessity means that delay in apprehension would create substantial and unreasonable risk to officers or others possibly resulting in serious physical injury or death.

Imminent danger means a significant threat that peace officers reasonably believe will result in death or serious bodily injury to themselves or to other persons.  Imminent danger is not limited to "immediate" or "instantaneous."  A person may pose an imminent danger even if they are not at the very moment pointing a weapon at another person.

Sufficiency of fear - According to the law, fear alone does not justify the use of deadly force.  There must be a sufficiency of fear for the use of deadly force to be justified.  (Penal Code Section 198).  There are three elements needed to establish sufficiency of fear.

- The circumstances must be sufficient to excite the fears of a reasonable person in like circumstances.
- The person must not act under the influence of fear alone.  There has to be some circumstance or overt act apart from the officer's fear.
- The decision to use deadly force must be made to save one's self or another from great bodily injury or death.


"DL- That was a lot of good detail in that statement right there.  During this whole time, how'd you feel?

CA- Well, well I was in shock.  I was scared and then I kept checking my pants. Remember I kept grabbing my pants and I kept checking my legs because I thought I was going to, I thought I was crushed, and I just didn't realize it yet.  I thought the adrenaline got the best of me and I was still going through it.  So I remember I kept grabbing my, both my legs and then I had to even go down to my, my, towards my boots and I was checking my legs and I was checking to see if there was any blood or anything, any, any

scuffs or any marks on my pants and there was nothing and I just kept thinking, I was like I should have been ran over by this car.  And then you know, I, I still don't know if, I don't know what, like what happened right there.  I, I should have been hit by the car."  (Cpl. Alvarado statement at 34).

Officers are also trained that the decision of whether or not to use deadly force may be influenced by the officer's:

- • training and experience
- • judgment
- • mental alertness
- • emotional maturity
- • existing facts and circumstances
- • understanding of the law as it relates to
  - agency policies concerning the use of deadly force
  - amount of force that is objectively reasonable to achieve the law enforcement mission  (LD 20: Chapter 3 – Use of Deadly Force, page 4-8 & 4-9.)

The standard for using the deadly force is that the deadly force can be used when necessary in defense of life.  Also, peace officers are trained not to overreact when using force, including deadly force, and an overreaction in the use of force is excessive force.

While there are other law enforcement tactics and tools that can qualify as deadly force, none carry the same high probability of death as the use of the law enforcement officer's firearm.  Accordingly, law enforcement officers are trained that they can only use firearms under the most extreme circumstances.  These situations are very rare and law enforcement officers are trained that the use of force must meet an objectively reasonable standard.  Law enforcement officers are trained that "Unreasonable Fear" is defined as: Generated in the officers' mind with no direct correlation to facts and situations.  As stated above, law enforcement officers are taught that any use of deadly force must be based on an objective rather than a subjective reasonable necessity of action to counter imminent danger.

Q.    "Were you trained that you should only use deadly force if there is an immediate threat of death or serious bodily injury?

A.    Yes.  But there is more to that.  It has to be imminent to myself or to

Page 21 of  43

somebody else.

Q.     Right. And that deadly force should only be used when there are no
       other reasonable options?

A.     Yes, sir.

Q.     And you were also trained to give a verbal warning before using
       deadly force when feasible?

A.     Yes, sir.

Q.     And you were trained to justify -- you have to justify each of your
       shots?

A.     Yes, I do.

Q.     And you were trained to take into consideration your background or
       backdrop before firing?

A.     Yes, sir.

Q.     Were you trained on the concept of reverence for human life?

A.     Yes, of course.

Q.     And were you trained if there is not an immediate or imminent threat
       of death or serious bodily injury to yourself or others, you should not
       use deadly force?

A.     Yes, you're correct." (Cpl. Alvarado deposition at 51:5-52:4).


**Force Options:**

Law enforcement officers are trained by POST that a subjects' resistance/actions to an
arrest will determine the type of force used by peace officers.  The following illustrates
how a subject's resistance/actions can correlate to the force applied by an officer:

Cooperative - Subject offers no resistance:

- Mere professional appearance
- Nonverbal actions
- Verbal requests and commands
- Handcuffing and control holds

Passive non-compliant - Does not respond to verbal commands but also
offers no physical form of resistance:

- Officer's strength to take physical control, including
  lifting/carrying
- Pain compliance control holds, takedowns and

techniques to direct movement or immobilize a subject

Active resistance - Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally or physically signaling an intention to avoid or prevent being taken into or retained in custody:

- Control holds and techniques to control the subject and situation
- Use of personal body weapons to gain advantage over the subject

Assaultive - Aggressive or combative; attempting to assault the officer or another person, verbally or physically displays an intention to assault the officer or another person:

- Use of devices and/or techniques to secure compliance and ultimately gain control of the situation
- Use of personal body weapons in self-defense and to gain advantage over the subject

Life-threatening - Any action likely to result in serious bodily injury or death of the officer or others:

- Utilizing firearms or any other available weapon or action in defense of self and others to stop the threat

**Constant reevaluation Requirement:**

Peace officers must continually reevaluate the subject's action and must be prepared to transition as needed to the appropriate force options.

Under the facts cited above, Mr. Benavente never verbally threatened to harm any person, and Mr. Benavente's conduct was not life-threatening to any person or officer at the time of the deadly force. Accordingly, methods to deal with Mr. Benavente given the totality of the circumstances of this incident (a single, non-life-threatening man) includes containment, verbal de-escalation (as trained), and the application of less-lethal force if necessary. Instead, Cpl. Alvarado overreacted in the use of deadly force.

Page 23 of 43

**Professional Standards Regarding the Use of Deadly Force in this Incident**:

Peace officers are trained that the use of deadly force constitutes a lawful and justifiable act of self-defense when the officer using deadly force actually and reasonably believes one or more of the following facts exist:

- That there is an imminent danger that the person against whom the deadly force is used will either kill or cause great bodily injury to another person.
- That it is necessary under the circumstances to use deadly force to prevent that person from killing or causing great bodily injury to the officer confronting the suspect.
- That it is necessary under the circumstances to prevent the escape of a suspect who presents a clear danger to the community as evidenced by the nature of the crime, or other obvious factors. In such cases deadly force is not allowed to prevent the escape of misdemeanor and most felony suspects.

In my opinion, under the set of facts demonstrated here, and especially when considering the video evidence that is documented related to the shooting, that Cpl. Alvarado could not have reasonably believed that any of the above circumstances existed at the time he used deadly force on Mr. Benavente.

