# EXHIBIT G

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   FRANK BENAVENTE; and NICOLE    )
     VENTRESS,                      )
 6                                  )  Case No.
                 Plaintiffs,        )  5:23-cv-00266-SSS-KK
 7                                  )
         vs.                        )
 8                                  )
     ALBERT ALVARADO; CITY OF       )
 9   ONTARIO and DOES 1 THROUGH     )
     10, inclusive,                 )
10                                  )
                 Defendants.        )
11                                  )

12

13

14         REMOTE DEPOSITION OF MICHAEL A. CALLAHAN

15                   TORRANCE, CALIFORNIA

16                   FRIDAY, MARCH 1, 2024

17

18

19

20

21

22   STENOGRAPHICALLY REPORTED BY:

23   Patricia L. Davis, RPR
     CSR No. 11521
24

25
```

Page 2

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4

5    FRANK BENAVENTE; and NICOLE    )
     VENTRESS,                      )
6                                   )   Case No.
             Plaintiffs,            )   5:23-cv-00266-SSS-KK
7                                   )
        vs.                         )
8                                   )
     ALBERT ALVARADO; CITY OF       )
9    ONTARIO and DOES 1 THROUGH     )
     10, inclusive,                 )
10                                  )
             Defendants.            )
11                                  )

12

13

14      REMOTE DEPOSITION OF MICHAEL A. CALLAHAN, TAKEN ON

15     BEHALF OF THE PLAINTIFFS, IN TORRANCE, CALIFORNIA,

16       COMMENCING AT 9:04 A.M. AND ENDING AT 11:28 A.M.

17        PACIFIC STANDARD TIME ON FRIDAY, MARCH 1, 2024,

18                 BEFORE PATRICIA L. DAVIS, RPR,

19          CERTIFIED SHORTHAND REPORTER NO. 11521.

20

21

22

23

24

25

Page 3

```
 1    APPEARANCES (VIA VIDEOCONFERENCE):

 2

 3    FOR PLAINTIFFS:

 4           LAW OFFICES OF DALE K. GALIPO
              BY:  MARCEL F. SINCICH, ESQ.
 5            21800 BURBANK BOULEVARD
              SUITE 310
 6            WOODLAND HILLS, CA  91367
              818-347-3333
 7            MSINCICH@GALIPOLAW.COM

 8

 9    FOR DEFENDANTS:

10            JONES MAYER
              BY:  DENISE L. ROCAWICH, ESQ.
11            3777 NORTH HARBOR BOULEVARD
              FULLERTON, CA  92835
12            714-446-1400
              DLR@JONES-MAYER.COM
13

14
      ALSO PRESENT:
15
              RICHARD LUCERO
16

17

18

19

20

21

22

23

24

25
```

Page 18

```
 1   link?  Are you able to click on the link or no?
 2       Q   Let me see if I can.
 3       A   I can put it in the chat if not, so that
 4   everyone can sort of uniformly access it.
 5       Q   If you don't mind doing that --
 6       A   Yes.
 7       Q   -- anyway, that might help.
 8       A   I'll do that right now.
 9           Let me know if that link pops up for you.  It
10   should be in the chat right now.
11       Q   Yeah, the link pops up and I'm looking in
12   Dropbox, and when I click on it, it says the PRO files
13   can't currently be previewed and then it is requesting
14   that I download.
15       A   Yeah, so a PRO file is a proprietary native
16   file from a piece of simulation software.  The easiest
17   way to see what's in the PRO file is I've generated some
18   printouts of some still images from it and inputs and
19   outputs from it, things like that.  So those would be
20   PDF files in that same simulation directory.
21       Q   Okay.  So where are the PDF files that would
22   correspond with the vehicle simulation?
23       A   So there's a file called "231164 3:00 p.m. Rest
24   Stills."  That's going to show you a top view,
25   basically, of the reconstruction.
```

Page 19

1         And you can scroll page by page through that
2    and it will be chronological.
3        Q    In what folder would I find that?
4        A    Still in the Simulation folder.
5        Q    Okay.  I don't have 2311 rest stills in the
6    Simulation folder.
7        A    You're probably looking at your downloaded
8    version from whenever --
9        Q    No, I'm looking in Dropbox.
10       A    That Dropbox link I just sent you?
11       Q    I don't know if it's the one you just sent or
12   the one that I got previously, but it's in Dropbox.  Let
13   me see.
14            MS. ROCAWICH:  The one in the chat has two
15   different rest stills, it looks like.  But it should
16   be -- it's the exact same link I forward from him to
17   you, so it should be identical to what he just put in
18   the chat.
19            MR. SINCICH:  Which is maybe why it's not
20   popping up a second one because I already have it open.
21            THE WITNESS:  That might be, yeah.  That might
22   be fair.  Maybe it closed out the one you have open.
23   And I apologize for any sort of technical housekeeping
24   on this.
25            MR. SINCICH:  No, that's fine.  I just want to

