EXHIBIT H

Robert Handy
TriChief Consulting Services
P.O. Box 4833
Huntington Beach, California 92605

Mr. James Touchstone
Jones Mayer Law
3777 North Harbor Blvd.
Fullerton, California 92835

Mr. Richard Lucero
Jones Mayer Law
3777 North Harbor Blvd.
Fullerton, California 92835

January 30, 2024

**Regarding: Frank Benavente, et al. v. Albert Alvarado, et al., United States District Court, Central District of California, Case # 5:23-CV-00266-SSS-KK**

Dear Mr. Touchstone and Mr. Lucero,

Thank you for retaining me to analyze and render opinions regarding the events surrounding the police pursuit and officer-involved shooting on February 22, 2021, involving Ontario police officers near North Beverly Court, north of 6th Street in Ontario, California.

Under the requirements of Rule 26, I have reviewed and analyzed reports, memorandums, documents, photographs, depositions, and other materials listed below.  I understand other discovery materials may still be produced for review.  Please be advised that if additional materials are provided, a supplemental report adding to or refining my opinions may be necessary.

### *Expertise*

I currently serve as the Director of Public Safety for Grand Canyon University (GCU) in Phoenix, Arizona. Before serving as the Director of Public Safety at GCU, I was the Police Chief in Huntington Beach and San Bernardino, California. I am a policing executive with over 33 years of comprehensive law enforcement experience. My experience includes extensive experience training and teaching new police officers, veteran officers, and command-level officers. I have also been retained as a subject matter expert to review police use of force incidents and policing practices and procedures nationwide. For a more detailed description of my experience, refer to my CV.

### *Documents Reviewed*

I have examined the reports, documents, recordings, photographs, and other materials below. The listed materials and my three-plus decades of experience were used to analyze the incident and render the opinions in this report.

Frank Benavente v. Albert Alvarado
U.S. District Court, Central District of California,
Case # 5:23-CV-00266-SSS-KK
Expert Report: Robert Handy
Page 2 of 16

**Reports, Documents, and Other Material**

- Ontario Police Department Report 21-0200936 and Related Supplements, Bates 0001-0244
- Computer Aided Dispatch Report-Fire, Bates 0256-0257
- Autopsy Report, Bates 0262-00331
- Officer Training Records, Bates 1115-1128
- Computer Aided Dispatch Report-Police, Bates 0245-2255
- Officer Alvarado Deposition and Exhibits 1-8
- Officer Vasquez-Lopez Deposition and Exhibits 1-7
- Officer Varela Deposition
- Nicole Ventress Deposition
- Officer Vasquez-Lopez Interview Transcript
- Ontario Police Department Policy Manual
- California POST Learning Domains
- California Penal Code
- California Vehicle Code

**Videos and Audio**

- Paul Soliz, Bates 01708
- Silvia, Lee, Bates 01736
- Crime Scene, Bates 01673
- Elivia, Lee, Bates 01689
- Crime Scene, Bates 01674
- Resident Info, Bates 01730
- Search Warrant, Bates 01731
- Allen and Monica Merki, Bates 01678
- Briones Interview, Bates 01691
- Eric Lopez, Bates 01699
- Crime Scene, Bates 01675
- Darlene Delgado, Bates 01696
- Sharnel Weaver, Bates 01734
- First Draft 1421 edit, Bates 01700
- Neighborhood Canvas, Bates 01718
- Thomas Brixey, Bates 01738
- Charles Copeland, Bates 01695
- Crime Scene, Bates 01676
- Neighborhood Canvas, Bates 01716
- Tiffany Smith, Bates 01739
- Neighborhood Canvas, Bates 01704
- Neighborhood Canvas, Bates 01714
- Neighborhood Canvas, Bates 01733
- Neighborhood Canvas, Bates 01715
- Tyler Brixey, Bates 01740
- 1522 N Beverly Court, Bates 01685
- Neighborhood Canvas, Bates 01688

2

**Frank Benavente v. Albert Alvarado**
**U.S. District Court, Central District of California,**
**Case # 5:23-CV-00266-SSS-KK**
**Expert Report: Robert Handy**
**Page 3 of 16**

- Neighborhood Canvas, Bates 01717
- Neighborhood Canvas, Bates 01703
- Neighborhood Canvas, Bates 01705
- Pre-Briefing, Bates 01732
- Neighborhood Canvas, Bates 01713
- Tara Lopez, Bates 01737
- Neighborhood Canvas, Bates 01712
- Interview Benavente's Mother, Bates 01701
- Witness, 621 W. 6Th, Bates 01686
- Neighborhood Canvas, Bates 01719
- Neighborhood Canvas, Bates 01706
- Misc. BWC, Bates 01663
- Ofc. at PD, Bates 01684
- Crime Scene, Bates 01655
- Crime Scene, Bates 01672
- Search Warrant, Bates 01735
- Crime Scene, Bates 01671
- Crime Scene, Bates 01682
- Crime Scene, Bates 01661
- Crime Scene, Bates 01688
- Crime Scene, Bates 01650
- Neighborhood Canvas, Bates 01693
- Neighborhood Canvas, Bates 01711
- Neighborhood Canvas, Bates 01722
- Crime Scene, Bates 01668
- Neighborhood Canvas, Bates 01710
- Crime Scene, Bates 01667
- Neighborhood Canvas, Bates 01729
- Neighborhood Canvas, Bates 01666
- Briones Interview, Bates 01692
- Neighborhood Canvas, Bates 01728
- Neighborhood Canvas, Bates 01727
- Neighborhood Canvas, Bates 01665
- Neighborhood Canvas, Bates 01664
- Neighborhood Canvas, Bates 01721
- Neighborhood Canvas, Bates 01677
- Neighborhood Canvas, Bates 01726
- Neighborhood Canvas, Bates 01662
- Incident BWC, Bates 01660
- Neighborhood Canvas, Bates 01725
- Neighborhood Canvas, Bates 01724
- Incident BWC, Bates 01659
- Incident BWC, Bates 01658
- Incident BWC, Bates 01657

**Frank Benavente v. Albert Alvarado**
**U.S. District Court, Central District of California,**
**Case # 5:23-CV-00266-SSS-KK**
**Expert Report: Robert Handy**
**Page 4 of 16**

- Incident BWC, Bates 01656
- Incident BWC, Bates 01654
- Duplicate, Bates 01683
- Incident BWC, Bates 01653
- Neighborhood Canvas, Bates 01723
- Neighborhood Canvas, Bates 01720
- Briones Interview, Bates 01689
- Crime Scene Arial, Bates 01649
- Incident BWC, Bates 01652
- Incident BWC, Bates 01651
- Neighborhood Canvas, Bates 01709
- Benavente's Mother, Bates 01697
- Benavente's Mother Bates 01707
- Incident BWC, Bates 01681
- Incident BWC, Bates 01669
- Incident BWC, Bates 01680
- Incident BWC, Bates 01670
- Briones Interview, Bates 01690
- Incident BWC, Bates 01679
- Incident BWC, Bates 01678
- Briones Interview, Bates 01702
- Neighborhood Video, Bates 01750
- Neighborhood Video, Bates 01746
- Neighborhood Video, Bates 01747
- Investigative BWC, Bates 01752
- Investigative BWC, Bates 01751
- Neighborhood Video, Bates 01748
- Neighborhood Canvas Video, Bates 01741
- Neighborhood Canvas Video Bates 01742
- Neighborhood Canvas Video Bates 01743
- Neighborhood Canvas Video Bates 01744

