# EXHIBIT I

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

```
 1                   UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3

 4   FRANK BENAVENTE; and NICOLE VENTRESS, )
                                          )
 5                  Plaintiffs,           )
                                          )
 6              vs.                       )Case No.
                                          )5:23-CV-00266-SSS-KK
 7   ALBERT ALVARADO; CITY OF ONTARIO;    )
     and DOES 1 through 10, inclusive,    )
 8                                        )
                    Defendants.           )
 9   _____)

10

11

12

13

14           REMOTE VIDEOCONFERENCE DEPOSITION OF

15                       ROBERT HANDY

16               MONDAY, FEBRUARY 19, 2024

17

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  50272
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 2

```
 1                    UNITED STATES DISTRICT COURT

 2                    CENTRAL DISTRICT OF CALIFORNIA

 3

 4   FRANK BENAVENTE; and NICOLE VENTRESS, )
                                          )
 5               Plaintiffs,              )
                                          )
 6               vs.                      )Case No.
                                          )5:23-CV-00266-SSS-KK
 7   ALBERT ALVARADO; CITY OF ONTARIO;    )
     and DOES 1 through 10, inclusive,    )
 8                                        )
                 Defendants.              )
 9   _____)

10

11

12

13

14        The remote videoconference deposition of ROBERT

15   HANDY, taken on behalf of the Plaintiffs, beginning at 1:59

16   p.m., and ending at 6:02 p.m., on Monday, February 19, 2024,

17   before Jinna Grace Kim, Certified Stenographic Shorthand

18   Reporter No. 14151.

19

20

21

22

23

24

25
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 3

```
 1    APPEARANCES OF COUNSEL:

 2

      For the Plaintiffs:
 3
              LAW OFFICES OF DALE K. GALIPO
 4            BY:  DALE K. GALIPO, ESQ.
              BY:  MARCEL SINCICH, ESQ.
 5            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 6            Tel:  818-347-3333
              Fax:  818-347-4118
 7            E-mail:  dalekgalipo@yahoo.com
              E-mail:  msincich@galipolaw.com
 8

 9    For the Defendants:

10            JONES MAYER
              BY:  DENISE ROCAWICH, ESQ.
11            3777 North Harbor Boulevard
              Fullerton, California 92835
12            Tel:  714-446-1400
              Fax:  714-446-1448
13            E-mail:  dlr@jones-mayer.com

14

15

16

17

18

19

20

21

22

23

24

25
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 20

1    Q.   How much do you charge an hour to work-up a case?

2    A.   $275.

3    Q.   And what about for deposition?

4    A.   $325.

5    Q.   How much do you charge for trial testimony?

6    A.   $325.

7    Q.   $325?

8    A.   Yes.  The same as deposition.

9    Q.   Did you provide a fee schedule to Mr. Touchstone or

10  anyone in his office a long with the report in this matter?

11    A.   I don't know if I did it along with the report.

12        I had done it in the past in other cases.

13        I don't know if I did on this case.

14    Q.   Okay.  I don't believe I received it in this case.

15        That's why I ask.

16    A.   I'm happy to --

17    Q.   How much -- how much time did you spend in working

18  up this case all the way to turning in your report?

19    A.   Roughly 40 hours.

20    Q.   Can you say that again, please?

21    A.   Roughly 40 hours.

22    Q.   Okay.  How --

23    A.   That's reviewing all the video, all the deposition,

24  everything I reviewed plus writing the report.

25    Q.   Okay.  Have you already billed for that time

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 21

1   spent?

2       A.   I have not.

3       Q.   Do you plan on billing sometime in the future?

4       A.   I do.

5       Q.   And how much time have you spent in the case since

6   writing your report to the time of starting this

7   deposition?

8       A.   Three to four hours.

9       Q.   I believe you mentioned that you had been deposed in

10  your capacity as an expert before; right?

11      A.   Yes.

12      Q.   How many times was that?

13           I don't know if I wrote that down.

14           I'm sorry.

15      A.   I don't know exactly.  Eight to ten.

16      Q.   Okay.  Did you provide a copy of your list of

17  deposition testimony to Mr. Touchstone or anyone from his

18  office?

19      A.   No.  The cases are listed on my CV.

20           They're just not denoted which ones I've done a

21  deposition on.

22      Q.   Okay.  Does your report list all the documents you

23  relied upon in forming your opinions in this case?

24      A.   Yes, it does.

25      Q.   Did you rely on any documents not listed in your

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 22

```
 1    report since turning in your report?

 2        A.   Not that I recall or know of, no.

 3        Q.   Did you review any other expert reports in this

 4    case?