**Ontario Police Department Training Policy:**

- That the Department will ensure its personnel possess the knowledge and skills necessary to provide a professional level of service that meets the needs of the community. (Ontario PD Policy Manual 208.1)
- Whenever possible, the Department will use courses certified by the California Commission on Peace Officer Standards and Training (POST). (Ontario PD Policy Manual 208.2)

**Ontario Police Department Field Training Officer Program Policy:**

- It is the policy of this department to assign all new police officers to

a structured Field Training Officer Program that is designed to prepare the new officer to perform in a patrol assignment, and possessing all skills needed to operate in a safe, productive and professional manner.  (Ontario PD Policy Manual 436.1)

**Ontario Police Department Body Worn Video System Policy:**

- The use of the portable video recording system provides documentary evidence for criminal investigations, internal or administrative investigations, and civil litigation.  (Ontario PD Policy Manual 451.1(b))
- The Ontario Police Department has provided designated personnel with portable recorders, either audio or video or both, for use during the performance of their duties.  The use of recorders is intended to enhance the mission of the department by accurately recording contacts between members of the department and the public.  (Ontario PD Policy Manual 451.2)
- The following personnel are required to carry and wear the BWV system in an approved manner while on duty.  All sworn personnel working patrol, whether as a regular assignment or in an extra duty/overtime status.  (Ontario PD Policy Manual 451.2)
- Unless it is unsafe or impracticable to do so, or mechanical issues that impede the use of the device are present, members shall make every reasonable effort to activate their BWV cameras prior to making contact in the following incidents:
    1.  Enforcement encounters where there is a reasonable suspicion that a person is involved in criminal activity or a violation of the law. This includes, but is not limited to dispatched calls, self-initiated activities, traffic stops, pedestrian checks or any other investigative or enforcement encounter.
    2.  Any other contact that becomes adversarial after the initial contact in a situation that would not otherwise require taping.

**The Required (and Trained) Tactical Response to this Incident:**

A seminal aspect of this incident was the gross departure from required tactics, which resulted in the death of Mr. Benavente.  These tactics are so fundamental that absent highly unusual and rare instances, failures to adhere to them are not excused or forgiven.

In this regard, it is helpful to compare what occurred during this incident in view of the basic tactical steps expected from trained law enforcement officers. However trained and expressed, the basic tactical steps understood and required are briefly stated as follows:

### Containment:

This phase includes getting the subject (Mr. Benavente) under control by restricting any opportunity to flee or change position so that a safe apprehension can occur. Initially, this can be a difficult problem if the subject is in flight. The professional wisdom is to create a containment zone, remain at a safe distance to relieve the emotional pressure on the target, and await sufficient assisting units and coordinate them into a team effort.

The training is that once the subject is located and/or contained, the objective is to keep the subject contained - preferably within an isolated area away from the public (or to evacuate bystanders from the containment area) - while they are dealt with by law enforcement officers who remain in positions of safety. Training in this regard is extensive and precise. Further, during containment, law enforcement officers are taught that leaving the safety of cover and exposing themselves is a forbidden tactic. The Cpl. Alvarado's conduct as testified, entering an open space and out of cover, was counter to training.

In this incident, Mr. Benavente was contained by three officer patrol vehicles. All that was necessary at this point in the incident was to re-enforce the containment of Mr. Benavente, position officers at strategic locations behind cover to maintain and implement the remaining proper tactical steps (as outlined below). This did not occur in this case. Instead, as testified, Cpl. Alvarado failed to remain in his vehicle when the red car was still moving, failed to remain behind cover or reposition to maintain cover, and ultimately used inappropriate deadly force against Mr. Benavente.

A primary purpose of establishing a containment includes providing the apprehending law enforcement officers with a safe and realistic assessment of the credible risks to be tactically resolved. Sound tactics accommodate the opportunity for such a safe assessment. In this case, Cpl. Alvarado squandered the ability for a tactical advantage by reacting too quickly, not giving Mr. Benavente any instructions or warning, and not giving sufficient time for Mr. Benavente to comply with instructions or warnings. It cannot

be overstated that according to the POST standards (and training and policies), the law enforcement officers involved in this incident were required to take a position of safety -- "cover" -- take sufficient time as events unfolded for the next expected step in the process -- "decompression."

### *Decompression:*

All living creatures, including human beings, have instinctive protective reflexes that will take control of the body during extreme stress, especially without any training to overcome or override these reflexes.  This is a very important issue in this incident.  As noted above, when subjects are placed under unnecessary stress, they will try to flee or, when there is no other option, they will fight to either ward off danger or to create an avenue of escape.  Trained and experienced law enforcement officers have both seen and experienced this human response.  It is a basic fact of life in the business of law enforcement work, and something every experienced law enforcement officer is trained to cope with.

Law enforcement officers are trained that there is always a point during any sudden demand upon a subject when it becomes counterproductive and can only be expected to drive the subject into a state of incoherent dread and terror rather than compliance.  As stress and/or anxiety increase, the ability for the contained subject to comply decreases.  Thus, a decompression pause is necessary, at which time, a rational activity (such as meaningful communication), can take place.  This did not occur in this case.  Cpl. Alvarado did not follow the basic tactical training and did not attempt to decompress/de-escalate the situation.  In my opinion, Mr. Benavente was not given ample opportunity to understand and comply.  Thus, the actions of Cpl. Alvarado unnecessarily escalated and exacerbated the situation.

### *Communication:*

In this phase, a law enforcement officer establishes contact with the subject (in this case Mr. Benavente) from a position of advantage/safety -- "cover." During this time, unknown issues such as language problems, impairments caused by intoxication, mental illness, emotional anxieties, and other issues that may interfere with safe apprehension become known and are dealt with.

Ignoring this key phase of contact often leads to a situation that deteriorates into confusion, and in which law enforcement officers take their own independent actions.  In this incident, there was no clear plan; and rather than working together in a coordinated plan, Cpl. Alvarado testified that he exited his patrol vehicle and fired, which was after Mr. Benavente collided with Officer Vasquez-Lopez's patrol vehicle.  The necessity for a calm and skilled law enforcement officer-subject communication cannot be overstated.  When this does not occur, law enforcement officers and civilians alike can be needlessly and avoidably injured or killed.

### *Instruction:*

Once the communication link has been established, a clear set of instructions, which contains enough detail to avoid surprises and assures understanding, is conveyed to the subject.  In this incident, a contact officer on scene would have explained to Mr. Benavente how to assume a position that would have facilitated a safe apprehension, and what he was not to do.

### *Statement(s) of Compliance:*

In this phase, the subject (in this case Mr. Benavente) states/expresses his understanding of the instructions that were given to him by the communicating officer/negotiator.  Mr. Benavente would have had an opportunity to ask questions for clarification and would have demonstrated his understanding of the instructions to the arrest team.

### *Surrender:*

This phase requires the subject (in this case Mr. Benavente) to physically perform the acts that were communicated to him by the communicating officer.  Mr. Benavente would have been instructed, and then taken the steps to move into a place and position for officers to approach and take him into custody without the use of any force.  This would have included Mr. Benavente voluntarily placing himself in an apprehension position with his hands empty and at his back for handcuffing.

### *Detention/ Apprehension:*

This final phase includes the actual proper reasonable physical restraint of the subject (if necessary), a search for any weapons, and his safe transport

to a facility for booking.