```
 1   make sure I understand what your simulation is.
 2          THE WITNESS:  Very good.
 3   BY MR. SINCICH:
 4      Q   Okay.  So from what you just sent, I clicked
 5   "Simulation" and now I'm seeing -- and what I'm seeing
 6   right now, for the record, it does say modified an hour
 7   ago.  So I don't know if these were recently placed in,
 8   but that's why when I downloaded it, it probably did not
 9   have them in there.
10      A   That would make sense.
11      Q   Okay.  So in here there's some stills, and
12   these stills are, essentially, the frames of the
13   simulation?
14      A   Yeah, it's basically a top view, animatic or
15   video, if you will, with stills of the reconstruction.
16   I think every tenth of a second, something like that.
17      Q   And these are overhead views?
18      A   That's right.
19      Q   Okay.  And then in terms of an accident
20   reconstruction of the officer-involved shooting, did you
21   create any kind of stills similar to this or any kind of
22   simulation of the officer-involved shooting itself?
23      A   Are you saying one that depicts people like
24   characters?
25      Q   Correct.
```

Page 44

```
 1      A    That's correct.
 2      Q    And then it was, as you indicate .7 seconds
 3   after the impact with Unit 1024 that it impacted Officer
 4   Vasquez-Lopez's vehicle?
 5      A    That's correct.
 6      Q    And then after the Hyundai impacted Officer
 7   Vasquez-Lopez's vehicle, about 1.1 seconds later the
 8   first shot was fired?
 9      A    That's correct.
10      Q    And then .4 seconds later, the second shot was
11   fired?
12      A    That's right.
13      Q    And then .4 seconds, the third shot was fired?
14      A    That's correct.
15      Q    Okay.  Now, when we look at the EDR data -- did
16   you use the EDR data to help compile this information?
17      A    Not really.  This is -- the timeline is mainly
18   coming from video and audio evidence, I would say, as
19   well as vehicle positions and damage analysis.  The EDR
20   is sort of where does it fit into this data set,
21   basically a where do we get sort of EDR data overlapping
22   this.
23      Q    Okay.  Now, the EDR data as it reads, zero
24   seconds would be the moment of impact with Officer
25   Vasquez-Lopez's vehicle; right?
```

```
 1   so before Vasquez-Lopez's impact, he's on the brakes.
 2        Q    Now, you mention in your discussion and then
 3   later in one of your opinions that there was a
 4   significant risk of catastrophic injury or death.  Do
 5   you see that or recall that?
 6        A    I do.
 7        Q    Do you have any kind of medical training or
 8   anything to render opinions about catastrophic injury?
 9        A    I have background in accident reconstruction
10   and testing involving pedestrians, dummies, and applying
11   forces to determine what sort of kinematics happen.  So
12   injury mechanism, I guess, is not something I would get
13   super specific into, but kinematics and probability of
14   serious injury based on how much energy there is, that's
15   absolutely something I could comment on.
16        Q    Okay.  Do you believe that the Hyundai posed a
17   significant risk of catastrophic injury or death at the
18   moment that it impacted Officer Vasquez-Lopez's vehicle?
19        A    I guess it's sort of broad.  With respect to
20   who in particular?
21        Q    Anyone.
22        A    Anyone?
23        Q    Yep.
24        A    I suppose taking a freeze-frame and knowing
25   where everyone is at this point in time, you know, so I
```

1 would say with hindsight, probably not.

2            Based on the facts we know about the case and
3 how the vehicle's being driven, I think that there is
4 significant risk of serious injury or death.
5       Q   Who is threatened of serious injury or death at
6 the moment of impact between the Hyundai and
7 Vasquez-Lopez's vehicle?
8       A   I believe Alvarado still is.  He's still in a
9 position where he's in the threshold of the door.  He
10 has no knowledge that this impact is going to happen
11 between Vasquez and Benavente.  And if Benavente
12 continues to arc his vehicle and swing his vehicle the
13 way that it is, he is going to be crushed by that door.
14            So he doesn't have knowledge that Benavente's
15 going to stop, so I still believe there's an active risk
16 to Alvarado from his perspective.
17       Q   Okay.  And what you just described is,
18 essentially, the moments prior to the impact; right?
19            MS. ROCAWICH:  Objection.  Vague as to impact.
20            Go ahead.
21 BY MR. SINCICH:
22       Q   Yeah, not knowing if the vehicle, if the
23 Hyundai was going to stop, from Alvarado's perspective,
24 that is occurring in the moments just before the impact
25 of Vasquez-Lopez's vehicle; correct?

1    A    Correct.  There's an active threat before that,
2    that's correct.
3    Q    Okay.  So outside of whether there was a threat
4    of the vehicle prior to the impact, at the moment of
5    impact and then at the time almost simultaneously, the
6    Hyundai rebounds and stops after impacting
7    Vasquez-Lopez's vehicle, do you have an opinion as to
8    whether the Hyundai posed a significant risk of
9    catastrophic injury or death to any person at that time?
10        MS. ROCAWICH:  I'm going to object as
11   misstating evidence when you said the Hyundai stopped.
12        You can answer.
13        THE WITNESS:  I haven't developed an opinion on
14   that.  I don't know where every single officer is
15   standing, standing civilians out on the sidewalks,
16   everything like that.  So I would say I've really not
17   evaluated that.
18   BY MR. SINCICH:
19   Q    Okay.  What is your understanding of where
20   Alvarado was at the moment of impact between the Hyundai
21   and Vasquez-Lopez's vehicle?
22   A    I think it's most probable that he is with his
23   torso and hips and head partially inside the threshold
24   of his vehicle.  With his feet I believe he's outside of
25   the vehicle and is in sort of an off-balance type of

Page 69