**Photos**
- Miscellaneous Photos of Police Vehicles, Bates 1129-1178
- Miscellaneous Crime Scene Photos, Bates 1179-1194
- Miscellaneous Crime Scene Photos,  Bates 1195-1391
- Autopsy Photos, Bates 1392-1539
- Photos of Benavente's Car, Bates 1540-1566
- Benavente Clothing Photos, Bates 1567-1579
- Officer Weapon Photos, Bates 1580-1592
- Officer Photos, Bates 1593-1621
- Witness Photos, Bates 1622-1629
- Crime Scene Photos, Bates 1630-1644

**Incident Summary**

On February 22, 2021, at approximately 2354 hours, Ontario Police Officer Andres Varela attempted to stop a car for a traffic violation in the area of West 4th Street and North Boulder Avenue in Ontario, California.  The vehicle was a red 2015, four-door Hyundai.  The driver of the car did not stop, and Officer Varela initiated a pursuit[1].  The pursuit traveled to the area of 6th Street and Beverly Court.  During the pursuit, the driver of the vehicle, later identified as Joseph Benavente, ignored traffic laws while attempting to evade the officers.  He swerved unexpectedly, made abrupt U-turns, drove through stop signs without stopping, and drove into oncoming traffic, endangering other drivers and nearly causing a traffic collision[2].  The driver was traveling at various rates of speed during the pursuit, stopping, slowing, changing direction, etc.  The general speed of the pursuit was estimated to be between 50-70 miles per hour through primarily residential streets[3].

Benavente slowed the car down after turning and driving north on Beverly Court, a cul-de-sac street.  Officer Varela believed the car was stopping.  Officer Varela turned on his police car's spotlight and prepared to jump out of his car if the driver were to run.  Instead of running or yielding to the traffic stop, Benavente reversed the car and rammed Officer Varela's police vehicle.  Officer Varela felt the collision was an intentional assault by the vehicle's driver because the driver had plenty of room to make a U-turn, which he had done earlier in the pursuit[4].  After colliding with Officer Varela's vehicle, Benavente continued in reverse, ramming into Officer Escobar and Corporal Alvarado's police vehicle.

Officer Escobar and Corporal Alvarado were a two-officer team and were the secondary unit in the pursuit.  They followed Officer Varela as the secondary unit throughout the pursuit from the initiation of the traffic stop.  Officers saw the car slow down several moments during the pursuit, with the driver hitting the brakes and swerving.  Several times, officers Varela and Escobar thought that the driver was either stopping and submitting to the traffic stop or getting ready to flee the car on foot[5].

Officer Vasquez-Lopez was in the area in a separate marked patrol vehicle assigned to a single officer unit.  He joined the pursuit in progress as the third unit.  He was pulling up to the other Officers on Beverly Court when Benavente stopped.  Officer Vasquez-Lopez thought the driver was possibly going to flee on foot[6].

After the car turned north on Beverly and before it collided with Varela's police car, Officer Escobar saw the suspect vehicle stop abruptly; he thought the driver of the vehicle was going to make a U-turn or drive up onto a yard.  His partner, passenger Corporal Alvarado, opened the door and stepped out of the police vehicle onto the street in the area of the open passenger door.  As Corporal Alvarado was getting out of the car, the suspect vehicle reversed and rammed into the first police car (Officer Varela's car), then kept coming backward, turned slightly, as if intentional, and into the two-officer car of Escobar and

---

[1] Ontario Police Report 210200936, Page 2
[2] Ontario Police Report 210200936, Supplement 44, Page 5
[3] Ontario Police Report 210200936, Supplement 66, Page 37
[4] Ontario Police Report 210200936, Supplement 44, Page 5
[5] Ontario Police Report 210200936, Supplements 44-Pages 4-5, 47-Pages 7-8, and Corporal Alvarado Deposition, Pages 28-30
[6] Officer Vasquez-Lopez Interview Transcript, Page 10

Frank Benavente v. Albert Alvarado
U.S. District Court, Central District of California,
Case # 5:23-CV-00266-SSS-KK
Expert Report: Robert Handy
Page 6 of 16

Alvarado.  Benavente's car struck the front side of the police vehicle near where Corporal Alvarado had just stepped out into the street and the passenger door he was standing behind[7].  Corporal Alvarado thought the suspect vehicle was going to crush him between the two vehicles (suspect vehicle and police car), and he fired his handgun at the driver (Benavente) through the window of the suspect's car.  In close proximity, time and distance wise, to the shots being fired, the suspect vehicle also collided with Officer Vasquez-Lopez's police vehicle as the officer arrived on the scene to assist.

After striking the third police car, Benavente's vehicle went forward, collided with the curb and a tree, then came to rest.  The passenger from Benavente's car was called out of the vehicle by officers and taken into custody.  Officers approached the suspect vehicle and observed the unresponsive driver, Joseph Benavente, slumped over in the seat.  Benavente was removed from the car by officers and appeared to be deceased.

<u>**Opinions And Basis For The Opinions**</u>

In this report, my main opinions are organized by number in bold below, followed by the basis for the opinions.  Other sub-opinions are included in the analysis under the Basis for Opinion/s headings following the numbered opinions.  My opinions are based on my training, education, and over 33 years of policing industry experience.  The incident began with the attempted traffic stop of a vehicle by Ontario, California, police officers for California Vehicle Code violations.  The attempt to stop the car was chronologically the first in a series of actions by the officers that are the focus of my analysis and expert opinions in this case and is subsequently the first opinion.  The analysis of the events leading up to the officer-involved shooting is a critical part of the analysis.

1. **The officers' decision to initiate a traffic stop on the red Hyundai, driven by Joseph Benavente, was reasonable, consistent with their training, and consistent with law enforcement industry standards.**

2. **The decision by the officers to pursue the vehicle following the attempted traffic stop was reasonable, consistent with Ontario Police Department policy, and consistent with industry standards in the State of California.**

3. **The officers' tactics to stop, detain, and apprehend Mr. Benavente were consistent with their training, Ontario Police Department Policy, and contemporary policing standards.**

*Basis for the Opinions*

Traffic enforcement is a regular part of a municipal police officer's duty.  Police officers in California are taught traffic enforcement in the police academy.  Officers are taught the legal reasons for traffic stops and how to apply the California Vehicle Code to traffic enforcement[8].  One of the primary reasons for a

---

[7] Ontario Police Report 210200936, Supplement 47, Page8-9
[8] California POST Learning Domain 28, Chapter 1

Frank Benavente v. Albert Alvarado
U.S. District Court, Central District of California,
Case # 5:23-CV-00266-SSS-KK
Expert Report: Robert Handy
Page 7 of 16

traffic stop is when an officer has reason to believe the driver of a vehicle has committed a traffic
infraction[9].