 5        A.   I don't believe so.  I would have to go through the

 6    list just to be sure, but I don't from my memory I don't

 7    believe so.

 8        Q.   Okay.  And you have a copy of your report handy?

 9        A.   I do.

10        Q.   Okay.  If there is something that you need to refer

11    to in there, if you can let us know.  It's not a memory

12    contest as far as that's concerned.

13             You can let us know if you need to refer to it.

14             Okay?

15        A.   Sure.

16        Q.   And does your report contain all of your opinions in

17    this case?

18        A.   Probably not, no.

19        Q.   What opinions do you have that are not contained in

20    the report?

21        A.   I don't know.  It's just kind of an unknown.

22             I have opinions on a lot of things that I read or

23    that I see.  Some are germane, some to you know what I was

24    asked to address, some apply specifically to the situation,

25    others may not, but I still have opinions.
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

1  this incident?

2      A.   He did not cause serious injury or death to any

3  person, but he certainly posed that risk, a substantial risk

4  of that.

5      Q.   Did Mr. Benavente ever verbally threaten any officer

6  or person in this incident?

7      A.   I don't believe he did verbally threaten anybody.

8      Q.   And I believe it's what we were alluding to, but

9  officers are trained that it has to be the objectively

10  reasonable officer standard under similar circumstances; is

11  that how use of force cases are evaluated?

12      A.   In general terms, yes.

13      Q.   Are officers trained that subjective fear alone is

14  insufficient to use deadly force?

15      A.   Yes.

16      Q.   Would you agree that sometimes -- strike that.

17          Would you agree that in a deadly force case such as

18  the case here, whether or not the force was reasonable or

19  appropriate depends on the facts?

20      A.   I think it depends on the totality of the

21  circumstances including facts and the officers'

22  perceptions.

23      Q.   Would you agree that sometimes in civil rights cases

24  like this, the facts are disputed?

25      A.   I would agree the facts are often disputed in cases

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 28

1    like this.

2        Q.   Is this your understanding that if this case were to

3    go to trial, that a jury would decide the facts of the

4    case?

5        A.   Yes.

6        Q.   Is it your understanding also if the case went to

7    trial, that the jury would ultimately decide whether or not

8    the force was reasonable or appropriate?

9        A.   Yes.

10       Q.   Would you agree that if there was no objectively

11   reasonable perception that the subject was an imminent or

12   immediate threat of death or serious bodily injury in this

13   case, that deadly force would be inappropriate?

14       A.   I would say that any case where there is no

15   objectively reasonable fear that deadly force is imminent or

16   present, that it would be inappropriate to use deadly force.

17            I want to make sure I understood your question.

18            That's why I repeated that.

19       Q.   I think you did based off of your response.

20            Thank you.  When using deadly force are officers

21   trained to have reverence for human life?

22            MS. ROCAWICH:  Objection.  Vague and ambiguous.

23            You can answer.

24            THE WITNESS:  At all times we train officers to have

25   reverence for human life including the officers' lives.

---

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 45

1         Do you plan on providing opinion as to

2     Mr. Benavente's subjective state of mind?

3         A.   I would probably based on statements he made to --

4     to the gal in the car.  Her name is on the top of my head,

5     sorry.  He made it to his wife.  He made the comment of

6     "watch this," and some other things that I think would go to

7     his state of mind.

8         Q.   When you're evaluating a use-of-force case, are you

9     essentially attempting to determine if an objectively

10    reasonable officer would or would not use force in similar

11    set of circumstances?

12        A.   Essentially, if I understood your question right.

13        Q.   And as part of the training officers, and what I'm

14    referring to is the training on whether or not force is

15    reasonable, you're required to not use the 20/20 vision of

16    hindsight; correct?

17        A.   Correct.

18        Q.   When you're evaluating a use-of-force case, do you

19    limit your evaluation as to whether the use of force was

20    reasonable to the information known to the officer at the

21    time?

22        A.   Well, I guess I do in a sense of evaluating their

23    specific decision-making, but it also helps kind of frame

24    whether their perception was reasonable or not.

25             There are other things that are indicators that the

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 46

1    actions were not intentional, for example.  In this case

2    multiple officers believed that the rapid acceleration of

3    backing of the car was intentional.

4         That statement that the officers didn't know at the

5    time supports their observation.