**Additional Opinions Thus Far:**

1.   Cpl. Alvarado's use of deadly force was inappropriate and
     unnecessary under the totality of the circumstances, was inconsistent
     with basic law enforcement training and violated basic POST
     standards and the standard of care pursuant to POST and officer
     training. Officers in California (including Cpl. Alvarado) and
     throughout the nation are trained that the right to life is a
     constitutional right.  Accordingly, Officers are to use lethal force
     always with a reverence for life and only in the direst of
     circumstances and only absent an obvious reasonable alternative.  In
     the case of deadly force, an officer may not use deadly force if there
     is not an imminent threat of great bodily harm or death against him
     or someone else. Here, Mr. Benavente was not an immediate threat
     of death or serious bodily injury to Cpl. Alvarado, or any other
     officer or person at the time of the use of deadly force.  The video
     recordings are the best physical and objective evidence in this case.
     Physical/objective evidence takes no side, does not lose its memory,
     and documents the true facts.  Based on my review of the materials,
     no reasonable officer would believe that they were going to be hit,
     run over, or crushed by a car under these circumstances.  No person
     was in the path of the red car.  No person (on foot) was directly in
     front of or behind the red car.  No person was hit, run over, or
     crushed by the red car.  The shots came after the red car collided
     with Officer Vasquez-Lopez's vehicle.  It appears that the red car did
     not move backwards any further after being stopped by Officer
     Vasquez-Lopez's vehicle.  Thus, the red car was stopped at the time
     of the shots. There must be a reasonably perceived threat in order to
     justify the use of deadly force, here there was not.  If the red car is
     not moving at the time of the shots and Cpl. Alvarado is standing to
     the side of the red car, there is no credible threat from the red car
     sufficient to justify the use of deadly force.  Therefore, a subjective
     belief that a person may be crushed is not supported by objective
     evidence.  Importantly, Cpl. Alvarado shot Mr. Benavente from the
     side.  Mr. Benavente was merely trying to get away from a minor
     traffic stop.  Officers, including Cpl. Alvarado, are trained and know

that they cannot shoot a person merely for fleeing.  To do so would
constitute inappropriate, unnecessary, and unjustifiable force, which
is what we have here.  Considering the absence of concrete evidence
to validate Cpl. Alvarado's assertion that he was out of the patrol
vehicle at the time of the shots and about to be crushed by his car
door, it is more likely that this incident is a result of Cpl. Alvarado
overreacting and using unnecessary force than reacting to an actual
perceived threat. Mr. Benavente was not actively resisting arrest in
any manner that would justify the use of deadly force.  As trained by
POST, resistance is generally divided into three categories, active
resistance, assaultive resistance, or life-threatening resistance.
Deadly force is only authorized if the subject's conduct is
life-threatening resistance.  Mere flight is at most active resistance,
for which the appropriate use of force options consists of vehicle
intervention techniques – not the use of deadly force. Cpl. Alvarado
did not issue a verbal deadly force warning prior to his use of deadly
force.  Further, based on my review of the video evidence it was
feasible for Cpl. Alvarado to issue a verbal deadly force warning
prior to his use of deadly force.  An officer's (here Cpl. Alvarado)
failure to take the time available to him and instead uses deadly force
instead of issuing a warning does not mean that the officer did not
have time.  It is my opinion that Cpl. Alvarado had time (it was
feasible) to give a warning and intentionally chose not to. Cpl.
Alvarado had reasonable, less-intrusive, alternatives to the use of
deadly force.  Reasonable alternatives to the use of deadly force,
including as described above, that were available to Cpl. Alvarado
include but are not limited to achieving cover, communicating, and
planning with other officers, coordinating resources such as a
helicopter, K9, or other support, communicating with the subject
(here Mr. Benavente), reinforce containment, tactical repositioning,
and less-lethal force options if necessary.  Further, based on my
review of the video evidence it was feasible for Cpl. Alvarado to
utilize any one or combination of the reasonable available
less-intrusive alternatives to the use of deadly force.  An officer's
(here Cpl. Alvarado) failure to take the time available to him and
attempt reasonable alternatives and instead used deadly force does
not mean that the officer did not have time or it was not feasible.  It
is my opinion that Cpl. Alvarado had time (it was feasible) to use
less-intrusive means and intentionally chose not to. Cpl. Alvarado

was not responding to a serious or violent crime at the initiation of his contact with Mr. Benavente. This incident started as a mere suspicion of tinted windows violation. The officers were not called to the scene to investigate an ongoing serious or violent crime. Due to the minor infraction involved in the beginning of this incident, the law enforcement officers' interest in stopping and detaining Mr. Benavente is greatly diminished. This was not a situation that constituted requiring split-second judgments by Cpl. Alvarado. My review of the objective facts of this case (as shown in the video evidence) are that Cpl. Alvarado had time and opportunity to utilize cover but failed to do so, had time and opportunity to utilize space and distance to create even more time but failed to do so, had time and opportunity to communicate with Mr. Benavente to de-escalate the situation but failed to do so, and had time and opportunity to communicate with partner officers to create a safe apprehension and containment plan for Mr. Benavente but failed to do so. For a reasonable officer to be in a situation to make a split-second judgment (as it relates to the use of deadly force) there must be a triggering event to that is reasonably perceived by the officer which the officer is reacting to and reasonably believes requires an immediate response. Based on my review of the materials, no reasonable officer would have perceived Mr. Benavente as an immediate threat of death or serious bodily injury. There was no triggering event under the circumstances that required an immediate response of deadly force. One of the reasons that Cpl. Alvarado's use of deadly force was inappropriate is because it was an overreaction to the situation, and he fired too quickly without a proper assessment of the need to do so. Circumstances are often if not always tense, uncertain, and rapidly evolving for law enforcement officers on patrol – this does not provide an excuse for law enforcement officers to use deadly force. However, in my analysis I allow for the fact that Cpl. Alvarado was in pursuit of a subject (thereby naturally making it tense), cannot predict the future (hereby naturally making it uncertain), and that this matter evolved from a vehicle stop to a vehicle pursuit within a matter of a minute (hereby naturally making it rapidly evolving). I also took into consideration that Mr. Benavente appeared to be attempting to flee the officers by vehicle. However, none of these circumstances alone

justify the use of deadly force used here. Cpl. Alvarado appears to have deliberately ignored POST and basic officer training leading to the unnecessary shooting of Mr. Benavente.  As such, Cpl. Alvarado's decisions and actions fell below the expected and required professional standard of care and reflected deliberate indifference (as trained) to the life and safety of Mr. Benavente.

2.      Cpl. Alvarado's tactics were inappropriate under the totality of the circumstances, were inconsistent with basic law enforcement training and violated basic POST standards and the standard of care pursuant to POST and officer training.

In my opinion, there were fundamental tactical errors in this incident. In my experience, a significant number of civilian deaths involving police result from a series of cascading departures from expected and required tactics and deliberate departures from training.  This appears as a key factor in the downward spiral of events resulting in the shooting of Mr. Benavente. Cpl. Alvarado failed to establish an incident specific tactical plan and failed to follow the trained default tactical plan for containing and communicating with a subject.  Cpl. Alvarado failed to de-escalate the situation, and instead inappropriate escalated the situation leading to his use of inappropriate and unnecessary force as defined by POST. Pursuant to LAPD training, tactical de-escalation involves the use of techniques to reduce the intensity of an encounter with a subject and enable an officer to have additional options to gain voluntary compliance or mitigate the need to use a higher level of force while maintaining control of the situation.  Cpl. Alvarado failed to de-escalate and failed to attempt to de-escalate the situation.  De-escalation techniques require planning, assessment, time, containment, use of resources, and communication. Officers should coordinate their approach to a subject – this did not occur here.  Officers should assess the situation and gather information – this did not occur here.  Officers should use (as trained) the equation Distance + Cover = Time, & Time = Options, which allows officers to communicate with the subject, refine tactical plans, and call for additional resources – this did not occur here.  Officers should make an effort to contain the subject to create more time and opportunity to de-escalate the situation – this did not occur here.  Officers should call for and utilize additional resources

with specialized expertise and tools to assist in control and containment of the situation – this did not occur here.  Officers should maintain communication between officers and communicate effectively with the subject (critically important as trained) including giving verbal warnings, use of persuasion, defusing, empathy, redirecting, and building a rapport – this did not occur here.