```
 1   position.
 2        Q    Okay.  And you reviewed Alvarado's statement in
 3   this case, and that's the statement that he made to
 4   investigators immediately after the incident?
 5        A    I have.
 6        Q    And you have reviewed his deposition testimony
 7   as well?
 8        A    I have.
 9        Q    Did Alvarado ever state in either of those two,
10   both interview and deposition, that he was off balance?
11        A    I don't recall.
12        Q    Did Alvarado ever state that he was pushed into
13   the threshold of his vehicle?
14        A    No, not verbatim.
15        Q    Did Alvarado ever state that after he exited
16   the vehicle that, essentially, by way of sequence he was
17   partially back in his vehicle and then had to come out
18   of his vehicle a second time?
19             MS. ROCAWICH:  Objection.  Vague as to
20   partially back in.
21             You can answer.
22             THE WITNESS:  No.
23   BY MR. SINCICH:
24        Q    What are you relying on when you're saying that
25   he was off balance?
```

Page 70

1    A   I'm really relying on kind of a number of
2    things, but with respect to his positioning in
3    particular, which is his pose, when we first see him
4    it's in Vasquez-Lopez's body cam footage.  That's the
5    first depiction we get, I believe, of Corporal Alvarado.
6         And I think somewhere between 1 and 2 seconds
7    has gone by from the last time a shot was fired, the
8    third shot.  He's still in a position where he's in a
9    shooting position with his hands.  He's still aligned
10   with sort of the target area.  And he doesn't appear to
11   have substantially changed his body position.
12        So I think that first glimpse we get of him is
13   really the point that I'm describing, which is he's
14   partially within the threshold.  His weight is not
15   really over his feet, but his feet have to be outside of
16   the vehicle at that point in time because we never get
17   clear evidence they come out, and we know the door
18   doesn't, you know, slam completely shut.
19        And so I would say it's really based on that.
20   It's based on the first evidence we get of him and how
21   much time transpires in his alignment with his target
22   basically.  It's sort of anchored in those.
23   Q   When you're looking at Officer Vasquez-Lopez's
24   body-worn camera video and we get that first glimpse of
25   where Alvarado is, isn't it fair to say that you don't

1   the threshold of his door, that he would not be at risk
2   of injury in this matter?
3       A   I probably wouldn't say it so loosely.
4   Injury's pretty broad.  But when I'm talking about
5   injury specifically in this report, I'm talking about,
6   like, severe traumatic injury, so tens of thousands of
7   pounds of force.
8           If he's sitting in the vehicle and his door is
9   closed, you might see things like spine injuries from a
10  lateral impact, things like that.  I don't think you'll
11  see severed limbs and things like that, if that makes
12  sense.  There's sort of a difference on the spectrum of
13  injury.
14      Q   Okay.  Is it fair to say that if Alvarado was
15  not in the threshold of his door at the time that he
16  fired his shots, that he would not be at risk of serious
17  injury or death?
18          MS. ROCAWICH:  Objection.  Calls for
19  speculation.
20          You can answer.
21          THE WITNESS:  I think I generally agree with
22  that.  I think the threat of serious injury is a
23  function of, in particular, where he is.
24  BY MR. SINCICH:
25      Q   Would you agree that if the Hyundai was not

1    moving, given Alvarado's position -- for instance, in
2    the threshold of the door -- if the Hyundai's not
3    moving, he would also not be at risk of serious bodily
4    injury or death?
5              MS. ROCAWICH:  Same objection.
6              THE WITNESS:  In complete hindsight, I would
7    probably agree with you.  If the vehicle is stopped and
8    he's standing there, then the vehicle, by definition,
9    can't impart any force.
10   BY MR. SINCICH:
11        Q    Is it fair to say that in this case the only
12   person that was catastrophically injured was