A series of court decisions interpreting the U.S. Constitution govern an officer's authority to contact,
detain, and arrest individuals. Officers are taught laws of arrest based on these decisions, starting with
reasonable suspicion to temporarily detain a person, probable cause to arrest an individual, and the
authority to use force to detain or arrest a person.  Peace officers may need to detain a person to
investigate involvement in criminal activity. To be lawful, a detention must be based on reasonable
suspicion that unlawful activity has occurred, is taking place, or is about to occur and that the person
detained is connected to that activity[10].

In this instance, Officer Alvarado was riding as the passenger in a two-officer unit (Officer Escobar was
driving) and noticed a red car driving next to them, approaching the traffic light at 4th Street and
Mountain Avenue.  Officer Alvarado testified in his deposition that he observed the vehicle turn onto
Mountain Avenue without stopping[11]. The two-officer unit of Alvarado and Escobar stopped at the traffic
light next to another Ontario patrol car, which was driven by Officer Varela. While they were stopped at
the light, Officer Alvarado told Officer Varela, "That's a good stop," referring to the red vehicle that just
ran the light, violating the California Vehicle Code (CVC)[12].  Officer Varela noticed the car also had tinted
windows, another violation of the CVC.   Officer Varela turned to follow the red car and attempted to
initiate a traffic stop[13].

Officer Varela attempted a traffic stop shortly after making the right turn onto Mountain Avenue.  The
red vehicle continued without stopping, swerved, and ran the stop sign at San Antonio.  Officers Escobar
and Alvarado followed Officer Varela and declared over the police radio that the vehicle was failing to
yield and not stopping.  These two fully marked police cars, with Officers Varela, Escobar, and Alvarado,
were in pursuit of the red vehicle northbound on San Antonio from Mountain Avenue at approximately
11:55 p.m. Officers Varela and Alvarado described engaging the lights and sirens of their police vehicles
as the two police cars attempted to stop the red 4 door car and began the pursuit[14].  A third police unit,
driven by Officer Vasquez-Lopez, joined the pursuit while it was in progress.

The initiation of the traffic stop was based on two separate violations of the California Vehicle Code
(CVC-26703-Prohibiting tint on windows and CVC-21453-Red light violation) observed by the officers.
The violations were independently observed by officers in each of the patrol cars.  In addition, the video
evidence and photos of the vehicle show the violation of the CVC prohibiting tinted windows (see Figure
#1 for crime scene photo depicting the violation).  Based on my training, experience, and evidence
reviewed in the case, the decision to stop the car for the noted CVC violations was consistent with the
training police officers receive from the State of California in Traffic Enforcement, Vehicle Pullovers, and

---

[9] California POST Learning Domain 22, Chapter 1
[10] CA POST Learning Domain 15, Chapter 3
[11] Officer Alvarado Deposition, Pages 31-32
[12] Ontario Police Department Report, 210200936, Supplement 66, Page 31
[13] Ontario Police Department Report, 210200936, Supplement 44, Page 5
[14] Ontario Police Department Report, 210200936, Supplement 44, Pg. 9, Supp. 66, Pg. 31-32

Frank Benavente v. Albert Alvarado
U.S. District Court, Central District of California,
Case # 5:23-CV-00266-SSS-KK
Expert Report: Robert Handy
Page 8 of 16

Professionalism and Ethics[15].  I also believe the attempted traffic stop was consistent with Ontario Police
Department Policy[16] and national standards and training for police officers.

Figure #1



17

After Officer Varela attempted the traffic stop of the red Hyundai, later determined to be driven by
Joseph Benavente.  The car initially appeared to pull over, but did not, continuing to drive and proceed
through the stop sign at Mountain and Fourth without stopping.  This is the approximate time the
officers went into pursuit, using their emergency vehicle lights and sirens to stop the car [18].  The
Hyundai, while driving north on Mountain, nearly struck an uninvolved vehicle that was traveling west.
Benavente slowed the car again as if to pull over to the right side of the road but instead made an abrupt
U-turn at 6th and San Antonio, then ran another stop sign.  Benavente then drove his vehicle on the
wrong side of the road into opposing lanes of traffic on 6th street[19].  Based on radio transmissions and

---

15 California POST Learning Domains 28, 22, and 1
16 Ontario Police Department Policy Manual, Policy 500
17 Photo of Benavente Vehicle, Exhibit #3 (depicting tint on window)
18 Ontario Police Department Report, 210200936, Supplement 44, Page 8
19 Ontario Police Department Report, 210200936, Supplement 44, Page 5

Frank Benavente v. Albert Alvarado
U.S. District Court, Central District of California,
Case # 5:23-CV-00266-SSS-KK
Expert Report: Robert Handy
Page 9 of 16

available body-worn camera footage, the pursuit continued for approximately two minutes before
Benavente reversed the vehicle into three police patrol cars.

It is my opinion, based on my training, experience, and the evidence reviewed, that the decision to
pursue Benavente after he failed to stop for the lawful traffic stop by the police officers was reasonable.
Various clips from neighborhood surveillance video confirm the officers' statements about their use of
lights and sirens (in compliance with the CVC) and Benavente's failure to yield to the officers' lawful
attempts to stop him[20].   Based on the aggregate of the materials reviewed, the overall conditions
surrounding the pursuit (speed of violator, weather, short duration, traffic volume, etc.) were consistent
with the decision to initiate and continue the pursuit.  The decision to initiate and continue the pursuit
and the pursuit itself was consistent with the CVC, Ontario Police Department Policy, and the standards
and training of police officers in California[21].

During the pursuit, the officers observed Benavente violating numerous sections of the CVC.  The CVC
violations, including unlawful flight from the officers while committing three or more CVC violations,
amounted to sufficient probable cause to arrest Benavente.  It is my opinion the attempted flight from
the officers and the dangerous conditions Benavente created by his erratic driving were valid reasons for
the officers to have pursued his arrest.  The officers' efforts to apprehend Benavente were also
consistent with the officers' training, Ontario Police Department Policy, and policing standards and
training.

4.  **The tactics the officers used as the pursuit was ending, just before the officer-involved
shooting, were consistent with their training, Ontario Police Department Policy, and
contemporary law enforcement standards.**

5.  **The use of deadly force by Corporal Alvarado on Joseph Benavente was reasonable, given the
totality of circumstances and the specific threat posed by Benavente at the time the force was
used.**

6.  **The use of deadly force was consistent with Corporal Alvarado's training as a police officer in
California and consistent with the standards and practices of law enforcement across the
country.**

### Basis for Opinions

As the pursuit proceeded onto North Beverly Court, the suspect vehicle, driven by Benavente, stopped
momentarily and suddenly reversed rapidly, colliding with three police vehicles involved in the pursuit.

---

[20] Neighborhood surveillance video, Bates #'s 01745, 01746, 01747, 01758, 01749, 01750
[21] CVC 21055, 25258, Ontario Police Policy 314, and POST LD-19, LD-28

The first vehicle Benavente ran into was driven by Officer Varela.  Officer Varela described his perceptions and mindset in an interview with detectives after the incident.

*Officer Varela's Perspective*

Officer Varela described being concerned during the incident because Benavente failed to stop. He was aggressively trying to flee, and Officer Varela saw Benavente's face was tattooed.  From Officer Varela's experience, he assumed Benavente may be armed with a gun.  When Benavente stopped on Beverly Court, Officer Varela's police car was behind Benavente's car, offset to prepare for a high-risk traffic stop. Officer Varela described Benavente stopping for a couple of seconds, then reversing the red Hyundai abruptly at a significant speed and crashing into the front of his police vehicle.  Officer Varela believed there were other opportunities for Benavente to escape in the moment and that ramming his and the additional police cars was intentional.  Varela believed that Benavente was trying to hurt him and the other officers[22].