6         So I believe that's important.

7         Q.   Whether or not Corporal Alvarado's perceptions were

8    reasonable are only based off the information that Corporal

9    Alvarado had, not any of the other officers; right?

10        A.   Correct.  But I think it goes to the reasonableness

11   of his feeling; right?  Other officers are similarly

12   situated.  So what were the other officers thinking who were

13   nearby.  I think that that can also be a factor, but in the

14   end, it's what Officer Alvarado perceived, yes.

15        Q.   And each of the other officers, they had a different

16   position and a different perspective of the incident?

17        A.   They had similar perspectives in some ways and

18   different ones in others, yes.

19        Q.   Is it fair to say that statements made by

20   Ms. Briones after the incident would be considered hindsight

21   information?

22        MS. ROCAWICH:  Objection.  Vague; also calls for a

23   legal conclusion.

24        You can answer.

25        THE WITNESS:  I think you can consider it different

FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL
Robert Handy on 02/19/2024

Page 64

```
 1    subject car went through without stopping?

 2        A.   I don't know exactly.  Two is my estimate off the

 3    top of my head.

 4        Q.   Which two stop signs is it your belief that he went

 5    through without stopping?

 6        A.   I would have to go back to the officer's

 7    testimony.

 8        Q.   Okay.  Do you know if there was any vehicles in the

 9    road?  And I'll be more specific.

10             Any vehicles in the intersection or stopped at the

11    stop signs when the subject vehicle went through those two

12    stop signs that you referred to?

13        A.   I'm not sure if it was in conjunction with the stop

14    sign, but the officers described a near collision with

15    another vehicle that was going I believe west when he was

16    going north.  I may have those directions off, but going

17    basically perpendicular to him.

18        Q.   I think you're correct in the cardinal direction

19    from my recollection, at least.

20        A.   That's my recollection, but again, I'm not 100

21    percent sure.

22        Q.   And based on your review of the records, do you have

23    an indication as to how close the subject vehicle came with

24    that civilian vehicle?

25        A.   I don't.
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 65

1    Q.   Do you know if that civilian vehicle had slammed on

2    the brakes or swerved out of the way?

3    A.   I don't.

4    Q.   To your knowledge, were there any civilians injured

5    during this incident?

6    A.   I don't believe they were.

7    Q.   Up to the point that the subject vehicle came to a

8    stop on Beverly before it went into reverse, do you think it

9    would have been appropriate to use deadly force against

10   Mr. Benavente?

11   A.   Can you repeat the question.

12        MS. ROCAWICH:  Objection.

13   BY MR. SINCICH:

14   Q.   Up until the point where the subject vehicle came to

15   a stop on Beverly before it went into reverse, do you think

16   it would have been appropriate to use deadly force against

17   Mr. Benavente?

18        MS. ROCAWICH:  Objection.  Incomplete, improper

19   hypothetical; calls for speculation.

20        You can answer.

21        THE WITNESS:  Based on the limited information you

22   provided, I wouldn't think so absent other circumstances.

23   BY MR. SINCICH:

24   Q.   Right.  And what I'm asking is all of the

25   information that you reviewed in this case in forming your

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 66

1   opinions, just at the time that the vehicle first came to a

2   stop, knowing everything you know about the case up to that

3   point, would it be appropriate to use deadly force against

4   Mr. Benavente?

5        A.   I don't recall anything in there that -- in the case

6   that I reviewed that would have justified deadly force to

7   that point.

8        Q.   Let's say that after the car went into reverse and

9   impacted Officer Varela's vehicle and then came to a stop, do

10  you think then it would be appropriate or inappropriate to

11  use deadly force against Mr. Benavente?

12            MS. ROCAWICH:  Same objection.  Incomplete, improper

13  hypothetical.

14            You can answer.

15            THE WITNESS:  I think that would depend on the

16  officer's perceptions.  I didn't see anything that indicate

17  that there would be an objective reason for a reasonable

18  officer to use deadly force, but again, it depends on the

19  officers at the scene and their perspective.

20  BY MR. SINCICH:

21       Q.   Okay.  Let's say that if everything's the same in

22  this incident, after the vehicle went -- and then kept going

23  in reverse and made initial contact with Officer Escobar's

24  vehicle but stopped approximately where they were bumper to

25  bumper, and the officers reasonably perceive what I'm

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 72

1   coming to a stop.

2       Q.   Do you know if the vehicle was actually stopped at

3   the time that Corporal Alvarado put boots on the ground?

4       A.   I don't know.

5       Q.   Does that detail inform on your opinions in any way

6   as to whether or not the force was reasonable?

7       A.   It doesn't because what I'm referring to if the car

8   was slightly rolling as it was coming to a stop because one

9   of the officers testified that opening the doors they were

10  coming to a stop.  Getting the door open and getting ready to

11  get out.

12          So whether a car was actually moving an inch or two

13  as his foot touched the ground, I don't know, and that

14  doesn't make a difference in my opinion in this case.

15      Q.   Are officers trained to exit the vehicle while their

16  patrol vehicle is still moving?

17      A.   Not specifically trained to do that.

18      Q.   As the chief of police would you essentially tell

19  your officers that that's an unsafe tactic and to refrain

20  from doing that?

21      A.   It depends.  If the tire is rolling an inch and the

22  officer's stepping out to engage a threat, it might not be an

23  unsafe practice.  We don't teach that generally to do that,

24  but I think it depends on the circumstances.

25          It's not uncommon for a passenger officer to be

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 74

1          What do you mean by that?

2          A.   I wasn't being that specific.

3          Q.   What is your understanding of what occurred in this

4    incident?

5          A.   So to me there, again, this is a summary, that he is

6    getting out of the vehicle.  That could be opening the door,

7    starting to lean out, stepping out, stepping on the side

8    pillar, but making movements to get out, taking a seat belt

9    off.  There is a process, there is other things that go into

10   it.  I'm not that specific here.  This is a summary.

11         Q.   Okay.  In rendering your opinions, did you form the

12   belief that Corporal Alvarado was out of the car at the time

13   that the red car came into contact with Officer Escobar's

14   car?

15         A.   He was out of the car around the time.

16              There was a point where he was in the car, and I

17   think got knocked back in the car partially, and then back

18   out of the car.  So it depends.

19              At what point you're talking about specifically, and

20   it all happened in very rapid succession.

21         Q.   What did you review in the record that informed you

22   that Corporal Alvarado got knocked back into the car and

23   knocked out of the car?

24         A.   It just appeared to me from the video that may have

25   occurred.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 75

1      Q.   Did you see anything in Corporal Alvarado's

2   statement to the detectives that he stepped out of the car,

3   got knocked back into the car, and then got knocked out of

4   the car again?

5      A.   I don't recall that statement, no.

6      Q.   Do you recall him testifying in his deposition

7   anything to that effect?

8      A.   I don't.

9      Q.   According to Corporal Alvarado, is it fair to say

10   that from his perspective Officer Escobar stopped the car, he

11   got out on foot, and then used deadly force, generally

12   speaking?

13         MS. ROCAWICH:  Objection.  Vague; misstates

14   evidence; calls for speculation.

15         You can answer.

16         THE WITNESS:  Again, I think in a very broad sense

17   and generally, yes.  But there is a lot more in his testimony

18   than that.

19   BY MR. SINCICH:

20      Q.   But nowhere in his testimony does he say anything

21   about getting back to the vehicle prior to using deadly

22   force; isn't that right?

23         MS. ROCAWICH:  Objection.  Asked and answered.

24         THE WITNESS:  I don't recall that.

25   BY MR. SINCICH:

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 76