3.      Based on my review of the record, Cpl. Alvarado violated basic officer training and POST standards, which is a reflection of his lack of adequate training, and a direct reflection of OPD's inadequate supervision, and training policies.  I also noted that OPD officials, ignoring the objective evidence as I have described above, ratified and approved of Cpl. Alvarado's use of inappropriate and unnecessary deadly force.

Cpl. Alvarado's use of deadly force against Mr. Benavente when Mr. Benavente was in a car that was not moving, and not officer or person was in the path of the car or about to hit, run over, or crushed by the car, demonstrates his complete lack of situational awareness, lack of control over his emotions and fears, and his completely inadequate training and understanding of basic use of force principles. The OPD, through its chain of command, appears to have endorsed the dangerous and out of policy tactics that are connected to this incident.  As such, their collective approval of these tactics puts the communities they serve at unnecessary future risk of death and/or injury from the officers involved in this case and other officers in the department who have been, or are now, similarly trained and/or supervised.

Based on my review of this matter, Cpl. Alvarado was a field training officer with over 10 years of experience as a police officer. His failures in this matter are not from a lack of opportunity to train, but more so a lack of following the training provided.  This indicates to me, and would indicate to a reasonable law enforcement officer, that the OPD's custom and practice is to fail to enforce their training and policies by ratifying inappropriate force.

4.      This incident appears to have resulted from a deliberate and gross departure from the fundamental tactics by Defendant Officer Alvarado, which are required and trained to officers before they are

allowed to exercise police powers.  As such, his actions were reckless and dangerous and resulted in the unnecessary use of lethal force that occurred.

5.      Officer Alvarado's use of deadly force was excessive and unreasonable (as trained).  His use of deadly force is inconsistent with police officer standards and training.  A reasonable officer under similar circumstances would not have used deadly force against Mr. Benavente as there was no immediate threat of death or serious bodily injury.

6.      There was no immediate defense of life situation during this incident.  Alternative measures were available to take the driver of the vehicle into custody without killing the driver and risking the safety of the public.

7.      Officer Alvarado's subjective fear in this case does not justify his use of excessive deadly force.  In general, subjective fear is insufficient to justify the use of deadly force.

8.      Officer Alvarado overreacted in using deadly force, and an overreaction in using deadly force is a use of excessive force.

Officers in California are trained that an officer's pre-shooting conduct leading up to a deadly use of force may affect whether a use of force is ultimately reasonable and therefore may be considered in the analysis of a use of deadly force.  Accordingly the reasonableness of an officer's use of deadly force includes consideration of the officer's tactical conduct and decisions leading up to the use of deadly force.  The significant departure from the basic tactical methods of safe apprehension tactical conduct in this incident resulted in the shooting death of Mr. Ramirez.

**My Qualifications To Review This Case:**

My opinions are based in part on my training, professional experience and education.  I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and

fifteen years as a Lieutenant.  I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988).  The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties.  Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail).  I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers.  Those cases included possible complaints relating to both misdemeanor and felony crimes.  They frequently required follow up investigations and interviews before the exact nature of the case could be determined.  As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer.  Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator.  At the time of my assignment, the MCJ held a daily

population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 2,400 cases for which I have been retained as a

**Page 36 of 43**

consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension. This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin. I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission. I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury. I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts. I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California. I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to

Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana.  I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons."  On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert."  On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons.  I was selected (January 24, 2020) to present on the topic of: "Use of force litigation under California's negligence standard and the impact of AB 392" at the National Police Accountability Project held at Loyola Law, Los Angeles, California.  On February 18, 2020, and on March 10, 2021, and on October 27, 2023.  I lectured (at request) at the University of California - Irvine, School of Law, Civil Rights Litigation Clinic.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas).  As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden.  The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of Redwood City*, 737 F.Supp.2d.1047.  I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007).  The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008).  The *Torres* case was appealed to the U.S. Supreme Court and returned for trial.  I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.*  (E.D. Wis Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training, discipline and supervision, and which resulted in significant policy changes within the MPD.  My opinions supported argument in the Ninth Circuit case: *A. D., a Minor; J. E., a Minor; Sue Casey, Plaintiffs-Appellees, v. State of California Highway Patrol, Defendant, and Stephen Markgraf.*, No. 09-16460, D.C. No. 3:07-cv-05483-SI (9th Circuit, Published Opinion).  My opinions supported

argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014). The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *(Baton use) Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014). Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014). I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644. My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184. My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.* No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.* No. 14-15098 (for publication). My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop," No. 15-55029 (not for publication). My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.*, Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches. My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force. My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322*, Carey Woodcock v. City of Bowling Green, et al,* Originating Case No. 1:13-cv-00124 regarding the use of lethal force. My opinions

supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al,* Originating Case No. 2:12-cv-01636- regarding the use of lethal force and Taser weapons.  My opinions supported argument in the Ninth Circuit opinion, Case No. 16-15606 (for publication), *Christian Longoria, et al v. Pinal County, et al,* Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit. My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego,* 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity. My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer,* Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force.  I participated as a retained expert in the USDC Fifth District case, *Stephen McCollum et al., v. Texas Department of Criminal Justice, et al.,* Case No.3:12-CV-02037 regarding in-custody hyperthermia deaths.  My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 17-55116 (for publication), *Susan Mellen, et al v. Marcella Winn, et al,* D.C. Case No. 2:15-cv-03006, GW AJW, regarding Detective Investigations and Qualified Immunity.  My opinions supported argument in the Ninth Circuit Case *Richard Vos; Jenelle Bernacchi, v City of Newport Beach, et al.,* Nos. 16-56791 (for publication) and which was settled by the Supreme Court, No. 16-56791, regarding the use of lethal force and mental illness.  My opinions (and quoted by name) supported argument in the Ninth Circuit Case *S.R. Nehad, et al. v. Browder, et al.*, No. 18-55035 (for publication) regarding the use of lethal force and custom and practice.  My opinions supported argument in the Ninth Circuit opinion, Case No. 17-55930 (not for publication), *Estate of Kevin Brown, et al. v. Michael Lambert, et al.*, D.C. No. 3:15-cv-01583-DMS-WVG, regarding Detective Investigations and Qualified Immunity.  My opinions supported argument in the Ninth Circuit opinion, Case No. 15-56339 (for publication), *Shane Horton, by his Guardian Ad, Litem Yvonne Horton, v. City of Santa Maria; Santa Maria Police Department; Andrew Brice*, D.C. Case No. 2:14-cv-06135- SJO-PJW, and *Jonathan Michael Castro v. County of Los Angeles, et al,* D.C. Case No. CV 10-5425 DSF (JEMx), 833 F.3d 1060 (9th Cir. 2016) (en banc), regarding jail standards, in-custody suicidal prisoners and qualified immunity.  My opinions supported argument in the Ninth Circuit opinion, Case No. 17-56270 (not for publication), *James Soler v. County of San Diego, et al.,* D.C. No. 3:14-cv-02470-MMA-RBB, regarding required verification of persons taken into custody pursuant to a warrant of arrest.  My opinions supported argument in the Ninth Circuit opinion, Case No. 18-17404 (for publication) *Tan Lam, v. City of Los Banos, et al.*  D.C. No. 2:15-cv-00531-MCE-KJN, regarding the use of lethal force.  My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 19-56035 (for publication), *Tiffany Tabares, et al v. City of Huntington Beach, et al*, D.C. Case No. 8:18-cv-00821, JLS-JDE, regarding use of force and subjects suffering mental illness.  I was retained as consultant regarding the