13   Mr. Benavente?
14        A    That's my understanding.
15        Q    Did you see any records that indicated that
16   Corporal Alvarado was injured at all?
17        A    I did not.
18        Q    How do you explain the fact that he was not
19   injured with your opinion that the Hyundai was a risk of
20   significant catastrophic injury or death?
21        A    I guess in layman's terms, I think he got lucky
22   that he didn't get crushed in that area.  The vehicle
23   changed trajectory at the very last second and instead
24   of getting crushed, he had his door get pushed into him
25   and that's the way the event unfolded.

Page 88

1   if that was my intent.
2           With vehicle reconstruction tools we're not
3   really able to sort of do all the things we need to do
4   really.  We're able to just sort of show a camera view
5   from a general area.
6       Q   Well, the bottom left-hand corner of this image
7   shows the Escobar vehicle; correct?
8       A   That's correct.
9       Q   Isn't it true that the Escobar vehicle had not
10  come to a stop and was not in this position at the
11  moment in time that the Hyundai began moving in reverse?
12      A   That's right.
13      Q   And then just going -- I'm just scrolling and
14  you can look at my screen or yours, but page 2, the
15  Hyundai begins moving; page 3, the Hyundai still is
16  moving in reverse; on page 4 it depicts kind of the
17  movement of impact between the Hyundai and Varela's
18  vehicle; is that right?
19      A   Correct, yes, something in that ballpark.
20  These are half-second intervals, so not the tightest
21  timeline on them, but yes, it's around that time.
22      Q   And at this time depicted on page 4, similar to
23  previously, Officer Escobar's vehicle was not in its
24  parked position at that time either; right?
25      A   That's correct.

Page 89

1    Q    And I'm just going to scroll to page 5 of
2    Exhibit 5 and then down to 6 and 7.
3         As depicted in all of these frames thus far,
4    you have the image of Officer Escobar's vehicle in a
5    stopped position; right?
6    A    Correct.  I would say not by design.  The
7    motion of that vehicle is not something I had really
8    enough evidence to sort of accurately demonstrate.  So
9    I'm just taking its position I know it sort of is in
10   when impact occurred.
11   Q    Well, you know where its headlights were
12   according to the DVR video; right?
13   A    That's right.
14   Q    And so as I continue on Exhibit 5, page 8
15   appears to show the approximate location of the Hyundai
16   impacting the front right bumper of Escobar's vehicle?
17   A    That's right.
18   Q    Okay.  And then just going from 9 to 10, by
19   page 10 the red car is no longer in view?
20   A    That's right.
21   Q    And on page 10, Escobar's vehicle is no longer
22   in view either; right?
23   A    That's right.
24   Q    Is there a reason for that?
25   A    I think it's the lateral displacement to the

Page 101

1          REPORTER'S CERTIFICATE

2

3          I, Patricia L. Davis, a Certified Shorthand

4   Reporter for the State of California, do hereby certify:

5          That said proceedings were taken before me at

6   the time and place set forth herein and was

7   stenographically reported by me in shorthand, and I

8   hereby certify that said proceedings are a full, true,

9   and correct transcript of my shorthand notes so taken;

10  that the dismantling, unsealing, or unbinding of the

11  original transcript will render the reporter's

12  certificate null and void.

13         Further, that if the foregoing pertains to the

14  Original transcript of a deposition in a federal case,

15  pursuant to F.R.C.P. 30(e)(2) before completion of the

16  proceedings, review of the transcript was not requested.

17         I further certify that I am neither counsel

18  for, nor related to any party to said action, nor in any

19  way interested in the outcome thereof.

20         IN WITNESS WHEREOF, I have subscribed my name

21  this 14th day of March, 2024.

22

23                              /s/Patricia L. Davis
                                PATRICIA L. DAVIS
24                                 CSR No. 11521

25