*Officer Escobar's Perspective*

Officer Escobar was driving the second police car in the pursuit.  His partner was Corporal Alvarado, who was riding in the passenger seat. Officer Escobar described Benavente as appearing desperate based on his speed, driving on the wrong side of the road, braking off and on, starting to pull over, then making a U-turn, etc.  As Benavente drove onto North Beverly Court, Officer Escobar believed Benavente would drive up onto a lawn or make a U-turn to continue his attempts to flee.  Officer Escobar stopped behind and to the left of Officer Varela's police car.  Officer Escobar saw the backup lights on the red Hyundai come on as the vehicle reversed rapidly and collided with Officer Varela's car.  After Benavente collided with Officer Varela's car, Officer Escobar saw Benavente continue backing up, swerve slightly, and come directly toward him and Corporal Alvarado.  Officer Escobar observed and heard the acceleration of Benavente's car and felt Benavente was trying to hurt them.[23]

Officer Escobar tried to turn and move their patrol car to the left to avoid Benavente as Benavente was reversing toward them.  Escobar was not able to avoid Benavente, whose car struck the police vehicle on the passenger side.  Officer Escobar recalled seeing the passenger door of the police car open as if Corporal Alvarado was going to get out and run and get into a foot chase just before Benavente's car collided with them.  As Benavente collided with them, Officer Escobar heard two or three gunshots. Officer Escobar believed the shots came from Corporal Alvarado and was scared Corporal Alvarado had been hit by Benavente's car.  Officer Escobar did not learn Corporal Alvarado was okay until later, after getting out of the car, taking cover, and then joining Corporal Alvarado in giving commands to Benavente and the passenger after the vehicle came to rest. Officer Escobar felt scared for himself and the other officers, describing Benavente's actions as going from desperate and trying to get away to violence directed at the officers[24].

*Corporal Alvarado's Perspective and the Use of Deadly Force*

---

[22] Ontario Police Department Report, 210200936, Supplement 44, Pages 14-25
[23] Ontario Police Department Report, 210200936, Supplement 47, Pages 2-37
[24] Ontario Police Department Report, 210200936, Supplement 47, Pages 2-37

Frank Benavente v. Albert Alvarado
U.S. District Court, Central District of California,
Case # 5:23-CV-00266-SSS-KK
Expert Report: Robert Handy
Page 11 of 16

Corporal Alvarado was the passenger in Officer Escobar's patrol vehicle.  Corporal Alvarado felt the incident was much more dangerous than a suspect trying to elude officers. He felt Benavente's erratic driving during the pursuit was an attempt to get Officer Varela to run into him, ==possibly setting up an ambush==[25].  As Benavente came to a stop on North Beverly Court, Corporal Alvarado thought they were going to be doing a "felony" or high-risk traffic stop[26].  Corporal Alvarado opened his police vehicle's door and stepped out as they approached Officer Varela and Benavente, who were momentarily stopped. In addition to the overall attempt to get away during the pursuit, Alvarado started getting out because he felt that during the pursuit, Benavente was trying to get Officer Varela to hit him to maybe ambush Varela.  He also saw Benavente fidgeting during the pursuit, ==possibly reaching for a weapon==[27].

Corporal Alvarado was standing outside the open police vehicle door when Benavente reversed, first colliding with Officer Varela's police vehicle, then his and Officer Escobar's vehicle.  Alvarado described everything happening rapidly, in approximately three seconds or less[28].  As Benavente's vehicle came at him, Corporal Alvarado felt like he was about to be crushed by Benavente's vehicle as Benavente crashed into their police vehicle. At one point, Corporal Alvarado thought he had been hit as Benavente's car ran in reverse down the side of the patrol car where he was standing in the door frame.  Benavente's car was within arm's reach of Alvarado[29] as it passed and struck the open door in front of where Alvarado was standing[30].

==Corporal Alvarado fired his weapon into the driver's window about the time the car was running into his police vehicle within arm's reach.==  His bullets struck and mortally wounded Benavente.  Corporal Alvarado can be seen in Figure #2 near the driver's window of Benavente's vehicle. The picture in Figure #2 is a screenshot of Officer Vasquez-Lopez's body-worn camera video that was taken approximately two seconds after Corporal Alvarado fired the shots at Benavente.  The footage shows Vasquez-Lopez just arrived on the scene moments before, stopping his police vehicle behind and slightly to the right of Escobar and Alvarado's vehicle.

*Officer Vasquez-Lopez's perspective*

Officer Vasquez-Lopez pulled up behind and to the side where Officer Escobar and Corporal Alvarado had stopped their unit.  As he pulled up, he saw Benavente's vehicle start reversing backward toward the officers.  Officer Vasquez-Lopez thought Benavente could have easily pulled forward and continued driving away from the officers; there was plenty of space.  However, the car reversed toward the officers.  Vasquez-Lopez described the vehicle reversing as not straight but in an "S" like motion toward the officers.  After colliding with the marked unit, Officer Vasquez-Lopez observed the car accelerate, reversing in his direction.  The vehicle then struck the front of Officer Vasquez-Lopez's vehicle.  As the suspect vehicle accelerated toward him, and Officer Escobar and Corporal Alvarado, Officer Vasquez-Lopez thought he was about to go through the windshield and be seriously injured from the impending impact[31].

---

[25] Ontario Police Department Report, 210200936, Supplement 66, Page 39
[26] Ontario Police Department Report, 210200936, Supplement 66, Page 38
[27] Ontario Police Department Report, 210200936, Supplement 66, Page 40
[28] Corporal Alvarado Deposition, Pages 28-30
[29] Ontario Police Department Report, 210200936, Supplement 66, Page 42
[30] Corporal Alvarado Deposition, Pages 28-30
[31] Officer Vasquez-Lopez Interview Transcript, Pages 9-10

Frank Benavente v. Albert Alvarado
U.S. District Court, Central District of California,
Case # 5:23-CV-00266-SSS-KK
Expert Report: Robert Handy
Page 12 of 16

Vasquez-Lopez's body-worn camera video shows him stopping his police vehicle and what appears to be his vehicle being struck by Benavente's car, which was in very close proximity to the collision and shooting with Alvarado. The video depicts the steering wheel and interior of Vasquez-Lopez's police vehicle as his police car is struck.  The audio from the video appears to depict Alvarado's gunshots immediately after the sound of the collision and approximately 2 seconds before the screenshot is taken. Officer Vasquez-Lopez immediately exited his police vehicle, and the video shows the proximity of Alvarado to Benavente (Approximately 2seconds after the shooting), where the screenshot was taken. Although there was no body-worn video available of Benavente's deadly assault on the officers, the screenshot in Figure #2 depicts the proximity of the vehicle to Corporal Alvarado moments after the shooting[32].