```
 1      Q.   Just going through something in your report here

 2   really quick.

 3           On Page 6 of your report at the top kind of along

 4   the same lines, you state, "Benavente's car struck the front

 5   side of the police vehicle near where Corporal Alvarado had

 6   just stepped out into the street and the passenger door he

 7   was standing behind."

 8           Do you see that sentence?

 9      A.   No, I don't.  I'm sorry.

10           Top of Page 6, I'm not there yet --

11           MS. ROCAWICH:  It's the very first sentence.

12           MR. SINCICH:  I'm sorry.  Very first sentence.

13           THE WITNESS:  I'm sorry.  I'm looking at -- maybe it

14   was -- it came out format wise different the last sentence on

15   Page 5 on my copy.

16   BY MR. SINCICH:

17      Q.   Okay.  It's the -- it would be the middle of the

18   second to last paragraph of the incident summary section

19   essentially.

20      A.   In the sentence, "Benavente's car struck the front

21   side of the police car near where Corporal Alvarado stepped

22   out of the street."

23      Q.   What you're indicating there is that Corporal

24   Alvarado had stepped out into the street at the time that

25   Benavente's car struck Officer Escobar's car; isn't that what
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 77

```
 1   you're indicating?

 2       A.   Where he had just stepped out, yes.

 3       Q.   Okay.  So and there you cite the footnote 7 which is

 4   a police officer report?

 5       A.   Yes.

 6       Q.   Okay.  So as far as you're concerned in terms of

 7   analyzing the case, did you assume that for the purpose of

 8   your opinions, that Corporal Alvarado had already stepped out

 9   of the car on the street at the time that Benavente's car

10   struck Officer Escobar's vehicle?

11       A.   Yes.  From his testimony and the investigations.

12       Q.   Okay.  Now, when you referenced the S-turn that

13   Mr. Benavente made in the car, is one possible reason for

14   that S-turn is that, for instance, Mr. Benavente was trying

15   to circle around the back of Officer Varela's car, and then

16   when he saw Officer Escobar's vehicle approaching, he turned

17   to try to avoid contact with Officer Escobar's car?

18           MS. ROCAWICH:  Objection.  Lacks foundation; calls

19   for speculation.

20           THE WITNESS:  I guess you can say anything is

21   possible.

22   BY MR. SINCICH:

23       Q.   That's one of the possible things that could have

24   occurred?

25       A.   I don't know.  I would have to look at exactly how
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 80

1          Do you see that?

2     A.   I do.

3     Q.   And when you say close in proximity in terms of

4    time, what are you referencing there?

5     A.   That the shots were fired immediately after the

6    collision, almost simultaneously, but not quite.

7          You can see the distinction on the video.

8     Q.   Can you also -- well, strike that.

9          Which video are you referring to?

10    A.   I believe it was Officer Vasquez-Lopez's body-worn

11   camera video.

12    Q.   Okay.  And on Officer Vasquez-Lopez's body-worn

13   video, can you hear the collision between the car and Officer

14   Vasquez-Lopez's vehicle?

15    A.   Yes.

16    Q.   And then can you subsequently hear the three shots

17   being fired by Corporal Alvarado?

18    A.   Yes.

19    Q.   Is it fair to say that there is some gap in between

20   the collision and the first shot being fired?

21    A.   There is a gap, but it's a second or maybe two.

22         I don't know.  It's very, very small amount of

23   time.

24    Q.   What is your understanding of what the car was doing

25   immediately after the collision with Officer Vasquez-Lopez's

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 91

1    Q.   Do you have a certain system when there is

2    conflicting testimony as to decide which one to choose to

3    consider in rendering your opinions?

4    A.   I base that on the totality of the circumstances.

5         There is other things.  There is no one specific

6    test.  I mean you look at all the circumstances.

7    Q.   Right.  That's what I'm trying to figure out here.

8         What is your methodology for determining which

9    statement to consider as true for the purposes of rendering

10   your opinions when you're presented with conflicting

11   testimony about a fact?

12   A.   Well, here the sworn deposition testimony that is

13   taken a little bit of time later, not the same night or in

14   hours after a critical incident.  It seems reasonable to me

15   that the red light violation occurred.

16        There is other officers that say it occurred.

17        Officer Varela says it later under oath that it

18   occurred, and it appears to me that it occurred.

19   Q.   The reason Officer Varela almost hit a civilian

20   vehicle as he was turning right was because the civilian