October 15, 2019 Law Enforcement Activity Related Death (including positional asphyxia) of Mr. Angel Zapata-Hernandez by San Diego Metropolitan Transit System (MTS) Code Compliance Officers.  My consultations included recommendations and resulted in significant changes in policy and training by the MTS.  I was a retained expert in the Temporary Restraining Order restricting the use of kinetic weapons during demonstrations issued April 19, 2021 in *Black Lives Matter v. City of Los Angeles, et al*, Case No.: CV 20-5027 CBM (Asx)..  My opinions supported argument in the Ninth Circuit opinion, Case No. 20-16351 (not for publication), *Terrance Amons, et al., v. Dillon Tindall et al.*  D.C. No. 4:19-cv-00301 KAW regarding use of lethal force.  My opinions supported argument in the Ninth Circuit opinion, Case No. 20-56254, D.C. No.2:19-cv-05370-CAS-JC (for publication), *Paulette Smith, individually and as Successor in Interest to Albert Dorsey, deceased, v. Edward Agdeppa, and City of Los Angeles, et al.*, regarding the use of lethal force.  My opinions supported argument in the Ninth Circuit opinion, Case No. 21-16709 (for publication), *Jose Murguia for himself and for the Estates of Mason and Maddox Murguia, v. Heather Langdon, et al.*  D.C. No. 4:19-cv-00942 DAD-RAM regarding "State-created danger."  My opinions supported argument in the Ninth Circuit opinion, Case No. 20-15651, D.C. No.2: 17-cv-02776 - JCM-NJK (for publication), *Rudy Rivera, v. Corrections Corporation of America*, regarding false imprisonment and callous disregard.  My opinions supported argument in the Ninth Circuit opinion, Case No. 19-56462, D.C. No.5: 18-cv-00762 - DMG-SP (for publication - Declined Review by the Supreme Court), *Estate of Clemente Najera Aguirre; J.S.;Y.S., v. County of Riverside; Dan Ponder* regarding the inflection of lethal force.  My opinions supported argument in the Ninth Circuit opinion, *SB v. County of San Diego*, 864 F. 3d 1010 - Court of Appeals, 9th Circuit, 2017.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006).  The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013).  I was quoted by the California Appellate Court (Second Appellate District, Division Three) and the California Supreme Court in *B.B., a Minor, etc., et al., v. County of Los Angeles, et al., Case No. B264946 Super. Ct. Nos. TC027341, TC027438, BC505918* regarding positional asphyxia issues.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography).  On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect.  California Penal Code Section 311.11 is required training for

all Law Enforcement Officers in California and taught extensively in the POST Basic
Learning Domain #9: "Crimes Against Children,"pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my
opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of
Tamir Rice by City of Cleveland police officers.  In March, 2016 I was requested by the
Delaware Attorney General to review and provide my opinions regarding the shooting
death of Jeremy McDole.  The AG report was published May 12, 2016.  I provided a
written Opinion for New Mexico AG regarding the shooting Death of Teresa Anaya that
included requested training opinions.  I have also consulted with, and provided written
opinions at the request of the U.S. Attorney (New York), the Santa Clara County District
Attorney, and the San Francisco District Attorney.  On June 16, 2021, I was selected by
the Los Angeles County District Attorney as a member of FACCT - an independent team
assigned to re-examine fatal use of force incidents by law enforcement officers and
recommend further action when appropriate.  On November 7, 2021, I was an Honoree of
the 2021 National Lawyers Guild of Los Angeles at their annual Awards Gala as a
recognized defender of Constitutional Rights.  I was the retained Use of Force consultant
regarding the May 28, 2010 homicide of Mr. Anastacio Rojas (USDC Case No. 11-CV-
0522-L NLS) and which was taken under formal consideration by the Inter-American
Commission on Human Rights (an international human rights tribunal) on November
2022.

My most recent trial testimony regarding the Americans With Disabilities (ADA) rights
and requirements (as trained by POST) was *Marina Borawick, v. City of Los Angeles, et
al.  Case No. 2:17-cv-02036 BRO-JC*, on March 30, 2023.

I have been found competent by both Federal and State Courts to render opinions as to
responsibilities as occurred in this case.  Additionally, a number of my cases have
involved law enforcement officers as civil plaintiffs and as criminal defendants.

A number of my cases have involved law enforcement officers as civil plaintiffs and as
criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER
International's products, including the Model M26, Model X26 and Model X2 ECDs.  I
own each, along with the download software.  I have reviewed all the TASER training
materials and am familiar with the risks and tactics associated with these potentially lethal
devices.  I have qualified as an expert on TASER products and testified both in deposition
and before juries on their usage.  Two published examples are *Lee v. Nashville*, 596 F.
Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S.

Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007).  My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW, and on November 1, 2018 in *Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-00236 BAS-NLS.*  There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct.  Executed February 2, 2024 at Santee, CA.


Roger A. Clark

**EXHIBIT "B"**

## SPECIFIC PORTIONS OF MR. CLARK'S REPORT THAT ARE AT ISSUE AND OBJECTIONABLE

• **Legal conclusions that invade the province of jury, including Mr. Clark's opinions that the officers used excessive force or that Corporal Alvarado lacked a reasonable belief of imminent threat of death or serious physical harm.** See Fed. Evid. Code § 702, Nationwide Transp. Fin. v. Cass Info. Sys., Inc., 523 F.3d 1051, 1058 (9th Cir. 2008) and Sanfilippo v. Foster, 2012 U.S. Dist. LEXIS 119898, *6-7 [citing multiple cases].

(1) "Based on the positions of Officer Varela and Cpl. Alvarado's patrol vehicles, approximately in the middle of the street, and the position of the red car, reversing along the right side of the street, any reasonable officer in Cpl. Alvarado's position (front passenger seat) and under the circumstances (focusing on the red car as the subject of the vehicle pursuit) would have recognized that the red car was moving in reverse prior to Cpl. Alvarado's patrol vehicle coming to a stop and prior to exiting the patrol vehicle." Exhibit "A" to Decl. Rocawich – Roger Clark Rule 26 Expert Report ("Clark Report") at p. 7.