Figure #2



It is my opinion, based on the totality of the circumstances, the tactics used during the attempted traffic stop, vehicle pursuit, and approach to the vehicle as it stopped on Beverly Court just before the use of deadly force were consistent with the officers' training, Ontario Police Department Policy, and modern policing practices and standards.  Some of those circumstances include:

- The traffic violations that preceded the pursuit were observed by officers in two different patrol vehicles while on routine patrol and are objectively reasonable reasons for any police officer to stop a car.

---

[32] Officer Vasquez-Lopez Body Worn Camera Footage, Bates #01669

Frank Benavente v. Albert Alvarado
U.S. District Court, Central District of California,
Case # 5:23-CV-00266-SSS-KK
Expert Report: Robert Handy
Page 13 of 16

- The decision to pursue the car was reasonable given the time of day, weather, traffic conditions, etc., all factors police officers consider when pursuing or not pursuing a vehicle.
- The positioning of the officers preparing for a high-risk car stop or foot pursuit as Benavente stopped on Beverly Court was logical based on Benavente's actions during the pursuit and his stopping on a cul-de-sac street.
- Given the circumstances, Corporal Alvarado's decision to leave the car as they pulled up to Benavente's stopped vehicle was a reasonable tactic.  The other officers consistently stated they were preparing for a high-risk stop or foot pursuit.  Alvarado was the only passenger officer, and it is not uncommon or unreasonable for a passenger officer to step out of a police vehicle under these circumstances.
- Benavente's mother, Nicole Ventress, was interviewed by detectives and indicated Benavente should not have been driving and that he was under the influence of methamphetamine and possibly heroin[33].  The toxicology results of blood taken during the autopsy confirmed Benavente was under the influence of methamphetamine[34].  It has been my experience that people under the influence of methamphetamine may act erratically and violently, endangering others by their actions.
- Based on the traffic violations committed by Benavente in the presence of the officers, including the erratic driving and unlawful flight, the officers had ample probable cause to pursue his arrest.

Police officers are taught the legal authority and considerations to consider when using deadly force. The legal authority and standards for lethal force are based on an objective reasonableness standard based on the Constitution's Fourth Amendment, as determined by the U.S. Supreme Court.  Officers are taught that they may use deadly force when it reasonably appears necessary to stop an imminent threat of death or serious bodily injury based on the totality of the circumstances presented to them at the time. The force they use must be objectively reasonable compared to the threat, resistance, and other circumstances perceived by or known to the officer when the force was used. Officers are also required to give a verbal warning when feasible, and encouraged to attempt to deescalate when circumstances permit through tactics and strategic communications[35].

Other areas taught to police officers in California include, officers are taught when they may use deadly force to prevent the escape of a fleeing suspect.  Deadly force can be used on a fleeing suspect only if the officer has probable cause to believe the suspect poses a significant threat of death or serious injury to the officer or others[36]. California also teaches police officers a standard of care after a use of force where part of the standard is: "Officers have a duty, as soon as it is safe and practical, to provide or request medical aid[37]."  In addition, California teaches police officers that operative provisions of the California Penal Code and the individual department policies are also standards for police officers when using deadly force[38].

It is my opinion, based on the totality of circumstances, that the use of deadly force in this instance was

[33] Nicole Ventress Interview, Bates #01707
[34] San Bernardino County Autopsy Report, Case Number 702103736
[35] CA POST Learning Domain 20, Chapter 3, 4
[36] CA POST Learning Domain 20, Chapter 3, 4
[37] California POST Use of Force Standards and Guidelines (2021), Page 21
[38] CA POST Learning Domain 20, Chapter 1

13

Frank Benavente v. Albert Alvarado
U.S. District Court, Central District of California,
Case # 5:23-CV-00266-SSS-KK
Expert Report: Robert Handy
Page 14 of 16

reasonable, consistent with the officers' training, consistent with Ontario Police Department Policy, and consistent with contemporary policing practices.  A summary of specific circumstances and evidence informing my opinion includes:

- Benavente fled from the officers during a lawful traffic stop, drove dangerously erratic, and appeared to have been trying to provoke a collision.
- After observing Benavente during the pursuit, Corporal Alvarado was certain Benavente saw them as police officers and was attempting to flee from them.  The witness in the car confirmed his observations; Ms. Briones stated Benavente was aware of the officers' attempt to stop him, and he was intentionally fleeing.  Benavente told Ms. Briones, "I am not fucking stopping."
- Corporal Alvarado thought Benavente was a possible gang member and that he was possibly armed.
- Upon Benavente stopping on Beverly Court, the officers began to spread their police vehicles out behind Benavente's car to deescalate the situation and call him out of the vehicle from a distance as they were trained and per Ontario Police policy.
- Officers Varela, Escobar, and Corporal Alvarado all independently believed Benavente was intentionally using his vehicle to ram into them, which would constitute an assault with a deadly weapon.  The witness in Benavente's car, Ms. Briones, confirmed the intentionality of the ramming.  Ms. Briones said Benavente told her, "Oh yea, watch this," as he reversed the vehicle rapidly into the police officers[39].
- Neighborhood surveillance video confirms the officers' statements regarding Benavente rapidly reversing in the direction of the officers, endangering the officers, and colliding with the police vehicles in a compressed time frame[40].
- Corporal Alvarado believed he had nowhere to go in the split second/s the car was careening toward him and thought he was about to be crushed by Benavente's vehicle.
- It has been my training and experience the reaction time for an officer to recognize a threat, react to the threat and take action to neutralize the threat takes some time.  It may be whole or fractions of seconds, but reactions take time to process while the incident, including suspect actions, often continue without pause.
- The video from Officer Vasquez-Lopez's body-worn camera and subsequent screenshot are illustrative of Corporal Alvarado's belief he was about to be crushed by Benavente's vehicle.
- Benavente's car struck the patrol car, and the car door where near where Corporal Alvarado was standing during the assault.
- Benavente was just over an arm's reach away in a moving vehicle, committing a violent assault, and his actions created a reasonable belief of serious injury or death for Corporal Alvarado.
- Corporal Alvarado believed he was about to be crushed between the police car and Benavente's car and had no other option to stop the threat Benavente posed to him and the other officers but to fire his weapon.  Alvarado told investigators later that had he not fired his handgun, Alvarado believed he would be in the hospital or dead based on the threat Alvarado believed Benavente posed at the time he fired his weapon[41].

---

[39] Briones Interview, bates #1702
[40] Neighborhood Surveillance video, Bates # 01745
[41] Ontario Police Department Report, 210200936, Supplement 66, Pages 39-44

Frank Benavente v. Albert Alvarado
U.S. District Court, Central District of California,
Case # 5:23-CV-00266-SSS-KK
Expert Report: Robert Handy
Page 15 of 16

- The incident unfolded rapidly, with the car windows up, sirens sounding, engines revving, cars were crashing etc.  It was not feasible for Alvarado to issue Benavente a verbal warning before firing his weapon[42].
- According to the CAD transcript, the shooting occurred at 2356 hours.  Medical aid was requested (fire received call) at 2358 hours.  Officers deemed the scene safe after the car was clear at 004.31.  Fire personnel moved into the scene from staging to evaluate Benavente at 004.51[43].
- Benavente was aggressively fleeing officers in a vehicle while posing a significant danger to anybody on or near the roads he traveled.  He rammed three police vehicles posing a substantial danger to the officers and would have continued to flee, posing a substantial risk to the public and officers unless stopped.