21   vehicle was attempting to go straight on a green light;

22   right?

23   A.   I'm not sure of that.

24   Q.   Okay.  If there was a civilian vehicle that was

25   attempting to go straight on a green light, would that be

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

1    right?

2        A.    Yes.

3        Q.    And that we mentioned earlier that Opinion 5 is

4    whether the use of deadly force was reasonable?

5        A.    Yes.

6        Q.    And then Opinion 6 is whether the use of force was

7    consistent with training?

8        A.    Yes.

9        Q.    Now, we covered earlier a little bit about the

10   defining of what rapid means when you reference the vehicle

11   going rapidly in reverse.

12            And I believe we discussed from the black box data

13   that the vehicle was approximately top speed of 15

14   miles-an-hour?

15       A.    Rapidly also can refer to acceleration.

16            You can go -- if you're going 15 in a very short

17   period of time in proximity to a passenger, that might be

18   rapidly.

19       Q.    Right.  So at some point in time the vehicle had to

20   have started at zero miles-per-hour, got up to 15

21   miles-per-hour, and then stopped at zero miles-per-hour after

22   the impact of Officer Vasquez-Lopez's vehicle; is that

23   fair?

24       A.    Yeah, I think that's fair.

25       Q.    And then you go on in your bases for your opinions

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 104

1   hide; is that fair?

2       A.   That's fair.  But we train officers when there is

3   furtive movements is what we refer to in a vehicle while

4   they're failing to stop, they could be hiding a weapon; could

5   be hiding contraband.

6           We expect their alert status to come up

7   substantially of a potential threat.

8       Q.   While they're hiding contraband, that's not same as

9   a threat of a gun, hiding a gun, is that fair?

10      A.   Yeah.  But they don't know until they walk up and

11  get shot or find drugs.

12          So they don't know what they may be doing.

13      Q.   Right --

14      A.   We teach them to perceive that that's a threat and

15  respond to that threat, so to perceive that that person

16  may be armed.

17      Q.   Okay.  Did any officer see a gun at any point in

18  time prior to the officer-involved shooting?

19      A.   No.  I don't believe so.

20      Q.   Did any officer see something that looked like a gun

21  prior to the officer-involved shooting?

22      A.   I don't believe so.

23      Q.   When Officer Varela looked inside the car, saw

24  Mr. Benavente's face tattoos, did he recognize any weapon

25  whatsoever inside the vehicle at that time?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 105

1      A.   I don't think so.

2      Q.   Is it fair to say that this is not a case where the

3   officers were being presented with the person threatening

4   with the gun?

5      A.   Actually, threatening with the gun that they see, I

6   would agree with that.

7      Q.   And Corporal Alvarado didn't use deadly force

8   because he thought that Mr. Benavente had a gun, potentially;

9   right?

10      A.   That was part of his justification, I believe.

11      Q.   Do you believe that he was he used deadly force

12   because he thought that he might have a gun?

13      A.   I believe part of his statement was he felt he was

14   in very close proximity to him and that he may have a weapon

15   as well.

16      Q.   Would it be reasonable to use deadly force on a

17   person who you think may have a weapon that you never see?

18      A.   Again, if you're only saying that that's the only

19   thing that exist, then it wouldn't be.

20      Q.   I'm  not --

21      A.   -- but this is in conjunction with him being what he

22   thought was crushed by the vehicle.

23      Q.   Right.  And I'm differentiating between the two.

24           Let's say everything in this case was exactly the

25   same except Corporal Alvarado did not feel like he was being

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 106

1    crushed.

2           MS. ROCAWICH:  Objection.  Incomplete, improper

3    hypothetical; calls for speculation; lacks foundation.

4    BY MR. SINCICH:

5       Q.    I'm sorry.  I have to finish my hypothetical real

6    quick.

7              So everything in the case is the same except

8    Corporal Alvarado does not feel like he is about to be

9    crushed in any way shape or form.  He never sees a gun in the

10   car, never sees a gun in Mr. Benavente's hand?

11             Would it be reasonable to use deadly force against

12   Mr. Benavente under the assumption that he might have a gun

13   because he fled, drove recklessly, and has face tattoos?

14             MS. ROCAWICH:  Objection.  Compound; lacks

15   foundation; improper and incomplete hypothetical.

16             THE WITNESS:  So in your hypothetical, if there is

17   no furtive movement or other thing to indicate that a gun