(2) "It is my opinion that no reasonable officer would fail to perceive what direction a subject vehicle is moving during a vehicle pursuit (here the red car) when the same officer (here Cpl. Alvarado) saw the subject vehicle come to a stop on the street and saw the subject vehicle contact the point vehicle (here Officer Varela's patrol vehicle)." Clark Report at p. 7.

(3) "I can conclude that Cpl. Alvarado was not in the path of the red car (or even the potential path of the red car) at the time of the shots. No officer was about to be struck by the red car at the time of the shots, no officer was about to be run over by the red car at the time of the shots, and no officer was about to be harmed by the red car at the time of the shots." Clark Report at p. 9.

(4) "The objective facts here, as explained above, are Cpl. Alvarado was not in the path of the red car at the time of or immediately prior to the shot shots. Therefore, no reasonable officer would believe that they were about to be hit or run over by the red car under these circumstances. Standing to the side of the red car when Cpl. Alvarado fired three shots eliminates the present ability or opportunity for the red car to immediately cause death or serious bodily injury to Cpl. Alvarado." Clark Report at p. 10.

(5) "It is not reasonable for an officer to believe that they are getting crushed when they are not getting crushed. There are no objective facts to support this subjective fear. The patrol car door was not crushing Cpl. Alvarado, the video appears to show that Cpl. Alvarado was not even outside of his patrol vehicle at the time of the shots, and Cpl. Alvarado did not know that his patrol vehicle door was struck by the red car at the time of the incident." Clark Report at pp. 10-11.

(6) "It is also not reasonable for an officer to believe they are going to be crushed by their patrol vehicle door under these circumstances." Clark Report at p. 11.

(7) "this was not a shooting at a moving vehicle situation because the red car was not moving at the time of the shots, which is why deadly force under these circumstances was unnecessary." Clark Report at p. 12.

(8) " it is reasonable to conclude that from Cpl. Alvarado's perspective, remaining in the same position was advantageous because there he was not in immediate risk of death or serious bodily injury from that position." Clark Report at p. 13.

(9) "Mr. Benavente's conduct was not life-threatening to any person or officer at the time of the deadly force." Clark Report at p. 23.

(10) "Cpl. Alvarado overreacted in the use of deadly force." Clark Report at p. 23.

(11) "that Cpl. Alvarado could not have reasonably believed that any of the above circumstances existed at the time he used deadly force on Mr. Benavente." Clark Report at p. 24.

(12) "ultimately used inappropriate deadly force against Mr. Benavente." Clark Report at p. 26.

(13) "Cpl. Alvarado's use of deadly force was inappropriate and unnecessary under the totality of the circumstances." Clark Report at p. 29 (1).

(14) "Mr. Benavente was not an immediate threat of death or serious bodily injury to Cpl. Alvarado, or any other officer or person at the time of the use of deadly force." Clark Report at p. 29 (1).

(15) "no reasonable officer would believe that they were going to be hit, run over, or crushed by a car under these circumstances. No person was in the path of the red car. No person (on foot) was directly in front of or behind the red car." Clark Report at p. 29 (1).

(16) "To do so would constitute inappropriate, unnecessary, and unjustifiable force, which is what we have here." Clark Report at p. 30 (1).

(17) "no reasonable officer would have perceived Mr. Benavente as an immediate threat of death or serious bodily injury. There was no triggering event under the circumstances that required an immediate response of deadly force. One of the reasons that Cpl. Alvarado's use of deadly force was inappropriate is because it was an overreaction to the situation, and he fired too quickly without a proper assessment of the need to do so." Clark Report at p. 31 (1).

(18) "Based on my review of the record, Cpl. Alvarado violated basic officer training and POST standards, which is a reflection of his lack of adequate training, and a direct reflection of OPD's inadequate supervision, and training policies. I also noted that OPD officials, ignoring the objective evidence as I have described above, ratified and approved of Cpl. Alvarado's use of inappropriate and unnecessary deadly force." Clark Report at p. 32 (3).

(19) "The OPD, through its chain of command, appears to have endorsed the dangerous and out of policy tactics that are connected to this incident. As such, their collective approval of these tactics puts the communities they serve at unnecessary future risk of death and/or injury from the officers involved in this case and other officers in the department who have been, or are now, similarly trained and/or supervised…. the OPD's custom and practice is to fail to enforce their training and policies by ratifying inappropriate force." Clark Report at p. 32 (3).

(20) "This incident appears to have resulted from a deliberate and gross departure from the fundamental tactics by Defendant Officer Alvarado, which are required and trained to officers before they are allowed to exercise police powers. As such, his actions were reckless and dangerous and resulted in the unnecessary use of lethal force that occurred." Clark Report at p. 32-33 (4).

(21) "Officer Alvarado's use of deadly force was excessive and unreasonable (as trained). His use of deadly force is inconsistent with police officer standards and training. A reasonable officer under similar circumstances would not have used deadly force against Mr. Benavente as there was no immediate threat of death or serious bodily injury." Clark Report at p. 34 (5).

(22) "Officer Alvarado overreacted in using deadly force, and an overreaction in using deadly force is a use of excessive force." Clark Report at p. 34 (8).

**• Opinions that are speculative, factual determinations that invade the province of the jury, opinions on witness credibility, opinions on Defendants' subjective knowledge or opinions on Decedent's intent.** <u>See</u> Fed.R. Evid. 702, <u>Goldman v. United States</u>, 245 U.S. 474 (1918), <u>Long v. Johnson</u>, 736 F.3d 891, 896 (9th Cir. 2013) and <u>Sanfilippo v. Foster</u>, 2012 U.S. Dist. LEXIS 119898 at *4-5 (E.D. Cal. August 23, 2012).

(23) "The red car appears to have corrected its direction of travel in order to avoid a direct collision with the front of Cpl. Alvarado's vehicle. It appears that the red car made a concerted effort to continue to reverse to the passenger side of the officers' vehicles." Clark Report at p. 6.

(24) "It appears from my review of the evidence that Cpl. Alvarado was still seated in his patrol vehicle and shot through his open door." Clark Report at p. 6.

(25) "Mr. Benavente stopped realizing that he was on a dead-end cul-de-sac street." Clark Report at p. 6.

(26) "(I took this as an effort to U-turn in reverse)." Clark Report at p. 7.

(27) "I took this as an effort to avoid a direct collision with Cpl. Alvarado's patrol vehicle)" Clark Report at p. 7.

(28) "I note that the video evidence clearly shows that the red car was going in reverse prior to Cpl. Alvarado's patrol vehicle coming to a stop (i.e., prior to Cpl. Alvarado exiting his patrol vehicle)." Clark Report at p. 7.

(29) "Based on the positions of Officer Varela and Cpl. Alvarado's patrol vehicles, approximately in the middle of the street, and the position of the red car, reversing along the right side of the street, any reasonable officer in Cpl. Alvarado's position (front passenger seat) and under the circumstances (focusing on the red car as the subject of the vehicle pursuit) would have recognized that the red car was moving in reverse prior to Cpl. Alvarado's patrol vehicle coming to a stop and prior to exiting the patrol vehicle." Clark Report at p. 7.

(30) "it appears from my review of the video evidence that the red car was to the side of the patrol vehicle at the time Cpl. Alvarado exited the patrol." Clark Report at p. 8.