Consistent with many contemporary police departments, the Ontario Police Department has a policy on officers shooting at moving vehicles. The policy for Ontario police officers in effect at the time of this incident was Policy 300.4.1

> ### 300.4.1  SHOOTING AT OR FROM MOVING VEHICLES
> *Shots fired at or from a moving vehicle are rarely effective and may involve additional considerations and risks.  When feasible, officers should take reasonable steps to move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants. An officer should only discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes there are no other reasonable means available to avert the imminent threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others. An officer may also use deadly force to apprehend a person fleeing in a vehicle if in compliance with section 300.4(b) of this policy[44].*

It is my opinion, based on the totality of circumstances, that Corporal Alvarado reasonably believed he was about to be crushed by Benavente's vehicle and did not have any place to move to avoid being struck and seriously injured or killed by Benavente's deadly assault.  Therefore, his decision to fire his weapon into Benavente's moving vehicle was within the Ontario Police Department Policy.

### Conclusion

The officers' actions in this case started as a traffic stop for two safety violations of the California Vehicle Code.  The officers initiated a police pursuit in response to Benavente's failure to yield to the lawful traffic stop and his aggressive attempts to flee.  The seriousness of the crimes committed by Benavente increased throughout the incident, from the start of the pursuit through the end of the encounter.  Benavente's erratic driving during the pursuit escalated the seriousness of the crime and caused the officers' legitimate concern.

When Benavente momentarily stopped on North Beverly Court, all the officers independently indicated they were preparing for a high-risk stop or foot pursuit and positioned their vehicles according to their

---

[42] Alvarado Deposition, Page 11
[43] CAD printouts from Fire and Police Bates #0245-0255 & #0256-0257
[44] Ontario Police Department Policy (Bates #000379), Page 48

**Frank Benavente v. Albert Alvarado**
**U.S. District Court, Central District of California,**
**Case # 5:23-CV-00266-SSS-KK**
**Expert Report: Robert Handy**
**Page 16 of 16**

training.  During the brief pause on Beverly Court, Benavente made the intentional decision to rapidly reverse his car in a manner constituting an assault with a deadly weapon, placing the officers' safety in jeopardy.  Because of Corporal Alvarado's positioning outside of his police vehicle as Benavente reversed the car, Alvarado was in a position of increased vulnerability to serious injury or death caused by Benavente's violent assault. Corporal Alvarado feared for his life and fired his weapon in self-defense.

The incident was escalated by Benavente's actions from the onset of the initial attempt to stop him for violations of the vehicle code.  Based on the witness's testimony from Benavente's car, Ms. Briones, Benavente was aware the police were trying to stop him, told Briones he was not stopping, and said, "Watch this," as he accelerated his vehicle backward and into the officers just before the shooting[45].  Her statements are consistent with the officers' observations that the assault appeared intentional.

It has been my experience that people under the influence of methamphetamine may act erratically and violently.  Their behavior can be more reckless and aggressive than other times when they are not under the influence.

Benavente controlled the pace and intensity of the encounter, escalating his actions and the threat level to the officers and community throughout the incident.  Based on my training, more than three decades of experience, and the totality of the circumstances, my overall conclusion is that the officers' actions and reactions to Benavente's escalations were appropriate and within the scope of the regulations, standards, and training governing police officers in California.

Respectfully Submitted,

*Robert Handy*

Robert Handy
Phoenix, Arizona

---

[45] Briones Interview, Bates #01702

Robert Handy
20118 N. 67th Avenue Suite #300-452
Glendale, Arizona 85308
(714) 916-7439   rob@trichief.com

___

## EXPERT WITNESS - LAW ENFORCEMENT / POLICE PRACTICES / USE OF FORCE

Law Enforcement Expert Witness with extensive experience in all levels and aspects of policing.  Particular expertise in police practices, tactics, training, use of force, and accountability.  Leader, facilitator or decision maker for hundreds of incident debriefings, after action reviews, post incident investigations, findings and outcomes.  Over 30 years of courtroom and other testifying experience in criminal cases, civil cases, depositions and arbitrations.

### KEY COMPETENCIES

- Police Practices
- Executive Leadership / Strategic Guidance
- Case Evaluation / Program Evaluation
- Gangs / Use of Force / Training / Procedures
- SWAT / Tactical Operations

- Special Event Management / Injuries
- Organizational Assessments
- Personnel Investigation and Review
- Multi-Agency / Critical Incident Response
- Accountability / Policies / Protocol

### LAW ENFORCEMENT LEADERSHIP EXPERIENCE

**Director of Public Safety – Grand Canyon University (GCU)**                                    **9/2023-Present**

Responsible for the oversight and leadership of the Public Safety Department, consisting of a police chief, sworn police officers, security guards, and professional staff who provide public safety services for the University.  With an expansive campus in Phoenix, Arizona, GCU is the largest private Christian University in the nation, serving more than 100,000 residential, commuter, and online students.

**Founder - TriChief Consulting Services, Huntington Beach, CA**                                    **5/2019-Present**

TriChief Consulting is a national consulting firm of law enforcement experts, consulting in business development, departmental assessments, performance audits, training audits, expert witness work, and more.

**Chief of Police - City of Huntington Beach, Police Department**
**12/2013 - 10/2020**

___

**Span of Control: 365 people, $82 million budget**

Recruited to provide executive leadership and management of this popular full-service beach city with a year-round population of 200,000 residents and millions of annual visitors.

- Implemented a variety of leadership and community-based policing principals including new standards, processes and technology systems to increase accountability, transparency and community responsiveness
- Created numerous programs and processes to engage the community and key stakeholders, and collectively identified priorities and implemented meaningful and sustainable solutions to complex challenges
- Developed regional approaches, partnerships, revenue offsets and service exchanges in key areas for substantial savings
- Oversaw planning and operations for large-scale special events with hundreds of thousands of attendees
- Conceptualized, coordinated and founded the California Police Chiefs Executive Development Institute at Drucker.  The program is an intense, in-residence course for police executives held on the Drucker School's campus at Claremont Graduate University each summer with a focus on collaborating with industry and academic leaders to prepare individuals to become law enforcement executives

- Founded and created the Huntington Beach Police and Community Foundation, supporting training, officer wellness and morale-boosting initiatives, community and youth programs and lifesaving equipment.

**Chief of Police - City of San Bernardino, Police Department**
**10/2011 - 12/2013**

**Span of Control: 410 people, $55 million budget**
Delivered executive leadership of comprehensive police services to a diverse community of 211,000 residents.

- Provided stability and leadership during the City's financial crisis, political crisis and bankruptcy, which led to historic reductions in personnel and resources for the Police Department
- Increased citizen and business partnerships to raise the level of transparency and trust with the community
- Expanded resources and priorities aimed at implementing transformative community programs and services
- Dramatically reduced use of force and citizen complaints through policy changes, officer training and accountability

**City of Phoenix Police Department**
**6/1990 - 10/2011**

Assigned simultaneously as the Maryvale Precinct Commander and Training Bureau Commander due to budget reductions.

**Commander, Maryvale Precinct (5/2010 - 10/2011) - Span of Control: 176 people, $21 million budget**
Successfully innovated and implemented programs and partnerships to lower crime.