18   might be being produced, I would agree with you.

19             But there are times when there are perception

20   shootings that are justified because the officer perceived

21   the person may have a weapon and maybe drawing that weapon on

22   them or maybe about to shoot them somebody else and turns out

23   that the object may not be a gun or whatever.

24   BY MR. SINCICH:

25      Q.    So did Corporal Alvarado ever testify or in his

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 107

1   statement to detectives mention that he thought Mr. Benavente

2   was making a furtive movement towards a gun immediately prior

3   to or at the time that he used deadly force?

4       A.   Not at the time he used deadly force, no.

5           Not that I recall.  I was basing that on your

6   hypothetical.

7       Q.   Right.  So in my hypothetical, if Corporal Alvarado

8   was not about to be crushed and didn't see Mr. Benavente

9   reaching for a gun or perceived any action that could have

10  been reaching for a gun even if it was a mistaken belief,

11  would it be reasonable to you for Corporal Alvarado to use

12  deadly force under the assumption that he had a gun merely

13  because he drove erratically in flight and had a face tattoo?

14          MS. ROCAWICH:  Objection.  Improper, incomplete

15  hypothetical; lacks foundation; vague.

16          THE WITNESS:  Based strictly on your hypothetical

17  and how you proposed it, no.

18  BY MR. SINCICH:

19      Q.   Okay.  And my hypothetical included everything else

20  that was happening in the case except for how I modified it.

21          Did you understand that?

22      A.   Well, I understood what you said, and basically you

23  said absent a furtive movement at the time and absent any

24  other perceptions.

25          I didn't hear Corporal Alvarado describe any of

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 126

1      Q.    Are officers trained that police officers may only

2   use deadly force to prevent the escape of a fleeing suspect

3   only if the officer has probable cause to believe that the

4   suspect poses a significant threat of death or serious bodily

5   injury?

6      A.    Essentially, yes.

7      Q.    And the reason why Corporal Alvarado used deadly

8   force in this case is because he thought that he was going to

9   be crushed by the vehicle door?

10     A.    That's what he articulated.  It doesn't mean that

11   there is another -- that there is not another justification

12   of deadly force.

13     Q.    When you're analyzing the reasonableness of Corporal

14   Alvarado's decision to use deadly force, are you basing it

15   off of the perspective of Corporal Alvarado at the time?

16     A.    Well, I am.  But that doesn't mean there is not

17   other reasons that could be factors.

18          It's just like if you arrest somebody on an assault,

19   but they also committed a robbery or you arrest them on the

20   wrong charge, that doesn't mean the one is invalid.

21          So I think there is another potential perspective

22   that deadly force could have be used here to stop a fleeing

23   felon.

24     Q.    Do you think this was a fleeing felon case?

25     A.    I don't know that it was.  I didn't hear that

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 127

1   articulated, but I think that one could make an argument for

2   that.

3       Q.   Do you have an opinion as to whether or not it's a

4   fleeing felon case or not?

5       A.   I don't believe that the officers articulated that

6   that was their justification.

7       Q.   If the officers did not articulate that that was

8   their justification, is it fair to say that this is not a

9   fleeing felon case?

10      A.   It still could be.  They could still be justified in

11  using deadly force in the scenario that they didn't

12  articulate that specific reason at the time they were

13  interviewed or at the time of their deposition.

14           They still could be legally justified in using it.

15      Q.   In order for an officer to use deadly force in a

16  fleeing felon situation, doesn't the officer have to have

17  reasonably perceived that the subject would cause death or

18  serious bodily injury if not immediately apprehended by the

19  use of deadly force?

20      A.   They do.  And I don't know that the officers were

21  asked that.

22      Q.   Well, the officers gave a statement to the

23  detectives; right?

24      A.   They did.

25      Q.   And the purpose of the statement based on your

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 129

1  a lot of the factors that go into their interviews that

2  they're not always you know as you would write out on paper

3  you and I would write out on a paper in a table top

4  exercise.

5      Q.   Do you recall that Mr. or rather that Corporal

6  Alvarado was asked in deposition why he used deadly force?

7      A.   I do.

8      Q.   And in his response did he mention anything about