(31) "It is apparent that the red car was not moving forward at the time of the shots and that no officer was directly in front of the red car at the time of the shots." Clark Report at p. 8.

(32) "It is apparent to me from review of the audio of Officer Vasquez-Lopez's body-worn camera video that the collision occurred prior to the three shots." Clark Report at p. 8-9.

(33) "Given that after Officer Vasquez-Lopez exited his vehicle, the red car was still in contact with Officer Vasquez-Lopez's patrol vehicle (after the shots and prior to the red car slowly rolling forward and to the right into the tree), I conclude and assume for the purposes of my opinions that the red car was not moving at the time of the shots." Clark Report at p. 9.

(34) "and that the vehicle was not moving at the time of the shots (keeping in mind that Cpl. Alvarado remained in the same position for all shots)." Clark Report at p. 9.

(35) "As stated above, the red car came to a stop prior to Cpl. Alvarado firing his three shots and Officer Vasquez-Lopez's patrol vehicle was blocking the red car from making any further movement backwards." Clark Report at p. 11.

(36) "It appears from Cpl. Alvarado's statement that he is unfamiliar with the requirements imposed by the Department on him through policy regarding shooting at moving vehicles." Clark Report at p. 12.

(37) " Cpl. Alvarado was already out of the path of the vehicle because he fired all three from the side of the vehicle and the patrol vehicle door was not in the process of crushing Cpl. Alvarado." Clark Report at p. 13.

(38) "It appears that from Cpl. Alvarado's perspective, if he would have moved, he believed would create a risk of serious injury or death." Clark Report at p. 13.

(39) "It is my opinion that any reasonable officer knowing that a vehicle is reversing for three seconds has enough time to reposition as stated above if the officer believed it was necessary to do so. Failing to attempt to reposition here demonstrates to me that Cpl. Alvarado did not believe it was necessary to do so under these circumstances." Clark Report at p. 13-14.

(40) "Mr. Benavente's vehicle was not moving at the time of the shots…The red car was blocked from moving rearward at the time of the shots. Clark Report at p. 14-15.

(41) "Officer Alvarado had reasonable less intrusive alternative options available…Officer Alvarado had the ability to move, including reenter his vehicle….Officer Alvarado does not appear to have assessed between shots…No person was in the path of the vehicle at the time of the shots….No person was about to be hit, run over, or crushed by the red car." Clark Report at p. 15.

(42) "Mr. Benavente's conduct was not life-threatening to any person or officer at the time of the deadly force." Clark Report at p. 23.

(43) " It appears that the red car did not move backwards any further after being stopped by Officer Vasquez-Lopez's vehicle. Thus, the red car was stopped at the time of the shots." Clark Report at p. 29 at (1).

(44) "If the red car is not moving at the time of the shots and Cpl. Alvarado is standing to the side of the red car, there is no credible threat from the red car sufficient to justify the use of deadly force." Clark Report at p. 29 at (1).

(45) "a subjective belief that a person may be crushed is not supported by objective evidence." Clark Report at p. 29 at (1).

(46) "Mr. Benavente was merely trying to get away from a minor traffic stop." Clark Report at p. 29 at (1).

(47) "Considering the absence of concrete evidence to validate Cpl. Alvarado's assertion that he was out of the patrol vehicle at the time of the shots and about to be crushed by his car door, it is more likely that this incident is a result of Cpl. Alvarado overreacting and using unnecessary force than reacting to an actual perceived threat." Clark Report at p. 30 at (1).

(48) "Mr. Benavente was not actively resisting arrest in any manner that would justify the use of deadly force." Clark Report at p. 30 at (1).

(49) "based on my review of the video evidence it was feasible for Cpl. Alvarado to issue a verbal deadly force warning prior to his use of deadly force…. It is my opinion that Cpl. Alvarado had time (it was feasible) to give a warning and intentionally chose not to." Clark Report at p. 30 at (1).

(50) "Further, based on my review of the video evidence it was feasible for Cpl. Alvarado to utilize any one or combination of the reasonable available less-intrusive alternatives to the use of deadly force…It is my opinion that Cpl. Alvarado had time (it was feasible) to use less-intrusive means and intentionally chose not to. Cpl. Alvarado." Clark Report at p. 30 at (1).

(51) "This was not a situation that constituted requiring split-second judgments by Cpl. Alvarado." Clark Report at p. 31 at (1).

(52) "Cpl. Alvarado had time and opportunity to utilize cover but failed to do so, had time and opportunity to utilize space and distance to create even more time but failed to do so, had time and opportunity to communicate with Mr. Benavente to de-escalate the situation but failed to do so, and had time and opportunity to communicate with partner officers to create a safe apprehension and containment plan for Mr. Benavente but failed to do so." Clark Report at p. 31 at (1).

(53) " Cpl. Alvarado's use of deadly force against Mr. Benavente when Mr. Benavente was in a car that was not moving, and not officer or person was in the path of the car or about to hit, run over, or crushed by the car, demonstrates his complete lack of situational awareness, lack of control over his emotions and fears, and his completely inadequate  training and understanding of basic use of force principles." Clark Report at p. 32 at (3).

(54) "There was no immediate defense of life situation during this incident. Alternative measures were available to take the driver of the vehicle into custody without killing the driver and risking the safety of the public." Clark Report at p. 34 at (6).

See also Opinions (1) through (6), (8) through (9) and (11) through (22) above.

• **Opinions that are beyond his expertise, including accident reconstruction and/or medical issues.** See Fed. R. Evid. 702 and Valtierra v. City of Los Angeles, 99 F.Supp.3d 1190, 1196 (C.D. Cal. Apr. 13, 2015).

(55) Additionally, the trajectory of the three shots to Mr. Benavente were left to right anatomically. Specifically, the gunshot wound to Mr. Benavente's neck entered the left side of the neck and exited the right side of the neck with a left to right direction of travel, and downward with no significant front/back deviation (see autopsy photos orange trajectory rod). The gunshot wound to Mr. Benavente's chest entered his left upper chest and the bullet was recovered from the right side of his back with a path of front to back, left to right, and downwards (see autopsy

photos pink trajectory rod). The gunshot wound to Mr. Benavente's left arm entered the top of the left shoulder, with a back to front, left to right, and upwards direction of travel (see autopsy report photos green trajectory rod)." Clark Report at p. 9

See also Opinions (31) through (35) and (37) through (38).

• **Opinions that are likely to mislead the jury and confuse the issues and those that contain inaccurate statements of law and fact.** See United States v. Geston, 299 F.3d 1130, 1136 (9th Cir. 2002).

(56) "It cannot be overstated that according to the POST standards (and training and policies), the law enforcement officers involved in this incident were required to take a position of safety -- "cover" -- take sufficient time as events unfolded for the next expected step in the process -- "decompression."" Clark Report at p. 26-27.

(57) "Officers, including Cpl. Alvarado, are trained and know that they cannot shoot a person merely for fleeing. To do so would constitute inappropriate, unnecessary, and unjustifiable force " Clark Report at p. 29-30 at (1).

(58) **"**Cpl. Alvarado appears to have deliberately ignored POST and basic officer training leading to the unnecessary shooting of Mr. Benavente." Clark Report at p. 31 at (1).