- Collaborated extensively with officers and stakeholders to architect and deploy programs relating to curfew diversion, graffiti reward, domestic violence prevention, and underage drinking programs
- Multiple programs became model programs for other jurisdictions across the city and country

**Commander, Training Bureau (5/2010 - 10/2011) - Span of Control: 68 people, $15 million budget**
Responsible for oversight of in-service training for over 4,000 employees and acting as department representative to the multi-agency basic training academy (ALEA) at The Phoenix Police Regional Academy. Department liaison with AZPOST.

- Reviewed all police shootings, significant uses of force, training, equipment, and policy changes city-wide
- Collaborated with internal teams to develop annual training curriculum for immigration enforcement, interpersonal communications and de-escalation, use of force, search and seizure, and other critical topics

**Commander, Office of Administration in the Chief's Office (7/2008 - 5/2010)**
Reported directly to the Executive Assistant Chief. Responsibilities for leading executive level projects, interacting with elected and appointed government officials and media, developing focus groups and managing labor relations. Led budget cuts +$37M.

- Oversaw construction of two new police precinct stations including the complete patrol deployment redesign of +2,000 employees based on geography, schedules, workload, and organizational priorities

**Commander, Tactical Support Bureau (3/2006 - 7/2008) - Span of Control: 145 people, $35 million budget**
Oversaw the planning and execution of tactical operations and special events throughout the city including large-scale emergencies, planned events, and detailed preparations for potential disasters.  Directly responsible for day to day leadership of the SWAT, fugitive apprehension, and airborne groups.

**Lieutenant, Tactical Support Bureau (2002-2006)**

Oversaw the Canine Unit, Rapid Deployment Unit, and acted as the relief SWAT Commander.  Part of a team responsible for preparing for mass casualty incidents and all other tactical emergencies.  Responded to tactical emergencies throughout the City of Phoenix and was either in command or part of the command structure of emergencies, tactical and large scale crowd events.

**Supervisory, Detective, and Officer assignments (1990 - 2006)**
- Lieutenant: Patrol Area Manager and Task Force Commander

- Sergeant: Basic Training Sergeant at the Academy, Walking Beat Sergeant, Administrative Sergeant in Police Chief's Officer, Patrol Sergeant (3 different precincts)
- Officer: Gang Squad Detective, Field Training Officer, and Patrol Officer

## FACULTY POSITIONS

**Adjunct Faculty Instructor - California State University Long Beach**
**2018 - 2022**

Developed online graduate course (Managing Police Organizations). Currently teaching undergraduate courses in Policing and a graduate course in Managing Police Organizations while mentoring students in their academic and professional goals.

**Adjunct Faculty Instructor - Arizona State University**
**1998 - 2013**

Developed and taught various upper division classes in the Criminal Justice program. Worked collaboratively with faculty to expand Criminal Justice program by developing new courses and providing subject matter expertise on various topics.
- Created classes in Police Use of Force, Community Policing, Organized Crime, Gangs, and Occupational Crime
- Mentored many students throughout their educational pursuits and into careers in criminal justice

## EDUCATION AND PROFESSIONAL CERTIFICATIONS

Executive and Advanced Certificates - California POST (2011 - 2016)
FBI National Academy Graduate, Class 214 - Federal Bureau of Investigation (2003)
Master of Public Administration - Arizona State University (1996)
B.S. Public Administration – University of Arizona (1990)

## PROFESSIONAL AFFILIATIONS AND COMMUNITY LEADERSHIP

1996 - present   Lifetime member, International Association Chiefs of Police
2010 - present   Lifetime member, Police Executive Research Forum
2015 - present   Executive Fellow, National Police Foundation
2015 - present   Founder, Board Member, Huntington Beach Police and Community Foundation
2014 - present   Member, First Vice President and Board Member, California Police Chiefs Association
2017 - present   Founder, Faculty, California Police Chiefs Association's Executive Leadership Institute at Drucker
2013 - present   President and Board Member, Boys and Girls Club of Huntington Valley
2015 - 2020      Board Member, Huntington Beach Hospital
2011 - 2020      Advisory Board Member, Anti-Defamation League
2008 - 2011      President and Board Member, Arizona Chapter of the FBI National Academy Associates
2008 - 2011      Founder and Director, Arizona Leadership Education and Development Youth Academy

**AWARDS**
(partial List)

Lifetime Achievement Award - International Public Safety Leadership and Ethics Institute's (IPSLEI)
Peace Maker Award - Greater Huntington Beach Interfaith Council
Man and Youth Award, Eagle Award, Eddy Award - Boys and Girls Club
Scouting's Spurgeon Award - Boy Scouts of America
Medal of Valor (two-time recipient) and Medal of Lifesaving (two-time recipient) - Phoenix Police Dept.
Excellence Award - City of Phoenix (two-time recipient)
Distinguished Service Award, Police Chief's Unit Award (two-time recipient)
Heroism Award - Rotary Club of Phoenix
LECC Cooperative Law Enforcement Award - United States Attorney's Office, Phoenix

**Specialized Training**
(partial List)

- Police Academy/Police Officer Certification, Phoenix Police Department, 1990 (640 hours)
- Gang Seminar, National Law Enforcement Institute, 1991 (16 hours)
- POST General Instructor Certification course, ALEOAC (AZPOST), 1992 (40 hours)
- Field Training Officer course, Phoenix Police Department, 1992 (20 hours)
- Report Writing course, Phoenix Police Department, 1993 (20 hours)
- Street Gangs and Subcultures, LA Sheriff's Department, 1994 (40 hours)
- Survival Awareness/Police Tactics, Federal Bureau of Investigation, 1995 (40 Hours)
- Advanced Gang course, AZ Department of Public Safety, 1995 (24 hours)
- Advanced Gang Investigators' School, National Law Enforcement Institute, 1995 (24 hours)
- Supervisor Development course, Phoenix Police Department, 1996 (80 hours)
- Firearms Instructor, AZPOST, 1996 (80 hours)
- Defensive Tactics Instructor, AZPOST, 1997 (64 hours)
- Intermediate Tactical Handgun, American Firearms Training and Tactics, 1997
- Physical Fitness Specialist, Cooper Institute, 1998 (40 hour)
- Advanced Tactical Handgun, American Firearms Training and Tactics, 1998
- Advanced Gang Conference, National Law Enforcement Institute, 1998 (16 hours)
- Defensive Tactics Instructor development, AZPOST, 1998 (24 hours)
- Police Bicycle certification, Phoenix Police Department, 1999 (40 hours)
- Officer Involved Shootings/Investigations, Partners in Training Inc, (24 hours)
- Risk Management, Gordon Graham, 2000    (8 hours)
- Officer Involved Shootings/Investigations, Public Agency Training Council, 2000 (24 hours)
- Peace Office Fitness Coordinator, FitForce, Inc, 2000 (40 hours)
- Rampart Debrief/Lessons Learned, FBI National Academy Associates 2001
- Legal Issues of Pattern and Practice, United State Department of Justice, 2001
- Enlightened Leadership, Larry Prochazaka, 2001 (40 hours)
- Leadership Forum, Phoenix Police Department, 2001 (40 hours)
- Legal Issues/Labor Management, Dale Anderson, 2002 (8 hours)
- Response to Terrorism, NYPD Emergency Services Unit, 2002 (16 hours)
- K-9 Manager course, K9 Academy for Law Enforcement, 2002 (40 hours)
- Officer Involved Shootings/Investigations, FBI National Academy Associates, 2003 (6 hours)
- FBI National Academy graduate, Class 214, FBI Academy, Quantico VA, 2003 (400 hours)
- Crisis Negotiation School, Federal Bureau of Investigation, 2003 (40 hours)
- SWAT Supervision and Command, National Tactical Officers Association, 2004 (40 hours)
- SWAT SCBA Tactical Deployments, Phoenix Police Department SWAT, 2004 (40 hours)
- K-9 Manager, Eden Consulting Group, 2004, (40 hours)
- Terrorism and Explosives class, United States Bureau of Alcohol Tobacco and Firearms, 2005