9  the criteria that would otherwise qualify as a fleeing

10  felon?

11      A.   I don't recall him mentioning that, no.

12      Q.   Essentially, the crux of a fleeing felon deadly

13  force shooting is that the officer believes that if the

14  subject escaped, he would be a threat to somebody else,

15  meaning, not that officer; is that fair?

16          MS. ROCAWICH:  Objection.  Asked and answered.

17          THE WITNESS:  Not that officer, but it could be

18  future officer, it could be the passenger in the car or the

19  other people, the public in general.

20  BY MR. SINCICH:

21      Q.   Right.  And in this case Corporal Alvarado stated

22  repeatedly that he used deadly force because he was in fear

23  of his own life being at risk; is that fair to say?

24      A.   He did state that.

25      Q.   When Corporal Alvarado states that he believed he

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 131

1      Q.   And another whether it's contingent or requirement

2   for an officer to reasonably feel like they're going to be

3   crushed is if the red car was still moving in order to push

4   on the door in order to potentially crush whatever part of

5   that bodily member was in the "V."

6           Is that fair to say?

7           MS. ROCAWICH:  Objection.  Vague; incomplete,

8   improper hypothetical; calls for speculation.

9           THE WITNESS:  I think we're talking about seconds

10  here, fractions of seconds, and I think there is a difference

11  between an officer's perception and then the reaction to the

12  threat.  So when he perceives himself being crushed, by the

13  time he reacts to that, the vehicle may very well be stopped,

14  but there is a -- my experience has been that there is a

15  moment in time or moments in time that it takes for an

16  officer to perceive the threat, decide how to respond to the

17  threat, and actually respond to the threat.

18          It's not instantaneously.

19  BY MR. SINCICH:

20      Q.   Do you have any kind of education or training in

21  perception reaction of officers in general?

22      A.   In general, yes.  We train that in use of force

23  training all the time.

24      Q.   What is the general time frame for an officer to

25  perceive a potential threat and then react to it based on

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 132

1    your training and experience?

2        A.   I don't -- I think it's different.  It's different

3    in many cases.  I don't know that there is a standard set

4    amount of seconds or portions of a second.

5        Q.   Right.  And that's what I was asking in the previous

6    question is, is there some form of range based on your

7    training as to where a reasonable officer would fall in terms

8    of their perception reaction to a potential threat?

9        A.   I don't know a specific range.

10        Q.   Do you know how fast Corporal Alvarado can perceive

11    a threat and then react to it?

12        A.   Specifically, no.

13        Q.   In this case is it fair to say that given the time

14    frame, it's possible for Corporal Alvarado to have perceived

15    a threat and then reacted to it?

16            MS. ROCAWICH:  Objection.  Vague and ambiguous.

17            THE WITNESS:  I think that's what he said, that he

18    perceived the threat and he reacted to what he perceived was

19    the threat.  I believe that was his testimony.

20    BY MR. SINCICH:

21        Q.   Okay.  And so there is kind of two components of him

22    feeling like he was about to be crushed that we covered.

23            One of them is that the vehicle is moving, and

24    another one is that he had some kind of bodily portion of his

25    body, or he was standing in the "V" of the door; right?

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 149

1    vehicle in the pursuit; right?

2        A.    We do.

3        Q.    So let me just press play and I'll go back.

4              (Video playing.)

5              (Video paused.)

6    BY MR. SINCICH:

7        Q.    All right.  I stopped it at two seconds into this

8    video.

9              Is it fair to say that from your perception of these

10   first two seconds, the red car went in reverse passing

11   Officer Varela's vehicle?

12       A.    About that, yes.

13       Q.    Okay.  So I want to go back to 0000 seconds, the

14   very start of Exhibit 3.

15             At this point in time we have the red car and

16   Officer Varela's vehicle shown; correct?

17       A.    Yes, I believe so.

18       Q.    And Officer Escobar's vehicle is not depicted in the

19   image; right?

20       A.    Yeah.  I don't see another police vehicle.

21       Q.    Okay.  I'm going to go -- I'm going to press play

22   and I'm going to try press stop and see what my perception

23   reaction is.

24             Okay.  It hasn't even hit one second.

25             Do you see how there's some lights behind the tree

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

Page 150