(59) "Officers in California are trained that an officer's pre-shooting conduct leading up to a deadly use of force may affect whether a use of force is ultimately reasonable and therefore may be considered in the analysis of a use of deadly force. Accordingly the reasonableness of an officer's use of deadly force includes consideration of the officer's tactical conduct and decisions leading up to the use of deadly force." Clark Report at p. 34 at (8).

See also Opinions (10), (20), (22) and (47) above.

# EXHIBIT "C"

CALIFORNIA COMMISSION ON PEACE OFFICER STANDARDS AND TRAINING

# Basic Course Workbook Series

## Student Materials

**Learning Domain 33**
**Arrest and Control**
**Version 5.1**

**Basic Course Workbook Series**
**Student Materials**
**Learning Domain 33**
**Arrest and Control**
**Version 5.1**

© Copyright 2005
California Commission on Peace Officer Standards and Training (POST)
All rights reserved.

Published 1998
Revised July 2005
Revised November 2005
Workbook Correction January 27, 2009
Workbook Correction July 19, 2012
Revised 2014
Correction April 2014
Revised July 2020
Revised February 2022

This publication may not be reproduced, in whole or in part, in any form or by any means electronic or mechanical or by any information storage and retrieval system now known or hereafter invented, without prior written permission of the California Commission on Peace Officer Standards and Training, with the following exception:

California law enforcement or dispatch agencies in the POST program, POST-certified training presenters, and presenters and students of the California basic course instructional system are allowed to copy this publication for non-commercial use.

All other individuals, private businesses and corporations, public and private agencies and colleges, professional associations, and non-POST law enforcement agencies in-state or out-of-state may purchase copies of this publication, at cost, from POST as listed below:

From POST's Web Site:
**www.post.ca.gov**
Go to Ordering Student Workbooks

# Awareness

| | |
|---|---|
| **Introduction** | **Awareness,** as it relates to arrest and control, means being alert to any potential threats a peace officer may face when approaching or interacting with a subject or a potentially dangerous situation. |

| | |
|---|---|
| **Foundations of arrest and control** | There are three basic principles that make up the foundation of arrest and control. All other skills or techniques will be reduced or neutralized if an officer does not practice control in a stressful situation.<br><br>• Awareness<br>• Balance<br>• Control<br><br>NOTE:     Awareness and control of the subject's hands continues to be universal safety points. |

| | |
|---|---|
| **Cover and concealment** | Peace officers must be aware of surrounding objects or areas that may be used as protection and concealment for the subject as well as themselves. Cover offers protection, while concealment only offers a place to hide.<br><br>Be aware of the location of cover. Use, be ready to use, and/or move to cover when necessary. The use of available cover continues to be a basic tactical consideration. |

*Continued on next page*

# Awareness, Continued

**Cover and concealment**
(continued)

The following chart gives examples that illustrate the difference between cover and concealment:

| Cover | Concealment |
|---|---|
| • trees<br>• walls – such as cement block or brick<br>• buildings, dumpsters<br>• vehicles | • shrubs, and bushes<br>• doorways<br>• vehicles |

**Potential hazards**

Peace officers are vulnerable to potential harm when approaching a subject. However, if they are aware of specific hazards that could endanger them, they can minimize potential harm. The following chart suggests a few potential hazards peace officers should consider when approaching a subject:

| | Potential Hazards | Avoiding Harm |
|---|---|---|
| **Proper distance** | Peace officers should maintain a proper distance between themselves and the subject in order to have a reactionary gap. | • Be aware of the subject from head to foot and everything in between<br>• Be aware of any body movement which may indicate any offensive or dangerous movement |
| **Subject's Hands** | Typically, it is the subject's hands (or what may be in them) that cause harm. | • Be aware of the location of the subject's hands and potential contents |

*Continued on next page*

# EXHIBIT "D"

CALIFORNIA COMMISSION ON PEACE OFFICER STANDARDS AND TRAINING

# Basic Course Workbook Series

## Student Materials

**Learning Domain 20**
**Use of Force/Deescalation**
**Version 5.4**

**Basic Course Workbook Series**
**Student Materials**
**Learning Domain 20**
**Use of Force/Deescalation**
**Version 5.4**

© Copyright 2005
California Commission on Peace Officer Standards and Training (POST)
All rights reserved.

Published 1998
Revised July 2005
Revised February 2006
Correction September 2008
Correction February 4, 2009
Revised June 2009
Correction February 2015
Revised January 2018
Correction April 2018
Revised October 2018
Revised December 2019
Revised April 2020
Updated April 2021

This publication may not be reproduced, in whole or in part, in any form or by any means electronic or mechanical or by any information storage and retrieval system now known or hereafter invented, without prior written permission of the California Commission on Peace Officer Standards and Training, with the following exception:

California law enforcement or dispatch agencies in the POST program, POST-certified training presenters, and presenters and students of the California basic course instructional system are allowed to copy this publication for non-commercial use.

All other individuals, private businesses and corporations, public and private agencies and colleges, professional associations, and non-POST law enforcement agencies in-state or out-of-state may purchase copies of this publication, at cost, from POST as listed below:

From POST's Web Site:
**www.post.ca.gov**
Go to Ordering Student Workbooks

# Considerations Regarding the Use of Deadly Force, Continued

**Use of deadly force on a fleeing person**

The decision to use deadly force in the apprehension of a fleeing person is guided by federal case law and California State law:

In 1985, the United States Supreme Court decided the case of *Tennessee v. Garner*, 471 U.S. 1, (1985), which established that a peace officer may use deadly force to prevent the escape of a fleeing suspect only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.

The Court applied the following points regarding when it would be objectively reasonable for an officer to use deadly force against a fleeing subject in this particular set of circumstances (e.g. using a firearm to stop a fleeing suspect escaping on foot).

| | Components of the Garner decision... |
|---|---|
| 1 | "...if the subject threatens the officer with a weapon or there is *probable cause* to believe that he has committed a crime involving the infliction or threatened infliction 1of serious physical injury [or death]." |
| 2 | "...*probable cause* to believe that the subject poses a threat of death or serious physical harm, either to the officer or others..." |
| 3 | "...*probable cause* to believe that the use of deadly force is *reasonably necessary*." [to prevent escape] |
| 4 | "...*some warning* be given prior to the use of deadly force *where feasible*..." |

NOTE:    This US Supreme Court decision of Tennessee v. Garner is only the baseline for use of deadly force in this particular set of circumstances.  Peace officers must know the applicable law and agency policies.  Officers should comply with agency policy and federal and state law.

*Continued on next page*

# Considerations Regarding the Use of Deadly Force, Continued

**Use of deadly force on a fleeing person**
*(continued)*

| *Penal Code Section 835a* **states in part:** | *Penal Code Section* |
|---|---|
| Notwithstanding subdivision (b), a peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary for either of the following reasons: | *(c)(1)* |
| To defend against an imminent threat of death or serious bodily injury to the officer or to another person. | *(A)* |
| To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended.  Where feasible, a peace officer shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts. | *(B)* |
| A peace officer shall not use deadly force against a person based on the danger that person poses to themselves, if an objectively reasonable officer would believe the person does not pose an imminent threat of death or serious bodily injury to the peace officer or to another person. | *(c)(2)* |

*Continued on next page*