- Trailing Service Dog Program, AZ Department of Corrections, 2005 (40 hours)
- Ethics in Law Enforcement, FBI National Academy Associates, 2005 (8 hours)
- Managing LEO Stress, Federal Bureau of Investigation (James Reese), 2005 (8 hours)
- Federal Emergency Management, IS-500, 700, 2006
- Physical Fitness Instructor, AZPOST, 2008 (40 hours)
- Regional Media Relations, FBI National Academy Associates, 2009
- Management Course, CA POST, 2009, (120 hours)
- Executive Development, CA POST, 2015 (80 hours)

## Expert Experience

- Trained thousands of police officers in use of force, firearms, tactics and police practices (1996-2011)
- Use of Force Board Member, Phoenix Police Department (1996-2011)
- Reviewed thousands of police use of force incidents (1996-2020)
- Led/participated in dozens of tactical reviews and investigations of significant uses of force (2002-2020)
- Led formal review of incident where two Phoenix Police officers were murdered (2005)
- Outside expert team member, comprehensive evaluation of the national FBI SWAT team program (2007)
- Outside expert team member, review of Dallas Police Department SWAT team program (2008)
- Final decision maker on hundreds of use of force cases from minor force to deadly force (2006-2020)
- Final decision maker on hundreds of discipline decisions from reprimands to terminations (2006-2020)
- Barajas v. State of CA, County of San Bernardino, et al (state case): Expert for the defense, police practices, wrongful death case with a deputy involved fatal collision (2021)
- Elser v. City of Huntington Beach (administrative case): Testified for defense in use of force case, qualified as expert (2021)
- Alnajjar v. County of San Bernardino, et al (state case): Expert for defense, police practices, personal injury case involving emergency driving (2021)
- Team member on organizational assessment, Little Rock, Arkansas, Police Department (2021)
- Lead consultant on property/evidence review, Costa Mesa, California, Police Department (2021)
- Outside expert for review of critical injury use of force, Inyo County, California (2021)
- Team member for organizational assessment, National City, California, Police Department (2022)
- Team member for organizational assessment, Santa Rosa, California, Police Department (2022)
- Lead consultant for organizational assessment, Upper Arlington, Ohio, Police Division (2022)
- Lead consultant for organizational assessment, Maricopa County, Arizona, Sheriff's Office (2022)
- DeAnna Sullivan v. City of Buena Park et al., Superior Court, State of California, County of Orange, expert for the defense police practices, use of force, wrongful death case (2022)
- Lourdes Vaughn v. City of Arvin, US District Court, Eastern District of California: Expert for defense, wrongful death, excessive force, police practices (2022)
- DiDonna v. City of Reedley, Superior Court County of Fresno, expert for defense, police practices, unlawful detention, arrest etc. (2022)
- Gonzalez v. City of Phoenix et al, US District Court, District of Arizona: Expert for police practices and excessive use of force for an in-custody death case (2022)
- State of North Dakota v. United States of America, US District Court, District of Northern Dakota, Southern Region, expert for plaintiff, police practices, arrest, use of force, mass arrests, large incident management in a protest case (2022)
- Dion Humphrey & William Humphrey v. City of Phoenix et al., United States District Court, District of Arizona, expert for defense on police practices, use of force, in custody death case (2022)
- Maxima Guerrero Sanchez, et al., v. City of Phoenix et al., United States District Court, District of Arizona, expert for the defense on police practices, false arrest, mass arrest protest case (2022)
- Calhoon v. City of South Lake Tahoe et al., United States District Court Eastern District of California, expert for defense, police practices, in a false arrest case (2022)
- Lead consultant for organizational assessment, Battle Creek, Michigan, Police Department (2023)

- Team member for organizational assessment, Redwood City, California, Police Department (2023)
- Team member for organizational assessment, Kalispell, Montana, Police Department (2023)
- Team member for organizational assessment, Pulaski County, Arkansas, Sheriff's Office (2023)
- Lead consultant for organizational assessment, Chattanooga, Tennessee Police Department (2023)
- Lead consultant for organizational assessment, Grand Canyon University Public Safety Department, Phoenix, Arizona (2023)
- Team member for organizational assessment, Knoxville, Tennessee Police Department (2023)
- Team member for organizational assessment, West Des Moines, Iowa, Police Department (2023)
- May v. City of Los Angeles World Airports Police Department, Superior Court of the State of California, County of Los Angeles, expert for the defense on police practices in a discrimination case (2023)
- Limon-Mendoza v. City of Corona United States District Court,  Case No. 5:23-cv-00134, expert for defense, use of force, wrongful death, police practices (2023)
- Subcontractor for New York Attorney General, conducting reviews of use of force cases from a municipal police department under investigation, 66 individual use of force incidents reviewed as of 5/2023
- Angelo Self v. City of Palm Springs, United States District Court, Central District of California, expert for defense in false arrest and excessive force case (2023)
- Emily Garcia v. City of Tustin, United States District Court, Central District of California, expert for defense in wrongful death, officer involved shooting case (2022)
- Los Angeles Schools Police Department, retained as a use of force expert for an internal personnel complaint of excessive force (2023)
- Mendez v. City of Fontana, United States District Court, Central District of California, expert for defense in wrongful death, officer involved shooting case (2023)
- Jasmine Williams, et al, v. City of Beverly Hills, et al, United States District Court, Central District of California, expert for the defense regarding wide range of police practices in discrimination case (2023)
- The Estate of Valentina Orellna Peralta, et al, v. City of Los Angeles, William Dorsey Jones, et al, United States District Court, Central District of California, expert for defense of officer in wrongful death, officer involved shooting case (2023)
- Ymelda Elena, et al, v. City of Los Angeles, William Jones Jr., et al, United States District Court, Central District of California, expert for defense of officer in wrongful death, officer involved shooting case (2023)
- Frank Benavente and Nicole Ventress v. Albert Alvarado, City of Ontario, et al, United States District Court, Central District of California, expert for defense in officer involved shotting case (2023)
- Lott v. City of Peoria, et al, Maricopa County Superior Court, expert for defense in officer involved shooting case (2023)
- Estate of David Pelaez Chavez, et al, v County of Sonoma, et, al, United States District Court, Northern District of California, expert in officer involved shooting case (2023)
- Anyka Harris et, al v City of Tulare et al, United States District Court, Eastern District of California, expert for defense in officer involved shooting case (2023)