```
 1   that are on arrival?

 2        A.   I do.

 3        Q.   Is it fair to say based on what you know about this

 4   incident, that that's Officer Escobar's vehicle that's

 5   approaching?

 6        A.   It would be, yes, likely.

 7        Q.   And at this point in time where I pressed pause, and

 8   it's still 00 and 00 seconds, the red car is already moving

 9   in reverse?

10        A.   Yes.

11        Q.   And it appears to be approximately the time that the

12   red car comes into contact with Officer Varela's vehicle?

13        A.   Approximately.  You can't tell if it's slightly

14   before or after or during the contact, but it's close.

15        Q.   Right.  I'm going to press play and stop briefly

16   again.

17             (Video playing.)

18             (Video paused.)

19   BY MR. SINCICH:

20        Q.   Okay.  I pressed stop, and it's at one second into

21   the video.

22             Do you see that now in the video of Exhibit 3, the

23   red car is essentially parallel side by side with Officer

24   Varela's vehicle?

25        A.   Yes.
```

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
Robert Handy on 02/19/2024

Page 151

1     Q.   And Officer Escobar's vehicle is still

2   approaching?

3     A.   I don't know if it's still approaching, but you can

4   barely see it, yes.

5     Q.   Okay.  And it's approached closer than the lights

6   were depicted previously; right?

7     A.   Yes.

8     Q.   And I'm going to press play and stop again really

9   quickly.  I stopped it at two seconds into the video.

10        Do you see at this time the red car appears to be

11   kind of changing angles almost in that S-turn that you

12   described earlier?

13     A.   Yes.

14     Q.   And this is approximately the time that Officer

15   Escobar's vehicle came to a stop; is that fair to say?

16     A.   Roughly yes.

17     Q.   And the red car is mostly already passed Officer

18   Varela's vehicle as Officer Escobar's vehicle is coming to a

19   stop?

20     A.   Hard to tell if he's passing just with the flash of

21   the light, but he is either just passed or just about to

22   pass.

23     Q.   Okay.  I have the ability to go frame-by-frame here.

24        I'm going to click this frame-by-frame on this VLC

25   player.

**FRANK BENAVENTE, ET AL vs ALBERT ALVARADO, ET AL**
**Robert Handy on 02/19/2024**

1                          CERTIFICATE

2                              OF

3           CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

4

5           I, JINNA GRACE KIM, CSR No. 14151, a Certified

6    Stenographic Shorthand Reporter of the State of California,

7    do hereby certify:

8           That the foregoing proceedings were taken before me

9    at the time and place herein set forth;

10          That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12          That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15          Further, that the foregoing is an accurate

16   transcription thereof.

17          I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21          IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  February 19, 2024.

23

24          _____
            Jinna Grace Kim, CSR No. 14151

25